**KESSLER TOPAZ MELTZER
  & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001

*Counsel for Plaintiff Richard R. Weston*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| RICHARD R. WESTON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOCUSIGN, INC., DANIEL D. SPRINGER, MICHAEL J. SHERIDAN, and CYNTHIA GAYLOR,<br><br>Defendants. | Case No. 3:22-cv-00824<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard R. Weston, ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by DocuSign, Inc. ("DocuSign" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired DocuSign securities between June 4, 2020, and December 2, 2021, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. DocuSign, a Delaware corporation with principal executive offices in San Francisco, California, offers software that facilitates electronic signatures and agreements. Specifically, in addition to DocuSign's eSignature services, the DocuSign Agreement Cloud software suite enables users to generate, distribute, and sign agreements, and further offers technological support for, among other things, negotiating agreements and collecting payments after signatures. DocuSign's common stock trades on the NASDAQ under the ticker symbol "DOCU."

3. Throughout the Class Period, Defendants repeatedly assured investors that DocuSign would continue to experience sustained growth in demand for its software even after COVID-19 pandemic restrictions were lifted.

4. Defendants' assurances proved to be false. On December 2, 2021, the Company revealed that billings of $565 million for the third quarter of fiscal 2022 "fell short of [DocuSign's] billings guidance, coming in at 28% year-over-year growth"—or roughly half of the prior quarter's

year-over-year growth rate. Additionally, the Company's fourth quarter fiscal 2022 financial guidance missed analysts' expectations.

5. Specifically, Defendants explained that, "[w]ith the boost from COVID-19 over the past year and a half, we experienced exceptionally high growth rates" but, "[a]s we move through Q3 and into the second half of the year, we saw demand slow and the urgency of customers' buying patterns temper."

6. On this news, the price of DocuSign common stock plummeted $98.73 per share, or more than 42%, from a close of $233.82 per share on December 2, 2021, to close at $135.09 per share on December 3, 2021.

7. This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose: (1) much of DocuSign's accelerated growth in 2020 and early 2021 was attributable to COVID-19 pandemic restrictions rather than a sustainable shift in demand for the Company's services; (2) demand for DocuSign's services was, in fact, waning as COVID-19 pandemic restrictions were being lifted; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

8. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiff and other members of the Class have suffered significant damages.

**II.     JURISDICTION AND VENUE**

9. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

10. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because DocuSign's principal executive offices are in San

1  Francisco, California and because many of the acts and conduct that constitute the violations of
2  law complained of herein, including the dissemination to the public of materially false and
3  misleading information, occurred in this District.

4      12.    In connection with the acts, conduct, and other wrongs alleged in this Complaint,
5  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,
6  including the United States mails, interstate telephone communications, and the facilities of the
7  national securities markets.

8  **III.    PARTIES**

9      13.    Plaintiff, as set forth in the accompanying certification, incorporated by reference
10 herein, purchased DocuSign securities at artificially inflated prices during the Class Period and has
11 been damaged thereby.

12     14.    Defendant DocuSign is a Delaware corporation headquartered at 221 Main Street,
13 Suite 1550, San Francisco, CA 94105.

14     15.    Defendant Daniel D. Springer ("Springer") has served as the Company's Chief
15 Executive Officer throughout the Class Period.

16     16.    Defendant Michael J. Sheridan ("Sheridan") served as the Company's Chief
17 Financial Officer during the Class Period until September 2020.

18     17.    Defendant Cynthia Gaylor ("Gaylor") has served as the Company's Chief Financial
19 Officer since September 2020.

20     18.    Defendants Springer, Sheridan, and Gaylor are collectively referred to herein as the
21 "Individual Defendants."

22     19.    The Individual Defendants, because of their positions with the Company, possessed
23 the power and authority to control the contents of DocuSign's reports to the SEC, press releases,
24 and presentations to securities analysts, money and portfolio managers, and institutional investors,
25 i.e., the market.  Each Individual Defendant was provided with copies of the Company's reports
26 alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and
27 opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and
28 access to material non-public information available to them, each of the Individual Defendants

knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

20. DocuSign and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

21. DocuSign, a Delaware corporation with principal executive offices in San Francisco, California, offers software that facilitates electronic signatures and agreements. Specifically, in addition to DocuSign's eSignature services, the DocuSign Agreement Cloud software suite enables users to generate, distribute, and sign agreements, and further offers technological support for, among other things, negotiating agreements and collecting payments after signatures.

### B. Defendants' False and Misleading Statements

22. The Class Period begins on June 4, 2020, to coincide with the Company's first announcement of quarterly financial results reflecting the onset of widespread COVID-19 pandemic mitigation efforts.

23. In a June 4, 2020 press release announcing its quarterly results, DocuSign reported quarterly revenue of $297 million—a 39% year-over-year increase. The press release included comments from Springer who explained that the Company's strong results "reflect our ability to help organizations accelerate their digital transformation as they adapt to the changing business environment, magnified by COVID-19." Defendant Springer further assured investors that "our Agreement Cloud offerings are not only helping customers carry on with business in this time of crisis, but will continue to deliver value as the world emerges from it."

24. During DocuSign's quarterly earnings call that same day, Defendant Springer observed that "[m]uch of the strong Q1 performance was driven by increased demand for eSignature from organizations that suddenly needed a way to sign and manage agreements from

wherever they were" due to pandemic restrictions, and opined "from a financial point of view, we believe this surge in eSignature adoption bodes well for future Agreement Cloud expansion."

25. During the earnings call, Defendant Springer went on to describe a permanent shift to remote work as a driver of DocuSign's growth:

> Let me speak briefly about where we see things going from here. ***While no one is 100% sure what the world will look like, it's clear that the ways of doing business are changing***. ***Remote work is here to stay***. Core business processes will only become more digital and agreements will need to be completed from anywhere, at any time on almost any device. As a result, for organizations that hadn't already embraced DocuSign for eSignature, that were only using us for a few select use cases, the pandemic has been a catalyst for the greater digital transformation of their end-to-end agreement processes. We always believed this transformation will happen and that a unifying platform for agreements will be needed. COVID-19 is just happening faster.
>
> That said, ***even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes. Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, they rarely go back***. ***So, in short, we expect the adoption of our core eSignature offering by new customers and the expansion of use cases by existing ones to continue***. This also acts as the on-ramp for the adoption of other Agreement Cloud products, sometimes at the same time, sometimes as follow on's.
>
> \*   \*   \*
>
> Yeah, ***I don't think we've seen anything particularly from COVID that would accelerate that move where we work with one or two divisions and now we get more of an enterprise solution*** other than the same macro piece we talked about, which is, ***as companies are increasingly seeing the need to drive the digital transformation, that's accelerating***. ***It probably, at the same rate, would accelerate those expansions from divisional projects to broader enterprisewide solutions***. But I think, at this point, we'd say, that phenomenon is occurring. It's always been a big growth opportunity for us and I think it's ***the same big growth opportunity for us going forward, but I don't think COVID acceleration of digital transformation is going to change that phenomenon or that rate at which we see that going, other than just making everything go a little bit faster***.

26. On September 3, 2020, the Company issued a press release announcing its second quarter fiscal 2021 results, reporting enormous growth in the Company's billings, with Defendant Springer stating that "the need to agree electronically and remotely has never been stronger." Defendant Springer also claimed that "[w]e are just scratching the surface of our Agreement Cloud

opportunity and believe we are increasingly becoming an essential cloud-software platform for organizations of all sizes."

27. During the Company's September 3, 2020 earnings call for the second quarter fiscal 2021, Defendant Springer reiterated that consumer demand for the Company's services would be durable:

> ***This is a great example of COVID-accelerated demand that we see as durable***. Now telehealth will remain after COVID-19, but the paperless processes that came with it will likely end up getting implemented for in-person clinic visits too because the electronic way is more efficient and a better experience than paper and clipboards.
>
> \*   \*   \*
>
> This illustrates a pattern we're seeing where established customers are now bringing eSignature to new divisions, departments, and regions.

28. During the same earnings call, Defendant Sheridan stated:

> And so we are endeavoring to stay ahead of the trends that we're seeing. We're looking at the demand data very carefully to try to forecast the trends and get ahead of that with capacity across the business. In terms of what will we anticipate post-COVID, I don't know that anybody has a great answer for that.
> It is our view that as we work through these difficult times, though, ***there's a greater awareness of need to digitize the business. And we believe that that's going to be sustained even after things return to whatever normal looks like in the future***. So we do believe that we're entering into a period of a "new normal." It doesn't necessarily mean that the highs of any particular quarter are going to be sustained forever. But at the same time, ***we don't see trends that things are going to return to the way they looked and trended pre-COVID.***

29. On that same call, Defendant Springer further represented that the shift to digital signature and agreement software was natural acceleration of growth rather than an acute response to pandemic restrictions:

> One thing that's always hard in answering a question around sort of more tectonic shifts like that is what's behind it? Is it a maturation of our business? Is it related to COVID, etc.? ***My view is from a COVID standpoint***, was the nature of your question, is ***we went through a period of time where people just got very focused 6 months ago on we just need to get things up and going quickly***. ***We need to work in a remote environment***.

* * *

*And I think the number of people that are rushing to us saying, "I need to make a quick adjustment to be able to deal with it like that," if they haven't got it done by now, I think they missed that window. What we are seeing now is people saying, "Wow, this is fantastic. There are more places where I could leverage this in my business."* And we're looking at expansion, as we talked about, of use cases within our base to more and more places that as I said before, we think they would have gotten there eventually. *It just accelerated those, and we're continuing to see that acceleration of those workflows into DocuSign because they realize how beneficial they are to their business*.

From a standpoint of that more platform thinking, I don't know that I would say I've seen that increase. *And I don't know if I'd say this increase would be due to COVID. The natural maturation for a lot of folks with us around the Agreement Cloud opportunity is as they start hearing us describe the future, they say, "You know what, I could see you as a more strategic part of my sort of IT infrastructure and my business process infrastructure." And so I think that's occurring more and more, but I think that's more to do with the fact that we're just getting bigger and having larger relationships with companies as we scale*. You look at that number of customers above $300,000, it's just sort of, one minute, that keeps growing, right, substantially.

And so I think *that's driving it more than a COVID reaction*. But again, it's hard to sort of separate out each of those components, but that would be my view.

30. On December 3, 2020, DocuSign held an earnings conference call for its third quarter fiscal 2021. During the call, Defendant Springer again projected sustained demand for DocuSign's services that would continue even after pandemic restrictions were lifted, stating:

As COVID-19 has accelerated the digital transformation of key business and agreement processes, DocuSign has become an increasingly essential cloud software platform. The last few quarters of heightened demand have offered a glimpse into the long-term growth opportunity we have.

* * *

When customers go from paper-based processes to digital agreement processes, **they do not go back**. *We believe that trend will hold when the pandemic subsides, and the DocuSign's value will persist no matter how the future of work unfolds*.

31. On March 11, 2021, during the Company's quarterly earnings call for the fourth quarter fiscal 2021, Defendant Springer further explained:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:22-cv-00824                                                                 7

> As a team, DocuSign was honored to play a role supporting people all over the world as they responded to the pandemic. We gained new customers, we expanded our relationship with others and we saw a surge in adoption of our products as accelerating a trend already under way, the digital transformation of agreements.
>
> \* \* \*
>
> ***As a result, we don't believe our new or expanded customers will be going back to paper even after the pandemic recedes***. We also don't believe life will go back to the way it was before. Of course, many in-person activities will be welcomed back. ***But when people found better ways during the pandemic, we believe those will continue and flourish, whether it's total or partial work from home, virtual visits to medical professionals or getting a document notarized remotely***.

32. During the same call, on the question of whether demand would decrease as COVID-19 pandemic restrictions were lifted, Defendant Springer represented:

> People aren't going back to paper. They're not going back to manual processing. So the real question, I think, is interesting in your question is, will that rate of new people coming to us change with -- as we start to move into some sort of return to "normalcy". ***We haven't seen any change yet***.

33. During DocuSign's first-ever analyst day on March 24, 2021, Defendants repeatedly refuted the idea that DocuSign was merely a "work-from-home stock" that would only temporarily benefit from unique pandemic circumstances. For example, Defendant Cynthia Gaylor, the Company's Chief Financial Officer, assured investors that "the permanence of the trends we've been seeing across the business look like they're really here to stay," and that the Company "expect[ed] to continue to see strong growth rates" even as pandemic mitigation efforts changed and ended.

34. Similarly, in response to a question from Annie Leschin, the Company's Vice President of Investor Relations, about "how investors should think about DocuSign post-pandemic," Defendant Springer explained that "the transformation that our customers are undergoing and leveraging DocuSign to drive . . . is not a short-term thing," and that "we have a significant amount of time ahead of us for this kind of very aggressive growth."

35. On its June 3, 2021 earnings call announcing financial results for the first quarter of its 2022 fiscal year, Defendant Springer predicted that the trend toward digital signature platforms would "accelerate":

> What began as an urgent need has now transformed into a strategic priority. And as a result, DocuSign has become an indispensable part of many organizations' business processes. Put another way, once businesses digitally transform their agreement processes, they simply don't go back.
>
> ***We believe this trend will only accelerate as the anywhere economy continues to emerge***.
>
> \*   \*   \*
>
> We're seeing that the phenomenon of that strong customer growth is why you see the net retention rate so high.
>
> \*   \*   \*
>
> So the phenomenon that people, once they see the benefits of the digital transformation, and particularly around the Agreement Cloud from having opportunity to grow their business with us, they don't go back. In fact, they look for additional opportunities to expand. So I don't think -- ***we don't talk about the Q1 pull forward like it was some fixed amount to pull forward that pays Peter and takes in Paul***.
>
> We look at it as just an increasing demand . . . . We are still in the early days, even of just the eSignature business. Our penetration is so low that it's a very, very large ocean from which we're pulling forward that continued strong customer demand.
>
> \*   \*   \*
>
> And quite frankly, if you think about during COVID, we didn't see the nature of the signature transactions different. They just were faster, right? And so we saw again that acceleration occurred. And as Cynthia pointed out, you know, as we're kind of rounding those quarters, and in many ways, I ***think starting to move into whatever the new normal will be, we're still seeing sort of an accelerated rate of that customer demand***. But I wouldn't say it's the size of the transactions are bigger.

36. During the same call, when analyst Alex Zukin from Wolfe Research stated that DocuSign was not "just the COVID stock," and that the Company is "very well positioned to actually . . . grow right through this and be even better positioned on the other side," Defendant

Springer agreed, stating that "I think you nailed it," and that "that's exactly what we're seeing." Defendant Springer emphasized that "[w]e look at it as just an increasing demand."

37. Similarly, during the Bank of America Securities Global Technology Conference on June 9, 2021, in response to a question from Brad Sills of Bank of America about anticipated demand for DocuSign's services as the economy reopens, Defendant Gaylor stated while "we wouldn't expect these accelerated growth rates to last forever . . . because we're so early in that addressable market and there's so much paper, to not use on the planet.  We think that this will just continue for a long time to come, and we'll continue to grow at very strong growth rates."

38. On a September 2, 2021 earnings call for the second quarter of fiscal 2022, Defendant Springer stated, in relevant part:

> We are helping organizations of all sizes leverage the power of the Agreement Cloud to digitize the foundation of doing business, the agreement process. ***Not only do customers see DocuSign as a vital part of their response to COVID***.
>
> ***Many have also seen a better way of doing business from anywhere***. ***And we believe that will become their new normal***.

39. Responding to a question from Wolfe Research analyst Alex Zukin about changes in the marketplace, Defendant Springer stated that "we feel good.  We feel like we're seeing a lot of demand . . . .  I do think we're going to continue to have strong growth rates . . . we're not seeing any differences in churn rates in any meaningful way" and "customers very rarely leave us."

40. Defendant Springer further explained that the Company's guidance for the third quarter of fiscal year 2022, which indicated slightly slower growth than in the previous few quarters, was "[not] indicative of any sort of significant slowing in the business," as "the numbers are strong" and "[w]e're continuing to add a large number of new customers each quarter."

41. Defendants continued to reassure investors about the sustainability of DocuSign's growth during several analyst conferences in September 2021.  First, on September 8, 2021, during Wolfe Research's Inaugural TMT Conference, Defendant Gaylor explained that customers "who came to us for a specific COVID use case that they no longer have" are "the vast minority" of users.

42. Similarly, during Citi's 2020 Global Technology Virtual Conference on September 13, 2021, Defendant Springer highlighted that "we think this is going to be a high-growth software company, [in] e-signature for years and years to come." Likewise, during the Piper Sandler 2021 Virtual Global Technology Conference that same day, Defendant Gaylor represented that while the Company did not expect its COVID-era growth rates to persist forever, "there is still a lot of runway" across "a $50 billion market opportunity."

43. During the Jefferies Software Conference held the following day, Defendant Gaylor emphasized that "we don't expect that level of growth at this scale to continue, but that doesn't mean that we won't have strong growth kind of for the foreseeable future."

44. The above statements identified in paragraphs 22-43 were materially false and misleading, and failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) much of DocuSign's accelerated growth in 2020 and early 2021 was attributable to COVID-19 pandemic restrictions rather than a sustainable shift in demand for the Company's services; (2) demand for DocuSign's services was, in fact, waning as COVID-19 pandemic restrictions were being lifted; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

C. **The Truth Emerges**

45. Plaintiff and other investors began to learn the truth about the Company's prospects on December 2, 2021, when DocuSign announced its third quarter fiscal 2022 financial results and provided guidance for the fourth quarter of fiscal 2022. Specifically, DocuSign reported third quarter fiscal 2022 billings of just $565.2 million, short of previous third quarter fiscal 2022 guidance for between $585 million and $597 million. The Company's fourth quarter fiscal 2022 guidance provided, in pertinent part, midpoint revenue guidance of $560 million, missing analysts' consensus estimates of $573.8 million, and billings guidance of $653 million, missing consensus estimates of $705.4 million.

46. During DocuSign's third quarter fiscal 2022 earnings call that same day, Defendants explained that billings growth for the third quarter of fiscal 2022 was lower than

expected, explaining that "we fell short of our billings guidance, coming in at 28% year-over-year growth."

47. Defendant Springer explained that the slowdown was occurring because the growth boost from the COVID-19 pandemic had dissipated earlier than expected:

> The market dynamics that we saw in the third quarter were markedly different from what we experienced in the first half of this year. ***With the boost from COVID-19 over the past year and a half, we experienced exceptionally high growth rates at scale as we captured customer demand at an unprecedented pace.*** As we move through Q3 and into the second half of the year, ***we saw demand slow and the urgency of customers' buying patterns temper. While we had expected an eventual step-down from the peak levels of growth achieved during the height of the pandemic, the environment shifted more quickly than we anticipated, and these were the primary contributors to our billing results in Q3 and our outlook for Q4.***
>
> \*   \*   \*
>
> [W]e actually expected to see more of that impact coming out of the kind of the COVID extra demand we had experienced. And we didn't, right? And so, we ended up outperforming in the first half by probably more than we expected.
>
> ***But in the second half, we saw this now come in much more dramatically in terms of that impact of the removal of that tailwind, if you will***. And I think there's sort of two components to it. One, that there is just sort of a change in the buying urgency we've seen from customers. And throughout the COVID era, we had a lot of folks who really needed to get things in place, particularly if they had a large part of their employee base working from home and needed to leverage the benefits of the work-from-anywhere solutions that we have at DocuSign.

48. Defendant Springer further admitted: "we always expected there to be a reduction of that really heightened COVID buying, which drove our growth rates dramatically higher than they had ever been even as we got bigger. So we expected that."

49. Defendant Gaylor also explained that the Company had seen "customers shift their buying patterns in the third quarter" and that Defendants "had expected this to happen more gradually" but experienced "more notable shift . . . than anticipated[.]"

50. In response to this news, the price of DocuSign common stock declined $98.73 per share, or more than 42%, from a close of $233.82 per share on December 2, 2021, to close at $135.09 per share on December 3, 2021.

## V. PLAINTIFF'S CLASS ACTION ALLEGATIONS

51. Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased DocuSign securities during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of DocuSign, and their families and affiliates.

52. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

53. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether Defendants violated the Exchange Act;

    b.    Whether Defendants omitted and/or misrepresented material facts;

    c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.    Whether the prices of DocuSign securities were artificially inflated; and

    f.    The extent of damage sustained by members of the Class and the appropriate measure of damages.

54. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.   MARKET DOCTRINE

57. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b. The omissions and misrepresentations were material;

   c. The Company's securities traded in an efficient market;

   d. The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

   e. Plaintiff and the Class purchased DocuSign securities between the time the Company and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

58. At all relevant times, the market for the Company's securities was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.   NO SAFE HARBOR

59. Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because,

at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

60. Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class. The prices of Company securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of DocuSign securities during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX. SCIENTER ALLEGATIONS

61. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Company securities during the Class Period.

## X. CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

62. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

63. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

64. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

65. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act  
Against the Individual Defendants**

66. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

67. The Individual Defendants acted as controlling persons of DocuSign within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

69. As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;
b. Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;
c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and
d. Such other and further relief as the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 8, 2022

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001

-and-

NAUMON A. AMJED
(namjed@ktmc.com)
DARREN J. CHECK
(dcheck@ktmc.com)
RYAN T. DEGNAN
(rdegnan@ktmc.com)
BARBARA A. SCHWARTZ
(bschwartz@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:   (610) 667-7706
Fax:   (610) 667-7056

*Counsel for Plaintiff Richard R. Weston*