**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

*Liaison Counsel for the Proposed Class*

**LABATON SUCHAROW LLP**
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
Robert S. Rowley (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
ivasilchenko@labaton.com
rrowley@labaton.com

*Counsel for Lead Plaintiff*
*and Lead Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD R. WESTON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DOCUSIGN, INC., DANIEL D. SPRINGER, MICHAEL J. SHERIDAN, CYNTHIA GAYLOR, and LOREN ALHADEFF, <br><br> Defendants. | Case No. 3:22-cv-00824-WHO |
| BENJAMIN LAPIN, derivatively on behalf of DOCUSIGN, INC., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL D. SPRINGER, ENRIQUE SALEM, PETER SOLVIK, INHI CHO SUH, MARY AGNES WILDEROTTER, TERESA BRIGGS, BLAKE J. IRVING, JAMES BEER, CAIN A. HAYES, CYNTHIA GAYLOR, MICHAEL J. SHERIDAN, and LOREN ALHADEFF, <br><br> Defendants. <br><br> and | Case No.: 3:22-cv-02980-WHO |

1  DOCUSIGN, INC., a Delaware
   Corporation,
2
                    Nominal Defendant.
3
   PETER VOTTO, derivatively on behalf of       Case No.: Case No. 4:22-cv-02987-WHO
4  DOCUSIGN INC.,
                                                **AMENDED CLASS ACTION**
5                   Plaintiff,                  **COMPLAINT FOR**
                                                **VIOLATIONS OF THE**
6  v.                                           **FEDERAL SECURITIES LAWS**

7  DANIEL SPRINGER, MICHAEL
   SHERIDAN, CYNTHIA GAYLOR,                    CLASS ACTION
8  SCOTT OLRICH, ENRIQUE S ALEM,
   PETER SOLVIK, INHI CHO SUH,
9  MARY AGNES WILDEROTTER,                      **DEMAND FOR JURY TRIAL**
   TERESA BRIGGS, BLAKE IRVING,
10 JAMES BEER, and CAIN HAYES,

11                  Defendants,

12 DOCUSIGN, INC.,

13                  Nominal Defendant.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2   I.    NATURE OF THE ACTION ................................................................................ 2

3         A.    Overview of DocuSign's Business ......................................................... 3

4         B.    The COVID-19 Pandemic Creates Unprecedented Demand Growth
                for eSignature ......................................................................................... 4
5
          C.    By the Summer of 2020, Defendants Are Aware of Alarming
6               Internal Warning Signs That This Record-High Demand Is
                Temporary but Falsely Assure Investors That DocuSign's Growth
7               Is Sustainable ......................................................................................... 5

8         D.    By Early 2021, Defendants Internally Know That Demand Issues
                Have Worsened but Continue to Falsely Reassure Investors That
9               Demand Remains Sustainable .................................................................. 9

10        E.    Defendants' Knowledge of Increased Competition and DocuSign's
                Failing CLM Sales Further Undermines Their Affirmations of
11              Sustainable Growth .............................................................................. 11

12        F.    Defendants Continue to Publicly Deny Any Adverse Demand
                Trends in Late 2020 and Early 2021 ..................................................... 12
13
          G.    By the Summer of 2021, Defendants Are Well Aware That the
14              Record-High Demand Generated During COVID-19 Was at an
                End ........................................................................................................ 14
15
          H.    Analyst Reports Confirm That the Market Was Materially Misled
16              by Defendants' Misrepresentations ....................................................... 15

17        I.    The Relevant Truth Begins to Emerge in December 2021 .................. 16

18  II.   JURISDICTION AND VENUE ....................................................................... 18

19  III.  PARTIES ......................................................................................................... 19

20        A.    Lead Plaintiffs ...................................................................................... 19

21        B.    Defendants ............................................................................................ 20

22        C.    Relevant Third Parties .......................................................................... 22

23  IV.   SUBSTANTIVE ALLEGATIONS OF FRAUD .............................................. 29

24        A.    Overview of DocuSign's Business ....................................................... 29

25              1.    DocuSign Pioneers eSignature ................................................. 29

26              2.    DocuSign's Business Model Focuses on Growth over
                      Profitability ............................................................................... 30
27
          B.    The COVID-19 Pandemic Forces a Massive Shift to a Remote
28              Work Environment, Fueling Explosive Growth for DocuSign's
                eSignature Product .............................................................................. 34

C.  Unbeknownst to Investors, Defendants Are Aware of Numerous Internal Red Flags That DocuSign's Explosive Growth in Early 2020 Due to the COVID-19 Pandemic Is Unsustainable ..................................... 38

    1.  New Customers Inform DocuSign That Demand for DocuSign's eSignature Product Is Only Temporary Due to the COVID-19 Pandemic ............................................ 38

        (a)  Internally, Customers Tell DocuSign by June 2020 That Their Need for DocuSign's Products Is for One-Off Uses Related to the Pandemic and That They Will Not Renew After the Pandemic Subsides ...................... 39

        (b)  Customers Refuse to Sign Long-Term Contracts ...................... 45

    2.  Defendants Predicate Their Early Class Period Statements Regarding Customer Retention on Outdated, Pre-COVID-19 Information ........................................................... 48

    3.  While Aware of These Red Flags Showing That DocuSign's High Demand in Early 2020 Was Fleeting, Defendants Falsely Assure Investors That This COVID-19-Fueled Growth Is Sustainable ........................................ 51

D.  As the COVID-19 Pandemic Recedes Beginning in Late 2020, Demand for DocuSign Begins to Decline, as Customers Previously Warned ......................................................................... 55

    1.  In Late 2020, as Businesses Adapt to the COVID-19 Pandemic and Vaccines Enter the Final Stages of Clinical Trials, Demand Wanes and Customers Reduce or Cancel Their DocuSign Subscriptions .................................. 55

    2.  Increased Competition from Adobe Further Drives Down Demand for eSignature .......................................... 66

    3.  DocuSign Struggles to Sell CLM from the Outset of the Class Period, Further Undermining Defendants' Claims of Sustainable Growth ........................................... 68

    4.  While Knowing That Demand Continued to Decline, Defendants Publicly Continue to Repeat Their False Narrative of Durable Growth in Late 2020 and Early 2021 ...................... 73

E.  By the Summer of 2021, Defendants Are Well Aware That the Record Demand Generated During COVID Is at an End .................................... 78

F.  Despite Knowing of Alarming Internal Data to the Contrary, Defendants Continue to Publicly Deny Any Adverse Trends in Summer and Fall of 2021 ...................................................... 81

G.  The Relevant Truth Regarding DocuSign's Unsustainable COVID-Fueled Growth Slowly Emerges ........................................ 83

1.  DocuSign Reports the Second-Lowest Billings Growth in Company History, but Defendants Continue to Reassure Investors That Demand Remains Durable ................................. 83

2.  Defendants Disclose a Second Consecutive Quarter of Disappointing Billings Growth, Which Declines Below Pre-COVID-19 Levels ........................................................ 86

3.  The Relevant Truth Is Fully Revealed When DocuSign Releases Disappointing Growth for the Third Consecutive Quarter and Reduces Billings Guidance ............................. 88

H.  Post-Class Period Developments ................................................ 90

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 91

A.  June 4, 2020 – Press Release and 1Q 2021 Earnings Call................................. 91

B.  June 10, 2020 – William Blair Growth Stock Conference ................................. 96

C.  September 3, 2020 2Q 2021 Earnings Call................................................ 97

D.  September 9, 2020 – DA Davidson Software and Internet Conference ................................................................... 99

E.  September 14, 2020 Deutsche Bank Virtual Technology Conference ................................................................... 100

F.  September 15, 2020 – Jefferies Software Virtual Conference........................... 101

G.  December 3, 2020 – 3Q 2021 Earnings Call ............................................ 102

H.  January 11, 2021 – Needham Virtual Growth Conference................................ 103

I.  March 1, 2021 – Morgan Stanley Technology, Media and Telecom Conference ................................................................... 104

J.  March 11, 2021 – 4Q 2021 Earnings Call .............................................. 106

K.  March 24, 2021 – DocuSign Virtual Financial Analyst Day.............................. 108

L.  March 31, 2021 – Alhadeff Tweet ...................................................... 110

M.  June 3, 2021 – 1Q 2022 Earnings Call ................................................ 110

N.  June 10, 2021 – Robert W. Baird Global Consumer, Technology & Services Conference ................................................................... 111

O.  September 2, 2021 – 2Q 2022 Earnings Call............................................ 113

P.  September 8, 2021 - Wolfe Research Inaugural TMT Conference ................... 115

Q.  December 2, 2021 - 3Q 2022 Earnings Call and First Partial Corrective Disclosure/Materialization of the Risk ........................... 115

R.  March 10, 2022 – 3Q 2022 Earnings Call and Second Partial
    Corrective Disclosure/Materialization of the Risk ................................................ 119

S.  June 9, 2022 – 4Q 2022 Earnings Call and Final Corrective
    Disclosure/ Materialization of the Risk ................................................................ 121

VI.   LOSS CAUSATION ............................................................................................................ 123

A.  December 2, 2021 - First Partial Corrective
    Disclosure/Materialization of the Risk ................................................................ 125

B.  March 10, 2022 – Second Partial Corrective
    Disclosure/Materialization of the Risk ................................................................ 128

C.  June 9, 2022 – Final Corrective Disclosure/Materialization of the
    Risk ...................................................................................................................... 131

VII.  ADDITIONAL INDICIA OF SCIENTER .......................................................................... 133

A.  Defendants Enriched Themselves Through Insider Sales While
    Possessing Adverse Information Not Available to the Public .............................. 134

    1.  Springer Sold Millions Worth of DocuSign Stock While
        Concealed Internal Metrics Showed Demand Was Rapidly
        Declining .................................................................................................. 134

    2.  Gaylor Sold Millions Worth of DocuSign Stock Less Than
        One Month Before the Company First Announced Its
        Stunted Billings Growth .......................................................................... 138

B.  The Demand for DocuSign's Products and Its Billings Growth
    Were Critical to the Company's Core Operations ............................................... 139

C.  Defendants' Close Personal Monitoring of DocuSign's Demand
    and Billings Growth Metrics Supports That They Had Actual
    Knowledge or Were Reckless in Not Knowing About Waning
    Demand and Slowing Billings Growth ................................................................ 142

D.  Defendants' Statements Themselves Support Scienter ......................................... 148

E.  The Departures of Defendants Sheridan, Alhadeff, and Springer at
    Key Points in the Class Period Support Scienter ................................................. 150

F.  Corporate Scienter ............................................................................................... 152

VIII.  CONTROL PERSON ALLEGATIONS ............................................................................... 153

IX.   CLASS ACTION ALLEGATIONS ..................................................................................... 154

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-
     THE-MARKET DOCTRINE .............................................................................................. 156

XI.   NO SAFE HARBOR .......................................................................................................... 158

XII.   CAUSES OF ACTION ....................................................................................................... 159

1    Court-appointed Lead Plaintiffs Deka International S.A. Luxembourg ("DIL") and Public

2  Employee Retirement System of Idaho ("PERSI") (together "Lead Plaintiffs"), individually and

3  on behalf of all persons and entities who or which, during the period from June 4, 2020 through

4  June 9, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of

5  DocuSign Inc. ("DocuSign" or the "Company") and were damaged thereby (the "Class"),[1] bring

6  this Amended Class Action Complaint for Violations of the Federal Securities Laws against

7  Defendants DocuSign and several of DocuSign's senior executives—Chief Executive Officer

8  ("CEO") Daniel D. Springer, former Chief Financial Officer ("CFO") Michael J. Sheridan,

9  current CFO Cynthia Gaylor, and former Chief Revenue Officer ("CRO") Loren Alhadeff

10  (collectively, the "Individual Defendants").

11    Lead Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon

12  information and belief as to all other matters, based upon, among other things, a review and

13  analysis of: (1) reports and documents filed by DocuSign with the Securities and Exchange

14  Commission ("SEC"); (2) reports issued by analysts covering or concerning DocuSign and its

15  business; (3) press releases, news articles, transcripts, videos, and other public statements issued

16  by or about DocuSign, its business, and the Individual Defendants; (4) an investigation conducted

17  by Lead Plaintiffs' attorneys, including interviews with former DocuSign employees; and (5)

18  other publicly available information concerning DocuSign, its business, and the allegations

19  contained herein.  Lead Plaintiffs believe that substantial additional evidentiary support exists

20  for the allegations herein and will continue to be revealed after Lead Plaintiffs have a reasonable

21  opportunity for discovery.

22

23

24

---

25    [1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any
Defendant who is an individual; (iii) any person who was an officer or director of DocuSign
26  during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant
has or had a controlling interest; (v) DocuSign's employee retirement and benefit plan(s) and
27  their participants or beneficiaries, to the extent they made purchases through such plan(s); and
(vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such
28  excluded person.

---

# I.        NATURE OF THE ACTION

1. This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors that purchased DocuSign stock during the Class Period.  Defendant DocuSign is a software company that provides an electronic signature solution ("eSignature"), its flagship product that accounts for the vast majority of its revenues.  Lead Plaintiffs allege that, during the Class Period, all Defendants falsely reassured investors that the massive surge in customer demand in early 2020 brought on by the COVID-19 pandemic—which forced companies to work remotely and turn to electronic processes like DocuSign's eSignature solution—was a "sustained rise in demand" and "not a short term thing" because, once customers switch to eSignature, "they rarely go back."  Defendants thus misled investors into believing that the Company's related explosive billings growth would continue well above pre-COVID-19 levels even once the pandemic receded.

2. In reality, however, as described by numerous former employees, Defendants knew and concealed from investors numerous adverse material facts indicating that this COVID-19-fueled demand was unsustainable after the pandemic subsided.  In particular, Defendants knew from the start of the Class Period that, *inter alia*, much of this new business influx was for one-time COVID-19 uses and that customers informed DocuSign that they would stop using DocuSign's eSignature once they returned to the office, as then further confirmed by key internal performance metrics that Defendants closely tracked, such as customer usage and retention rates, which declined significantly during the Class Period.  As a result of Defendants' misrepresentations, DocuSign's stock price soared to all-time highs during the Class Period, which allowed Defendants, including Springer, the Company's CEO, to sell more than ***$153 million*** worth of DocuSign stock at artificially inflated prices.  Investors gradually learned the truth through three

corrective disclosures—on December 2, 2021, March 9, 2021, and June 9, 2022—when Defendants revealed that DocuSign had missed its billings growth expectations in three consecutive quarters due to a substantial slowdown in business after the initial surge of COVID-19-fueled demand had dissipated.  On such news, DocuSign's share price plummeted, including more than 42 percent in a single day on the first disclosure, resulting in billions of dollars of losses for its shareholders.

### A.    Overview of DocuSign's Business

3. In 2003, DocuSign pioneered and brought to market its eSignature solution, which for the first time allowed customers to sign and send documents without the need for paper copies and wet signatures.  Since the Company's founding, and continuing to today, eSignature has been DocuSign's core product as its sales are the largest single contributor to the Company's revenues.

4. As the first mover in the eSignature market, DocuSign was able to grow exponentially over its first fifteen years in operation.  Indeed, immediately after DocuSign's Initial Public Offering ("IPO") on in April 2018, the Company was valued at over $4.4 billion and ended its first fiscal year[2] as a public company with revenues totaling more than $700 million, which then grew dramatically—by almost $300 million—to more than $970 million the next fiscal year.

5. However, even with such large and growing revenues, DocuSign was not, and has never been, profitable.  For each year of the Company's operations, including to the present, DocuSign has reported a net loss.  As a result, both before and during the Class Period, Defendants needed to convince the market that the Company's revenues would be able to cover the cash flows

---

[2] DocuSign's fiscal year begins on February 1 and ends on January 31.  The Company identifies each fiscal year based on the year in which it ends.  For instance, DocuSign's fiscal year 2019 ended on January 31, 2019.

necessary for it to remain viable, as well as show that the Company had a path toward profitability.

6. Accordingly, Defendants told investors that the Company's future financial success depended on substantial sales and billings growth. "Billings" is a key performance metric, which DocuSign publicly discloses, that measures the amounts invoiced to customers over a particular time period. By contrast, revenue measures money actually received from customers. To grow sales and billings, Defendants touted DocuSign's "land and expand" business model, under which the Company needed to first "land" with a customer, generally by selling its eSignature product into one department or for one specific use, and then "expand" either through upselling that customer more eSignatures or by selling other products—primarily, the Company's new contract lifecycle management ("CLM") product that it launched in 2018, a highly complex software that allowed businesses to manage and track contracts through negotiations with multiple parties.

**B.      The COVID-19 Pandemic Creates Unprecedented Demand Growth for eSignature**

7. In March 2020, the COVID-19 pandemic unexpectedly ushered in a much more rapid and dramatic growth opportunity for DocuSign as the virus entered the United States and began to spread rapidly. By March 11, 2020, COVID-19 was declared a global pandemic, and by April 7, 2020, nearly every U.S. state issued lockdown or shelter-in place-orders requiring people to stay in their homes and businesses to close in order to mitigate the spread of COVID-19.

8. As a result, most U.S. businesses were forced to continue operations remotely with employees largely working from home, thereby needing an electronic means to accomplish tasks that had previously been done in person, such as signing documents. Accordingly, DocuSign's eSignature product represented a crucial alternative to manual processes during this remote work

environment, particularly at the beginning of the pandemic when people were concerned that the virus could spread through physical contact with contaminated surfaces, such as mail and pen and paper.  Indeed, studies showed that the virus could live on certain surfaces for weeks.  This global crisis, therefore, caused demand for DocuSign's eSignature product to skyrocket to unprecedented levels between March and June 2020.  Indeed, during that time, which encompassed the first quarter of the Company's 2021 fiscal year, DocuSign's revenues grew by **27%** compared to the same quarter a year earlier.  Similarly, over the same quarter, the Company's billings grew by a record **59%**, the highest growth rate that the Company had experienced since its IPO in 2018**.**

9.  Billings is one of the few metrics that DocuSign provides guidance on to investors, telling them where the Company expects to be in terms of billings for the next quarter and the next year.  Critically, at the outset of the Class Period and continuing throughout, DocuSign chose to provide higher and higher billings guidance to investors.  In contrast, other "work from home" technology companies that saw increased demand during the COVID-19 pandemic, such as Zoom (a videoconferencing software provider) and Slack (an instant messaging software provider), acknowledged that there was substantial uncertainty regarding how the pandemic would shape their businesses moving forward and specifically declined to raise their guidance after the pandemic began.  Accordingly, during the Class Period, investors were highly focused on whether DocuSign's aggressive guidance was achievable and its growth durable in a post-pandemic world.

    **C.**    **By the Summer of 2020, Defendants Are Aware of Alarming Internal Warning Signs That This Record-High Demand Is Temporary but Falsely Assure Investors That DocuSign's Growth Is Sustainable**

10. From the beginning of the Class Period, Defendants were aware that demand for DocuSign's products was unsustainable after the COVID-19 pandemic subsided.  Specifically,

DocuSign was experiencing multiple adverse sales conditions, which Defendants knew or recklessly disregarded would cause the Company's billings growth to decline once the temporary demand driven by the COVID-19 pandemic subsided.  Specifically, according to numerous former employees ("Confidential Witnesses" or "CWs"), Defendants were aware during the Class Period that: (i) customers informed DocuSign at the beginning of the Class Period that they did not intend to (and ultimately did not) renew their contracts with DocuSign once they were able to return to their offices, as subsequently reflected in low internal product usage and retention metrics, including a ***30% decline*** in customer usage by ***December 2020***; (ii) much of the eSignature sales growth that DocuSign experienced during the COVID-19 pandemic was the result of one-off COVID-19-related use cases that would not recur after the pandemic ended; (iii) from the beginning of the Class Period, customers were signing up for short-term, one-year eSignature contracts—in contrast to the three-year contracts that DocuSign tried to push—that they did not renew, contributing to the decline in retention rates that was apparent internally by February 2021 (one year after the COVID-19 pandemic began); (iv) DocuSign's sales of its new CLM product were also struggling to take off, including because it was a complex software that had significant integration issues with customers' platforms; and (v) throughout the Class Period, DocuSign was losing substantial  eSignature business to Adobe, a cheaper competitor.

11. The first warnings that the unprecedented demand and growth that DocuSign experienced at the beginning of the COVID-19 pandemic was not sustainable came directly from DocuSign's customers.  From the start of the Class Period, customers told DocuSign sales employees that they were using DocuSign only to function remotely during COVID-19 lockdowns and would not renew their contracts after the pandemic subsided.  For example, according to CW 6, "immediately from the get-go" when she joined DocuSign, before the Class Period, customers were telling her that they were purchasing the product for one-time use cases related to the

COVID-19 pandemic.  Likewise, CW 7, recalled that there were "absolutely" indications before she left DocuSign in June 2020 that demand eventually would dry up, saying that ***many customers told her they would not renew their contracts after they returned to the office***.[3]

12. Such customer feedback was also confirmed by key internal metrics that DocuSign closely tracked, which already showed by the start of the Class Period that customers were not using the full capacity of their DocuSign subscriptions (i.e., all of the eSignatures purchased)—an important indicator that customers were unlikely to renew their contracts once the pandemic subsided.  For example, CW 6 recalled seeing ***low usage rates*** across government and education clients when she joined the Company (before the Class Period began).

13. In addition, as described in further detail below, based on the accounts of multiple CWs who spanned many different industries (internally called "verticals") and regions across DocuSign's business, Defendants knew from numerous customers, including large companies like Door Dash and Uber, that their use for DocuSign was directly tied to the pandemic and would not recur after the pandemic.  Indeed, the pandemic itself created a variety of one-off uses for eSignatures that were specifically related to COVID-19 health and safety mitigation measures that would no longer exist once the pandemic subsided and lockdowns end.  These one-time uses included documents to receive federal loans through the Payroll Protection Program ("PPP"), documents related to COVID-19 mask mandates and consent forms, and return-to-work COVID-19 waivers.

14. For example, CW 4 recalled that when she joined DocuSign in summer 2020, after the pandemic had already begun, she and others at DocuSign saw a "prevalence" of one-time use cases by customers for DocuSign's eSignature product that would not extend beyond the

---

[3] All emphases in CW statements are added.

pandemic, such as for PPP loans and the other types of loans being extended at the beginning of the pandemic.  CW 4 explained that she told others at DocuSign that she did not want to take these kinds of one-off use COVID-19 deals because they would not renew their contracts.  But, according to CW 4, *Alhadeff brushed off such feedback*, essentially saying "tough shit," "sign them up," and then "go find other use cases" for them; in other words, sign up such customers, even if they were one time use, and then try to get them to expand to additional uses later.

15. Additionally, many of the Company's customers refused to sign long-term three-year contracts, preferring instead to sign one-year contracts that allowed them the flexibility to cancel as soon as the pandemic subsided.  While, before the Class Period, most of DocuSign's contracts were one year in length, it was only during the pandemic that enterprise and commercial customers—which made up the majority of the Company's revenues—decided to shift to one-year contracts to wait out the pandemic.  For example, CW 8 said that some of her customers wouldn't even discuss a multi-year or 18-month contract because they wanted to see how the pandemic played out.  CW 7 also explained that Account Executives would typically push a three-year contract to ensure customers continued to use DocuSign even after the pandemic, but "nobody wanted to be in a three-year contract," and most ended up with a one-year contract instead.

16. Indeed, rather than disclose these adverse sales conditions affecting the long-term sustainability of the demand for DocuSign's products, Defendants, throughout the Class Period, assured investors that DocuSign would continue on the same growth trajectory even after the pandemic subsided.  For example, on June 4, 2020, the first day of the Class Period, Springer told investors that "*we don't anticipate customers returning to paper or manual-based processes*" because "*they rarely go back*"—despite internal feedback from numerous customers to the contrary.  At the same time, in response to direct questions by analysts, Springer

downplayed the impact of one-time COVID-19 use cases on DocuSign's billings growth, insisting that they were the "***extreme minority***," when, in fact, they represented a substantial portion of the Company's new business according to multiple CWs.  Further, on September 3, 2020, Springer denied any adverse demand trends, assuring investors that "***we don't see trends that things are going to return to the way they looked and trended pre-COVID.***"  In contrast, however, CWs reported that Defendants were aware of adverse demand trends by this time, including the notably low customer usage rates, which indicated that customers would not renew once their contracts were up and demand, therefore, would return to its normal, pre-COVID-19 levels.

> **D.     By Early 2021, Defendants Internally Know That Demand Issues Have Worsened but Continue to Falsely Reassure Investors That Demand Remains Sustainable**

17. By late 2020 and early 2021, as COVID-19 vaccines were rolled out and businesses began to return to in-person work environments, DocuSign's eSignature demand and sales began to wane, as described by numerous CWs.  In particular, by December 2020, a key internal performance metric showed that product usage was down significantly for many customers who purchased eSignature after the pandemic began, an important red flag that customers would not be renewing their contracts.  In particular, CW 1, whose Principal Analyst role gave her insight into metrics ***for the entire Company and for all products***, recalled that customer product usage levels for DocuSign's products had declined approximately ***30% year-over-year*** by December 2020, based on internal analyses at the time.  CW 1 explained that a decline of 30% in customer product usage ***correlated directly to a significantly higher customer renewal churn rate***.[4]

---

[4] Churn is an industry term used internally within DocuSign to describe situations in which customers either stop doing business with DocuSign, such as by not renewing their contracts, or downsizing their subscriptions.

Importantly, both usage and churn rates were key performance indicators of future billings and revenues that Defendants closely tracked throughout the Class Period.

18. Further, CW 1 recalled that by February 2021, initial internal analyses showed that not only product usage, but *also customer renewal rates were declining for all segments and all customers*.  Indeed, according to CW 1, as many customers who signed up for DocuSign in March 2020 only signed up for one-year contracts, February 2021 would mark the time period within which the first wave of post-COVID customers would be renewing (or not renewing) their contracts with DocuSign.

19. Likewise, another CW, who was a leader in the Company's Customer Success group, described similar alarming trends in customer usage and retention that were apparent internally by February 2021.  Specifically, CW 4 recalled that DocuSign was *exceeding its customer churn numbers and struggling with consumption (i.e., usage)[5] in February 2021, i.e., missing its consumption targets*—as shown in data analytics that she presented at a quarterly internal meeting (Quarterly Business Review) at this time, which was also attended by senior executives such as Senior Vice President ("SVP") of Customer Success, Lambert Walsh.  Notably, at this time, DocuSign's customer retention rate was *only at 70-71%,* which CW 4 described as "*horrible*" given that companies typically target 90-95% retention.  Moreover, DocuSign's consumption or usage growth was only 20%—less than *half* of the targeted 44% growth, as was also presented at this February 2021 QBR meeting.

20. Similarly, per CW 10, demand for DocuSign in her team's customers was already on a "*downward slide*" in February 2021, as customers were beginning to return to the office as the

---

[5] CW 4 explained that her team referred to product usage rates as "consumption" rates—i.e., customers' "consumption" of eSignature envelopes.

pandemic waned and the initial COVID special use case deals were wrapping up.  In particular, CW 10 stated that *she knew management was concerned about sales problems due to waning demand for DocuSign's products in early 2021* because management began to "micromanage" sales data in Salesforce.[6]  As an example, CW 10 explained what she referred to as the "Red Weekend," which she believes took place sometime between February and early April 2021, when management "went crazy" looking through every single sales deal in Salesforce.

21. At this same time while Defendants internally were panicking about waning demand and sales growth, as evidenced by these key internal performance metrics showing declining usage and retention, Springer chose to enrich himself.  Specifically, on February 1, 2021, while DocuSign's stock price was artificially inflated as a result of his fraud, Springer sold over *$81 million* of DocuSign stock—his first ever open market sale of DocuSign stock since the Company's IPO in 2018.  Moreover, in total, Springer sold more than *$153 million* of his DocuSign stock during the Class Period.

**E.     Defendants' Knowledge of Increased Competition and DocuSign's Failing CLM Sales Further Undermines Their Affirmations of Sustainable Growth**

22. Defendants' representations of durable growth were also undermined by their knowledge of increased competition, primarily from Adobe, from the start of Class Period.  Indeed, while Defendants publicly downplayed the impact of competition from Adobe—claiming, for example, that "*we don't see a big change in the competitive dynamic with Adobe*" and that "*there hasn't been really a changing dynamics [in the competitive landscape]*"—internally, Defendants knew the opposite.  Per multiple CWs, throughout the Class Period, DocuSign was in fact losing significant sales to Adobe, which provided a similar but cheaper product.  For example, CW 4

---

[6] Salesforce is a client relationship management ("CRM") database, which allows businesses to track sales among other metrics.

recalled that DocuSign was getting "pounded" by competitor Adobe during her time with the Company (summer 2020-spring 2022).  In particular, CW 4 noted that net retention for the first quarter of fiscal 2022 (beginning in February 2021) was **below 70%** because of DocuSign's sales losses to Adobe.  Further, CW 4 said that DocuSign lost four accounts, worth $1 million in revenue total, to Adobe because of pricing in the summer of 2021.

23. Further, though Defendants publicly touted DocuSign's CLM product as a crucial driver of sustainable long-term revenue, in reality, as described by numerous CWs, the Company was never able to effectively sell the product given its complexity and multiple integration issues that the Company faced throughout the Class Period.  Indeed, CW 8, a Regional Vice President, stated that she spoke with Alhadeff by phone and through Slack starting a few months into CW 8's tenure about the issues selling CLM.  During one of the calls, *Alhadeff acknowledged to CW 8, around June 2020, that DocuSign was struggling to sell CLM*.  Moreover, once the COVID-19 pandemic caused a surge in demand for DocuSign's eSignature product, the Company shifted all of its resources to meeting that demand, essentially abandoning its CLM sales efforts during that time.

### F.     Defendants Continue to Publicly Deny Any Adverse Demand Trends in Late 2020 and Early 2021

24. Although Defendants knew that demand issues steadily grew worse in late 2020 and 2021, they continued to publicly repeat their false narrative that the growth generated during the COVID-19 pandemic was sustainable.  Indeed, as customers followed through with their warnings given since the beginning of the pandemic that they would leave DocuSign to return to pen-and-paper signature processes as they return to the office, Defendants continued to publicly deny any adverse demand trends, including repeating their refrain that customers do not leave DocuSign once they start using eSignature.  For example, on December 3, 2020, Springer falsely

claimed that "*[w]e don't see customers going back to pen and paper*."  Similarly, on January 11, 2021, Gaylor  denied that DocuSign's high growth after the pandemic began was a one-time blip, insisting that "the pandemic really accelerated what people were otherwise going to do. *And so it's not kind of a one and done sort of mentality.*"  Similarly, on a March 11, 2021 earnings call, in response to an analyst's direct question about whether Defendants were seeing "any change in the demand environment based on more of a return to normalcy" given the COVID-19 vaccine rollout, Springer repeatedly denied any such adverse trends, insisting: "*We haven't seen anything*."

25. Gaylor  also reiterated such assurances on March 24, 2021, emphasizing that "*the permanence of the trends we've been seeing across the business look like they're really here to stay.*"  Moreover, at this same time, when asked specifically about the "sustainability" of DocuSign's growth, Springer responded: "*[T]his is not a short-term thing.  This is not something that just sort of happened because of the pandemic.*"  Just a week later, Alhadeff issued a similar tweet, insisting that "*I don't see levels of adoption @DocuSign changing significantly post-pandemic.*"

26.  Such statements were directly contrary to extensive internal evidence showing that by this time, customers were leaving DocuSign in droves as one-off COVID-19 uses like PPP dried up and many businesses returned to in-person work.  Indeed, contrary to this positive public façade, CWs stated that DocuSign management, at this time, was scrambling amid growing internal "panic" and "hysteria" about COVID-19-fueled demand waning as they drilled down on every potential deal in Salesforce no matter how small.  Moreover, contrary to Defendants' denials that they "haven't seen" any adverse demand trends, by this point in time Defendants knew of, among other things, alarming trends in key performance metrics indicating that

DocuSign's prior explosive growth was in fact "a short-term thing" that "just sort of happened because of the pandemic." In particular, as described above, by March 2021, not only was there a *30%* decline in product usage rates but, customer renewal rates had also dropped as well. Indeed, CWs described DocuSign's internal retention rate of 70-71% at this time as "horrible" given that it was far below the targeted 90-95% rate.

### G. By the Summer of 2021, Defendants Are Well Aware That the Record-High Demand Generated During COVID-19 Was at an End

27. By the summer of 2021, the demand for DocuSign's products had deteriorated to such a point that it severely impacted the Company's revenue forecasts for future quarters. For example, CW 3recalled that in the third quarter of 2021, the Company began to see a slowdown in growth. CW 3 opined that by the third quarter of 2021, the booking forecast was concerning. Specifically, CW 3 explained that, in her opinion, one month into the third quarter of 2021, bookings came in weak. In CW 3's opinion, bookings in the third quarter of 2021 were alarming. Further, CW 3 explained that lower bookings in 2021 led to lower billings and ultimately lower revenue. CW 3 recalled that senior executives at the Company (*including Defendant Gaylor*) were made aware that the Company was pacing behind and trending behind historical norms. CW 3 explained that every forecast iteration that the Company ran, and all booking numbers were shared with the senior leaders, including Defendant Gaylor, who would then meet with and report such numbers to Defendant Springer. Further, CW 3 recalled that Defendant Alhadeff was familiar with the booking numbers and was updated on them regularly. CW 3 also recalled that additional internal financial analyses were given to Defendant Gaylor, which Defendant Gaylor then relayed to Defendant Springer, showing that by September 2021, the Company's internal financial forecasts were in decline in comparison to historical data.

28. Thus, Defendants were well aware by the third quarter of 2021 that the adverse demand and sales trends the Company saw internally as early as 2020, including low usage and retention rates, were now manifesting themselves in adverse future financial forecasts, as expected.

29. Moreover, multiple other CWs corroborate that DocuSign's sales and demand issues worsened as 2021 progressed, as Defendants acknowledged internally. For example, CW 13 recalled that sales leadership, including *Alhadeff*, discussed all throughout her tenure that 2021 was an "***unprecedented down year***," beginning when she joined DocuSign in ***June 2021***.

30. However, even with the Company's internal metrics showing that demand was cratering and would continue to do so into the foreseeable future, Defendants refused to tell investors the truth, instead repeating the same false assurances they had throughout the Class Period.  For example, on September 8, 2021, Gaylor  again insisted to investors that "***people are not going to go back to pen and paper***" and minimized the impact of "customers who came to us for a specific COVID use case that they no longer have" as "***the vast minority***" of DocuSign's business.  On the same day, Springer also specifically denied any "***significant slowdown***" in demand, emphasizing that "***we're not seeing any differences in churn rates in any meaningful way*** . . . ***customers very rarely leave us***"—in stark contrast to the accounts of CWs.

### H.    Analyst Reports Confirm That the Market Was Materially Misled by Defendants' Misrepresentations

31. Defendants' false reassurances had their intended effect of convincing the market and allaying any investor concerns.  Indeed, throughout the Class Period, after Defendants made their misstatements, numerous analysts issued reports echoing Defendants' rosy affirmations.  For example, on June 4, 2020, RBC wrote "we believe demand trends are ***durable***" and that "[o]nce a customer starts DocuSigning, ***they don't go back to paper***, they become a target for upsell for CLM[.]"  Similarly, a June 5, 2020 Deutsche Bank report noted that "[e]ven more encouraging

is DocuSign's messaging that the quarter was strong excluding the tailwinds from the pandemic and that new customers and expansions realized in this environment *are here to stay.*"  Likewise, on September 3, 2020, RBC wrote: "When asked on the call back about the *durability of bookings success, management noted that no one was nervous about the company's ability to execute*.  Additionally, the company believes that *there is a 'new normal' that will benefit the company even after the pandemic subsides*[.]"  Further, a September 4, 2020 Oppenheimer report stated that "[w]e think the Agreement Cloud and the flagship eSignature product *will drive durable growth for the foreseeable future*."

32.  These positive analyst reactions continued as the Class Period progressed.  For instance, a December 3, 2020 RBC report enthused:  "What is even more impressive in our minds is that this [growth] is being driven almost entirely by an acceleration of the core e-Signature business with the company being confident . . . *that they can maintain growth above pre-pandemic levels in a post-pandemic world*."  Likewise, on March 12, 2021, William Blair wrote: "[W]e believe DocuSign's recently added customers are likely to continue expanding usage of e-Signature and CLM solutions moving forward.  While customers in other industries may churn following the pandemic, *we do not believe DocuSign will experience any uptick to its normal churn cadence*."  Further, in a June 10, 2021 report, RBC continued to credit Defendants' reassurances: "DocuSign was arguably one of the biggest beneficiaries (after Zoom) of the sudden shift to remote work and saw business meaningfully accelerate.  *We view these changes as irreversible and the tailwinds as sustainable,* as companies adopting e-signatures and digital agreements *are unlikely to go back to manual processes*."

## I.     The Relevant Truth Begins to Emerge in December 2021

33.  By December 2, 2021, however, Defendants could no longer conceal the severe demand declines that the Company was experiencing, disclosing that its billings growth declined to 28%

for the quarter—*half* of the *59%* growth that DocuSign reported in 2020 after the COVID-19 pandemic began.  On this news, DocuSign's stock price plummeted *more than 42%*, as investors began to understand that Defendants' prior assurances about the sustainability of DocuSign's COVID-19-fueled growth post-pandemic were false and misleading.  Indeed, multiple analysts subsequently downgraded their rating of DocuSign's stock, with Wedbush, for example, explaining that "[l]ast night was *a debacle quarter from DOCU*," and that "we believe the company is seeing *a much more difficult selling environment*."  Similarly, Wolfe Research noted that "[t]he billings weakness miss *was a result of a return to more normalized purchasing patterns by customers in the [second half]*, as it seems that the [first half] and last year represented a meaningful pull-forward of consumption patterns."

34. At the same time, however, Defendants continued to insist: "Even as the pandemic subsides and people begin to return to the office, *they are not returning to paper.  eSignature and the broader Agreement Cloud are clearly here to stay.*"  Such false reassurances helped reassure investors that this billings miss was a mere speedbump for DocuSign's durable growth trajectory, as supported by contemporaneous analyst reports.  For example, Evercore wrote that "[f]rom a longer-term perspective, we believe the shift towards e-Signature technology is not going away."

35. On March 10, 2022, however, DocuSign announced a second consecutive quarter of disappointing billings growth, which had decreased further to 25%—the lowest billings growth that DocuSign had ever experienced as a public Company—and reduced billings guidance, causing DocuSign's stock price to fall *more than 20%*.  Analysts were again shocked, with Morgan Stanley noting, for example, that "DocuSign's Q4 underscored that *the growth scare of Q3 was not a one quarter event*."  Likewise, Wedbush recognized that "[l]ast night *the demise of the Docusign growth story continued*."  Defendants, nevertheless, continued their false

denials on the related earnings call, with Springer again repeating that "[a]s the pandemic subside[s] and people begin to return to the office, ***they are not returning to paper. eSignature is clearly here to stay***."

36. Finally, on June 9, 2022, the relevant truth concerning the temporary nature of the demand for DocuSign's products during the COVID-19 pandemic was fully revealed when DocuSign disclosed a third consecutive quarter of poor billings growth, which had now dropped to ***just 16%***—the lowest billings growth DocuSign had ever experienced as a public Company—and once again drastically cut billings guidance. Further, Defendants directly linked these disclosures to diminished demand as the pandemic receded, admitting, for example, that they "***saw urgent demand wane***" and that this "shift in customer buying patterns ***coming out of the pandemic was quicker than we anticipated***." As a result, DocuSign's stock price fell ***more than 24.5%*** on Friday, June 10, 2022, and another ***10%*** on Monday, June 13, 2022. Indeed, analysts like Wedbush recognized that this disclosure of "yet another disappointing quarter as the company once again lowered billings guidance" meant "***the end of DOCU's core growth story is now essentially over***[.]" Moreover, shortly thereafter, on June 21, 2022, DocuSign announced Springer's abrupt departure, explaining that he "agreed to step aside" as CEO, effective immediately.

## II.     JURISDICTION AND VENUE

37. These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

38. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

39. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  DocuSign transacts business in California, including in this District.  Further, DocuSign's securities trade on the NASDAQ stock market under the ticker symbol "DOCU."  In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Lead Plaintiffs

40. Lead Plaintiff Public Employee Retirement System of Idaho ("PERSI") is a public pension fund that provides retirement, disability, survivor, and other benefits to more than 170,000 members in the State of Idaho.  PERSI has approximately $22 billion assets undermanagement.  On April 18, 2022, the Court appointed PERSI as Lead Plaintiff for this litigation.  As set forth in the attached certification (Exhibit A), PERSI purchased DocuSign's common stock during the Class Period and suffered damages as a result of Defendants' fraud.

41. Lead Plaintiff Deka International S.A. Luxembourg ("DIL") is an investment fund management company established under the laws of Luxembourg and is a 100% subsidiary of DekaBank.  DIL is a Luxemburg fund management company of fonds commun de placement ("FCPs"), the French term for investment funds, which have no legal personality and must be managed by a Luxembourg management company under Luxembourg law; as such, DIL has exclusive authority to make investment decisions for the FCPs it manages and to bring suit to recover any losses incurred by those FCPs.  On April 18, 2022, the Court appointed DIL as Lead Plaintiff for this litigation.  As set forth in the attached certification (Exhibit B), DIL purchased

DocuSign's common stock during the Class Period and suffered damages as a result of Defendants' fraud.

## B. Defendants

42. Defendant DocuSign is the largest provider of eSignature products in the world.  The Company is incorporated in Delaware, and its principal place of business is located at 221 Main Street, Suite 1550, San Francisco, CA 94105.  DocuSign's common stock trades on the NASDAQ under the symbol "DOCU."

43. Defendant Daniel D. Springer ("Springer") served as the Company's CEO from January 2017 to June 21, 2021.  In his role as CEO of DocuSign, Springer participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the DocuSign's ability to sustain the demand generated during the COVID-19 pandemic.  During the Class Period, Springer sold 356,479 shares of DocuSign stock in open market transactions, reaping proceeds of $81,850,879.  In addition, during the Class Period, Springer sold 354,598 shares through "Code F" transactions, which are dispositions of stock for the purpose of paying the exercise price of certain options or to satisfy tax obligations, reaping proceeds of $71,545,825.89.  In total, during the Class Period, Springer sold 711,077 shares for more than $153 million in proceeds.

44. Defendant Michael J. Sheridan ("Sheridan") served as DocuSign's CFO from August 2015 to September 2020 and as President of International at DocuSign from September 2020 to December 2021.  In his role as CFO of DocuSign, Sheridan participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the DocuSign's ability to sustain the demand generated during the COVID-19 pandemic.

45. Defendant Cynthia Gaylor ("Gaylor") has served as DocuSign's CFO since September 2020, when she took over this role from Sheridan.  In her role as CFO of DocuSign, Gaylor participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact relating to the DocuSign's ability to sustain the demand generated during the COVID-19 pandemic.  During the Class Period, Gaylor  sold 5,983 shares of DocuSign common stock in open market transactions, reaping proceeds of $3,316,298.  In addition, during the Class Period, Gaylor sold 9,070 shares through "Code F" transactions, reaping proceeds of $2,134,128.71.  In total, during the Class Period, Gaylor sold 15,053 shares for more than $5.4 million in proceeds.

46. Defendant Loren Alhadeff ("Alhadeff") has served as CRO since February 2019. However, on March 7, 2022, DocuSign announced his intended resignation, explaining that the effective date of his resignation has not been finalized but is expected to occur before the end of fiscal year 2023 as the Company searches for his replacement.  As CRO, Alhadeff has been primarily responsible for leading the Company's sales and customer success functions.  In his role as CRO of DocuSign, Alhadeff participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the DocuSign's ability to sustain the demand generated during the COVID-19 pandemic.

47. DocuSign is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

48. The scienter of each of the Individual Defendants and each of the other employees and agents of the Company is similarly imputed to DocuSign under *respondeat superior* and agency principles.

## C.     Relevant Third Parties[7]

49. CW 1 was employed by DocuSign as a Principal Analyst from November 2020 through November 2021.  CW 1 described herself as a member of the Sales and Business Intelligence groups.  CW 1 explained that her position was initially in the Customer Success department, which was later merged into the Sales department.  As part of her role, she was involved in analysis concerning Professional Services attached to licenses.  Specifically, as a Principal Analyst, CW 1 evaluated which professional or educational services first-time or renewing DocuSign customers might require.  As a part of this role, CW 1 reviewed metrics, including customer usage data, which was tracked separately and linked to Salesforce, after the data had been passed through, or "scrubbed," by the product teams.  CW 1 further noted that she accessed all the data through spreadsheets and, later, through a data warehouse tool called Snowflake.  CW 1 explained that Snowflake is a repository for all the Company's data, including that which was stored in Salesforce.  CW 1 elaborated that Snowflake was used for data storage and a tool to conduct data analysis.  In particular, CW 1 said that, through Snowflake, she could track different KPIs (key performance indicators) and other metrics.  According to CW 1, the C-Suite would have seen information derived from Snowflake and converted into reports or slide decks for their consumption.

50. Moreover, as part of her role, CW 1 looked at future forecasting for new and renewal sales in order to forecast what professional or educational services the businesses would need going forward and how to calibrate that on the services side in order to ease the integration of DocuSign software into customers' systems.  In other words, CW 1 specifically reviewed whether or not DocuSign's licenses pipeline was healthy enough to support Professional Services

---

[7] All CWs are described in the feminine to protect their identity.

targets.   According to CW 1, through Snowflake she had insight into metrics **for the entire Company and for all products**.  Specifically, CW 1 said she had access to and regularly viewed all global customer product usage data, sales data, and pipeline information from all of its channels.  CW 1 explained that DocuSign used all of these metrics to forecast customer renewals and churn based on historical trends.

51. Further, as part of her role at DocuSign, CW 1 prepared slide decks for monthly and quarterly business review meetings ("MBR" and "QBR," respectively), which were attended by her director Anshul Saxena, as well as Vice President of Global Success Operations Jeremy Scheffel and SVP of Customer Success Lambert Walsh.   Moreover, CW 1 recalled that throughout her tenure at the Company she was on monthly or quarterly video conference calls, or townhall meetings, held by DocuSign's CEO, Springer, and other C-Suite members.

52. CW 2 was employed by DocuSign as a Senior Director of Global Partner Solutions, from November 2013 through June 2021.  CW 2 reported directly to Ryan Cox, Vice President of Global Partner Solutions.  According to CW 2, Cox then reported to Mark Register, SVP, and Register reported to Neil Hudspith, who at the time was DocuSign's CRO.  According to CW 2, after Hudspith retired, the Global Partner Sales organization reported to Scott Olrich, Chief Operating Officer ("COO").   CW 2 explained that, as Senior Director of Global Partner Solutions, she traveled to meet with partner organizations in order to establish partner relationships.  CW 2 elaborated that she provided sales, integration, and educational consulting to the partner organizations as well as DocuSign's internal sales teams in order to enable the partners to build out and integrate their products with DocuSign's features.  CW 2's territory was global.

53. CW 3[8] was employed by the Company in the Finance department during the Class Period. CW 3 had access to the forecasting models and generated reports relating to such information during her tenure at the Company.

54. CW 4[9] was employed by DocuSign as a leader within Customer Success group between the summer of 2020 and spring 2022. During the latter portion of her tenure at the Company, CW 4's responsibilities included the Strategic Enterprise segment, which she said included all enterprise customers within established verticals and was the Company's largest segment and had the largest customers, as well as the commercial segment of DocuSign's Customer Success team. CW 4 explained that the enterprise and commercial portfolios had a combined $600 million or $700 million worth of business, which would have represented about half of DocuSign's total business at that point. In her role as a leader in the Customer Success group, CW 4's reporting structure ended with former SVP of Customer Success Lambert Walsh, who reported to Springer. According to CW 4, Walsh and Alhadeff were peers in terms of their seniority levels.

55. CW 5 was employed by DocuSign as a Regional Vice President ("RVP") of Sales – Enterprise from April 2020 through December 2021. In this role, CW 5 led a team of seven

---

[8] At CW 3's request, Lead Plaintiffs have withheld additional details of CW 3's employment at DocuSign. While Lead Plaintiffs believe that the details of CW 3's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information, including CW 3's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request. In addition, CW 3 requested that certain of her allegations be removed and/or edited in order to further protect her anonymity. Again, while Lead Plaintiffs believe that CW 3's allegations are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional details from CW 3's statements to the Court for an *in camera* inspection at the Court's request.

[9] At CW 4's request, Lead Plaintiffs have withheld additional details of CW 4's employment at DocuSign. While Lead Plaintiffs believe that the details of CW 4's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information, including CW 4's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

Enterprise Account Executives based in the mid-Atlantic region, spanning New Jersey, Delaware, Washington DC, Virginia, and Pennsylvania.  CW 5 explained that customers were categorized as "enterprise" if they had over $2 billion in revenue, regardless of the size of the contract they signed with DocuSign.  CW 5 further explained that DocuSign's verticals[10] included the public sector, government, education, legal and financial services, and health and life sciences.  According to CW 5, DocuSign's geographical territories ("geos") were divided into three territories on the East coast, three in the central region, and three on the West coast.  CW 5 reported to Adam Hack, Current Area Vice President ("AVP"), Enterprise-East, who reported to Michael Mothersbaugh,[11] who reported to Jim Holscher, former GVP of Enterprise Sales.  CW 5 stated that she attended weekly forecast meetings that were held every Friday with all the enterprise leaders across geos, as well as the RVPs, AVPs, and GVP of Enterprise Sales Jim Holscher.  CW 5 recalled that Holscher and the other GVPs would then meet with Alhadeff immediately following the weekly meeting that she attended.

56. CW 6[12] was employed by DocuSign as an Account Executive from before the Class Period began until the spring of 2022.  CW 6 was based in San Francisco, and her customers were primarily in middle America.

---

[10] According to the Company's public filings with the SEC, DocuSign organizes its sales employees into segments called "verticals," which correlate to different industries that DocuSign services.  According to the Company's 2021 10-K, DocuSign's "industry verticals[] includ[e] real estate, financial services, insurance, health care and life sciences, government, higher education, communications, retail, manufacturing, nonprofits and more."

[11] According to LinkedIn, Michael Mothersbaugh is currently the Vice President of North American Enterprise Sales at DocuSign.

[12] At CW 6's request, Lead Plaintiffs have withheld additional details of CW 6's employment at DocuSign.  While Lead Plaintiffs believe that the details of CW 6's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information, including CW 6's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

57. CW 7 was employed by DocuSign from September 2018 through June 2020.  CW 7 had previously worked at SpringCM, which DocuSign acquired in September 2018.  At DocuSign, CW 7 most recently worked as an Account Executive – Small and Medium-sized Business, responsible for sales of DocuSign's eSignature and CLM products to companies with as many as 250 employees.  CW 7's territory was originally Chicago, but she was later moved to the Northeast territory.  CW 7 reported to RVP John Hakewill, who reported to Vice President Dave Simon, who might have reported to GVP Jim Holscher.

58. CW 8[13] was an RVP employed by DocuSign from the beginning of the pandemic through Spring of 2021.  CW 8's responsibilities included managing salespeople who were tasked with upselling and cross-selling acquired products to DocuSign's existing customer base.

59. CW 9 was employed by DocuSign from August 2020 through March 2022.  CW 9 worked as an Enterprise Account Executive for the Life Sciences & Healthcare verticals and was based in Chicago.  CW 9 explained that Enterprise Account Executive meant that she was an Account Executive whose clients had at least $2 billion in revenue.  In this role, CW 9 was primarily responsible for sales to companies in the healthcare industry including hospitals, which made up the bulk of her clients.  CW 9 reported to RVP Jeremy Ballanco, who reported to Vice President Alpesh Patel, who reported to GVP Jim Holscher, who then reported to Alhadeff.

60. CW 10[14] was employed by DocuSign, as a Strategic Account Executive from fall 2020 through the summer of 2021.  CW 10 explained that a Strategic Account Executive was the

---

[13] At CW 8's request, Lead Plaintiffs have withheld additional details of CW 8's employment at DocuSign.  While Lead Plaintiffs believe that the details of CW 8's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information, including CW 8's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

[14] At CW 10's request, Lead Plaintiffs have withheld additional details of CW 10's employment at DocuSign.  While Lead Plaintiffs believe that the details of CW 10's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can

highest level of Account Executive at DocuSign.  CW 10 was originally hired as a specialist to sell CLM, but the role was dissolved around the end of November or early December 2020 without explanation.  Accordingly, during the majority of her tenure at DocuSign, in her role as Strategic Account Executive, CW 10 was responsible for selling DocuSign's eSignature product to customers in the "state and local/education" ("SLED") vertical.  CW 10 reported to an RVP, who reported to Wendy Blatt, current AVP, who reported to Cameron Kahn, former AVP of Enterprise Sales.  CW 10 explained that DocuSign had dashboards that tracked everyone's sales performance, so you could see how you compared to other account executives on the team or versus others across the country.  According to CW 10, *senior management had access to Salesforce*.  CW 10 further explained that the dashboards in Salesforce showed who entered new pipeline each week, who closed certain deals, and what stage the deals were in.  While at DocuSign, CW 10 attended various regular sales meetings, including for example, sales meetings that were for the entire West Coast region.

61. CW 11 was employed by DocuSign from October 2020 through July 2021.  CW 11 worked as an Account Executive.  CW 11's responsibilities included converting DocuSign customers that had outgrown their monthly plan to an annual plan.

62. CW 12 was employed by DocuSign from May 2015 through May 2021.  While CW 12 officially left DocuSign in May 2021, she went on a leave of absence from the Company in November 2020 and, therefore, had no insight into customer trends or related data from that point on. Her most recent title at DocuSign was Senior Analytics Manager.  In this role, CW 12 worked within the Customer Success Department, reporting to Anshul Saxena, Senior Director, Customer Success Analytics & Data Science.  According to CW 12, Saxena reported to Lambert

---

provide additional information, including CW 10's exact title and dates of employment to the Court for an in camera inspection at the Court's request.

Walsh, former SVP of Customer Success.  When she started at the Company, CW 12's job responsibilities included providing analytical support to the Customer Success Department by analyzing customer retention and abandonment rates, among other metrics.  CW 12 also helped create a "customer adoption index," which documented several internally tracked metrics for the Company.  In particular, according to CW 12, this customer adoption index tracked, among other metrics, the number of envelopes leveraged, or used, by customers against the total number purchased; whether sales successfully upsold additional resources to the customer during its most recent renewal; and whether customers engaged with the Customer Success team during the contract.

63. CW 13 was formerly employed by DocuSign from June 2021 through April 2022.  CW 13 worked as an Account Executive – Major Accounts, responsible for sales of eSignature to higher education institutions located in the western United States. CW 13 recalled that the entire sales organization, including executives as senior as the CRO, had access to information in Salesforce. CW 13 further explained that the sales organization "from top to bottom" had access to Salesforce.  According to CW 13, all customer and prospective customer data lived in Salesforce, including information about renewals and revenue.  CW 13 added that Salesforce was where leadership got all their reporting and analysis when it came to forecasting numbers.  CW 13 initially reported to Jessica Shane until Shane was promoted to AVP in February 2022.  CW 13 then reported to RVP Kelli Pillino.  According to CW 13, Shane reported to AVP Anne Wilbur, and Pillino reported to AVP Justin Gilleg.  CW 13 believed that Wilbur and Gilleg reported to Alhadeff.

64. CW 14[15] was formerly employed by DocuSign from summer 2020 through winter 2022. CW 14 worked as an Enterprise Account Executive.

## IV.     SUBSTANTIVE ALLEGATIONS OF FRAUD

### A.     Overview of DocuSign's Business

#### 1.     DocuSign Pioneers eSignature

65. Headquartered in San Francisco, California, in 2003, DocuSign pioneered the concept of eSignatures, which, for the first time allowed customers to sign and send documents electronically without the need for a fax machine or mail service.  This followed closely on the heels of then-president Bill Clinton signing into law the Electronic Signatures in Global and National Commerce Act, which established the validity of eSignatures in commerce.

66. Since its founding in 2003, and continuing to the present, DocuSign's eSignature solution has been DocuSign's core product as its sales are the largest single contributor to the Company's revenues.  Indeed, DocuSign generates revenues from two segments: (1) subscriptions; and (2) professional services.   The subscriptions segment accounted for over 94 percent of the Company's revenues for the past three fiscal years.  Significantly, DocuSign's eSignature product accounts for substantially all its subscriptions segment revenue and is the primary source of its professional services segment revenue.[16]

---

[15]  At CW 14's request, Lead Plaintiffs have withheld additional details of CW 14's employment at DocuSign.  While Lead Plaintiffs believe that the details of CW 14's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information, including CW 14's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

[16] While DocuSign does not identify what percentage of its revenue is derived from sales of eSignature versus other products, in the Company's annual reports filed with the SEC on Forms 10-K, for the fiscal years ended January 31, 2020 (the "2020 10-K") and January 31, 2021 (the "2021 10-K"), DocuSign confirms that it "derive[s] ***a significant majority*** of [its] revenue from [] e-[S]ignature solutions."

67. DocuSign's eSignature software operates under what is known as a Software as a Service ("SaaS") model.  Under SaaS, instead of selling a customer a physical copy of the Company's software, DocuSign sells them a subscription and provides the customer with a license to use DocuSign's software for a specific period of time, usually ranging between one and three years.  Under this SaaS model, the eSignature product is typically accessed through the internet, with users having individual log-in credentials to access the software from the cloud.

68. When purchasing a subscription, DocuSign's eSignature customers must also purchase a certain number of what the Company calls "envelopes," that the customer must use over the duration of their subscription.  Much like its physical counterpart, DocuSign defines an envelope as "a container for documents that you send to a recipient to sign."  When sending documents to be signed, a DocuSign customer packages them within an envelope that is then sent to the party for signatures.  Each envelope, regardless of the number of signatures contained within, counts as one envelope toward a customer's allotment.

### 2.   DocuSign's Business Model Focuses on Growth over Profitability

69. As the pioneer in the eSignature market, DocuSign was able to grow exponentially over its first fifteen years in operation.  Indeed, immediately after DocuSign's IPO on April 27, 2018, the Company was valued at $4.41 billion and ended that fiscal year on January 31, 2019 ("FY 2019") with revenues totaling over $700 million.  In the next year, DocuSign's revenues increased dramatically.  For the fiscal year ending January 31, 2020 ("FY 2020"), DocuSign's revenues grew to over $970 million, an almost $300 million improvement over the previous year.

70. However, even with these large and growing revenues, DocuSign was not, and has never been, profitable; in fact, for each year of the Company's operations, including to the present, DocuSign has reported a net loss.  Indeed, though DocuSign touts that its core eSignature solution has better functionality than other less-expensive products, particularly when it comes to

document security, most customers consider eSignature as a commodity and do not want, nor care, about added features at a higher price. Indeed, as further detailed below, multiple CWs corroborate that DocuSign customers saw its eSignature solution as a commodity that was interchangeable with other competitors' cheaper eSignature products, particularly Adobe's. Accordingly, during the Class Period, DocuSign faced significant pricing pressure from key competitors like Adobe, which constrained the Company's ability to charge even higher prices. Because of this pricing constraint, along with the fact that DocuSign has significant expenses related to sales and marketing, the Company has never turned a profit. According to the Company's Form 2021 10-K, DocuSign generated a net loss of $426.5 million for FY 2019 and a net loss of $208.4 million for FY 20.

71. As a result, both before and during the Class Period, Defendants needed to convince the market that the Company's revenues would be able to cover the cash flows necessary to remain viable, as well as to show investors that DocuSign had a path toward profitability. Defendants assuaged the markets' concerns about DocuSign's lack of profitability by stating that the Company's future financial success depended on substantial sales and billings growth. Indeed, as Citi explained in a February 27, 2020 analyst report, DocuSign's "**hyper-growth status (>30% revenue growth at DocuSign's scale) is likely the most important driver of [its stock price] valuation**[.]"

72. Specifically, the Company assured investors that it was poised to take advantage of the full worldwide Total Addressable Market ("TAM") for eSignature, which it estimated to be worth approximately $25 billion. TAM is a business term used to describe a business' revenue potential, or the total amount of revenue that a product or service could possibly generate for the business. In other words, it is the total amount of market demand for a product or service in a given year. In the context of DocuSign's eSignature TAM, Defendants touted to investors that,

while the Company was already generating over $700 million per year in eSignature revenue, with a $25 billion TAM for eSignature, it could still potentially capture another $24 billion in sales per year for eSignature alone.

73. Although DocuSign was the leader in the eSignature market during the Class Period, holding 70% of the global eSignature market share, Defendants assured investors that DocuSign had only scratched the surface of the Company's TAM opportunity.  Indeed, DocuSign's path to profitability rested on its ability to capture as large a share of that market as possible.  To that end, DocuSign employed a "land and expand" business model, which the Company touted as the way to capture a significant portion of the approximately $24 billion in sales still left in the eSignature TAM.

74. The land and expand business model required DocuSign to first "land" with a customer, generally by selling its eSignature product into one department or for one specific use, and then "expand" by upselling that customer more envelopes or selling other products.  Indeed, as customers became more and more saturated with DocuSign's eSignature product, *i.e.*, they had already purchased as many envelopes as they could use, the Company needed to diversify its product offerings in order to have something to upsell to its customers beyond more envelopes.  To fill this need, on September 4, 2018, DocuSign purchased SpringCM, a cloud-based document generation and CLM software company.

75. CLM is a highly sophisticated software, allowing companies to generate, edit, and track contracts through multiple rounds of negotiations with different parties.  Once the CLM customer and their counterparty agree on a contract, CLM allows the customer to send out that contract for signatures and then provides a place for the customer to store that contract for use in later negotiations or as a template for later, similar contracts.  As a result, CLM is a much more complex and costly product than eSignature.  For example, CLM requires customers to integrate

it into preexisting CRM software, such as Salesforce, which can be a technically difficult task for both DocuSign and its customers.  CRM software is commonplace in large businesses, allowing them to manage key business processes, including customer data, sales, contracts, employee records, and variety of other important metrics.  CRM software is generally highly customizable depending on the needs of the business using it.

76. Having a CLM product to offer customers could provide a way for DocuSign to diversify its revenue streams outside of eSignature and grow billings, but only if the Company was able to properly sell and market the product.  Customers who had already bought their full capacity of eSignature envelopes could then become a target for CLM upsell.  Moreover, DocuSign touted to investors that CLM on its own represented an additional $20-25 billion in TAM, essentially doubling the overall market for DocuSign's products.

77. Over the next two years after September 2018, DocuSign continued to develop and market its CLM product to customers with varying success.  On March 21, 2019, DocuSign issued a press release announcing the release of the Company's "Agreement Cloud," which the Company described as a "suite of products and integrations for digitally transforming how organizations prepare, sign, act on, and manage agreements." The main component of the Agreement Cloud, outside of DocuSign's core eSignature product, was the Company's CLM product.  Springer touted the Agreement Cloud as a way "to modernize [DocuSign's customers'] entire systems of agreement—what happens before, during, and after the signature."  The Company also explained that, with the Agreement Cloud, the Company's total TAM increased to $50 million, essentially doubling that of eSignature alone, based primarily on the additional TAM attributed to CLM.

**B.    The COVID-19 Pandemic Forces a Massive Shift to a Remote Work Environment, Fueling Explosive Growth for DocuSign's eSignature Product**

78. In early 2020, the COVID-19 virus entered the United States and began to spread rapidly. By March 11, 2020, the World Health Organization ("WHO") declared COVID-19 a global pandemic, and infection rates in the United States began to rise at an alarming rate.  Due to the uncontrolled spread of the virus, between March 19, 2020 and April 7, 2020, nearly every state in the United States issued an unprecedented public safety mandate: lockdown or shelter-in-place orders requiring most people to stay in their homes and requiring non-essential businesses to close in order to mitigate the spread of COVID-19.

79. While businesses and workers designated as "essential" were exempted from such orders, the vast majority of businesses were precluded from reopening, and millions of workers were quarantined in their homes.  As a result, businesses that traditionally operated in person needed to scramble to quickly adapt to a remote work environment.

80. Companies needed to find remote solutions for almost every mundane task that might occur in an average workday, including remote ways to conduct meetings, communicate with employees, edit documents, and sign contracts or other documents.  For example, a business that generally required new hires to fill out hiring paperwork in person when conducting an interview or on the new hire's first day needed to shift to having that document filled out and signed electronically as new hires were onboarded remotely.  Similarly, any business that required contracts to be signed regularly, such as law firms having clients sign retention agreements, needed to pivot to a remote solution.

81. In addition, because at beginning of the pandemic people were concerned that the COVID-19 virus could survive on hard surfaces for weeks and be transmitted not only from person to person but also through physical contact with contaminated ("fomite") surfaces, many

people were hesitant to touch anything that had been outside of their home for fear of contracting COVID-19.  Indeed, many people went so far as to disinfect groceries before putting them away and immediately take off and wash any clothing that had been worn outside.  This shift heavily impacted businesses that remained open during the pandemic as they had to find a way to fill out and sign documents remotely.  Most notably, businesses operating in the healthcare field, such as doctors' offices and hospitals, which remained open during the pandemic and traditionally required patients seeking care to fill out and sign admission questionnaires and other forms, needed to move to a contactless method of filling out such documents in order to reduce the spread of COVID-19.

82. As nearly every business in the United States abruptly made this drastic shift to a remote work environment in early 2020, electronic and internet-based technology products thrived.  Indeed, as business adapted to remote work processes, electronic software and other "work from home" technological products like Zoom video conferencing, Slack instant messaging, and DocuSign eSignatures became essential resources.  When many people were stuck working remotely from their homes and hesitant to touch any item that had been outside of their home for fear of contracting COVID-19, an option that did not require any physical touch to sign or mail hard copy documents was the clear choice.  Accordingly, demand for DocuSign's eSignature product skyrocketed beginning in March 2020.

83. Thus, while COVID-19 wreaked havoc throughout the world—infecting, hospitalizing, and killing millions—it also presented DocuSign with an opportunity to grow at record-breaking levels.  And Defendants took full advantage of that opportunity.

84. Specifically, during the period between March and June 2020, DocuSign experienced unprecedented sales and revenue growth as result of demand driven by the COVID-19 pandemic.  Indeed, during that time, which encompassed the first quarter of the Company's 2021 fiscal year

(ending on April 30, 2020), DocuSign recorded total revenue of more than $297 million—an increase of $80 million and almost **27% higher** than the same quarter one year earlier.  Moreover, the Company recorded billings of over $342 million, representing a year-over-year billings growth of **59%**, the highest billings growth rate that the Company experienced since its IPO in 2018.

85. Billings is the primary metric that DocuSign uses to track performance and growth even though it is not recognized under Generally Accepted Accounting Principles ("GAAP"). DocuSign describes "billings" in its 2020 Form 10-K as "a key metric to measure [the Company's] periodic performance."  DocuSign defines billings as total revenues, plus the change in its contract liabilities and refund liability, less contract assets and unbilled accounts receivable in a given period.  Essentially, this means that billings accounts for a quarter's total revenue, plus the invoiced amount for any new contracts that DocuSign enters into during that period, even if the invoice is not yet paid.  As a result, the billings metric reflects sales to new customers along with renewals and additional sales to existing customers.  Only amounts **invoiced** to a customer in a given period are included in billings.

86. Billings is one of the few financial metrics for which DocuSign provides public guidance to investors.  Indeed, each quarter DocuSign releases its quarterly billings guidance, advising the market of how much it expects its billings to grow (or decline) over the next quarter and through the end of the year.  Accordingly, investors closely monitor billings guidance to determine whether the Company believes that it will have strong financial performance in the next quarter based on increased customer demand.

87. Notably, while DocuSign continued to provide higher and higher billings guidance until the end of the Class Period, other technology companies offering remote work capabilities that received an unprecedented influx of new business due to the COVID-19 pandemic acknowledged

that there was substantial uncertainty regarding how the COVID-19 pandemic would shape their business moving forward.  For instance, in June 2020, while recording unprecedented revenues from the pandemic, Zoom chose not to substantially raise its guidance as a result of uncertainty surrounding the pandemic, recognizing that such pandemic-driven high revenues would likely not last as COVID-19 receded.

88.  Indeed, during her opening remarks on Zoom's June 2, 2020 earnings call, Zoom's CFO explained that "[t]he COVID-19 pandemic adds an unprecedented new variable to our business model where historical knowledge may no longer apply."  Similarly, when one analyst asked Zoom's CEO about the company's anticipated future growth as a result of the COVID-19 pandemic, the CEO responded that Zoom's first priority was to ensure that its service was operating properly and only "down the road, we are going to figure out where we are going to double down on the new growth areas."

89. Likewise, in June 2020, Slack withdrew its fiscal year 2021 billings guidance for the same reason, even after exceeding the market's expectations for earnings and revenue growth.  Indeed, although Slack at the time reported revenues of $201.7 million, a *50%* year-over-year increase, and billings of $206 million, a *38%* year-over-year increase, it withdrew its full-year billings guidance citing "ongoing uncertainties surrounding the COVID-19 pandemic[.]"

90. Recognizing that DocuSign's new customers who signed up during the pandemic might not behave in the same way as previous customers, analysts were highly focused throughout the Class Period on whether this sudden influx of new business, and the Company's related unprecedented revenue and billings growth, were sustainable for the long-term.  Indeed, analysts specifically saw the more conservative approaches that other such thriving "work from home" technology companies, e.g., Zoom and Slack, took in setting financial guidance as a result of the COVID-19 pandemic and specifically sought to understand if or how DocuSign was different.

91. For example, on June 4, 2020, the first day of the Class Period, one analyst specifically asked DocuSign about this issue, noting that "Zoom's guidance was pretty flat versus having just this massive [first quarter] because of their concern that those smaller customers that signed up for Zoom might churn off as we open back up."   In response, Sheridan falsely asserted that "*[DocuSign's] situation is not analogous to Zoom* . . . [because] the value propositions, again we're delivering are *sustainable*[.]"

92. These and other such assurances by Defendants throughout the Class Period thus convinced analysts of the long-term sustainability of DocuSign's explosive growth post-pandemic.   For example, immediately after the call, RBC issued an analyst report specifically noting that the Company was "*capable of sustaining durable growth*" and that "*[t]he [C]ompany believes a very small percentage of deals in the quarter are temporal, one-time use cases that will not extend post-COVID.*"

C.   **Unbeknownst to Investors, Defendants Are Aware of Numerous Internal Red Flags That DocuSign's Explosive Growth in Early 2020 Due to the COVID-19 Pandemic Is Unsustainable**

1.   **New Customers Inform DocuSign That Demand for DocuSign's eSignature Product Is Only Temporary Due to the COVID-19 Pandemic**

93. Before the COVID-19 pandemic, DocuSign operated in an environment where customers migrated to eSignature processes by choice, as opposed to out of necessity.   Therefore, historically, most if not all customers who purchased DocuSign products did not go back to pen and paper signature processes after they started using DocuSign.   However, according to multiple former employees, many customers who signed up for DocuSign products during the pandemic did so out of a temporary need to function in a remote work environment brought on by an unprecedented global crisis.   As a result, unbeknownst to investors, many customers that purchased DocuSign during the pandemic did not plan to keep using DocuSign's eSignature

solution after COVID-19 receded and businesses returned to an in-person work environment. Indeed, at least four CWs corroborate that DocuSign customers specifically told them in 2020, early in the Class Period, that they did not plan to renew their DocuSign contracts after the pandemic subsided.  This was particularly true of small businesses that were struggling to make ends meet during the pandemic, and thus, could not, in the long term, afford DocuSign's product, particularly in light of cheaper offerings from competitors like Adobe.

94. As a result, from the beginning of the Class Period, Defendants were aware that, contrary to their own public statements assuring sustained demand and continued unprecedented growth after the pandemic, demand for their products would not last, based on multiple internal warning signs that they concealed from investors, as detailed below.  Indeed, by the end of 2020, DocuSign was aware of, *inter alia*: customer feedback that they would not renew their DocuSign contracts post-pandemic; declining customer product usage metrics that likewise signaled that customers were unlikely to renew; and the fact that customers had signed up for short-term one-year contracts that would allow them to leave DocuSign as soon as the pandemic subsided.

> **(a)** **Internally, Customers Tell DocuSign by June 2020 That Their Need for DocuSign's Products Is for One-Off Uses Related to the Pandemic and That They Will Not Renew After the Pandemic Subsides**

95. The earliest warnings that demand for DocuSign's eSignature product would not last came directly from its new customers who signed up after the pandemic began in early 2020 (i.e., the "post-COVID" customers, as opposed to "pre-COVID" customers who joined before the pandemic).  Many customers, particularly small and medium-sized businesses, which made up a substantial majority of DocuSign's post-COVID customer base, reported to DocuSign sales employees that they would not renew their eSignature contracts with DocuSign once COVID-19 receded and they were able to return to their offices.

---

AMENDED CLASS ACTION COMPLAINT
CASE NO. 22-CV-00824-WHO

96. Specifically, multiple CWs confirm that during the period between March 2020 and June 2020, customers reported that they were purchasing DocuSign's eSignature solution only to work remotely due to the COVID-19 pandemic and would not renew their contracts when they return to an in-person work environment.   For example, according to CW 6, a former Account Executive, "immediately from the get-go" when she joined DocuSign (before the Class Period), customers were telling her that they were purchasing the product for one-time use cases related to the COVID-19 pandemic.

97. For example, CW 6 explained that her education clients used DocuSign for IEPs (Individualized Education Program legal documents for kids receiving special education services) and similar documents.   Indeed, CW 6 recalled that these education clients no longer needed DocuSign after they went back to in-person learning as the pandemic subsided.   CW 6 added that clients used DocuSign early in the pandemic to distribute grants to constituents, for HR purposes, and for vaccine immunization consent requests that required a legally binding signature; however, after lockdowns lifted and people went back to the office, these use cases "kind of just dropped off."

98. Likewise, CW 7, a former Account Executive – Small and Medium-sized Business, recalled that there were "absolutely" indications before she left DocuSign in June 2020 that demand eventually would dry up, saying that ***many customers told her they would not renew their contracts after they returned to the office***.   CW 7 added that the customers wanted the ability to revert to the processes that they were using before the pandemic without being locked into a long-term contract.

99. Additionally, other CWs corroborate that their customers also provided similarly alarming feedback later in 2020.   In particular, CW 9 stated that, as early as August 2020, many customers were saying that they did not intend to renew their COVID-19-based one-off use

contracts after the pandemic subsided.   Similarly, CW 11, who worked at DocuSign as an Account Executive from October 2020 through July 2021, stated that many of her clients expressed that they were seeing significant growth tied to the pandemic, which created a short-term need for additional DocuSign envelopes while everyone worked remotely.   CW 11 recalled that this was a "narrative that we heard consistently" during her time with the Company. Importantly, CW 11 said that these same clients told her they **planned to return to pen and paper** signatures after the pandemic ended.

100. Such customer feedback was also corroborated by key internal metrics that DocuSign closely tracked, which already showed, by the start of the Class Period, that customers were not using the full capacity of their DocuSign subscriptions—an important indicator that customers were unlikely to renew their contracts once the pandemic subsided.   Specifically, according to CW 6, **the biggest indication that a client would not renew was low usage rates**.   Other CWs corroborated as much.   For example, as detailed further below (*see infra* at ¶140), CW 1, a Principal Analyst whose responsibilities included reviewing such product usage metrics and other internal data in Snowflake for forecasting purposes, saw that a decline in customer product usage **correlated directly to a significantly higher customer renewal churn rate**.   In fact, CW 1 elaborated that she saw a **strong** correlation between the two.

101. Importantly, CW 6 recalled seeing **low usage rates** across government and education clients when she joined the Company (which was before the Class Period began).   CW 6 explained that usage rates were tracked in an application within Salesforce that could have been accessed by executives, including Springer.   Thus, Defendants knew or recklessly disregarded early on in the Class Period, but did not disclose to investors, that these new post-COVID-19 customers were unlikely to renew their contracts given these low customer usage rates.

102. In addition, based on the accounts of multiple CWs who spanned many different regions and verticals across DocuSign's business, Defendants knew from numerous customers, including large companies like Door Dash and Uber, that their use for DocuSign was directly tied to the pandemic and would not continue afterward. Indeed, the pandemic itself created a variety of one-off uses specifically related to COVID-19 health and safety measures that would no longer exist once the pandemic subsided and lockdowns ended. This included uses such as signing documents to receive federal loans through PPP, which was in effect from April 2020 to May 31, 2021; COVID-19 mask mandates and consent forms; and return-to-work COVID-19 waivers.

103. For example, CW 8, a former RVP, said that some of her customers had one-off use cases that would not exist after the pandemic subsided. Specifically, CW 8 recalled that her client Door Dash used DocuSign during COVID-19 lockdowns for forms related to hiring and firing. CW 8 also recalled that her customer Uber used DocuSign for I-9 employment forms. CW 8 added that some non-profit customers made one-time purchases related to COVID-19. CW 8 also stated that businesses within the healthcare vertical made large one-time purchases, for uses such as sending out consent forms for COVID tests.[17]

104. Likewise, CW 4 also recalled that when she joined DocuSign, in summer of 2020, after the pandemic had already begun, she and others at DocuSign saw a "prevalence" of one-time use cases by customers for DocuSign's eSignature product that would not extend beyond the pandemic, such as for PPP loans and the other types of loans being extended at the beginning of the pandemic. CW 4 explained that by "prevalence" of one-time use cases, she meant that it was not that the majority of new customers were only purchasing DocuSign for one-off COVID

---

[17] Although CW 8 was not personally involved with the healthcare vertical, CW 8 explained that she had discussions with people who were running retirement homes who said they wanted to use DocuSign for COVID-19 testing consent forms. CW 8 further explained that she participated in forecast calls on which the COVID testing consent forms were discussed.

related use cases, but rather that DocuSign was selling a "large volume" of business for such one-time COVID use to a few extremely high-volume customers, such as small fintech companies (as opposed to, for example, Bank of America) who had no other use for DocuSign after the pandemic.  CW 4 added that when they were doing their internal analysis of DocuSign's COVID exposure from one time use cases, they saw large spikes of sales that were very concentrated in a few customer accounts, ***and they were concerned about how they would sustain such sales after the pandemic.***  Because these one-time use cases were hard to quantify, Defendants should have honestly informed investors about the uncertainty of sustained growth, but instead, they falsely and misleadingly claimed that the growth would continue after the pandemic subsided.

105.  Further, CW 4 stated that even though these were one-time use cases, they were booked as recurring revenue.  CW 4 explained that she told others at DocuSign that she did not want to take these kinds of one-off use COVID-19 deals because they would not renew their contracts.  But, according to CW 4, ***Alhadeff brushed off such feedback***, essentially saying "tough shit" – "sign them up" and then "go find other use cases" for them; in other words, sign up such customers, even if they were one time use, and then try to get them to expand to additional uses later.  Accordingly, Alhadeff knew from the outset of the Class Period that a significant portion of DocuSign's new business during the pandemic was the result of these one-off COVID-19 uses that would end once the pandemic receded.

106.  However, CW 4 noted that finding additional use cases was much more difficult to achieve for certain companies—for example, a small, 38-person "fintech" company as compared to Bank of America—so not every customer that was booked as recurring revenue actually ended up renewing.  CW 4 explained that the small fintech company she mentioned was called Teslar.  CW 4 added that Teslar bought "tens of millions" of envelopes from DocuSign for one-time use cases but would have no need for DocuSign once the pandemic ended.  CW 4 recalled that there

was a lot of internal debate between the sales and customer success teams about whether to book these deals as recurring or one-time revenue.  CW 4 elaborated that the general sentiment was that the situation was great for one-time bookings, but no one wanted to carry the renewal on the books because they knew there would be churn—in other words, there would be "nothing to renew later" given these were one-time COVID-19 use cases.

107.  In addition, CW 5, an RVP who led a team of seven Enterprise Account Executives in the mid-Atlantic region, recalled that in summer 2020, DocuSign had some large public sector and government deals that were known to be one-off deals, since they were related to extending unemployment benefits.  CW 5 explained that one of these deals was a New York State deal for eSignatures for enhanced unemployment benefits in the second quarter of calendar 2020, which would have spanned May 2020 through July 2020.

108.  Other CWs in different regions or verticals of the Company echoed these concerns about the temporary nature of these post-COVID-19 or "post-pandemic" deals in 2020.  For instance, CW 10, a Strategic Account Executive who worked on the SLED vertical team, which she described as the "highest producing team" for DocuSign in 2020 after COVID-19 began, meaning the team had the biggest sales growth by industry within DocuSign at that time, explained that a COVID-19 deal would have been driven by a COVID-19-related use case, such as applications for COVID-19 relief-funded housing.  CW 10 gave the example of a large county in the Southwestern United States using DocuSign to fill out forms for volunteering with the COVID-19 vaccine rollout.  CW 10 said that she was personally worried about these one-off COVID-19 use cases and had conversations with customers who said they were returning to the office and thus would have less demand for DocuSign's products.

109. Further, DocuSign actively tracked these one-off deals during the Class Period. Specifically, CW 10 recalled that there was a "radio button" in Salesforce to designate COVID-19 or not COVID-19 deals.

110. Additionally, in an attempt to take advantage of any potential source of growth, no matter how short term, DocuSign began ***targeting*** businesses that were eligible for federal loans through the PPP.  DocuSign recognized that these customers would not likely be able to afford to use DocuSign after the pandemic subsided, but continued to target them, nonetheless, resulting in inflated billings that would not recur after the pandemic receded and PPP money was no longer available.  Specifically, according to CW 7, DocuSign was targeting companies that had received loans that were extended by the PPP with the intention of having customers leverage that money to pay for DocuSign products.

111. Likewise, CW 6 explained that local government clients received one-time grants distributed by the federal government through the American Rescue Plan and Infrastructure Bill, for example, that they would use to purchase DocuSign.  CW 6 recalled that the clients were upfront about the fact that they wouldn't be able to afford DocuSign after the grant money dried up.

### (b)      Customers Refuse to Sign Long-Term Contracts

112. In addition, during the Class Period and unbeknownst to investors, customers refused to enter into longer-term contracts with DocuSign because they wanted to have flexibility to stop using DocuSign once they were able to return to an in-person work environment.  Accordingly, this was another undisclosed red flag alerting Defendants to the unsustainability of its record-breaking demand and billings growth beyond 2020.  CWs consistently corroborated that the three-year contracts with DocuSign comprised most of the Company's revenue and that most new customers during the pandemic would sign only one-year contracts for one-off COVID-19-

related uses because they intended to leave DocuSign once they returned to in-office work. Indeed, for the large enterprise and commercial clients, which made up the substantial majority of DocuSign's revenue, a three-year contract was typical.  Specifically, according to CW 1, a three-year contract term is standard in the SaaS industry for enterprise and commercial customers; one-year terms were an aberration.  CW 1 explained that, for larger, enterprise customers, implementation of the new software can take up to one year, so a one-year contract would often not be worth the time, energy, or money compared to the three-year term.  CW 1 added that most of the Company's revenue is derived from larger enterprise customers.

113. Likewise, according to CW 7, before the COVID-19 pandemic began, most of the Company's enterprise and commercial customers, which contributed the majority of the Company's revenues, typically engaged in a three-year contract with DocuSign.  CW 7 explained that as a result, while before the pandemic, the majority of the Company's contracts were one-year in length, most of the Company's revenue was tied to three-year contracts.  CW 7 further explained that this changed after the pandemic began and enterprise and commercial customers would only sign one-year contracts for new use cases.

114. According to numerous CWs responsible for sales in different regions and sectors, during the Class Period, customers refused to sign up for longer-term, three-year contracts that DocuSign tried to push on them, instead opting for shorter one-year contracts that allowed them the flexibility to opt out of DocuSign once the pandemic subsided and they were able to return to an in-person work environment.  For example, CW 8 said that some of her customers wouldn't even discuss a multi-year or 18-month contract because they wanted to see how the pandemic played out.  CW 7, who left DocuSign in June 2020, also explained that Account Executives would typically push a three-year contract to ensure customers continued to use DocuSign even after the pandemic, but "nobody wanted to be in a three-year contract" and most ended up with

a 1-year contract instead.  Thus, Defendants were already aware of such issues by the start of the Class Period in June 2020.

115. Likewise, CW 1 stated that a lot of customers that signed up for DocuSign during the pandemic would only sign a one-year contract instead of a typical three-year deal because they wanted to see how the pandemic progressed.  In addition, according to CW 2, going into the pandemic, many of her customers were focused on simply surviving.  CW 2 explained that "simply surviving" meant that during the pandemic, all businesses with human-facing components, such as real estate, banking, shipping, and the like, were trying to figure out how they would be able to get necessary documents such as contracts signed when people could not meet face-to-face.  CW 2 noted that these customers were trying to figure out how to run their businesses while the COVID-19 pandemic forced them to work remotely and were no longer able to meet in person.

116. Recognizing that post-COVID-19 customers were looking for the shortest contracts possible, DocuSign management issued a top-down directive to sales personnel to push customers toward longer-term eSignature packages using various deceptive sales tactics in order to try to ensure that they would continue using DocuSign products after the pandemic ended.  For example, CW 7, who left in June 2020 and thus was familiar with the sales tactics up to that point, explained that she was encouraged to tell customers that a monthly rate of $250 for a year was the best rate she could offer, even though DocuSign did offer a smaller package that cost about half the price.  Indeed, CW 7 reiterated that she would tell these "mom and pop shops," which were struggling to stay in business, that $250 a month, or $3,000 a year, was the best rate she could offer, even though the minimum contract was actually $1,500 a year.  According to CW 7, her boss, John Hakewill, a current RVP, and "leadership all the way up the board," were encouraging salespeople to refrain from telling customers about the smaller, less expensive

packages and to push the bigger, more expensive packages instead.  CW 7 explained that this was a sales tactic to lock in customers who would likely leave after the pandemic.  Such CW statements confirm that Defendants recognized by the start of the Class Period that this customer hesitation to sign up for longer-term contracts would further jeopardize DocuSign's ability to sustain the high demand and growth that it experienced in early 2020 when the pandemic began.

> ### 2. Defendants Predicate Their Early Class Period Statements Regarding Customer Retention on Outdated, Pre-COVID-19 Information

117. Defendants touted DocuSign's massive growth in early 2020 as sustainable in large part because customers do not go back to pen and paper processes once they transition to DocuSign, but that was false and misleading.  Defendants knew that customers who purchased DocuSign during the pandemic behaved differently than pre-COVID-19 customers because, among other things, those new customers needed eSignature for one-off COVID-19-related uses and would not renew after the pandemic.  Nevertheless, at least through late 2020, Defendants ran no new analyses to determine whether the Company would be able to retain these new customers at the same rate as before the pandemic.  Instead, Defendants intentionally or recklessly relied on outdated, pre-pandemic information about customer behavior that they knew or recklessly disregarded was unlikely to be true for post-COVID-19 customers.  Thus, Defendants had no reasonable basis for their rosy assurances concerning the sustainability of DocuSign's high growth beyond the pandemic for this reason as well.

118. Indeed, according to CW 12, who most recently worked at a DocuSign as a Senior Analytics Manager in the Customer Success Department,[18] the Company did not adopt different

---

[18] As discussed previously, CW 12 worked at the Company during the early part of the Class Period, as she was actively working from May 2015 through November 2020 but only officially left the Company in May 2021.

metrics pre-and post-COVID-19.  CW 12 explained that, during the height of COVID-19, the Company's focus was much more on dealing with the surge in new customers, getting those customers helped and up to speed, with less attention on forecasting.  CW 12 described it as a "scramble" to help address the influx of customers.

119. Importantly, CW 12 explained that Springer was using **_historical_** customer retention rates—**_using pre-COVID numbers_**—as a guide for forecasting what future growth and retention rates would be.  Thus, during the early portion of the Class Period, Defendants had no updated, reliable metrics to support their assertions that post-COVID-19 customers would stay with DocuSign for the long haul (as pre-COVID-19 customers may have done).  The metrics from prior quarters could not be used as a proxy for the sustainability of demand during the pandemic because pre-COVID-19 customers voluntarily signed up for eSignature for routine use whereas post-COVID-19 customers were effectively forced to temporarily use eSignature to keep their businesses afloat while working remotely and often for one-off use cases that would cease once the pandemic subsided.  Accordingly, when Springer publicly assured investors in June 2020 and other early portions of the Class Period that, once customers adopt DocuSign, "**_they rarely go back_**," he knew or recklessly disregarded that there were no internal analyses to support the truth of that assertion as it related to customers who purchased DocuSign products after the pandemic began.

120. Further, according to CW 12, at the time she went on a leave of absence from DocuSign in November 2020, she did not think that anyone was "looking at" projecting the retention rate for new customers yet.  She elaborated that by new customers, she meant those customers added post-COVID-19.  CW 12 added that a great deal of her job duties involved understanding what was going on across the Company, functioning as a Company interface in order to integrate data.

1    For that reason, CW 12 further explained, it is likely that she would have learned of any such

2    retention projections as part of her duties.

3        121. Indeed, even if Defendants had tried to determine what the actual retention rates for

4    post-COVID-19 customers would have been, they likely would have been unable to do so.  In

5    order to determine retention rates for customers who signed up after the COVID-19 pandemic

6    began, DocuSign had to first determine which customers were not going to renew their contracts,

7    which would have only occurred after one year at the earliest, given that was the shortest contract

8    term available.  For that reason, Defendants should have been forthright about the uncertainty of

9    sustained growth, like Zoom and Slack were, rather than painting an unsupported, rosy picture.

10       122. Specifically, CW 12 noted that retention rates for customers take longer to analyze, as

11   customer contracts are typically for a year or more.  For that reason, CW 12 explained, renewal

12   and retention rate information—which would include any upselling of new products or services,

13   or reduction in the monthly payments due to surplus envelopes or under-utilization—could not

14   be analyzed for a specific customer until a year or more after the contract starts.  Indeed, as other

15   CWs describe in further detail below, by February 2021, approximately one year into the

16   pandemic, as the first wave of post-COVID-19 customers' contracts came up for renewal, the

17   Company began to experience a significant drop-off in customer usage and retention rates.

18       123. As a result, Defendants did not and could not have had any analytical support to suggest

19   that customers who purchased DocuSign after the COVID-19 pandemic began would actually

20   stay with the Company once the pandemic subsided.  Moreover, given that customers expressly

21   warned DocuSign that they would leave after the pandemic and refused to sign long-term

22   contracts, as further corroborated by low customer usage rates from the start of the Class Period,

23   Defendants were on notice of the exact opposite—i.e., that these customers would not likely

behave in the same way as pre-COVID-19 customers and, thus, could not rely on pre-pandemic metrics or trends.

        **3.**      **While Aware of These Red Flags Showing That DocuSign's High Demand in Early 2020 Was Fleeting, Defendants Falsely Assure Investors That This COVID-19-Fueled Growth Is Sustainable**

124. Throughout the Class Period, Defendants falsely touted that the demand that DocuSign was experiencing during the COVID-19 pandemic would last even after the pandemic receded and customers returned to in-person work environments. Indeed, as described above, despite seeing multiple early indications that the COVID-19-fueled demand for the Company's eSignature product was temporary, Defendants concealed these issues from investors and continued to push a false narrative of sustained demand and billings growth.

125. The Class Period begins on June 4, 2020 when the Company released its first quarter of fiscal 2021 financial results. During the related earnings call on that day, Springer touted the Company's 59% year-over-year billings growth that quarter, attributing it to increased demand as a result of the COVID-19 pandemic and touting its durability, stating, for example: "*[E]ven when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes.* Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits*, they rarely go back*." Later, on the same call, Sheridan doubled down on this statement, similarly assuring: "We believe this accelerated growth in new customers and expansion within our installed base was driven by a sudden prioritization of our products, but *we also believe that these customers will remain with us*[.]"

126. Understanding that the COVID-19 pandemic represented a once-in-a-generation crisis, analysts were highly focused on whether DocuSign's sudden, massive sales and billings growth was sustainable beyond the pandemic. This was particularly so as other companies who

benefitted from the remote work environment refused to say that the positive impact of the

pandemic on their bottom line would be long-lasting.  The most prominent example of this was

Zoom, which, at this time in mid-2020, refused to increase its financial guidance on the basis of

increased, COVID-19 fueled demand.  Accordingly, an analyst specifically questioned Sheridan

about Zoom's decision during the Company's June 4, 2020 earnings call, asking: "[A]s I'm sure

you listened to yesterday, . . . Zoom's guidance was pretty flat versus having just this massive

Q1 because of their concern that those smaller customers that signed up for Zoom might churn

off as we open back up.  So I'd just love to hear your perspective on that."  Sheridan responded

as follows, doubling down on Springer's false reassurances concerning the sustainability of the

demand for DocuSign's products:

> Yes.  Let me start on the churn perspective.  ***We don't think that our situation is
> analogous to Zoom volumes*** and so forth.  As I mentioned previously, we believe
> that, of course, our business, like any, has churned.  ***We think it's going to remain
> pretty stable because we think that the value propositions, again, we're
> delivering are sustainable, whether it's a work-from-home environment or not.***"

127. Similarly, analysts were also extremely interested in how much of the Company's

billings growth was derived from one-time COVID-19-related uses.  For example, on this June

4, 2020 earnings call, an analyst asked directly about the impact of applications for federal PPP

loans and other one-time use cases on DocuSign's billings growth.  Springer responded that they

represented the "***extreme minority***" of the demand that the Company was seeing, thus, once

again, denying that its massive growth was a temporary COVID-19-driven blip.

128. Springer and Sheridan's statements above were materially false and misleading because

unbeknownst to investors, by the beginning of the Class Period, Defendants were already aware

of several internal red flags showing the unsustainability of this COVID-19-fueled demand, as

detailed above in § IV.C.  In particular, much of DocuSign's new business consisted of temporary

one-off COVID-19 use cases and its customers were specifically telling DocuSign's sales

personnel by this time that they would not renew their contracts with DocuSign once the pandemic subsided and they were able to return to an in-person work environment. Indeed, as explained above, directly contrary to Springer's statements, multiple CWs corroborate that customers made clear that they intended to return to pen and paper-based signature processes as soon as they were able. These specific warnings from customers also were confirmed by customers' declining usage rates in summer of 2020, which, according to CWs, were a strong indicator that customers would not renew their contracts.

129. Moreover, while aware of key warnings signs that such demand would not last, Defendants chose to base their statements on outdated information concerning customer trends before the pandemic began, which was unlikely to be true of post-COVID-19 customers. As the length of contracts that began after the pandemic started were almost all one-year long, Defendants would not have been able to conduct any retention analyses to support their statements that customers would remain with DocuSign after the pandemic.

130. Indeed, far from being the "extreme minority" that Defendants proclaimed, one-off COVID-19-specific use cases, such as those related to signing PPP loans and vaccination consent forms, which would not recur once the pandemic subsided, represented a substantial portion of the increased demand that DocuSign experienced during the early stages of the pandemic. Accordingly, the demand created by these one-off uses was sure to disappear as the pandemic subsided. In addition, customers who purchased DocuSign after the COVID-19 pandemic began refused to enter into long-term contracts because they wanted the flexibility to opt-out of using DocuSign as soon as they were able to return to an in-person work environment.

131. Moreover, at the same time Defendants were making the above the statements, the Company's internal messaging suggested that they knew that the demand was not sustainable. For instance, CW 7 stated that by June 2020, her boss current RVP John Hakewill, Hakewill's

boss Vice President Dave Simon, ***and all the way up to the CEO Dan Springer***, in all-hands

meetings were encouraging salespeople to "take advantage of this time" and of people working

remotely.  CW 7 interpreted "take advantage of this time" or "take advantage of the moment" to

mean that COVID-19 demand would eventually decline.

132. Defendants' contrary public statements had their intended effect of assuaging analysts'

initial concerns about the durability of DocuSign's unprecedented growth.  For example, on June

4, 2020, RBC issued an analyst report stating that, "[w]hile COVID benefited the quarter, ***we

believe demand trends are durable*** and pipeline strong" and, "[w]hile the narrative around a very

strong quarter and conservative guide is a simplistic summary of events[,] we think the bigger

multi-year investment opportunity is increasingly more obvious to us***.  Once a customer starts

DocuSigning, they don't go back to paper, they become a target for upsell for CLM[.]***"  RBC

further noted that "[w]e see a company with a large, sustainable leadership position in a newer,

underpenetrated TAM capable of ***sustaining durable growth***" and reported that "***[t]he

[C]ompany believes a very small percentage of deals in the quarter are temporal, one-time use

cases that will not extend post-COVID***."

133. Similarly, on June 5, 2020, Deutsche Bank wrote that "[e]ven more encouraging is

DocuSign's messaging that the quarter was strong excluding the tailwinds from the pandemic

and that ***new customers and expansions realized in this [ COVID-19] environment are here to

stay***," explaining that "DocuSign is adamant that demand brought forward as a result of the

current environment is ***here to stay[.]***"

134. As the Class Period progressed, Defendants maintained their false story of sustainable

growth.  For example, on September 3, 2020, during the Company's earnings call discussing its

second quarter 2021 financial results, Springer stated that the COVID-19 pandemic was "causing

greater adoption of our offerings, ***something we believe will persist beyond the crisis.  Because***

*in our experience, it's very rare to see anyone go back to paper once they've gone digital.*"
Further, later on this earnings calls, Springer doubled down on this statement, denying any
adverse trends that could undermine continued growth after the pandemic, stating that "*we don't
see trends that things are going to return to the way they looked and trended pre-COVID*."
These statements were directly contrary to internal information reported by CWs as discussed
above, including customer feedback telling DocuSign that they would not renew after the
pandemic and *declining customer usage rates* from the start of the Class Period, which were a
key adverse trend confirming as much.  Moreover, as described above, while Defendants assured
the market that "it's very rare" for customers to leave DocuSign, they failed to disclose that this
information was based on pre-COVID-19 customer metrics that were not comparable to the new
demand environment that the COVID-19 pandemic created.  Unlike pre-COVID customers, who
*chose* to move to eSignature from pen and paper-based signature processes, as the CWs above
reported, many customers who purchased DocuSign after the pandemic began had no intention
of remaining with DocuSign once the pandemic subsided and they could return to in-person
work.

> **D.  As the COVID-19 Pandemic Recedes Beginning in Late 2020, Demand for
> DocuSign Begins to Decline, as Customers Previously Warned**
>
> **1.  In Late 2020, as Businesses Adapt to the COVID-19 Pandemic and
> Vaccines Enter the Final Stages of Clinical Trials, Demand Wanes
> and Customers Reduce or Cancel Their DocuSign Subscriptions**

135. By Fall 2020, as the world began to adapt to the COVID-19 pandemic and many states
lifted their stay-at-home orders, the urgent demand for DocuSign's products that was present at
the beginning of the pandemic began to dissipate.  As they explicitly warned DocuSign when
they purchased the Company's products at the beginning of COVID-19 pandemic, many
customers began to abandon DocuSign as they started returning to an in-person work
environment.  Notably, according to multiple CWs, by late 2020 or early 2021, it was clear

internally that customers who had purchased DocuSign at the height of the pandemic would not remain long-term customers.

136. Indeed, by November 2020, it appeared that the end of the COVID-19 pandemic was finally imminent with the arrival of vaccines. On November 9, 2020, Pfizer announced that its COVID-19 vaccine had proven effective in over 90% of patients and that it could have more than 50 million vaccine doses available by the end of 2020. In December 2020, the United States COVID-19 vaccination effort finally began with the emergency approval and rollout of the Pfizer COVID-19 vaccine to certain subsets of the population. At the same time, by December 2020, almost every state had progressed past the first threshold of their reopening plans and at least a dozen were entering into their third or fourth phase of their reopening plan, which meant allowing businesses, activities, and other venues to resume operations with minimal limitations.

137. To many Americans, this signaled the return to normalcy that had been beyond reach for months—including a safe return to in-person social and business activities. Moreover, businesses understood that they would imminently be able to return to their offices and resume in-person work activities, including signing documents. Accordingly, customers who only purchased DocuSign as a result of the pandemic began to leave the Company, causing the short-lived demand for DocuSign's products to continue further on its steady decline.

138. Indeed, through the Salesforce and Snowflake databases, Defendants were able to specifically track the differences between customers who purchased DocuSign before and during the pandemic. CW 1 recalled that from the time she started at DocuSign in November 2020, the Company actively tracked pre-COVID-19 customers separately from customers who signed on to DocuSign during the COVID-19 pandemic. CW 1 explained that there was a specific "flag" in Snowflake, which identified pre- and post-COVID-19 customers. CW 1 elaborated that post-

COVID-19 customers referred to those that purchased DocuSign products after the COVID-19 pandemic started.

139. Specifically, the Company tracked key metrics, such as product usage and retention rates, separately for customers who purchased DocuSign after the COVID-19 pandemic began. For example, CW 1 recalled that at least since she started at DocuSign, the Company was actively tracking whether customers who signed up before the pandemic or during the pandemic had higher renewal or usage rates. CW 10 also recalled that there was a "radio button" in Salesforce to designate COVID-19 or not COVID-19 deals. CW 10 explained that a COVID-19 deal would have been driven by a COVID-19-related use case, such as applications for COVID-19 relief-funded housing. CW 10 was personally worried about such one-off COVID-19 use cases and had conversations with customers who said they were returning to the office and, thus, would have less demand for DocuSign's products. Similarly, CW 4 explained that when they were doing their internal analysis of DocuSign's COVID exposure from one time use cases, they saw large spikes of sales that were very concentrated in a few customer accounts, *and they were concerned about how they would sustain such sales after the pandemic*.

140. Indeed, these separate analyses of customers who signed up after the COVID-19 pandemic began showed that these customers used and retained DocuSign at lower rates than customers who purchased DocuSign before the pandemic began. Specifically, CW 1 recalled that the *customers that signed up during the pandemic had a higher churn rate and a steeper drop off in usage.*[19] CW 1 explained that these metrics would have been sent to executives. By December 2020, DocuSign's undisclosed internal product usage metric, which functioned as a

---

[19] As discussed further below, CW 4 noted that one internal key performance indicator was customer churn.

key sales performance indicator, showed that product usage was down significantly for many customers who purchased DocuSign products after the pandemic began, an important red flag that customers would not be renewing their contracts.  Specifically, CW 1, who, as part of her role as a Principal Analyst, reviewed metrics in Snowflake, stated that the decline in product usage first became apparent to her in December 2020, shortly after she started at DocuSign.  In particular, CW 1 recalled that customer product usage levels for DocuSign's products had declined approximately ***30% year-over-year*** by December 2020 based on internal analyses at the time.  CW 1 explained that a decline of 30% in customer product usage ***correlated directly to a significantly higher customer renewal churn rate***.  CW 1 elaborated that she saw a ***strong*** correlation between product usage and customer renewal churn rates.[20]  CW 1 also noted that the product usage metric was an important, key internal metric or component to tie together data, or warning signs, of patterns being followed by customers post-COVID-19.

141. Additionally, CW 1 stated that the trend of declining usage was confirmed between April and June of 2021.  Accordingly, a substantial decline in a key internal performance metric was visible as early as December 2020 and continued as the Class Period progressed.

142. Moreover, CW 1 recalled that she reported the 30% decline in product usage to her supervisor, Director Anshul Saxena.  CW 1 further explained that Saxena and Vice President of Global Success Jeremy Scheffel probably communicated that information to SVP of Customer Success Lambert Walsh.

143. Further, as the Company's internal metrics showed that demand was decreasing amongst post-COVID-19 customers, DocuSign shifted how it approached those customers when their

---

[20] As discussed previously, CW 6 corroborated that usage rates were a key indicator of renewals internally.  *See supra* at ¶ 100 (CW 6 explained that the biggest indication that a client would not renew was low usage rates, and that usage rates were tracked in an application within Salesforce).

contracts came up for renewal, focusing on trying to get them to stay rather than upselling them with additional envelopes or products as they would normally have under the "land and expand" business model.  Specifically, CW 1 recalled that the renewal rate for post-pandemic customers was lower than for pre-pandemic customers.  CW 1 explained that she shared reports with the "warning signs" about product usage and renewal rates as early as January and February 2021, and possibly as early as December 2020, with Vice President of Global Success Operations Jeremy Scheffel and SVP of Customer Success Lambert Walsh, who then probably sent the reports to Springer.

144. Moreover, CW 1 recalled that, by February 2021, initial internal analyses showed that not only product usage but *also customer renewal rates were declining for all segments and all customers*.  According to CW 1, these declines in product usage and renewal rates were "warning signs."  CW 1 explained that the decline in renewal rates became apparent later than the product usage drop, in February 2021, because that is when most contracts were up for renewal.  Indeed, according to CW 1, as many customers who signed up for DocuSign in March 2020 only signed up for one-year contracts, February 2021 would mark the time period within which the first wave of post-COVID-19 customers would be renewing (or not renewing) their contracts with DocuSign.  CW 1 further confirmed that these declining retention and usage trends touched across all products.[21]

145. These lower usage and renewal rates for customers who signed up after the pandemic began were reflected in how the Company thought about and approached these customers when their contracts came up for renewal.  Rather than trying to *expand* their presence within the

---

[21] CW 1 explained that, because eSignature was the Company's most widely used product, it was the most heavily analyzed, and that the usage rates for eSignature products and other products, such as the CLM-related products, were different.  CW 1 added that renewal and usage rates were all declining, but those rates were different for different products.

customer as DocuSign would normally do under their land and expand business model, DocuSign was focused on merely **keeping** their business.  Indeed, CW 1 explained that with pre-pandemic customers, DocuSign discussed their upsell potential and how to sell them into larger packages. In contrast, CW 1 recalled that, with post-pandemic customers, DocuSign discussed how to get them to leverage under-utilized product areas and how to convince the customers that they needed DocuSign.  CW 1 recalled that DocuSign was concerned with retaining customers that had signed up during the pandemic more than customers that had signed up prior to the pandemic **given the former's lower usage and renewal metrics, which indicated that they would likely not renew their contracts.**  CW 1 explained that this was particularly true of post-COVID-19 customers, who had negotiated shorter contracts as they were unsure how the pandemic would progress.

146. Other CWs corroborate that these issues were known internally by February 2021.  In particular, CW 4, who was a leader in the Customer Success group, said she heard from Vice President of Sales - Renewal Management Brian Smith that DocuSign was struggling with customer renewals because the COVID-19-related one-time use cases were not renewing.  CW 4 explained that she spoke with Brian Smith regularly, i.e., in biweekly check-ins, beginning in late 2020 or early 2021.  Thus, CW 4 recalled that they were struggling with customer renewals because the one-time COVID-19-related use cases not renewing **in late 2020 or early 2021**.  CW 4 also noted that one internal key performance indicator was customer churn.

147. Importantly, CW 4 recalled that DocuSign was **exceeding its customer churn numbers and struggling with consumption**, (**i.e., usage)** [22] **in February 2021 i.e., missing its consumption targets**.  CW 4 explained that DocuSign was targeting a year-over-year consumption increase of

---

[22] CW 4 explained that her team referred to product usage rates as "consumption" rates— i.e., customers' "consumption" of eSignature envelopes.  In their public statements, Defendants also referred to product usage rates as "consumption."  *See* § V. *supra.*

44% between fiscal 2021, which she referred to as the " COVID" year because that is when the pandemic began, and fiscal 2022.[23]  However, CW 4 noted that DocuSign's consumption and other internal targets were "unrealistic" and "ridiculous," adding that she was seeing growth of around **20%** year-over-year from calendar 2020 in eSignature envelope/usage consumption across commercial and enterprise (which combined together represented about half of DocuSign's total business, as discussed above), but that this was much lower than the targeted **44%** growth.  Thus, according to CW 4, they were seeing growth but not at the inflated rate that they had anticipated.  CW 4 recalled that she and her colleagues acknowledged the targets were ridiculous by the time of DocuSign's QBR meeting—a quarterly internal meeting that she participated in and presented at after joining DocuSign—in February 2021.

148. CW 4 explained that GVP of Customer Success Kim Peretti and SVP of Customer Success Lambert Walsh were the highest-ranking employees at these QBRs.  CW 4 also explained that, at these QBR meetings, which she recalled occurred via Zoom videoconference at the time, she presented (along with others) to Walsh via Google Slides.[24]  In particular, CW 4 recalled that, *at this February 2021 QBR, she presented that DocuSign was exceeding its customer churn numbers and struggling with consumption, i.e., missing its consumption targets* (the numbers discussed above—i.e., only 20% versus the targeted 44% consumption growth).  CW 4 explained that the Customer Success analytics team produced about 120 Google Slides with all the datapoints.  According to CW 4, the meeting participants, including herself,

---

[23] DocuSign's fiscal year 2021 ended on January 31, 2021, and its fiscal year 2022 ended January 31, 2022.

[24] According to CW 4, also presenting at this QBR were Julie Valenti (former Vice President, Customer Success Management), Matt Miller (Senior Director-Customer Success), Whitney Littman (Sr. Director, Customer Success Management), Natalie Power (VP, Global Success at Scale), and other Customer Success leaders.

would go through the slides and add their comments with the business rationale behind the data—i.e., to "tell the story" based on the data analytics in the slides.

149. CW 4 recalled that they "*did not have a good story" to tell* at this February 2021 QBR based on the churn and consumption data analytics that were presented in the meeting, which showed that customer churn was increasing and consumption was decreasing.  With respect to the excessive churn they were seeing at that time, CW 4 elaborated that, at that time, for the current fiscal year, she had forecasted a gross retention rate of *70%-71%,* which she described as "*horrible*."  CW 4 explained that companies typically want to see a gross retention rate of *90%-95%.*  CW 4 further elaborated that this is what they were seeing in terms of the retention and consumption rates for the current fiscal year at the time (i.e., for fiscal year 2022, which began in February 2021) and that this was only getting worse as they looked at forecasts further out in the future, i.e., for the next fiscal year, which would be fiscal 2023.  Moreover, CW 4 commented that those numbers for the next fiscal year, i.e., fiscal 2023, were projected to be "*real ugly,*" and that this indicated *sustained challenges in their book of business*.  CW 4 also noted that there was a correlation between consumption and churn, meaning if a customer is consuming less, they will churn more.

150. Indeed, according to CW 4 by the February 2021 QBR, it was clear to her and others in attendance at this QBR that they were "really struggling," explaining that she meant they were really struggling because of these excessive churn numbers and that they were struggling against their consumption targets (i.e., that they were missing these targets), as discussed above.  CW 4 recalled that Walsh didn't seem shocked by the presentation at the QBR in February 2021.

151. Likewise, CW 10 stated that she joined DocuSign in fall 2020, toward the end of a COVID-19 windfall for the State and Local government/Education ("SLED") team of which she was a part.  CW 10 explained that the SLED team had been the "highest producing team" for

DocuSign in 2020 after COVID-19 began, meaning the team had the biggest sales growth by industry within DocuSign at that time.  But, per CW 10, demand for DocuSign at a state and local level (from her SLED customers) was already on a "*downward slide*" in February 2021, as customers were beginning to return to the office as the pandemic waned and the initial COVID-19 special use case deals were wrapping up.  Indeed, CW 10 added that in February 2021 she saw a "noticeable gap" between closed deals at the time and closed deals the year prior.

152. Further, CW 10 specifically recalled that management seemed concerned about waning demand in February 2021, because they were actively tracking and asking about small ("$5k deals") or deals that were unlikely to close at the time.  CW 10 explained that the focus on small deals suggested they did not have many other options and that they did not have big deals to focus on.

153. In particular, CW 10 stated that *she knew management was concerned about sales problems due to waning demand for DocuSign's products in early 2021*, because management began to "micromanage" sales data in Salesforce.  CW 10 explained that she believes that senior management knew that sales were not going well because they had access to Salesforce, which provided detailed information about sales.  CW 10 added that DocuSign was "very diligent" about using Salesforce.  CW 10 explained that the dashboards in Salesforce showed who entered new pipeline each week, who closed certain deals, and what stage the deals were in (at least for her SLED team, which are the only Salesforce dashboards she had access to).  CW 10 further explained that the second-, third-, and fourth-line managers were always looking at sales deals in various Salesforce dashboards.  According to CW 10, they could see from such sales dashboards when there were no strong pipelines or that sales were not closing or falling out of the pipeline, which would provide indicators of negative sales performance.  CW 10 recalled that one dashboard showed data about customer renewals, which was important because renewals

were among the best upsell opportunities and because DocuSign did not want to lose existing customers.  According to CW 10, based on such sales information in the Salesforce dashboards, *management could tell sales "were not going so well" at the end of the first quarter of calendar year 2021.*

154. As an example of management micromanaging sales data in Salesforce, CW 10 explained what she referred to as the "Red Weekend," which she believes took place sometime between February and early April 2021, when management "went crazy" looking through every single sales deal in Salesforce and "came down hard," including on sales personnel in other regions of the country.[25]  Specifically, CW 10 related how management made all the account executives across the country in the SLED vertical work over the weekend to update Salesforce metrics and ensure that data about every single deal was populated correctly.  CW 10 personally recalled working that entire Sunday updating the relevant sales metrics in Salesforce.

155. CW 10 recalled that management went into a "hysteria" about the sales personnel properly filling out the various sales data in Salesforce.  CW 10 added that she likely coined the term "Red Weekend" to refer to this project because she felt like it was a "blood bath" for sales personnel, and the phrase "may have been repeated."  CW 10 also described this "Red Weekend" as a "top-down" directive from senior management rather than just from her direct managers. CW 10 added that her first and second-line managers told her that upper management would review everything in Salesforce either that day or the following day.  CW 10 suggested that the directive from senior management to the first and second-line managers came from someone above former AVP of Enterprise Sales Cameron Kahn.

---

[25] CW 10 explained that she could only say that the Red Weekend happened to her SLED team nationwide; she was not sure whether the Red Weekend occurred to other verticals.

156. Other CWs described similar sales troubles in February 2021. For example, CW 5 specifically recalled that she took over an account in February 2021 whose contract was up for renewal nine months from then. According to CW 5, when she took over the account in February 2021, she could see their usage was poor and the customer was already telling her they wanted to stop using DocuSign. CW 5 recalled that even before she took over the account, the RVP who had the account previously could tell the customer was unlikely to renew.

157. Similarly, CW 9 said that salespeople were starting to panic around February 2021 because the run-up from COVID-19 was gone *and nobody had new business booked at that point*. Further, CW 9 recalled *40%-50%* of her clients saying at that time that they no longer needed to use DocuSign for COVID-19 use cases now that COVID-19 lockdowns had ended. CW 9 explained that hospitals, which made up the bulk of her clients, traditionally use paper processes, and she recalled that many HR procedures that relied on DocuSign during lockdowns, such as new hire paperwork, went back to using pen and paper as people returned to the office during that time. CW 9 recalled that *the churn was "pretty significant"* with her book of clients.

158. Likewise, CW 7 said that a former colleague, who still works at DocuSign as a Mid-Market Account Manager and is responsible for accounts during renewals and has direct insight into the renewals business, told her in January or February of 2021 that she was "extremely far" from meeting quotas and business was "extremely slow" at that time. CW 7 elaborated that the former colleague told her business had "dried up" at that time as lockdowns lifted and people returned to the office.

159. This alarming decline in demand for DocuSign's products continued into the spring of 2021. In particular, CW 5 recalled that, in spring 2021, she saw one of DocuSign's biggest eSignature deals that had closed just a year prior churn *from $800,000 per annum to $50,000* per annum. This represented a decline of approximately *94%*. CW 5 recalled that a few other

large strategic accounts had been signaling for a long time (at least nine months) that they would churn from $600,000 per annum to maybe $100,000 per annum or nothing.  This represented a decline of approximately *83%.*

### 2.      Increased Competition from Adobe Further Drives Down Demand for eSignature

160.  In addition to the one-time COVID-19 specific demand issues that DocuSign began to experience in 2020, as outlined above, the Company also faced increased competition, primarily from Adobe, from the start of Class Period, further reducing demand for DocuSign's eSignature product.  Indeed, while Defendants publicly downplayed the impact of competition from Adobe, per multiple CWs, throughout the Class Period, DocuSign was in fact losing significant sales to Adobe, which provided a similar but cheaper product called Acrobat Sign.  Indeed, according to CW 5, pricing was "very much" an issue for DocuSign.  Notably, CW 5 attributed much of the churn that DocuSign experienced during the relevant time period to competition and specifically pricing.

161. Multiple CWs detailed these increased competition problems, which further adversely impacted DocuSign eSignature demand and sales growth.  For example, CW 4 recalled that DocuSign was getting "pounded" by competitor Adobe during her time with the Company (summer 2020-spring 2022).  CW 4 recalled that between summer 2020 and June 2021, she was getting on calls with customers and hearing that they had already signed with Adobe.

162. According to CW 4, Adobe was "good enough" for the upmarket customers to leave DocuSign.  CW 4 explained that, when she switched to the Strategic Enterprise customers, the impact from Adobe was even more pronounced.  CW 4 recalled that net retention for the first quarter of fiscal 2022 (beginning in February 2021) *was below 70%* because of DocuSign's sales losses to Adobe.  Further, CW 4 recalled that DocuSign lost $1 million in revenue to Adobe in

the summer of 2021.  CW 4 added that Adobe was significantly cheaper, costing about $.25 on the dollar, as compared to DocuSign's eSignature product.

163. CW 4 elaborated that because her Strategic Enterprise customers were so large, losing even a few of those deals was material.  Further, CW 4 explained that at that time they lost four accounts, worth $1 million in revenue total, to Adobe because of pricing.  CW 4 commented that this was the first time they saw such a "big hit" from Adobe and that this "opened everyone's eyes" internally.  CW 4 recalled that by May or June 2021, she had forecasted a net retention of 73% for those customers, meaning that there had been approximately a 27% decline in retention on the business that was up for renewal.  CW 4 explained that the Strategic Enterprise portfolio was worth $250 million and 40% of the business ($100 million) was up for renewal, meaning she was forecasting losing $27 million of the $100 million up for renewal (since she was forecasting a net retention of 73%).

164. Other CWs corroborated these competition issues from Adobe, including due to its cheaper pricing.  For example, CW 2 stated that Adobe included eSignature features as a free or low-cost addition to its other suite of products, such as Photoshop and Acrobat.  CW 2 noted that DocuSign had features for its eSignature product that Adobe could not match, but many companies did not care about those features and only wanted the free eSignatures.  CW 2 further elaborated that the added features, such as extra security, CLM, Artificial Intelligence, and identity protection resources and anything not directly tied to getting contracts or documents signed – were viewed by customers as not an absolute necessity.  In contrast, CW 2 noted, eSignature capability was a necessity for customers to run their business.  CW 2 further confirmed that customers saw Adobe's eSignature product as a complete substitute for DocuSign's eSignature product, meaning that, to her customers, eSignature could be viewed as a commodity.

165. Similarly, CW 14 said that eSignature was a commodity for some customers, and such customers did not necessarily care what service they used for that. CW 14 explained that Adobe would often undercut DocuSign on eSignature pricing. For example, CW 14 recalled one eSignature customer, which she described as a "very recognizable name," chose Adobe over DocuSign when it came time to expand their contract during the Class Period. CW 14 explained that DocuSign and Adobe then split the business, since DocuSign still had the initial business, but Adobe won the $15,000 expansion opportunity.

166. Likewise, CW 9 described Adobe as an "extremely challenging competitor" because Adobe does not rely on its eSignature business to the extent that DocuSign does and, therefore, can charge less. For example, CW 9 recalled that she attempted for eight months to win Cardinal Health's business from Adobe but ultimately failed because DocuSign could not compete on pricing. CW 9 explained that Cardinal Health could have paid $850,000 for DocuSign's eSignature product or $150,000 for Adobe's eSignature product.

167. Finally, CW 10 also stated that DocuSign faced lots of competition, including Adobe (which she described as its biggest competitor), and that many of their customers in SLED were price-sensitive, meaning they wanted cheaper products and that made it hard for DocuSign to compete with Adobe on price. CW 10 added that Adobe's products were not as good as DocuSign's, but Adobe had a lot of established business and was able to offer a significantly lower price point.

### 3. DocuSign Struggles to Sell CLM from the Outset of the Class Period, Further Undermining Defendants' Claims of Sustainable Growth

168. Given numerous internal signs that the COVID-19-fueled demand for DocuSign's eSignature product was short-lived, the Company needed to pivot in order to sustain the high billings growth that it had been touting to the market. To that end, during the Class Period, the

Company sought to rely on the "expand" portion of its land and expand business model by upselling customers into CLM software that DocuSign had recently launched after acquiring SpringCM. However, according to multiple CWs, from as early as June 2020, the Company was experiencing significant issues selling CLM. These CLM sales struggles thus compounded the slowdown in eSignature sales that began in late 2020, as the CWs described above, further endangering DocuSign's ability to sustain its prior COVID-19-fueled growth.

169. In particular, CW 8, an RVP, explained that she spoke with Alhadeff by phone and through Slack starting a few months into CW 8's tenure about the issues selling CLM. During one of the calls, ***Alhadeff acknowledged to CW 8 around June 2020 that DocuSign was struggling to sell CLM***.

170. Similarly, according to CW 4, DocuSign's sales team was struggling to sell CLM, which was apparent to her when she joined DocuSign in summer 2020, noting that the sales team was better at taking customers' orders than at proactively making a sale. CW 4 recalled that she was told, when she first joined the Company, that DocuSign had a vision for CLM, but the product never seemed to progress during her tenure. CW 4 added that CLM was "not ready for prime time," and DocuSign was struggling to implement the product. CW 4 explained that these CLM implementation struggles included integration issues with the product, which she described as a complex product that needed to be integrated with customers' various internal databases and pull in data from various sources (for example, for contracts).

171. As a result, when DocuSign needed to pivot to sell CLM to sustain the growth it experienced after the COVID-19 pandemic began, it was unable to. Indeed, CW 9 stated that as the COVID-19 demand dried up in early 2021, salespeople were encouraged to sell additional products such as CLM. CW 9 explained that management knew DocuSign was going to struggle to hit its financial targets in 2021 and was looking for ways to grow outside of eSignature. CW

9 recalled that management therefore emphasized the importance of selling CLM products and products from Seal Software, which DocuSign acquired in 2020. Similarly, CW 14 explained that selling CLM and other products that weren't eSignature was a "huge priority" for DocuSign. Likewise, CW 8 recalled that DocuSign was doing everything they could to sell CLM, such as giving double revenue compensation on CLM deals. Such CW accounts confirm Defendants' increasing internal desperation to drive sales, which stood in stark contrast to their positive public assurances of continued growth to investors during the Class Period.

172. However, DocuSign had neither the resources nor the sales staff with the necessary expertise to sell CLM effectively. Indeed, CW 2 described how, once COVID-19 hit, there was a surge in customer demand for the eSignature product. To deal with that surge in demand, CW 2 explained that DocuSign turned its focus away from all its other product offerings. CW 2 described how, due to the pandemic, customers needed eSignatures to continue functioning while working remotely, so DocuSign focused all its sales and business development efforts on its eSignature business. CW 2 characterized that shift as a regression in terms of sales focus, particularly after the Company's pre-COVID-19 efforts to land and expand by selling CLM products after developing customers through its eSignature offerings.

173. In short, while CLM was a huge priority for DocuSign before the COVID-19 pandemic began, DocuSign temporarily de-emphasized CLM sales in 2020 as demand for eSignature skyrocketed during the earliest stages of the pandemic. However, upon seeing eSignature demand waning by 2021 as companies began returning to in-person work, DocuSign once again returned its focus on selling CLM.

174. Indeed, when DocuSign shifted to prioritizing its CLM sales again in 2021, it found that its decisions to focus on eSignature sales at the beginning of the Class Period severely stunted its ability to sell CLM effectively. For example, while DocuSign had originally hired specialized

account executives to sell the Company's CLM product, the Company dissolved that role during the early stages of the COVID-19 pandemic in order to have all sales employees focused on eSignature.  Specifically, CW 10 stated that she was originally hired as a specialist to sell CLM, but the role was dissolved around the end of November or early December 2020 without explanation.  CW 10 described the dissolution of her CLM specialist role as the "rug being pulled out from under her."

175. Similarly, CW 9 recalled that in 2020, DocuSign created specialist roles for people to sell the CLM product.  CW 9 further recalled that in 2021, everyone including herself was tasked with selling the CLM product, while DocuSign went back to having specialists sell it in 2022. CW 9 explained that selling CLM was very different than selling eSignature products, saying it's a sophisticated sale that takes six to nine months to complete.  CW 9 explained that it was a "very costly mistake" to move away from the specialists from SpringCM, which DocuSign had spent hundreds of millions of dollars acquiring, only to revert back to that sales model 12 months later. According to CW 9, the specialists had either left DocuSign or moved into other sales roles in the intervening 12 months.

176. Moreover, a significant portion of DocuSign's customers who purchased DocuSign solely to work remotely during the pandemic had no use for the Company's CLM product. Indeed, the most attractive feature of DocuSign's CLM software to many customers was the ability to directly integrate the product into Salesforce or other CRM tools.  However, for many of the small businesses that signed up for DocuSign during the pandemic, this was irrelevant as they did not use Salesforce or any other CRM tool.  Specifically, CW 7 explained that the draw of SpringCM, the company that DocuSign acquired, and its CLM product was that it could integrate with Salesforce and with a client's CRM tool to ensure that information in their CRM could be pulled quickly and auto populated into an agreement.  CW 7, who was responsible for

sales to small and medium sized businesses, elaborated that most of her clients didn't have a need for the Salesforce integration product, which allowed the clients to centralize and organize contracts in CLM.  Further, CW 7 added that for clients that didn't use Salesforce, the CLM product "didn't make sense."

177. Additionally, while DocuSign's CLM software was optimized to work with Salesforce, the Company experienced significant issues integrating CLM into other CRM tools.  For example, CW 10 said that the Company experienced issues integrating CLM in its customers' systems, which made certain sales difficult.  CW 10 recalled specifically that Google was one of the systems with which DocuSign could not integrate CLM, which led to potential customers going elsewhere.  CW 10 described this as extremely frustrating and disappointing that CLM didn't work with Google, given the prevalence of Google over Microsoft, which was compatible with DocuSign.

178. Similarly, CW 2 described the CLM software as a "turd," at least in terms of integrating it into DocuSign's sales channel.  CW 2 explained it was a larger software product, and that many companies had some form of CLM equivalent for managing their contracts.  CW 2 added that it was very easy for a prospective customer to sign up for a free eSignature demo account; that could be done in about 5 minutes.  In contrast, CW 2 noted that it was much more challenging for a customer to obtain a CLM demo.  It could not be done quickly and the API, or Application Programming Interfaces, required to use the CLM software were not published.  CW 2 further noted that DocuSign's CLM products were very focused on Salesforce's platform and did not work well with SAP's platform.  Finally, as discussed above, CW 4 also corroborated these integration issues with CLM.

179. In sum, during the Class Period, DocuSign's sales struggles with CLM, due to all of the above issues detailed by the CWs, exacerbated the Company's worsening problems with

retaining and growing its prior COVID-19-fueled eSignature business, further undermined Defendants' public assurances of durable growth post-COVID-19.

> **4.    While Knowing That Demand Continued to Decline, Defendants Publicly Continue to Repeat Their False Narrative of Durable Growth in Late 2020 and Early 2021**

180. Though, as described, during the period from December 2020 through April 2021, Defendants continued to see declining demand reflected through adverse sales conditions and in internal metrics and analyses, Defendants repeatedly assured the market that the demand generated during the COVID-19 pandemic was sustainable.  Indeed, as customers followed through on what they had warned DocuSign about at the beginning of the pandemic, in fact leaving DocuSign to return to pen and paper signature processes as they returned to the office, Defendants continued to publicly deny any adverse sales trends, including repeating their refrain that customers do not leave DocuSign once they start using eSignature.

181. For example, on the Company's December 3, 2020 earnings call discussing DocuSign's third quarter 2021 financial results, Springer stated that "*[w]hen customers go from paper-based processes to digital agreement processes, they do not go back.  We believe that trend will hold when the pandemic subsides,* and that DocuSign's value will persist no matter how the future of work unfolds."

182. Additionally, on the same earnings call, when asked how the demand for eSignature was impacting the Company's ability to upsell CLM software, Springer touted the Company's CLM product, explaining that "*Agreement Cloud is right back where we want it to be in terms of top of mind with our customers*" and assuring investors that it would be a driver of the Company's future growth:

> I had a call this morning with a very large customer of ours.  And they said, hey, we're super excited to be now reaccelerating our plans to roll out CLM.  While they had been dramatically increasing their signature usage over the course of the

year, they said, now is the time. ***We're ready to reaccelerate with CLM. And I think that's what we're going to see throughout the next few quarters.***

183. However, unbeknownst to investors, DocuSign's customers were indeed "***go[ing] back" to pen and paper*** signature processes as the pandemic subsided at this time in late 2020 and early 2021. This was particularly true of customers who purchased DocuSign after the COVID-19 pandemic began. Indeed, as described above, DocuSign actively tracked customers who purchased DocuSign before the pandemic separately from customers who purchased DocuSign after the pandemic began, and post-pandemic customers exhibited significantly higher churn rates and lower product usage rates.

184. By December 2020, DocuSign's undisclosed internal product usage metric that functioned as a key sales performance indicator showed that product usage was down significantly for many customers who purchased DocuSign products after the pandemic began, an important red flag that customers would not be renewing their contracts. Specifically, CW 1, who analyzed product usage and other such customer metrics in Snowflake as part of his Principal Analyst role (*see supra* at ¶140), stated that the decline in product usage first became apparent to him in December 2020, shortly after she started at DocuSign. In particular, as discussed above, CW 1 recalled that customer product usage levels for DocuSign's products had declined approximately ***30% year-over-year*** by December 2020, based on internal analyses at the time. Accordingly, a substantial decline in a key internal performance metric was visible as early as December 2020, and continued as the Class Period progressed.

185. Similarly, as detailed above, multiple CWs confirm that Defendants had access to Salesforce, which contained critical metrics showing that ***retention and product usage rates were declining by this time in late 2020.*** This meant that the Company's upsell opportunities with these customers were fading and it was significantly more likely that customers would leave

DocuSign rather than renew their contract, much less purchase more envelopes or DocuSign's CLM product.  Accordingly, Defendants had access to and were aware of information showing that customers were in fact leaving DocuSign and returning to pen and paper processes as the pandemic subsided.

186. Further, Defendants were also aware that DocuSign was experiencing significant competition from Adobe, causing the Company to lose business as a result of Adobe's ability to offer eSignature through its pre-existing suite of products, such as Photoshop and Acrobat, at a substantially reduced price.  Indeed, according to multiple CWs, throughout the Class Period, customers were leaving DocuSign to use Adobe's cheaper product.  Specifically, as described above, DocuSign lost large deals, amounting to at least $1 million in annual revenue as a result of competition from Adobe.

187. Additionally, while Defendants touted that CLM would drive sustainable growth, the Company was unable to effectively sell CLM after the COVID-19 pandemic for multiple reasons, as detailed above.  Accordingly, DocuSign was not "ready to reaccelerate" CLM sales, as Defendants represented at this time in December 2020.  Moreover, given these CLM sales the Company could not rely on CLM to sustain the record growth it experienced during the COVID-19 pandemic.

188. However, Defendants' false narrative continued to assuage investor concerns.  For example, on December 3, 2020, RBC issued an analyst report stating that "[w]hat is even more impressive in our minds is that this is being driven almost entirely by an acceleration of the core eSignature business with *the company being confident . . . that they can maintain growth above pre-pandemic levels in a post-pandemic world.*"  Similarly, a J.P. Morgan report on the same day noted that "DOCU remains the best positioned company in our coverage to retain the

momentum gained during the pandemic if vaccines finally lead to a more open economy and return to office."

189. Defendants continued their false narrative of DocuSign's durable growth as the Class Period progressed.  For instance, on March 1, 2021, Springer participated in the Morgan Stanley Technology, Media and Telecom Conference, where he spoke about the sustainability of the demand DocuSign experienced during the COVID-19 pandemic, again flatly denying that DocuSign's demand and unprecedented growth were temporary.  Specifically, he assured: "*[N]o one's going back to paper and manual process.*  Once you transform your business that way, seeing the value, sort of done the work, right.  Going back to paper, going back to the manual processes and the time lags and the cost increases, *we just don't see people going back in use cases.*"

190. Moreover, as COVID-19 vaccination rates began to climb during the first half of 2021, analysts began to question a how a return to an in-person work environment might impact the demand for DocuSign's products and cause the Company's billings growth to slow.  For example, on March 11, 2021, during DocuSign's earnings call discussing the Company's fourth quarter 2021 financial results, one analyst directly asked Springer "is there any change in the demand environment based on more of a return to normalcy?"  Springer unequivocally denied any such trends, stating, for example, that "*[w]e haven't seen anything*" and "*we haven't seen anything in our business that suggests that, that will change*.  . . . *People aren't going back to paper. They're not going back to manual processing*."

191. Additionally, when asked whether DocuSign saw any changes in competition, Springer downplayed pressures from other eSignature companies: "The second part of your question *around the competitive landscape, we don't think there's been any change.  We always say very*

*aggressively, when we think about competition, we fundamentally think about paper, when we think about paper and manual processes.*"

192. Such statements were directly contrary to extensive internal evidence showing that by this time customers were in fact leaving DocuSign in droves as one-off COVID uses like PPP dried up and many businesses returned to in-person work. Indeed, contrary to this positive public façade, according to CWs, internally DocuSign management at this time was scrambling amid growing panic and hysteria about COVID-fueled demand waning as they drilled down on every potential deal in Salesforce no matter how small. In particular, as described above, by March 2021, not only was there a ***30%*** decline in product usage rates, but customer renewal rates had dropped as well. Further, Defendants were aware that by this time, DocuSign was really struggling given the excessive churn numbers and missed consumption targets, as presented at a February 2021 QBR attended by SVP Walsh—including a customer retention rate of ***only 70-71%, vs. the targeted 90-95%,*** which was considered horrible internally.

193. Further, because many customers who signed up for DocuSign in March 2020 only signed up for one-year contracts, February 2021 marked the time period within which the first wave of post-COVID customers would be renewing (or not renewing) their contracts with DocuSign. As explained above, according to CW 1 the renewal rate for post-pandemic customers was lower than for pre-pandemic customers. Accordingly, contrary to Springer's above statements, customers who purchased DocuSign at the beginning of the COVID-19 pandemic were in fact going back to manual signature processes as the pandemic subsided and Defendants had access to internal metrics showing exactly that. Moreover, Springer's statement downplaying the impact of competition was also false and misleading because, by this time, Adobe was in fact taking substantial business away from DocuSign, as described by CWs above.

Further, CLM was not helping to drive DocuSign's growth, contrary to Defendants' public assurances, given all the CLM sales struggles internally described above.

194. Defendants' statements continued to convince analysts of their false narrative of the sustainability of DocuSign's growth.  For example, on March 12, 2021, William Blair released a report stating: "*[W]e believe DocuSign's recently added customers are likely to continue expanding usage of eSignature and CLM solutions moving forward*.  While customers in other industries may churn following the pandemic, *we do not believe DocuSign will experience any uptick to its normal churn cadence*."

195. That same day, a Morgan Stanley report similarly stated: "*[W]e see a sustainable growth trajectory ahead* with plenty of room for beat/raise quarters" and "[w]e see DOCU's strong competitive positioning *coupled with durable COVID tailwinds* as helping it penetrate a $25B+ mkt oppy while traction of the Agreement Cloud [CLM] drives long-term growth."

### E.   By the Summer of 2021, Defendants Are Well Aware That the Record Demand Generated During COVID Is at an End

196. DocuSign's demand problems continued to deteriorate in the summer of 2021, as many COVID one-off uses had ended and customers' one-year contracts expired amidst a large-scale return to the office.  Indeed, at the time, President Biden had declared the summer of 2021 to be the "summer of freedom" from the COVID-19 pandemic after vaccines had become widely available and over 50% of the population of the United States was fully vaccinated.  Moreover, by that time, most states had either completely lifted their lockdown restrictions or were in the final phases of doing so.  Even California and New York, states that had experienced some of the most devastating effects of the pandemic, had lifted most COVID-19 restrictions by June 15, 2021.  As a result, demand for DocuSign's core eSignature product plummeted even further in the summer of 2021.

197. Numerous CWs confirm that by summer of 2021, internally Defendants were well aware that DocuSign's prior COVID-fueled growth was over.  Indeed, no later than the summer of 2021, internally Defendants actively acknowledged to DocuSign employees that its stock price was artificially inflated due to the market's misimpression about the demand for the Company's products—a misimpression created by Defendants' repeated public assurances that the explosive COVID-fueled demand growth was sustainable, as discussed above.

198. Specifically, CW 1, who throughout her tenure was on monthly or quarterly video conference calls held by DocuSign's CEO, Springer, and other C-Suite members, recalled that around June or July 2021, Springer said at an all-hands meeting that CW 1 participated in that DocuSign stock price was about $50 per share higher than it should have been.  In fact, according to CW 1, DocuSign's inflated valuation was acknowledged by the whole executive board by July 2021.  Likewise, CW 1 recalled hearing from other DocuSign employees that the stock price was extremely high when it should not have been.  CW 1 understood that Springer's comments were in regard to analysts and the investing public being overly optimistic about how DocuSign's stock was performing, and that Springer wanted to manage the employees' expectations as to the company's true value.  CW 1 explained that she knew the reason that the public was overvaluing the Company was due to the COVID "blip," and that, internally, all the Company's employees knew.  CW 1 added that Springer did not directly tie the stock price to reduced demand post-COVID, but that was the employees' understanding regarding why the stock was overvalued.  CW 1 further recalled that the employees' understanding was based on the metrics showing declining demand.

199. Likewise, CW 4 recalled that the churn and consumption numbers discussed above (*see supra* at ¶¶ 147-50) continued to worsen throughout 2021.  In particular, CW 4 noted that these struggles became worse as they got deeper into calendar year 2021, i.e., fiscal year 2022,

explaining that ***these numbers (churn and consumption rates) continued to deteriorate in calendar year 2021, and that this was apparent by the next QBR in 2021, which was in the summer of 2021***.  CW 4 explained that by this time DocuSign was "getting their ass kicked by Adobe."  Specifically, as also discussed above in § IV.E., she recalled that there was one quarter, approximately in the summer of 2021, where they had lost $1 million in revenue to Adobe.  CW 4 added that by summer of 2021, they saw a big churn spike, with a lot of sales losses to Adobe.

200. CW 4 believed that Walsh likely then presented a roll-up of the information that he received at these QBR meetings to the Executive Leadership Team ("ELT"), which included executives like the CEO and CFO.  CW 4 explained that Walsh would meet with the ELT to "manage expectations" based on what he was hearing in the QBRs.  CW 4 further elaborated that Walsh would meet with the ELT regularly to update them on the business and that she believes it was "normal protocol" for Walsh to roll up the information presented at the QBRs to the ELT.

201. CW 4 recalled that she was scheduled to meet with the ELT, including COO Scott Olrich, in the summer of 2021 to explain the trends she was seeing, but she was bumped off the schedule multiple times and never actually met with them.  CW 4 had been told that the goal of that meeting would be to provide context for the churn and consumption challenges that they were seeing in the summer of 2021.

202. Additionally, CW 13 recalled that sales leadership, including AVP Jessica Shane, AVP Justin Gilleg, RVP Kelli Pillino, AVP Anne Wilbur and ***Alhadeff***, discussed all throughout her tenure that 2021 was an "***unprecedented down year***."  CW 13 recalled that those statements began as early as ***June 2021***, when she started at DocuSign, and continued until she left in April 2022.  CW 13 recalled that the statements were made at team meetings and Alhadeff's were made at town halls.

203. CW 3 recalled that in the third quarter of 2021, the Company began to see a slowdown in growth.  CW 3 opined that by the third quarter of 2021, the booking forecast was concerning.  Specifically, CW 3 explained that, in her opinion, one month into the third quarter of 2021, bookings came in weak.  In CW 3's opinion, bookings in the third quarter of 2021 were *alarming.*  Further, CW 3 explained that lower bookings in 2021 led to lower billings and ultimately lower revenue.

204. CW 3 recalled that senior executives at the Company (including Defendant Gaylor ) were made aware that the Company was pacing behind and trending behind historical norms. CW 3 explained that *every forecast iteration that the Company ran and all booking numbers were shared with the senior leaders, including Defendant Gaylor*, *who would then meet with and report such numbers to Springer*.  Further, CW 3 recalled that Defendant Alhadeff was familiar with the booking numbers and was updated on them regularly.  CW 3 also recalled that additional internal financial analyses were given to Defendant Gaylor, which Gaylor then relayed to Defendant Springer, showing that by September 2021, *the Company's internal financial forecasts were in decline in comparison to historical data*.

### F. Despite Knowing of Alarming Internal Data to the Contrary, Defendants Continue to Publicly Deny Any Adverse Trends in Summer and Fall of 2021

205. However, even as these additional internal metrics showed that the demand for DocuSign generated at the height of the COVID-19 pandemic had all but disappeared, Defendants continued to repeat their false narrative regarding the sustainability of the Company's growth.  For example, on June 3, 2021 (which was in the midst of DocuSign's fiscal second quarter 2022), during DocuSign's earnings call reporting on the financial results in the first quarter of fiscal 2022 (ending on April 30, 2021), Springer touted the Company's growth and reiterated his comments regarding the sustainability of that growth, stating that "once businesses

[digitally] transform their agreement processes, *they simply don't go back.  We believe this trend will only accelerate as the anywhere economy continues to emerge.*"  Similarly, later in the same call, Springer stated that "once [customers] see the benefits of the digital transformation, particularly around the Agreement Cloud from having opportunity to grow their business with us, *they don't go back.  In fact, they look for additional opportunities to expand.*"

206. Similarly, on September 2, 2021, during DocuSign's earnings call reporting on the financial results in the second quarter of fiscal 2022 (ending on July 31, 2021) an analyst directly asked Springer if the Company was seeing any adverse trends in product demand to suggest slower billings growth.  In response, Springer denied any such slowdown, including as evidenced by customer churn rates: "We feel like we're seeing a lot of demand . . . *I don't think there's a perspective we have that the business has some significant slowdown . . . we're not seeing any differences in churn rates in any meaningful way . . . customers very rarely leave us*."  As discussed above, these statements were directly contrary to internal evidence known to Defendants by this time, including specifically *excessive churn rates*, which had dropped to a "horrible" 70-71% retention (vs. the targeted 90-95%) by February 2021 and continued to deteriorate later in 2021.

207. Additionally, on September 8, 2021, Gaylor participated in the Wolfe Research Inaugural TMT Conference.  When asked about the "durability" of the growth that DocuSign experienced as a result of the COVID-19 pandemic, Gaylor responded that "*people are not going to go back to pen and paper* once they've signed digitally or once they've been able to do agreements and the different components of agreements, digitally.*"  Later in the discussion, Gaylor further stated "*we think DocuSign is a sustainable business process, right, across the Agreement Cloud,*" referring to CLM, and not just eSignature, as a key driver of DocuSign's growth sustainability.

208. Likewise, during the same conference, when asked about the impact of COVID-related one-time-use cases on DocuSign's growth, Gaylor minimized its significance, stating: "[T]here are some customers who came to us for a specific COVID use case that they no longer have . . . . But *I would say that's the <u>vast minority</u> versus the majority of the motion*."

209. As Defendants made these statements, they continued to conceal the internal metrics showing that demand for DocuSign's products was continuing to decline as the world emerged from the COVID-19 pandemic.  Indeed, as discussed above, in an internal DocuSign townhall meeting, Springer admitted as much, telling employees in June of 2021 that the Company's stock was overvalued at the time.  Further, as explained above, additional internal financial analyses given to Gaylor, which she relayed to Springer—showed, for example, that by September 2021, the Company's internal financial forecasts were alarming.  Indeed, CW 4 recalled that the churn and consumption numbers continued to worsen throughout 2021.  In particular, CW 4 noted that these struggles became worse as they got deeper into calendar year 2021, i.e., fiscal year 2022, explaining that these numbers (churn and consumption rates) continued to deteriorate in calendar year 2021, and that this was apparent by the next QBR in 2021, which was in the summer of 2021.

### G. The Relevant Truth Regarding DocuSign's Unsustainable COVID-Fueled Growth Slowly Emerges

#### 1. DocuSign Reports the Second-Lowest Billings Growth in Company History, but Defendants Continue to Reassure Investors That Demand Remains Durable

210. On December 2, 2021, Defendants were no longer able to hide the waning demand from investors.  As customers stopped renewing their contracts when they returned to their offices and one off COVID-related uses dried up completely, DocuSign's billings growth rate dropped dramatically from its prior record levels.  Specifically, on December 2, 2021, after the market

closed, DocuSign released its financial results for the third quarter 2022 wherein the Company revealed that its year-over-year billings growth had decreased to 28% for the quarter—*half* of the *59%* growth that DocuSign's previously reported in 2020 after COVID began.  At the time, this represented the second lowest billings growth that DocuSign reported as a public company. Moreover, the Company's 28% billings growth rate represented a *35%* decrease from the same quarter a year prior and an 8% decrease from the same quarter immediately preceding the COVID-19 pandemic, meaning that not only was DocuSign far from sustaining the growth that it had experienced during the pandemic, but it was performing even lower than it had before the pandemic.  Compounding DocuSign's disappointing billings growth, DocuSign also announced the departure of former CFO Michael Sheridan, one of the primary executives responsible for setting the Company's billings guidance early in the pandemic.

211. DocuSign also held an earnings call on December 2, 2021, discussing the Company's third quarter 2022 financial results (the "December 2, 2021 Earnings Call").  During that call, Springer admitted that the "primary contributors" to DocuSign's billings miss was slowing demand and a tempering in the urgency of customers' buying patterns.  Moreover, though just months earlier he had denied that "***the business has some significant slowdown[,]***" and that demand would wane post-pandemic when directly pressed by analysts on whether DocuSign's record growth was sustainable, Springer now admitted to the market that Defendants ***always*** expected demand to slow as the COVID-19 pandemic subsided:

> [W]e <u>always</u> *expected there to be a reduction of that really heightened COVID buying*, which drove our growth rates dramatically higher than they had ever been even as we got bigger.  So we expected that.  I think the piece that we didn't expect are really the other 2 factors.  ***So the one is while we would expect people to sort of return to sort of normalcy in purchasing, we didn't realize that they had been sort of well stocked with DocuSign,*** if you will.  And we saw some of that purchasing behavior ***where people were, as you said, in that heightened demand model, probably purchasing more aggressively than we would have seen in the past***.

212. In response, on December 3, 2021, the first trading day following the release of DocuSign's 28% billings growth rate, DocuSign's stock price dropped dramatically, falling $98.73 per share, or *more than 42%*, to close at $135.09.

213. Analysts were shocked by this news.  For example, on December 3, 2021, Citi issued an analyst report describing DocuSign's billings miss as "*one of the biggest SaaS whiffs in recent memory*[.]"  The same day, Wedbush downgraded its rating of DocuSign's stock from "Outperform" to "Neutral," stating that "[l]ast night was *a debacle quarter* from DOCU[,]" and explaining that "we believe the company is seeing *a much more difficult selling environment* as the company expands into broader CLM deals with eSignature going through a major growth transition in the field."  Similarly, Wolfe Research downgraded DocuSign's stock rating to "Peer Perform," noting that "*[t]he billings weakness miss was a result of a return to more normalized purchasing patterns by customers in the [second half]*, as it seems that the [first half] and last year represented a meaningful pull-forward of consumption patterns, while management seemingly took the foot off the glass on new demand generation."  J.P. Morgan similarly downgraded DocuSign from "neutral" to "underweight" noting that "*pandemic tailwinds came to a much faster than expected halt for DocuSign*[.]"

214. Notably, J.P. Morgan issued another analyst report on December 8, 2021, noting that Adobe's financial reporting, due on December 16, 2021, would be an important indicator of DocuSign's continued ability to grow, explaining that "[Adobe] is the #1 competitor to DocuSign, and . . . if Adobe says that it had a very good quarter with Adobe Sign, then the concern will shift to market share shifts and the competitive threat that Adobe poses."  On December 16, 2021, after Adobe announced that it had a "phenomenal" quarter with respect to eSignature, J.P. Morgan issued a follow-up report noting that "*Adobe results now beg the question of whether the competitive dynamics between DocuSign and Adobe have changed*."

Indeed, as Adobe announced a substantial uptick in eSignature sales while DocuSign reported record low growth, investors recognized that DocuSign had in fact experienced adverse competitive "trends" that significantly impacted its billings growth, contrary to Defendants' repeated prior denials.

215. However, even after the Company's December 2, 2021 disclosures, DocuSign's stock price remained artificially inflated as Defendants' continued to reassure the market that demand for the Company's eSignature and CLM products would continue to drive future growth.  In particular, during the December 2, 2021 Earnings Call, Springer assured investors that "*[e]ven as the pandemic subsides and people begin to return to the office, they are not returning to paper.  eSignature and the broader Agreement Cloud are clearly here to stay,* and DocuSign's value will persist no matter how the future of work unfolds."

### 2. Defendants Disclose a Second Consecutive Quarter of Disappointing Billings Growth, Which Declines Below Pre-COVID-19 Levels

216. On March 10, 2022, the relevant truth concerning the temporary, COVID-fueled nature of DocuSign's prior record billings growth was further partially revealed.  Specifically, on March 10, 2022, after the market closed, DocuSign released its financial results for the fourth quarter 2022 wherein the Company revealed that its year-over-year billings growth had decreased to 25% for the quarter—the lowest billings growth DocuSign had ever experienced as a public Company and a 21% decrease from the same quarter a year prior.  Moreover, DocuSign disclosed that its billings guidance for the fiscal year ending January 31, 2023, would be between $2.71 billion and $2.73 billion, representing a substantial slowdown in billings growth.  Additionally, the Company announced the planned resignation of Alhadeff, whose responsibilities as CRO primarily included driving sales within the Company.

217. Also on March 10, 2022, DocuSign held an earnings call, discussing the Company's fourth quarter 2022 financial results.  During that call, Springer attributed the Company's poor billings growth and lower billings guidance to waning demand for the Company's product as companies returned to in-person work environments.  Specifically, Springer stated "[i]n the second half of the year, there were more challenging macro conditions impacting our customers' priorities.  *We saw a diminished level of urgency in their buying patterns*" and "*[a]s we saw urgent demand wane*, we have just begun to shift in our sales motion, back to a demand generation mode of cross-sell, upsell and departmental expansion."

218. On this news, on March 11, 2022, the first trading day following the release of DocuSign's 25% billings growth rate, DocuSign's stock price dropped precipitously, falling $18.87 per share, or *over 20%*, to close at $75.01—the lowest price per share for DocuSign stock since March 2020, thereby erasing the entirety of DocuSign's stock price gains during the COVID-19 pandemic.

219. Analysts were once again caught off guard by the Company's disclosure of its continuing poor billings growth and lower guidance.  For example, on March 11, 2022, Wedbush issued a report explaining that these disappointing financial results revealed the unsustainability of DocuSign's prior record growth that was driven by the COVID-19 pandemic:

> *Last night the demise of the Docusign growth story continued* as the [work-from-home] poster child delivered good January results which were more than offset by very weak and concerning guidance *which speaks to some darker days ahead*.  *Following a trend from the prior quarter the sales environment at DOCU has quickly changed and it appears the pull forward sales activity during* COVID *is making for an incredibly difficult uphill selling environment* in the field and thus slowing down the expansion of CLM deals."

The same day, Morgan Stanley also issued a report similarly explaining that "DocuSign's Q4 underscored that *the growth scare of Q3 was not a one quarter event*[.]"

220. However, even after DocuSign reported a record low billings growth rate, Defendants continued to assure the market that DocuSign's demand generation problems were temporary. For example, on March 10, 2022, during the company's earnings call, Springer again repeated: "*As the pandemic subside[s] and people begin to return to the office, they are not returning to paper.  eSignature is clearly here to stay*, and the movement toward the broader Agreement Cloud will only continue to gain prominence."

### 3. The Relevant Truth Is Fully Revealed When DocuSign Releases Disappointing Growth for the Third Consecutive Quarter and Reduces Billings Guidance

221. On June 9, 2022, the relevant truth concerning the temporary nature of the demand for DocuSign's products during the COVID-19 pandemic was fully revealed.  Specifically, on June 9, 2022, after the market closed, DocuSign released its financial results for the first quarter 2023 wherein the Company revealed that its year-over-year billings growth had decreased to *just 16%* for the quarter—the lowest billings growth DocuSign had ever experienced as a public Company, and the third quarter in a row where the Company experienced disappointing billings growth. Moreover, DocuSign lowered its billings guidance for the second quarter of 2023 by approximately $200 million, representing even lower growth moving forward into the third quarter of 2023.

222. Also on June 9, 2022, DocuSign held an earnings call, discussing the Company's first quarter 2023 financial results, during which Springer attributed the Company's poor billings growth and lower billings guidance to waning demand for the Company's products as businesses returned to in-person work environments.  For example, when asked by one analyst whether the Company's lower billings was the result of macroeconomic conditions, Springer admitted that DocuSign's growth problems were the result of diminished demand, stating: "I think we believe the *larger impact for us is coming off the sort of very aggressive buying that we had during*

*COVID*." Later, on the same call, Springer further elaborated, explaining that the demand the Company experienced during the COVID-19 pandemic was the result of one-off use cases that no longer existed:

> I would agree with the assessment that initially, probably underestimated, *I underestimated sort of the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was*. Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like 6, 7 quarters. *So it wasn't that we were not aware of the dramatic economics of it. I think we just didn't understand what portion of that would be things like onetime use cases or an acceleration where people bought in a more fulsome way*.

223. On this news, the price of DocuSign's stock fell $21.43 per share, or *over 24.5%*, to close at $65.93 on June 10, 2022, the first trading day after the Company's earnings announcement.

224. Analysts were again surprised by DocuSign's dismal growth disclosures and acknowledgment that future quarters would be even worse. However, they finally fully understood that Defendants' promises of sustainable growth could not and would not be fulfilled, and the Company would likely continue to slide even further. For example, on June 10, 2022, Wedbush issued an analyst report noting that DocuSign's billings decline was result of demand declines and the Company's inability to shift to CLM sales:

> Last night, DocuSign delivered yet another disappointing quarter as the company once again lowered billings guidance which continues to overshadow the top-line revenue beat the company experienced this quarter. *The demise of DOCU's growth story continues* as the WFH [work from home] poster child faces new and ongoing complications with the selling environment following COVID's pull forward effect on sales over the previous two years and deceleration of their planned expansion of CLM deals.

Wedbush went on to explain that DocuSign's latest disclosure finally apprised them of the truth regarding DocuSign's growth, stating that "*we believe that the end of DOCU's core growth story is now essentially over* with the clock striking midnight following a billings guidance drop of

~$200 million pointing to an uncertain future for the remainder of FY23." Similarly, William Blair downgraded DocuSign's stock from "Outperform" to "Market Perform" because of DocuSign's "weaker-than expected billings guidance for fiscal 2023."

225. Further, on Friday June 10, 2022, after the market closed, Wolfe Research issued a report downgrading DocuSign stock from "market perform" to "underperform," citing the fact that "[m]anagement disclosed they underestimated the level of pulled forward spending during COVID, and are now seeing customers reduce expansion" and "drastically reducing billings guidance" as the reasons for the downgrade.

226. As the market continued to digest the above disclosures, as reflected, for example, in related analyst commentary and downgrades discussing the extent of the demand and growth problems facing DocuSign, investors continued to react negatively to the news, causing DocuSign's stock price to fall another $6.81, *or over 10%*, to close at $59.12 on Monday June 13, 2022.

## H.    Post-Class Period Developments

227. On June 21, 2022—less than two weeks after DocuSign reported its abysmal billings growth and drastically reduced billings guidance—the Company abruptly announced Springer's resignation. In DocuSign's June 21, 2022 press release addressing Springer's departure, the Company explained that Springer "agreed to step aside" as CEO, effective immediately. Thus, DocuSign made clear that Springer's departure was not voluntary. Moreover, DocuSign's Chairman Maggie Wilderotter immediately took over as the Company's interim CEO, indicating that Springer's departure was abrupt and hasty, before DocuSign could even line up a potential replacement. Indeed, Seeking Alpha, a financial news outlet, described the departure as "sudden and unexpected." As the primary architect of DocuSign's supposed growth strategy during the pandemic who repeatedly and falsely assured investors that such demand and growth were not

temporary COVID-fueled blips, Springer's suspicious departure on the heels of the final corrective disclosure revealing the exact opposite to investors further supports his scienter.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

228. Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of DocuSign's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

229. Throughout the Class Period, Defendants made a series of misrepresentations concerning the sustainability of the unprecedented product demand and billings growth that DocuSign experienced as a result of the COVID-19 pandemic in 2020, while simultaneously omitting material facts indicating that such growth would be short-lived and demand was waning as customers returned to in-person work environments, as detailed below.

### A.    June 4, 2020 – Press Release and 1Q 2021 Earnings Call

230. The Class Period begins on June 4, 2020, when DocuSign held an earnings call discussing the Company's first quarter 2021 financial results (the "June 4, 2020 Earnings Call"). During the call, Springer touted the Company's unprecedented 59% year-over-year billings growth that quarter, attributing the growth to increased demand as a result of the COVID-19 pandemic.  Springer then went on explain that the influx of demand was not one-time in nature, but represented sustainable long-term growth that would continue after the pandemic receded, explaining that:

> We always believed this transformation will happen and that a unifying platform for agreements would be needed.  With COVID-19, it's just happening faster. ***That said, even when the COVID-19 situation is behind us, we don't anticipate***

*customers returning to paper or manual-based processes. Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, <u>they rarely go back</u>.*

231. Similarly, later on the call, in response to an analyst's question about the effect of one-time COVID use cases, such as applications for federal PPP loans, on DocuSign's billings growth, Springer downplayed their impact: "Yes. There definitely will be some examples that are use cases that are more project-oriented or onetime in nature. *We see that as the <u>extreme minority</u>.*"

232. Sheridan later doubled down on Springer's statements regarding the durability of DocuSign's billings growth, stating that "[w]e believe this accelerated growth in new customers and expansion within our installed base was driven by a sudden prioritization of our products, *but we also believe that these customers will remain with us[.]*"

233. Similarly, in response to an analyst question regarding the Company's churn rate for customers who signed up with DocuSign during the pandemic in comparison to Zoom, Sheridan stated that "*[DocuSign's] situation is not analogous to Zoom* . . . [because] *[w]e think [churn is] going to remain pretty stable because we think that the value propositions, again, we're delivering are sustainable, whether it's a work-from-home environment or not."*

234. On that same call, Springer further touted the sustainability of the increase in eSignature sales and that it would also boost sales of the Company's Agreement Cloud, of which CLM was the largest product: "*we expect the adoption of our core eSignature offering by new customers and the expansion of use cases by existing ones to continue. This also acts as the on-ramp for the adoption of other agreement cloud products, sometimes at the same time and sometimes as follow-ons.*"

235. Later on the call, Springer further asserted that the Company had a significant pipeline of customers ready to adopt its CLM product, stating that "it's not like we're thinking about the

CLM sale opportunity and saying, well, we can't go talk to someone for CLM, other than the people that joined last quarter with Signature, *we've got years of Signature customers that have sort of a pent-up opportunity for us to bring the Agreement Cloud, and that's where we're really focused today.*"

236. Defendants' June 4, 2020 statements were false and misleading because contrary to their public statements touting the sustainability of the demand for DocuSign's products and the Company's billings growth while downplaying any adverse sales conditions, the Company was experiencing multiple adverse sales conditions, which Defendants knew or recklessly disregarded would cause the Company's billings growth to decline once the demand driven by the COVID-19 pandemic subsided.  Specifically, according to numerous CWs, Defendants were aware during the Class Period that: (i) customers informed DocuSign at the beginning of the Class Period that they did not intend to (and ultimately did not) renew their contracts with DocuSign once they were able to return to their offices, as reflected in low product usage rates that were apparent internally by the start of the Class Period; (ii) much of the eSignature sales growth that DocuSign experienced during the COVID-19 pandemic was the result of one-off COVID-19-related use cases that would not recur after the pandemic ended; (iii) from the beginning of the Class Period, customers were signing up for short-term, one-year eSignature contracts—in contrast to the three-year contracts that DocuSign tried to push; (iv) DocuSign's sales of its new CLM product were also struggling to take off, as Alhadeff acknowledged internally no later than June 2020, including because it was a complex software that had significant integration issues with customers' platforms; and (v) throughout the Class Period, DocuSign was losing substantial  eSignature business to Adobe, a cheaper competitor.

237. Specifically, by June 4, 2020, DocuSign was already experiencing significant red flags showing that customers who purchased DocuSign's products as a result of the COVID-19

pandemic would not remain long-term customers for DocuSign. For example, CW 7, a former Account Executive – Small and Medium-sized Business, recalled that there were "absolutely" indications before she left DocuSign in June 2020 that demand eventually would dry up, saying that customers told her they would not renew their contracts after they returned to the office. Such customer feedback, as corroborated by other CWs, *see* § IV.C.1 *supra*, directly contradict Defendants' assurances that customers would not "***return[] to paper or manual-based processes***" once the pandemic ended as "***they rarely go back***," and that "***customers will remain with us[.]***"

238. Further, as discussed above, *see* § IV.C.2 *supra*, Springer's statement that customers "***rarely go back***" to pen and paper after beginning to use DocuSign was predicated on flawed pre-COVID-19 metrics, which were not updated until over a year after the pandemic began, and were not representative of customers who signed up during the pandemic. Indeed, while pre-pandemic customers chose to shift their signature processes to DocuSign, customers who signed up after the pandemic began did so out of necessity for one-off COVID-related uses or only temporarily while forced to work remotely, and thus did not behave in the same manner. Thus, Springer's statement was false for the additional reason that he knowingly relied on outdated retention metrics.

239. Similarly, much of the business that DocuSign received during the COVID-19 pandemic consisted of one-off uses cases directly related to the pandemic, such as PPP loans in 2020, which would not recur once the pandemic subsided—directly contrary to Defendants' statements above, for example, representing that such one-off use COVID cases were the "***extreme minority***." For example, as explained above, *see* ¶¶ 102-03 *supra,* certain large companies, such as Door Dash and Uber, used DocuSign during lockdowns in order to complete paperwork that normally would have been done in person, such as forms related to hiring and firing. Further, companies also

needed to use DocuSign to sign paperwork specifically related to the COVID-19 pandemic, such as forms related to COVID testing consent and the like.

240. In addition, as detailed above *see* § IV.C.1.(b) *supra*, new customers refused to sign long-term, three-year contracts with DocuSign that sales personnel pushed, instead signing up for one-year contracts to ensure the flexibility to move back to pen and paper processes once they returned to the office, directly contrary to Defendants' assurances above that, for example, they would not "***return[] to paper or manual-based processes***."

241. Moreover, the statements above in paragraphs 234 and 235 touting the Company's ability to sell its CLM were also false and misleading because DocuSign struggled to sell CLM from the beginning of the Class Period, for a variety of reasons, including primarily that DocuSign lacked both the infrastructure and personnel necessary to adequately sell CLM as a result of the Company's decision to move its resources away from CLM to eSignature at the beginning of the COVID-19 pandemic.  In particular, as a result of the influx of demand for DocuSign's eSignature product, the Company temporarily abandoned its CLM sales to focus on eSignature during this time, as discussed above, *see* § IV.D.3 *supra*.  Moreover, a significant portion of DocuSign's customers who purchased DocuSign solely while forced to work remotely during the pandemic had no use for the Company's CLM product.  Indeed, as discussed above, *see id.*, the most attractive feature of DocuSign's CLM software to many customers was the ability to directly integrate the product into Salesforce or other CRM tools.  However, for many of the small businesses that signed up for DocuSign during the pandemic, this was irrelevant as they did not use Salesforce or any other CRM tool.  Moreover, the CLM software had significant integration issues. *Id.*

242. Analysts were convinced by Defendants' assurances regarding the sustainability of DocuSign's billings growth.  For example, on June 4, 2020, RBC issued an analyst report stating

that "[w]hile COVID benefited the quarter, *we believe demand trends are durable* and pipeline strong" and "[w]hile the narrative around a very strong quarter and conservative guide is a simplistic summary of events we think the bigger multi-year investment opportunity is increasingly more obvious to us.  Once a customer starts DocuSigning, *they don't go back to paper, they become a target for upsell for CLM[.]*"  On the same day, Piper Sandler additionally noted that "[a]s e-signature drives customer growth, *cross-selling opportunities for Agreement Cloud products are increasing.  We believe that these trends will continue to benefit the company moving forward and into the post-COVID environment* as remote work and reduced travel become the new normal for many organizations."  Similarly, on June 5, 2020, Deutsche Bank noted that "*[e]ven more encouraging is DocuSign's messaging that the quarter was strong excluding the tailwinds from the pandemic and that new customers and expansions realized in this environment are here to stay*."  Further, with respect to the Company's CLM product, on June 5, 2020, Evercore ISI explained "[t]he company had an extremely impressive quarter in the eSignature business, and noted that due to their land and expand model which is typically le[d] with the eSignature product, *this will bode well for further CLM expansions over the next 3-4 quarters*."

### B.     June 10, 2020 – William Blair Growth Stock Conference

243. On June 10, 2020, Springer participated in the William Blair Growth Stock Conference where he spoke about the effect of the COVID-19 pandemic on DocuSign's billings growth.  Specifically, when an analyst asked about the "sustainability" of the Company's billings growth, Springer responded as follows, downplaying the impact that temporary one-off use COVID-19 cases had on driving DocuSign's record growth:

> *While there are some COVID-19 very specific use cases* that we could imagine that might happen to, *the majority of the things that we've seen has just been an acceleration*.  People have taken the road map they had, what they wanted to do when they pulled that forward because they're in a work-from-home situation,

certain use cases needed to get done very quickly in that format. So from that standpoint, we feel pretty bullish about the growth prospects.

244. Springer's June 10, 2020 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, herein. Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

245. Analysts were again encouraged by Defendants' reassurances that DocuSign's record growth was not a temporary blip driven by the COVID-19 pandemic. For example, on June 24, 2020, Oppenheimer issued an analyst report echoing Defendants' statements regarding the sustainability of DocuSign's growth, stating that "[w]e believe its value proposition is compelling and that *organizations that adopt DocuSign will never revert to old workflows*" and "as work begins to normalize, the usage of some of these [work-from-home] applications may taper back versus the high water marks seen during the pandemic. *We believe DocuSign will be mostly immune to this.*"

C.    September 3, 2020 2Q 2021 Earnings Call

246. On September 3, 2020, DocuSign held an earnings call discussing the Company's second quarter 2021 financial results (the "September 3, 2020 Earnings Call"). During that call, Springer touted the Company's 61% year-over-year billings growth that quarter and reiterated his comments from the previous quarter regarding the sustainability of that growth, stating:

> I spoke last quarter about how so many of [DocuSign's customers] faced a sudden need to transition to remote work when the pandemic first hit. Today, that need has evolved from an initial crisis response to a business necessity. And because agreements are central to doing business, the need to agree electronically and remotely has never been stronger. This is causing greater adoption of our offerings, *something we believe will persist beyond the crisis. Because in our experience, it's very rare to see anyone go back to paper once they've gone digital.*

247. During the same call, Springer continued to tout the sustainability of the unprecedented demand that DocuSign experienced at the beginning of the pandemic explaining that:

> Our operating margins and cash flows reached record levels, while we continue to make key investments to address the heightened demand.  As is evident from these numbers, ***the trends that emerged in the latter half of Q1 have continued throughout Q2.  We've seen a sustained rise in demand for our core eSignature offering***, not only from new customers, but also those expanding across use cases, departments and borders.

248. Later, during the same call, Springer doubled down on such assurances, explaining that "[i]t is our view that . . . there's a greater awareness of need to digitize the business.  ***And we believe that, that's going to be sustained even after things return to whatever normal looks like in the future . . . we don't see trends that things are going to return to the way they looked and trended pre-COVID***."

249. Defendants' September 3, 2020 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, herein.  In particular, Springer's statement denying seeing any adverse "trends that things are going to return to the way they looked and trended pre-COVID" was false and misleading because by this point they were aware of adverse sales indications, including customer reports that they would return to pen and paper after the pandemic, the fact that most were signing up only for short-term, one-year contracts, and declining product usage metrics indicating that customers would not be renewing their DocuSign contracts.  Moreover, Springer's statement that "***it's very rare to see anyone go back to paper once they've gone digital***" also was misleading in that he failed to disclose that the Company was relying on flawed pre-COVID customer metrics, as detailed above, *see* § IV.C.2. *supra*, which were not representative of post-COVID customers.  Indeed, as discussed above, Springer was using historical customer retention rates—using pre-COVID numbers—as a guide for forecasting what future growth and retention rates would be.

250. Defendants' statements continued to reassure analysts of the long-term sustainability of DocuSign's growth.  For example, on September 3, 2020, RBC issued a report noting that "*[w]hen asked on the call back about the durability of bookings success, management noted that no one was nervous about the company's ability to execute*.  Additionally, *the company believes that there is a 'new normal' that will benefit the company even after the pandemic subsides*[.]" Based on these representations, RBC further concluded: "*[w]e believe a premium is warranted given the durable, accelerating trends* around digital workflows which we believe DOCU is uniquely poised to benefit from *over a multi-year period.*"

251. Similarly, on September 4, 2020, Oppenheimer released a report stating that "[w]e think the *Agreement Cloud and the flagship eSignature product will drive durable growth for the foreseeable future* that will result in DocuSign becoming a much bigger and more profitable business."

## D.     September 9, 2020 – DA Davidson Software and Internet Conference

252. On September 9, 2020, Springer participated in the DA Davidson Software and Internet Conference.  During that conference, analysts specifically asked Springer about the impact of competition from Adobe on DocuSign's sales.  In response, Springer downplayed the effect of Adobe's competition on DocuSign's business: "[W]hen you think about the question around the competitiveness, we do really thoughtful analysis every quarter *. . . .  There has been virtually no change since we've been a public company, 10 quarters in, and we're just not seeing it.*" Springer went on to explain that Company's main competition was in fact pen and paper processes, rather than any eSignature provider, stating: "We talk about it very clearly.  It sounds sometimes like a little tough to achieve, but we mean it very straightforward, *which is our biggest competitor is paper* . . .  That's what we have to make sure we can beat and show the dramatic ROI benefit, and the rest of it takes care."

253. Springer's September 9, 2020 statements minimizing the impact of competitors such as Adobe on the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, herein.  In particular, such statements were directly contradicted by CW statements above describing the adverse impact of Adobe's cheaper products on DocuSign's sales, including that Adobe was able to offer its eSignature product at a significantly reduced rate by bundling it with its Photoshop and Acrobat software.  *See* § IV.D.2. *supra*. Moreover, because customers saw eSignature as a commodity, such that either product was considered a comparable substitute for the other, the lower priced option from Adobe was significantly more attractive than DocuSign's purportedly superior, but much more expensive, product.  Indeed, as a result, DocuSign lost millions of dollars' worth of eSignature sales to Adobe throughout the Class Period, as detailed above. *Id.*  Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

### E.    September 14, 2020 Deutsche Bank Virtual Technology Conference

254. On September 14, 2020, Springer participated in the Deutsche Bank Virtual Technology Conference where he talked about the sustainability of DocuSign's billings growth.  When asked whether demand was beginning to "normalize" back to pre-COVID levels, Springer emphatically responded: "[W]e feel very strongly that once people have gone digital from their paper-and-manual-based processes, ***they don't go back.  No one's going to***." He further explained: "When you get back in the office, you don't go, 'Yes, I'd love to go back to that thing again where I typewrite a letter and mail it out.' ***It just doesn't happen,*** yes, so we feel pretty confident that those use cases that have accelerated, as you articulated it, ***they're here for the long term.***"

255. Similarly, when asked about any changes in competition from Adobe and other eSignature providers, Springer replied:

> *[W]e haven't seen a lot of change.*  And every quarter, we do a detailed analysis right before earnings" and "we go through this analysis.  When we look at our pricing, we look at by geography.  We look at it by vertical.  We look at it by the industry size, trying to understand if there's anything changing.  *We haven't seen a lot of change . . . .*  So it doesn't mean we'll never see it, *but we haven't yet.*

256. Springer's September 14, 2020 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, herein.  Similarly, Springer's statements regarding competition with Adobe were false and misleading for the reasons set forth in paragraph 253, herein.  Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

## F.     September 15, 2020 – Jefferies Software Virtual Conference

257. On September 15, 2020, Springer participated in the Jefferies Software Virtual Conference.  During that conference, Springer was asked about the "durability" of the "digital transformation" many businesses had experienced because of COVID-19.  Springer responded with a self-described "incredibly high degree of confidence" that:

> [F]or the transformation we've had to date, there's been a lot of questions about if people brought stuff into the DocuSign world, that once we're in a -- whatever a new normal might look like, not everyone's working from home, will somewhat pull back.  *And I feel very strongly the answer is people don't go back*" and "*we don't feel there's a sense of stuff that's accelerated this year would disappear.*"

258. Springer's September 15, 2020 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, herein.  Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

### G.        December 3, 2020 – 3Q 2021 Earnings Call

259. On December 3, 2020, DocuSign held an earnings call discussing the Company's third quarter 2021 financial results (the "December 3, 2020 Earnings Call").  During that call, Springer touted the Company's 63% year-over-year billings growth that quarter and reiterated his comments regarding the sustainability of that growth, stating: "DocuSign's value proposition remains strong, ***whether customers began using our product before or after the pandemic began.  We don't see customers going back to pen and paper.***"

260. Later, during the same call Springer doubled down on this statement, assuring investors: "when customers go from paper-based processes to digital agreement processes, ***they do not go back.  We believe that trend will hold when the pandemic subsides,*** and that DocuSign's value will persist no matter how the future of work unfolds.*"*

261. Similarly, when asked whether the demand for the Company's eSignature product had been "pulled forward" by the pandemic, such that demand in later quarters would decrease, Springer assured investors this was not the case, stating: "We're just executing at a higher rate today.  ***And so we've accelerated that growth not because we're sort of robbing from the future, but we're just getting closer towards that $25 billion TAM opportunity.***"

262. Additionally, when asked how the demand for eSignature was impacting the Company's ability to upsell CLM software, Springer touted the Company's CLM product, explaining that "***Agreement Cloud is right back where we want it to be in terms of top of mind with our customers***" and assuring investors that it would be a driver of the Company's future growth:

> I had a call this morning with a very large customer of ours.  And they said, hey, we;re super excited to be now reaccelerating our plans to roll out CLM.  While they had been dramatically increasing their signature usage over the course of the year, they said, now is the time.  We're ready to reaccelerate with CLM.  ***And I think that's what we're going to see throughout the next few quarters.***

263. In addition to the reasons set forth in paragraphs 236-40, herein, Springer's December 3, 2020 statements were false and misleading because, by December 2020, DocuSign had internal metrics and reports showing that demand was decreasing rapidly.  In particular, as discussed above, *see* §§ IV. C and IV.D.1 *supra*, clients continued to tell DocuSign sales employees that they would be returning to pen and paper signature processes as they were able to return to the office.  Further, by December 2020, DocuSign's undisclosed internal metrics showed that product usage was down significantly for many customers who purchased DocuSign products after the pandemic began, an important red flag that customers would not be renewing their contracts.  Specifically, as discussed above, CW 1 recalled that customer product usage levels for DocuSign's products had declined approximately ***30%*** year-over-year by December 2020.

264. Defendants' false narrative continued to assuage market concerns about the durability of DocuSign's growth.  For example, on December 3, 2020, RBC issued an analyst report stating that: "What is even more impressive in our minds is that this is being driven almost entirely by an acceleration of the core eSignature business with ***the company being confident . . . that they can maintain growth above pre-pandemic levels in a post-pandemic world***."

265. Similarly, on the same day, J.P. Morgan issued a report noting that "DOCU remains the best positioned company in our coverage to retain the momentum gained during the pandemic if vaccines finally lead to a more open economy and return to office."

## H.    January 11, 2021 – Needham Virtual Growth Conference

266. On January 11, 2021, Gaylor  participated in the Needham Virtual Growth Conference. During the conference, Gaylor   discussed the increased demand for DocuSign's eSignature product and reiterated its sustainability:

> I think the great news for DocuSign is we believe that the acceleration to digital is, it's just ***the pandemic really accelerated what people were otherwise going to do.  And so it's not kind of a one and done sort of mentality.  It's really a kind of progression of things that were going to happen over a period of time . . . .***

AMENDED CLASS ACTION COMPLAINT
CASE NO. 22-CV-00824-WHO

We saw that kind of in mid-Q1 into Q2 and some in Q3 as well, and we kind of *continue to see that accelerated demand. But we believe it's kind of once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience and are in the kind of more digitized experience.* So we've certainly been a beneficiary of that demand, but *we also believe that, that demand will continue.* It may just not continue at the pace that we saw earlier this year.

Gaylor reiterated this statement later at the conference, stating "[a]s I said*, people, once they move on to our platform and into kind of our product portfolio, they don't tend to go back to pen and paper.*"

267. Gaylor 's January 11, 2021, statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40 and 263, herein.   Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

**I.   March 1, 2021 – Morgan Stanley Technology, Media and Telecom Conference**

268. On March 1, 2021, Springer participated in the Morgan Stanley Technology, Media and Telecom Conference.   During the conference, Springer spoke about the sustainability of the demand DocuSign experienced during the COVID-19 pandemic:

And when I think about going forward, we think 2 big things.  One, people are going to continue to accelerate on their digital transformations because they're seeing the incredibly high -- higher ROI.  So that's for sure one.  Second is *no one's going back to paper and manual process.*  Once you transform your business that way, seeing the value, sort of done the work, right.  *Going back to paper, going back to the manual processes and the time lags and the cost increases, we just don't see people going back in use cases.*

269. In addition to the reasons set forth in paragraphs 236-40 and 263, herein, Springer's March 1, 2021 statements were false and misleading because the Company was internally aware of several additional concealed metrics showing that demand for DocuSign's products was waning as the pandemic began to recede and business began to return to an in-person work

environment.  Specifically, as discussed above, *see* § IV.D.1 *supra*, CW 1 stated that by February 2021, internal analyses showed that product usage and renewal rates were declining across the board for all of DocuSign's products and all of its customers, providing critical "warning signs" that the Company would not be able to sustain the demand generated during the COVID-19 pandemic.  Further, the Company also began to see declines in retention rates for customers who purchased DocuSign after the COVID-19 pandemic began.  Indeed, because many customers who signed up for DocuSign in March 2020 only signed up for one-year contracts, February 2021 marked the time period within which the first wave of post-COVID customers would be renewing (or not renewing) their contracts with DocuSign.  Specifically, CW 1 recalled that the customers that signed up during the pandemic had a higher churn rate and a steeper drop off in usage.

270. Similarly, as discussed above, *see id.*, multiple CWs confirm that by this time in March 2021, DocuSign customers were leaving in droves, as vaccines rolled out and pandemic restrictions began to subside.  Indeed, clients who had purchased DocuSign for one-off COVID-specific use cases no longer needed to use eSignature as those uses began to dissipate.  For example, CW 1 recalled that by February 2021, initial internal analyses showed that not only product usage, but also customer renewal rates were declining for all segments and all customers—declines she described as "warning signs."  Likewise, according to CW 4, at that time, for the current fiscal year, she had forecasted a gross retention rate of 70%-71% (vs. the typical 90-95% rate), which she described as "horrible."  Indeed, according to CW 4 by the February 2021 QBR, it was clear to her and others in attendance at this QBR that they were "really struggling," explaining that she meant they were really struggling because of these excessive churn numbers and that they were struggling against their consumption targets (i.e., that they were missing these targets), as discussed above.  CW 4 further explained that this is what they were seeing in terms of the retention and consumption rates for the current fiscal year

at the time (i.e., for fiscal year 2022, which began in February 2021) and that this was only getting worse as they looked at forecasts further out in the future, i.e., for the next fiscal year, which would be fiscal 2023.  CW 4 further commented that those numbers for the next fiscal year, i.e., fiscal 2023, were projected to be "real ugly," and that this indicated sustained challenges in their book of business.  Further, according to CW 10, based on sales information in the Salesforce dashboards, management could tell sales "were not going so well" at the end of the first quarter of calendar year 2021.  These sales issues only grew worse in early 2021, as was readily apparent to management based on the sales metrics in Salesforce.  *See Id.*  Indeed, CW 10 recalled that management went into a "hysteria" about the sales personnel properly filling out the various sales data in Salesforce.  Other CWs corroborated such statements.  Similarly, CW 9 said that salespeople were starting to panic around February 2021 because the run-up from COVID was gone and nobody had new business booked at that point.  CW 9 also recalled that the churn was "pretty significant" with her book of clients.

271. Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

**J.      March 11, 2021 – 4Q 2021 Earnings Call**

272. On March 11, 2021, DocuSign held an earnings call discussing the Company's fourth quarter 2021 financial results (the "March 11, 2021 Earnings Call").  During that call, Springer touted the Company's 46% year-over-year billings growth that quarter and reiterated his comments regarding the sustainability of that growth, stating that "***we don't believe our new or expanded customers will be going back to paper even after the pandemic recedes***."

273. Similarly, in response to an analyst's question about whether Defendants were seeing "any change in the demand environment based on more of a return to normalcy" given the

COVID-19 vaccine campaign had begun in late 2020, Springer repeatedly denied any such adverse trends:

> ***We haven't seen anything.*** I don't know whether we would be a leading or a lagging indicator, Pat. But ***we haven't seen anything in our business that suggests that, that will change***. Now if you recall, we've said this about -- starting about 3/4 ago, that our forecast on this is that the people that have come with new customers or new use cases to DocuSign that are COVID-19-centric, ***they're not going back. People aren't going back to paper. They're not going back to manual processing***. So, the real question, I think, is interesting in your question is, will that rate of new people coming to us change with -- as we start to move into some sort of return to "normalcy". ***We haven't seen any change yet***. And maybe that the change isn't enough and there's not enough new activity to have driven the change in the demand environment. ***But at this point, yes, we haven't seen a change yet.***

274. Additionally, when asked whether DocuSign saw any changes in competition, Springer downplayed pressures from other eSignature companies, stating: "The second part of your question ***around the competitive landscape, we don't think there's been any change. We always say very aggressively, when we think about competition, we fundamentally think about paper, when we think about paper and manual processes.***" Springer later on the call reiterated this statement, stating that "[w]e have such a dramatic market share lead and, quite frankly, product capability lead in eSignature that it's – there's just ***– the competition, I said, is paper.***"

275. Defendants' March 11, 2021 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, 263, and 269-70 herein. Similarly, Defendants statements downplaying competition from Adobe, including specifically denying "any change" in the "competitive landscape," were false and misleading for the reasons set forth in paragraph 253, herein.

276. Analysts again were comforted by Defendants' reassurances about the continued sustainability of DocuSign's growth after the pandemic. For example, on March 12, 2021, William Blair released an analyst report stating that "we believe DocuSign's recently added customers are likely to continue expanding usage of eSignature and CLM solutions moving

forward.  While customers in other industries may churn following the pandemic, ***we do not believe DocuSign will experience any uptick to its normal churn cadence.***"

277. That same day, Morgan Stanley issued a report similarly stating that "***we see a sustainable growth trajectory ahead*** with plenty of room for beat/raise quarters."  Morgan Stanley was also encouraged by Defendants' statements denying any adverse competitive trends, noting that "[w]e see ***DOCU's strong competitive positioning*** coupled with ***durable*** COVID tailwinds as helping it penetrate a $25B+ mkt oppy while traction of the Agreement Cloud ***drives long-term growth***."

**K.      March 24, 2021 – DocuSign Virtual Financial Analyst Day**

278. On March 24, 2021, DocuSign hosted its first "analyst day," during which Gaylor interviewed Springer about a variety of topics impacting DocuSign's business.  While asking her first question to Springer, Gaylor  stated that "***the permanence of the trends we've been seeing across the business look like they're really here to stay.***"

279. Later during that same interview, Gaylor  asked Springer about the demand for products outside of eSignature, such as CLM software.  In response, Springer touted CLM as a significant driver of DocuSign's future growth, stating that "we see ***particularly in CLM and CLM+[26]. . . . That's going to be a real growth area for us.  And I think we're going to see that really kick off in fiscal year '22 to start to reaccelerate, and that will become noticeable as a growth driver in our business literally this year.***"

---

[26] CLM+ is the same as the Company's traditional CLM product but includes advanced analytics and artificial intelligence capabilities.

280. Similarly, during the investor Q&A portion of the interview, Springer was specifically asked about "how investors should think about DocuSign post-pandemic" and the "sustainability of [the Company's] growth[,]" to which he responded:

> One is that the transformation that our customers are undergoing and leveraging DocuSign to drive, ***this is not a short-term thing.  This is not something that just sort of happened because of the pandemic***.  This is something that was happening and it's been happening for years, and ***we believe it's going to continue to happen for years***.  We think that what we've seen happen, because of the pandemic, is that ***we've seen sort of a onetime step-up where people actually accelerated their transformation at a faster rate***. . . .  But we are pleased to see that the core things that were driving that, the transformations, the ROI people are getting, the roadmaps that our customers are showing us about all the additional things they want to do, that's just with eSignature as well as the rest of the DocuSign Agreement Cloud.  We feel that we're so early in the TAM, and we have a significant amount of time ahead of us for this kind of very aggressive growth.

281. Additionally, during the same call one analyst asked whether there was a change in the competitive landscape with regard to DocuSign's competition with Adobe.  In response, Alhadeff downplayed competition from Adobe, stating that "I think in general, ***we don't see a big change in the competitive dynamic with Adobe***."

282. Further, during the Q&A portion of the presentation, Gaylor  responded to a question regarding CLM, stating that "***it is a huge part of our future in terms of how we're going to grow revenue over time.  And kind of sustain our growth over a long period of time.***"

283. Defendants' March 24, 2021 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, 263, and 269-70 herein.  Similarly, Alhadeff's statements in paragraph 281 denying "a big change in the competitive dynamic with Adobe" were false and misleading for the reasons set forth in paragraph 253, herein.  Further, Defendants' statements in paragraphs 279 and 282 touting CLM as a driver of DocuSign's sustainable growth were false and misleading for the reasons set forth in paragraph 241, *supra*.

### L.        March 31, 2021 – Alhadeff Tweet

284. On March 31, 2012, Alhadeff issued a public "tweet," or post, on the social media platform, Twitter, with a link to a news article discussing the surge in demand for DocuSign's eSignature product, stating: "***I don't see levels of adoption @DocuSign changing significantly post-pandemic.*** Once a company sees the benefits of a digital process, there's multiple reasons to stay with it."

285. Alhadeff's March 31, 2021 statement touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, 263, and 269-270 herein.  Indeed, by this time Alhadeff was well aware of the declining demand for DocuSign's products.  For example, CW 3 recalled that Alhadeff was familiar with the booking numbers and was updated on them regularly.  As described above, by this time, such forecasts and other metrics showed significant sales declines.  *See* § IV.D.1., *supra*. Additionally, Alhadeff's March 31, 2021 statement was not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

### M.        June 3, 2021 – 1Q 2022 Earnings Call

286. On June 3, 2021, DocuSign held an earnings call discussing the Company's first quarter 2022 financial results (the "June 3, 2021 Earnings Call").  During that call, Springer touted the Company's growth and reiterated his comments regarding the sustainability of that growth, stating that "***once businesses digitally transform their agreement processes, they simply don't go back.  We believe this trend will only accelerate as the anywhere economy continues to emerge.***" Similarly, later in the same call, Springer stated that "***once [customers] see the benefits of the digital transformation, particularly, around the Agreement Cloud from having***

*opportunity to grow their business with us, they don''t go back.  In fact, they look for additional opportunities to expand.*"

287.  In addition to the reasons set forth in paragraphs 236-40, 263, and 269-70 *supra,* Defendants' June 3, 2021 statements touting the sustainability of the demand for DocuSign's products were false and misleading because, as discussed above in § IV.E *supra*, by the summer of 2021, the demand for DocuSign's products had further plummeted and, internally, Defendants recognized DocuSign's prior COVID-fueled growth was over.  For instance, CW 4 recalled that the churn and consumption numbers continued to worsen throughout 2021.  In particular, CW 4 noted that these struggles became worse as they got deeper into calendar year 2021, i.e., fiscal year 2022, explaining that these numbers (churn and consumption rates) continued to deteriorate in calendar year 2021, and that this was apparent by a QBR in the summer of 2021.  CW 4 explained that by this time DocuSign was "getting their ass kicked by Adobe." Specifically, she recalled that there was one quarter, approximately in the summer 2021, where they had lost $1 million in revenue to Adobe.  CW 4 added that by summer of 2021, they saw a big churn spike, with a lot of sales losses to Adobe.  CW 4 elaborated that because her Strategic Enterprise customers were so large, losing even a few of those deals was material.  CW 4 further explained that at that time they lost four accounts, worth $1 million in revenue total, to Adobe because of pricing.

### N.     June 10, 2021 – Robert W. Baird Global Consumer, Technology & Services Conference

288. On June 10, 2021, Gaylor  participated in the Robert W. Baird Global Consumer, Technology & Services Conference.   When asked by an analyst whether DocuSign was experiencing any "moderation" in demand as the COVID-19 pandemic waned, Gaylor  denied

any slowdown, assuring that "once people move to the platform and they see the value, ***they're not going to go back and move to pen and paper, right?***"

289. Later during the same conference, Gaylor  was asked about the impact of competition on DocuSign's business, to which she replied: "[W]e do look at the competitive landscape quite closely as it relates to the Agreement Cloud but also just in eSignature.  ***But I'd say there hasn't been really a changing dynamics***."

290. Gaylor 's June 10, 2021 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, 263, 269-70, and 287 herein.  Further, Gaylor 's misstatements denying any adverse "changing dynamics" in the "competitive landscape" were false and misleading because, as corroborated by multiple CWs, the Company was losing significant sales to Adobe, including because Adobe was able to offer substantially lower prices by integrating eSignature into its suite of products.  Additionally, the statements were not accompanied by any cautionary language identifying important factors that could cause actual results to differ materially from any results projected.

291. Once again, analysts were buoyed by these reassurances.  For example, on the same day as the Robert W. Baird Conference, RBC issued an analyst report stating: "DocuSign was arguably one of the biggest beneficiaries (after Zoom) of the sudden shift to remote work and saw business meaningfully accelerate.  ***We view these changes as irreversible and the tailwinds as sustainable***, as companies adopting e-signatures and digital agreements are unlikely to go back to manual processes."

292. Similarly, one week later, on June 18, 2021, Wedbush issued a report noting that "[w]ith the DocuSign Agreement Cloud as well as its CLM offering (SpringCM) providing many additional use cases beyond just signing a contract, DocuSign is continuing to expand throughout

the entire deal process which is a major differentiator in this environment" and "we believe that DOCU is in a sweet spot to continue to receive significant customer spending given its unique solution set with an eSignature shift that has likely ***permanently changed*** among enterprises moving forward."

### O.      September 2, 2021 – 2Q 2022 Earnings Call

293. On September 2, 2021, DocuSign held an earnings call discussing the Company's second quarter 2022 financial results (the "September 2, 2021 Earnings Call").  During that call, Gaylor  touted the Company's 47% year-over-year billings growth that quarter and reiterated the Company's previous comments regarding the sustainability of that growth, stating that "***[r]egardless of whether people go back to the office, we don't see them going back to pen and paper***."

294. Similarly, when one analyst asked Springer if the Company was seeing any adverse trends in product demand to suggest slower billings growth, Springer denied any such slowdown, responding: "We feel like we're seeing a lot of demand . . . ***I don't think there's a perspective we have that the business has some significant slowdown*** . . . ***we're not seeing any differences in churn rates in any meaningful way*** . . . ***customers very rarely leave us***."

295. In addition to the reasons set forth in paragraphs 236-40, 263, 269-70. and 287 *supra,* Defendants' September 2, 2021 statements touting the sustainability of the demand for DocuSign's products were false and misleading because, as discussed above in § IV.E. *supra,* by the second quarter of 2021, DocuSign experienced additional indications of waning demand as the pandemic began to fully recede as COVID-19 vaccinations became widespread and businesses opened back up en masse.  Indeed, Defendants' rosy public statements stood in stark contrast to the alarming internal data.  For example, CW 3 recalled that in the third quarter of 2021, the Company began to see a slowdown in growth.  CW 3 opined that by the third quarter

of 2021, the booking forecast was concerning.  Specifically, CW 3 explained that, in her opinion, one month into the third quarter of 2021, bookings came in weak.  In CW 3's opinion, bookings in the third quarter of 2021 were alarming.  Further, CW 3 explained that lower bookings in 2021 led to lower billings and ultimately lower revenue.  CW 3 recalled that senior executives at the Company (*including Defendant Gaylor*) were made aware that the Company was pacing behind and trending behind historical norms.  CW 3 explained that *every forecast iteration that the Company ran, and all booking numbers were shared with the senior leaders, including Defendant Gaylor, who would then meet with and report such numbers to Defendant Springer*.  Further, CW 3 recalled that Defendant Alhadeff was familiar with the booking numbers and was updated on them regularly.  CW 3 also recalled that additional internal financial analyses were given to Defendant Gaylor, which Defendant Gaylor then relayed to Defendant Springer, showing that by September 2021, *the Company's internal financial forecasts were in decline in comparison to historical data.*

296. Moreover, contrary to Defendants' statements assuring that they were "not seeing any differences in churn rates," internally CWs described declining retention rates (70-71% vs. targeted 90-95%), i.e., excessive churn, in addition to usage/consumption challenges, which had grown worse by this time in 2021, as was discussed in summer 2021 QBRs with senior executives like SVP Walsh, who regularly updated the Individual Defendants on the business, including the information presented at the QBRs, at ELT meetings, as detailed above.  Indeed, CWs recounted that by the summer of 2021, Adobe was inflicting substantial customer losses because of its cheaper pricing  Additionally, by this time, Defendants internally acknowledged to employees that its stock price was artificially inflated given the market's misimpression about the sustainability of the Company's COVID-fueled demand, as discussed above.  Likewise, CW 13

1    recalled that sales leadership, including *Alhadeff*, discussed all throughout her tenure that 2021

2    was an "*unprecedented down year*" beginning when she joined DocuSign in *June 2021*. *See Id.*

3        **P.      September 8, 2021 - Wolfe Research Inaugural TMT Conference**

4    297. On September 8, 2021, Gaylor  participated in the Wolfe Research Inaugural TMT

5    Conference.  When asked about the "durability" of the growth that DocuSign experienced as a

6    result of the COVID-19 pandemic, Gaylor responded that "*people are not going to go back to*

7    *pen and paper* once they've signed digitally or once they've been able to do agreements and the

8    different components of agreements, digitally*.*  And I think that's really a key differentiator from

9    some of the other market dynamics you're seeing around kind of the pandemic, in particular."

10       298. Similarly, when asked about the impact of COVID-related one-time-use cases, Gaylor

11   stated "there are some customers who came to us for a specific COVID use case that they no

12   longer have . . . .  But *I would say that's the <u>vast minority</u> versus the majority of the motion*."

13       299.  Gaylor 's September 8, 2021 statements touting the sustainability of the demand for

14   DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-

15   40, 263, 269-70, 287, and 295-96 herein.  Additionally, the statements were not accompanied by

16   any cautionary language identifying important factors that could cause actual results to differ

17   materially from any results projected.

18       **Q.      December 2, 2021 - 3Q 2022 Earnings Call and First Partial Corrective**
            **Disclosure/Materialization of the Risk**

19       300. On December 2, 2021, for the first time, it was partially revealed that DocuSign was

20   experiencing dramatically slowed billings growth as a result of waning demand for its products

21   as customers began returning to their offices and resumed in-person signature processes.

22   Specifically, on December 2, 2021, after the market closed, DocuSign released its financial

23   results for the third quarter 2022 wherein the Company revealed that its year-over-year billings

24   growth had decreased to 28% for the quarter.  At the time, this represented the second lowest

billings growth that DocuSign had ever reported as a public company.  Indeed, it was **half** the 59% billings growth rate DocuSign reported when the pandemic first began.  Further, the Company's 28% billings growth rate represented a **35%** decrease from the same quarter a year prior, when DocuSign billings growth rate peaked at 63%, and an 8% decrease from the same quarter immediately preceding the COVID-19 pandemic, meaning that not only was DocuSign far from sustaining the high growth that it had experienced during the pandemic, but it was actually performing even lower than it had before the pandemic.

301.  Compounding DocuSign's disappointing billings growth, DocuSign also announced the departure of former CFO Michael Sheridan, one of the primary executives responsible for setting the Company's billings guidance early in the pandemic.  Indeed, as described above, as CFO in June 2020, he was a key part of DocuSign's decision to raise billings growth guidance at that time while other technology companies that benefitted from COVID-19, like Zoom and Slack, refused to do so.

302. DocuSign also held an earnings call on December 2, 2021, discussing the Company's third quarter 2022 financial results the ("December 2, 2021 Earnings Call").  During that call, Springer admitted that the Company "saw demand slow and the urgency of customers' buying patterns temper[,]" which were "primary contributors" to DocuSign's billings miss.  Moreover, though just months previously denying any "significant slowdown" in demand and insisting that the pandemic-driven demand was durable for the long-term, Springer, in response to an analyst's question about billings growth, now admitted to the market that Defendants had "always" expected decreased demand after the pandemic receded:

> [W]e always expected there to be a reduction of that really heightened COVID buying, which drove our growth rates dramatically higher than they had ever been even as we got bigger.  So we expected that.  I think the piece that we didn't expect are really the other 2 factors.  So the one is while we would expect people to sort

of return to sort of normalcy in purchasing, we didn''t realize that they had been sort of well stocked with DocuSign, if you will. And we saw some of that purchasing behavior where people were, as you said, in that heightened demand model, probably purchasing more aggressively than we would have seen in the past.

303. Such disclosures partially revealed to the market for the first time that the falsity of Defendants' prior Class Period statements—*i.e.*, that DocuSign's unprecedented demand and billings growth after the pandemic began were in fact fleeting and driven in large part by one-time COVID-19-related uses, rather than sustainable for the long term and the "minority" of its new business, as Defendants had repeatedly assured.

304. However, even after the Company's December 2, 2021 disclosures, DocuSign's stock price remained artificially inflated as Defendants' continued to reassure the market that demand for the Company's eSignature and CLM products would continue to drive future growth. Specifically, during the December 2, 2021 Earnings Call, Springer again insisted to investors that "[e]ven as the pandemic subsides and people begin to return to the office, *they are not returning to paper. eSignature and the broader Agreement Cloud are clearly here to stay*, and DocuSign's value will persist no matter how the future of work unfolds."

305. Springer's December 2, 2021 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, 263, 269-70, 287, and 295-96 herein.

306. In response to Defendants' disclosures, on December 3, 2021, the first trading day following the release of DocuSign's 28% billings growth rate, DocuSign's stock price dropped dramatically, falling $98.73 per share, or more than *42%*, to close at $135.09.

307. Analysts were shocked by Defendants' disclosures of disappointing billings growth. For example, on December 3, 2021, Citi Research issued an analyst report describing DocuSign's billings miss as "*one of the biggest SaaS whiffs in recent memory*[.]"

308. The same day, Wedbush downgraded its rating of DocuSign's stock from "Outperform" to "Neutral" stating that "[l]ast night was *a debacle quarter* from DOCU[,]" and explaining that "we believe the company is seeing *a much more difficult selling environment* as the company expands into broader CLM deals with eSignature going through a major growth transition in the field."

309. Similarly, that same day, Wolfe Research downgraded DocuSign's stock rating to "Peer Perform," noting that "*[t]he billings weakness miss was a result of a return to more normalized purchasing patterns by customers in the [second half of the year]*, as it seems that the[first half] and last year represented a meaningful pull-forward of consumption patterns, while management seemingly took the foot off the glass on new demand generation."

310. On the same day, J.P. Morgan similarly downgraded DocuSign from "neutral" to "underweight," writing that "*pandemic tailwinds came to a much faster than expected halt for DocuSign*[.]"

311. Notably, J.P. Morgan issued another analyst report on December 8, 2021, noting that Adobe's financial reporting, due on December 16, 2021, would be an important indicator of DocuSign's continued ability to grow, explaining that "[Adobe] is the #1 competitor to DocuSign, and . . . if Adobe says that it had a very good quarter with Adobe Sign, then the concern will shift to market share shifts and the competitive threat that Adobe poses."  On December 16, 2021, after Adobe announced that it had a "phenomenal" quarter, J.P. Morgan issued a follow-up report, noting that the positive "Adobe results now beg the question of whether the competitive dynamics between DocuSign and Adobe have changed."  Accordingly, analysts recognized that the December 2, 2021 disclosures of DocuSign's underperformance as compared to its key competitor Adobe also revealed the falsity of Defendants' prior misstatements denying

any adverse competitive trends, including that increased competition from Adobe was impacting DocuSign's sales.

**R.     March 10, 2022 – 3Q 2022 Earnings Call and Second Partial Corrective Disclosure/Materialization of the Risk**

312. On March 10, 2022, the relevant truth concerning DocuSign's dramatically slowed billings growth as a result of waning demand post-COVID was again partially revealed through a second consecutive quarter of disappointing billings growth.  Specifically, on March 10, 2022, after the market closed, DocuSign released its financial results for the fourth quarter 2022 wherein the Company revealed that its year-over-year billings growth had dropped once again— this time, to 25% for the quarter—the lowest billings growth DocuSign had ever experienced as a public Company, far short of the 59% growth it had previously reported during the beginning of the pandemic and 15% lower than the 40% billings growth the Company had experienced just a year earlier.  Moreover, DocuSign announced that its billings guidance for the fiscal year ending January 31, 2023, would be between $2.71 billion and $2.73 billion, representing a substantial slowdown in billings growth.  Additionally, the Company announced the resignation of Alhadeff, whose responsibilities as CRO primarily included driving sales within the Company.

313. Also on March 10, 2022, DocuSign held an earnings call, discussing the Company's fourth quarter 2022 financial results (the "March 10, 2022 Earnings Call").  During that call, Springer attributed the Company's poor billings growth and lower billings guidance to waning demand for the Company's product as companies returned to in-person work environments.  Specifically, Springer stated: "In the second half of the year, there were more challenging macro conditions impacting our customers' priorities.  We saw a diminished level of urgency in their buying patterns . . . .  As we saw urgent demand wane, we have just begun to shift in our sales motion, back to a demand generation mode of cross-sell, upsell and departmental expansion."

314. On this news, on March 11, 2022, the first trading day following the release of DocuSign's 25% billings growth rate, DocuSign's stock price dropped precipitously, falling $18.87 per share, or **over 20%**, to close at $75.01—the lowest price per share for DocuSign stock since March 2020, thereby erasing the entirety of DocuSign's stock gains during the COVID-19 pandemic.

315. Analysts were once again surprised by the Company's disclosure of a second consecutive quarter of poor billings growth and now lower guidance.  For example, on March 10, 2022, J.P. Morgan issued an analyst report stating that "[t]he normalization of growth and demand post-pandemic is expected to continue well into fiscal 2023."

316. Similarly, the next day on March 11, 2022, Wedbush issued a report explaining that:

> **Last night the demise of the Docusign growth story continued** as the [work-from-home] poster child delivered good January results which were more than offset by very weak and concerning guidance **which speaks to some darker days ahead**.  **Following a trend from the prior quarter the sales environment at DOCU has quickly changed and it appears the pull forward sales activity during COVID is making for an incredibly difficult uphill selling environment** in the field and thus slowing down the expansion of CLM deals."

The same day, Morgan Stanley also issued a report explaining that "DocuSign's Q4 underscored that the growth scare of Q3 **was not a one quarter event[.]**"

317. However, even after DocuSign reported a record low billings growth rate, Defendants continued to assure the market that DocuSign's demand generation problems were termporary.  Specifically, on March 10, 2022, during the March 10, 2022 Earnings Call, Springer again repeated that "[a]s the pandemic subside[s] and people begin to return to the office, **they are not returning to paper.  e-Signature is clearly here to stay,** and the movement toward the broader Agreement Cloud will only continue to gain prominence."  Springer's March 10, 2022 statements touting the sustainability of the demand for DocuSign's products were false and misleading for the same reasons set forth in paragraphs 236-40, 263, 269-70, 287, and 295-96, herein.

**S.**     **June 9, 2022 – 4Q 2022 Earnings Call and Final Corrective Disclosure/
Materialization of the Risk**

318. On June 9, 2022, contrary to Defendants' repeated prior assurances that the demand for DocuSign's products during the COVID-19 pandemic was sustainable, the full truth concerning the temporary nature of that COVID-driven demand was fully revealed through disclosures of a third consecutive quarter of poor billings growth.  Specifically, on June 9, 2022, after the market closed, DocuSign released its financial results for the first quarter 2023 wherein the Company revealed that its year-over-year billings growth had decreased to just *16%* for the quarter—the lowest billings growth DocuSign had ever experienced as a public Company, and the second quarter in a row where the Company experienced record low billings growth.  Moreover, DocuSign lowered its billings guidance for the second quarter of 2023 by approximately $200 million, representing even lower growth moving forward into the third quarter of 2023.

319. Also on June 9, 2022, DocuSign held an earnings call, discussing the Company's first quarter 2023 financial results (the "June 9, 2022 Earnings Call"), during which Springer attributed the Company's poor billings growth and lower billings guidance to waning demand for the Company's products as businesses returned to in-person work environments.  For example, when asked by one analyst whether the Company's lower billings was the result of macroeconomic conditions, Springer admitted that DocuSign's growth problems were actually more driven by diminished demand after the pandemic receded, stating that "I think we believe the larger impact for us is coming off the sort of very aggressive buying that we had during COVID."  Later on the same call, Springer further elaborated, admitting that much of the demand the Company experienced during the COVID-19 pandemic was the result of one-off use cases that no longer existed:

> I would agree with the assessment that initially, probably underestimated, I underestimated sort of the impact in the post-COVID sort of demand acceleration

and maybe how dramatic that was.  Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like 6, 7 quarters.  So it wasn't that we were not aware of the dramatic economics of it.  I think we just didn't understand what portion of that would be things like onetime use cases or an acceleration where people bought in a more fulsome way.

320. In sum, the June 9, 2022 disclosures fully revealed the relevant truth concerning the unsustainability of DocuSign's billings growth and demand for its products as the COVID-19 pandemic subsided and businesses returned to an in-person work environment.

321. On this news, the price of DocuSign's stock fell $21.43 per share, or *over 24.5%*, to close at $65.93 on June 10, 2022, the Company's lowest share price since October 2019.

322. Analysts were again shocked by DocuSign's third consecutive quarter of dismal billings growth and acknowledgment that future quarters would be even worse, but finally fully understood that Defendants' prior promises of sustainable growth could not and would not be fulfilled.  For example, on June 10, 2022, Wedbush issued an analyst report noting that DocuSign's billings growth decline was the result of demand declines and the Company's inability to shift to CLM sales:

> Last night, DocuSign delivered yet another disappointing quarter as the company once again lowered billings guidance which continues to overshadow the top-line revenue beat the company experienced this quarter.  The demise of DOCU's growth story continues as the WFH [work from home] poster child faces new and ongoing complications with the selling environment following COVID's pull forward effect on sales over the previous two years and deceleration of their planned expansion of CLM deals.

Wedbush went on to explain that DocuSign's latest disclosure finally apprised them of the truth regarding DocuSign's growth, stating that "we believe that the end of DOCU's core growth story is now essentially over with the clock striking midnight following a billings guidance drop of ~$200 million pointing to an uncertain future for the remainder of FY23."  Similarly, William Blair downgraded DocuSign's stock from "Outperform" to "Market Perform" because of DocuSign's "weaker-than expected billings guidance for fiscal 2023."

323. Further, on Friday June 10, 2022, after the market closed, Wolfe Research issued a report downgrading DocuSign stock from "market perform" to "underperform," citing the fact that "[m]anagement disclosed they underestimated the level of pulled forward spending during COVID, and are now seeing customers reduce expansion" and "drastically reducing billings guidance" as the reasons for the downgrade.

324. As the market continued to digest the above disclosures, including, for example, as reflected in related analyst commentary and downgrades discussing the extent of the demand and growth problems facing DocuSign, investors continued to react negatively to the news, causing DocuSign's stock price to fall another $6.81*, or over 10%*, to close at $59.12 on Monday June 13, 2022.

## VI.    LOSS CAUSATION

325. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of DocuSign common stock and operated as a fraud or deceit on Class Period purchasers of DocuSign common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

326. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased DocuSign common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased DocuSign stock at the artificially inflated prices at which it traded during the Class Period.

327. The relevant truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between December 2, 2021, and June 9, 2022.  During this period, DocuSign's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited DocuSign's stock price.  It was not until

the final partial corrective disclosure and/or materialization of concealed risk on June 9, 2022, that the full truth was known to the market, such that there was no longer any artificial inflation in DocuSign's stock price attributable to the fraud.

328. The declines in DocuSign's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

329. As a result of their purchases of DocuSign common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (i.e., damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused DocuSign common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $310.05 per share on September 3, 2021.

330. By concealing from investors, the adverse facts detailed herein, Defendants presented a misleading picture of DocuSign's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of DocuSign common stock fell significantly. These declines removed the inflation from the price of DocuSign common stock, causing real economic loss to investors who had purchased DocuSign common stock during the Class Period.

331. Each decline in the price of DocuSign common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

332. The economic loss, i.e., damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of DocuSign common stock and the subsequent significant decline in the value of DocuSign

common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

333. The market for DocuSign common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 4,255,644 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, DocuSign's common stock traded at artificially inflated prices.  Lead Plaintiffs and other Class members purchased DocuSign common stock relying upon the integrity of the market relating to DocuSign common stock and suffered economic losses as a result thereof.

334. The declines in DocuSign's common stock price on December 3, 2021, March 11, 2022, and June 10-13, 2022 were a direct and foreseeable result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the market closed on December 2, 2021, March 10, 2022, and June 9, 2022.  The timing and magnitude of DocuSign's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

### A.   December 2, 2021 - First Partial Corrective Disclosure/Materialization of the Risk

335. On December 2, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period were revealed and/or partially materialized when DocuSign released its financial results for the third quarter 2022 wherein the Company revealed that its billings growth had decreased to 28% for the quarter—representing the second lowest billings growth that DocuSign had ever reported as a public company.  This growth rate was also only *half* of the Company's prior 59% billing

growth rate that it reported when the pandemic first began.  Moreover, the Company's 28% billings growth rate represented a 35% decrease from the same quarter a year prior and an 8% decrease from the same quarter immediately preceding the COVID-19 pandemic, meaning that not only was DocuSign far from sustaining the growth that it had experienced during the pandemic but it was actually performing even lower than it had before the pandemic.  DocuSign's billings miss partially revealed to the market for the first time that the demand DocuSign experienced during the COVID-19 pandemic was not sustainable as Defendants had repeatedly assured investors, but rather was specifically driven by the temporary work-from-home environment during the pandemic.

336. Compounding DocuSign's abysmal billings growth, DocuSign also announced the departure of former CFO Michael Sheridan, one of the primary executives responsible for setting the Company's billings guidance early in the Class Period.  Indeed, as described above, as CFO in June 2020, he was a key part of DocuSign's decision to raise billings growth guidance at that time while other technology companies that benefitted from COVID-19, like Zoom and Slack, refused to do so.

337. Later that same day, during the December 2, 2021 Earnings Call DocuSign confirmed that it was experiencing dramatically slowed billings growth as a result of waning demand for its products as customers began returning to their offices and resumed in-person signature processes.

338. The December 2, 2021 disclosures about DocuSign's slowed billings growth and the reasons therefore were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the sustainability of DocuSign's billings growth and the demand for its products after the COVID-19 pandemic.

339. Moreover, the Company's third quarter financial results and the December 2, 2021 Earnings Call revealed new information that Defendants' misstatements, omissions, and

fraudulent course of conduct previously concealed and/or obscured from the market.  The Company's third quarter financial results and the December 2, 2021 Earnings Call partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the sustainability of DocuSign's billings growth and the demand for DocuSign's product as the COVID-19 pandemic receded and businesses returned to an in-person work environment.

340. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of DocuSign common stock fell $98.73 per share, or more than *42%,* to close at $135.09 per share on December 3, 2021.

341. Analysts were shocked by this news.  For example, on December 3, 2021, Citi Researched issued an analyst report describing DocuSign's billings miss as "*one of the biggest SaaS whiffs in recent memory*[.]"  The same day, Wedbush downgraded its rating of DocuSign's stock from "Outperform" to "Neutral" stating that "[l]ast night was a debacle quarter from DOCU[,]" and explaining that "we believe *the company is seeing a much more difficult selling environment as the company expands into broader CLM deals with e-Signature going through a major growth transition in the field*."  Similarly, Wolfe Research downgraded DocuSign's stock rating to "Peer Perform" noting that "*[t]he billings weakness miss was a result of a return to more normalized purchasing patterns by customers in the 2H [second half], as it seems that the 1H [first half] and last year represented a meaningful pull-forward of consumption patterns*, while management seemingly took the foot off the glass on new demand generation."  J.P. Morgan similarly downgraded DocuSign from "neutral" to "underweight" noting that "*pandemic tailwinds came to a much faster than expected halt* for DocuSign[.]"

342. Still, the Company's stock remained artificially inflated, even after this news, as Defendants continued to reassure the market that demand for DocuSign's products would continue even after businesses returned to in-person work environments.  Specifically, during the December 2, 2021 Earnings Call, Springer assured the market that "[e]ven as the pandemic subsides and people begin to return to the office, *they are not returning to paper.  eSignature and the broader Agreement Cloud are clearly here to stay,* and DocuSign's value will persist no matter how the future of work unfolds."

343. Analysts were reassured by these statements concerning the durability of the Company's future growth.  For instance, on December 3, 2021, RBC issued an analyst report noting that "[w]e believe DocuSign is making the move from product to platform and any bull thesis does rely on non-core products growing as a percentage of the business.  *Early traction with CLM is encouraging to us* and gives us confidence DocuSign can grow into a broader agreement cloud."

344. That same day, Evercore also released an analyst report similarly explaining that "*[f]rom a longer-term perspective, we believe the shift towards e-Signature technology is not going away* and verticals like government are still in the very early innings." Similarly, J.P. Morgan issued a report on the same day stating that "[w]e believe electronic signatures and digital contracting will continue to see secular adoption regardless of the macro environment because of the improved efficiency and cost savings it brings to companies."

     **B.**     **March 10, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk**

345. On March 10, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period were further partially revealed and/or materialized.  On that date, after the market closed, DocuSign released its financial results for the fourth quarter 2022 wherein the Company revealed

that its year-over-year billings growth had decreased to 25% for the quarter—the lowest billings growth DocuSign experienced as a public Company and a 21% decrease from the same quarter a year prior.

346. Moreover, DocuSign announced that its billings guidance for the fiscal year ending January 31, 2023, would be between $2.71 billion and $2.73 billion, representing a substantial slowdown in billings growth.  Additionally, the Company announced the resignation of Alhadeff, whose responsibilities as CRO primarily included driving sales within the Company.

347. Also on March 10, 2022, DocuSign held the March 10, 2022 Earnings Call, during which Springer attributed the Company's poor billings growth and lower billings guidance to waning demand for the Company's products as businesses returned to in-person work environments.  Specifically, Springer stated "[i]n the second half of the year, there were more challenging macro conditions impacting our customers' priorities.  ***We saw a diminished level of urgency in their buying patterns***" and "[a]s ***we saw urgent demand wane***, we have just begun to shift in our sales motion, back to a demand generation mode of cross-sell, upsell and departmental expansion."  He then further admitted that this change in demand was a result of the end of the COVID-19 pandemic, stating that "***the shift in customer buying patterns coming out of the pandemic was quicker than we anticipated***."

348. The March 10, 2022 disclosures about the waning demand for DocuSign's products and slowing billings growth were foreseeable consequences of, and within the zone of risk concealed by, Defendants misrepresentations and omissions concerning the sustainability of the demand for DocuSign's products and the Company's billings growth.

349. Moreover, the March 10, 2022 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures partially revealed the relevant truth concerning the

sustainability of DocuSign's billings growth and the demand for DocuSign's product as the COVID-19 pandemic waned and businesses returned to an in-person work environment.

350. On this news, the price of DocuSign's stock fell $18.87 per share, or **over 20%**, to close at $75.01 on March 11, 2022.

351. Analysts were once again surprised by the Company's disclosure of its second consecutive quarter of disappointing billings growth and now lower guidance as well.  For example, on March 10, 2022, J.P. Morgan issued an analyst report stating that "***[t]he normalization of growth and demand post-pandemic is expected to continue well into fiscal 2023***."  Similarly, the next day on March 11, 2022, Wedbush issued a report explaining that:

> ***Last night the demise of the Docusign growth story continued*** as the [work-from-home] poster child delivered good January results which were more than offset by very weak and concerning guidance ***which speaks to some darker days ahead***.  ***Following a trend from the prior quarter the sales environment at DOCU has quickly changed and it appears the pull forward sales activity during*** COVID ***is making for an incredibly difficult uphill selling environment*** in the field and thus slowing down the expansion of CLM deals."

The same day, Morgan Stanley also issued a report explaining that "DocuSign's Q4 underscored that the growth scare of Q3 ***was not a one quarter event[.]***"

352. However, the Company's stock remained artificially inflated, even after this news, as Defendants continued to reassure the market that demand for DocuSign's products would continue even after businesses returned to in-person work environments.  Specifically, during the March 10, 2022 Earnings Call, Springer again repeated that "[a]s the pandemic subside[s] and people begin to return to the office, ***they are not returning to paper.  eSignature is clearly here to stay***, and the movement toward the broader Agreement Cloud will only continue to gain prominence."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.      June 9, 2022 – Final Corrective Disclosure/Materialization of the Risk**

353. On June 9, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false and misleading representations and omissions during the Class Period were fully revealed and/or materialized.  On that date, after the market closed, DocuSign released its financial results for the first quarter 2023 wherein the Company revealed that its year-over-year billings growth had decreased to 16% for the quarter—the lowest billings growth DocuSign had ever experienced as a public Company, and the second quarter in a row where the Company experienced its lowest ever billings growth.  Moreover, DocuSign lowered its billings guidance for the second quarter of 2023 by approximately $200 million, representing even lower growth moving forward into the third quarter of 2023.

354. Also on June 9, 2022, DocuSign held the June 9, 2022 Earnings Call, during which Springer attributed the Company's poor billings growth and lower billings guidance to waning demand for the Company's products as businesses returned to in-person work environments.  For example, when asked by one analyst whether the Company's lower billings was the result of macroeconomic conditions, Springer admitted that DocuSign's growth problems were the result of diminished demand, stating that "I think we believe the larger impact for us is coming off the sort of very aggressive buying that we had during COVID."  Later on the same call, Springer further elaborated, explaining that the demand the Company experienced during the COVID-19 pandemic was the result of one-off use cases that no longer existed:

> I would agree with the assessment that initially, probably underestimated**, *I underestimated sort of the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was*.**  Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like 6, 7 quarters.  So it wasn't that we were not aware of the dramatic economics of it.  ***I think we just didn't understand what portion of that would be things like onetime use cases*** or an acceleration where people bought in a more fulsome way.

355. The June 9, 2022 disclosures about the waning demand for DocuSign's products and slowing billings growth were foreseeable consequences of, and within the zone of risk concealed by, Defendants misrepresentations and omissions concerning the sustainability of the demand for DocuSign's products and the Company's billings growth.

356. Moreover, the June 9, 2022 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.   These disclosures revealed the relevant truth concerning the sustainability of DocuSign's billings growth and the demand for DocuSign's product as the COVID-19 pandemic waned and businesses returned to an in-person work environment.  Further, this disclosure revealed for the first time that a substantial portion of DocuSign's growth during the pandemic consisted of one-off use cases that would not recur once the pandemic subsided.

357. On this news, the price of DocuSign's stock fell $21.43 per share, or **over 24.5%**, to close at $65.93 on June 10, 2022, the Company's lowest share price since October 2019.

358. Analysts were again surprised by DocuSign's dismal growth and acknowledgment that future quarters would be even worse, but finally fully understood that Defendants' promises of sustainable growth could not and would not be fulfilled, and the Company would likely continue to slide even further.  For example, on June 10, 2022, Wedbush issued an analyst report noting that DocuSign's billings decline was the result of demand declines and the Company's inability to shift to CLM sales:

> Last night, DocuSign delivered yet another disappointing quarter as the company once again lowered billings guidance which continues to overshadow the top-line revenue beat the company experienced this quarter.  ***The demise of DOCU's growth story continues*** as the WFH poster child faces new and ongoing complications with the selling environment following COVID's pull forward effect on sales over the previous two years and deceleration of their planned expansion of CLM deals.

Wedbush went on to explain that DocuSign's latest disclosure finally apprised them of the truth regarding DocuSign's growth, stating that "***we believe that the end of DOCU's core growth story is now essentially over*** with the clock striking midnight following a billings guidance drop of ~$200 million pointing to an uncertain future for the remainder of FY23." Similarly, William Blair downgraded DocuSign's stock from "Outperform" to "Market Perform" because of DocuSign's "weaker-than expected billings guidance for fiscal 2023."

359. Further, on Friday June 10, 2022, after the market closed, Wolfe research issued a report downgrading DocuSign stock from "market perform" to "underperform," citing the fact that "[m]anagement disclosed they underestimated the level of pulled forward spending during COVID, and are now seeing customers reduce expansion" and "drastically reducing billings guidance" as the reasons for the downgrade.

360. As the market continued to digest the above disclosures, including, for example, as reflected in related analyst commentary and downgrades discussing the extent of the demand and growth problems facing DocuSign, investors continued to react negatively to the news, causing DocuSign's stock price to fall another $6.81, or over 10%, to close at $59.12 on Monday June 13, 2022.

## VII.    ADDITIONAL INDICIA OF SCIENTER

361. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over DocuSign's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in § V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary

violators of the federal securities laws.   In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. Defendants Enriched Themselves Through Insider Sales While Possessing Adverse Information Not Available to the Public[27]

362. Knowing all along that DocuSign was experiencing declining demand for DocuSign's products as the COVID-19 pandemic receded, Defendants Springer and Gaylor enriched themselves at the expense of DocuSign investors.   As explained above, while Defendants touted the sustainability of the billings growth DocuSign experienced during the COVID-19 pandemic throughout the Class Period, Defendants concealed adverse information concerning the unsustainability of the COVID-fueled demand for DocuSign's products.   Armed with the knowledge that DocuSign's stock price was artificially inflated as a result of their false and misleading statements and omissions, Defendants Springer and Gaylor collectively sold over 360,000 shares in open market transactions, reaping almost ***$85 million*** in proceeds, at key, suspiciously timed points in the Class Period.   In addition, Defendants Springer and Gaylor collectively reaped over ***$73.5 million*** in "Code F" sales, purportedly made to pay for their personal taxes and/or the strike prices of certain options in connection with Company-issued stock.   In total, during the Class Period, Defendants Springer and Gaylor sold 726,130 shares, reaping proceeds of ***over $158 million***.

### 1. Springer Sold Millions Worth of DocuSign Stock While Concealed Internal Metrics Showed Demand Was Rapidly Declining

363. After trading around $88 as of March 2020, DocuSign's stock price skyrocketed to over $147 at the beginning of the Class Period, in light of the increased demand for eSignature

---

[27] Lead Plaintiffs analyzed the trading by the Individual Defendants during the Class Period and during the period from DocuSign's IPO in April 2018 to the first day of the Class Period (the "Control Period").   The Control Period is approximately three months longer than the Class Period.

products, and corresponding record billings growth, brought on by the COVID-19 pandemic.  As long as the public continued to believe that this demand and billings growth were sustainable and DocuSign would not lose the customers that had transitioned to eSignature after the start of the pandemic, Defendants would be able to prevent DocuSign's stock price from falling.

364. However, in reality, no matter how many times Defendants told the market that the demand for its products was sustainable and that customers were not going back to pen and paper after the pandemic subsided, the underlying truth was that DocuSign was seeing internal metrics and other indicators showing that customers would leave once the pandemic receded and demand, and thus growth, would return to pre-pandemic levels.  Thus, knowing that the stock price would drop when this was revealed Springer sold a massive block of stock soon after the Company's internal metrics showed alarming trends in declining demand for DocuSign's products.

365. Indeed, on February 1, 2021, Springer sold ***356,479 shares*** of DocuSign stock reaping proceeds of ***$81,850,879,*** while DocuSign's stock was trading at approximately $230 dollars per share, almost three times its price immediately before the Class Period.  This sale represented a disposition of over 19.2% of Springer's DocuSign stock.  Further, Springer's massive sale stands in stark contrast to the $0 in open market sale proceeds he earned during the Control Period.  In fact, ***Springer's sale was the first time he had ever sold a single share of stock into the open market since DocuSign went public in April 2018***, three years before his sale.

366.  In addition to these open market sales, during the Class Period, Springer also disposed of 354,598 shares of his DocuSign stock through "Code F" transactions[28] worth $71,545,825.89, which were purportedly withheld by the Company to pay for her personal taxes and/or the

---

[28] These transactions were coded with an "F" designation on Defendants' SEC Form 4s.  "F" transactions are defined by the SEC as the "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."

exercise price of certain options in connection with Company-issued stock. These sales represented a disposition of almost 12% of Springer's DocuSign stock.

367. In total, during the Class Period, Springer sold **711,077** shares, reaping over $153 million in proceeds. These sales represented a disposition of almost 24% of Springer's DocuSign stock.

368. Further, although Springer's open market sales were made pursuant to a 10b5-1 trading plan, he adopted that plan only month prior, on December 8, 2020, which as described below was at approximately *the same time* after he learned of adverse internal reports and other material information showing declining demand. In fact, Springer's sale and adoption of his 10b5-1 plan coincided directly with internal DocuSign reports showing waning demand. Specifically, as detailed above in § IV.D., CW 1 stated that customer product usage levels for DocuSign's products had declined approximately **30%** year-over-year by December 2020. CW 1 further recalled that *by February 2021*, initial internal analyses showed that not only customer product usage, but also renewal rates, were declining for all segments and all customers. Indeed, according to CW 1, as many customers who signed up for DocuSign in March 2020 only signed up for one-year contracts, February 2021 would mark the time period within which the first wave of post-COVID customers would be renewing (or not renewing) their contracts with DocuSign. CW 1 shared the reports with the "warning signs" about product usage and renewal rates as early as January and February 2021 and possibly as early as December 2020 with Vice President of Global Success Operations, Jeremy Scheffel, and SVP Walsh, who then probably sent the reports to Springer. In addition, as discussed above, by February 2021, Defendants were aware that DocuSign was really struggling with excessive churn (including a "horrible" 70-71% retention rate vs. the targeted 90-95%) and missed consumption/usage targets, as was presented in a

February 2021 QBR attended by Walsh, who regularly updated the Individual Defendants on such information at ELT meetings.

369. Similarly, as detailed above in § IV.D., multiple CWs confirm that by February 2021, internally Defendants were beginning to panic as demand for DocuSign had begun to greatly diminish as the COVID-19 vaccines were rolled out and many businesses returned to in-person work environments.  For example, CW 9 stated that salespeople were starting to panic around February 2021 because the run-up from COVID was gone and nobody had new business booked at that point.  CW 9 recalled some of her clients saying at that time that they no longer needed to use DocuSign now that COVID had ended.  Similarly, CW 10 described what she referred to as the "Red Weekend," which she believes took place sometime between February and early April 2021, when management "went crazy" looking through every single sales deal in Salesforce and "came down hard" including on sales personnel in the SLED vertical in other regions of the country.  CW 10 recalled that management went into a "hysteria" about the sales personnel properly filling out the various sales data in Salesforce.  In addition, as discussed above in § IV, multiple CWs corroborate that Springer, as well as the rest of executive management, had access to Salesforce, which contained these metrics showing waning demand and declining customer usage and retention rates.

370. Further, on September 15, 2021, less than two months before DocuSign first revealed its slowing billings growth, Springer disposed of 13,735 shares of his DocuSign stock, worth $3,580,705.30, through Code F transactions, ostensibly to pay for Springer's personal taxes and/or the exercise price of certain options related to Company stock.  At that time, DocuSign stock was trading at $267.98 per share, less than $50 below the company Company's record Class Period high share price of $310.50 (on September 3, 2021), and almost *four times* the $72.31 share price on March 16, 2020, just before the COVID-19 pandemic reached the United States.

371. As such, Springer—knowing that DocuSign could not sustain the demand for its products that the Company experienced during the COVID-19 pandemic—enriched himself before the public could find out the truth.

        **2.**       **Gaylor Sold Millions Worth of DocuSign Stock Less Than One Month Before the Company First Announced Its Stunted Billings Growth**

372. In addition to Springer's sales as DocuSign internally saw waning demand, Gaylor sold through open market transactions over 35.7% of her DocuSign stock at a suspicious time—less than one month before Defendants' first partial corrective disclosure when the Company announced its second lowest billings growth rate ever, shocking the market and driving DocuSign's stock price down by almost $100 per share. Indeed, on November 8, 2021, Gaylor sold 5,983 shares of DocuSign common stock, reaping proceeds of $3,316,298 while DocuSign's stock price was trading at approximately $270 per share, not far from the Company's record Class Period high share price of $310.50 (on September 3, 2021), and almost *four times* the $72.31 share price on March 16, 2020, just before the COVID-19 pandemic reached the United States. Like Springer, Gaylor's November 8, 2021 trade was the first time she had ever sold a single share of DocuSign stock into the open market, taking advantage of the artificially inflated price that tumbled dramatically less than a month later.

373. In addition to these open market sales, during the Class Period, Gaylor also disposed of 9,070 shares of her DocuSign stock through "Code F" transactions worth $2,134,128.71, which were purportedly withheld by the Company to pay for his personal taxes and/or the exercise price of certain options in connection with Company-issued stock. These sales represented a disposition of almost *42%* of Gaylor's DocuSign stock.

374. In total, during the Class Period, Gaylor sold 15,053 shares, reaping over $5.45 million in proceeds. These sales represented a disposition of over *69%* of Gaylor's DocuSign stock.

375. Notably, while Gaylor 's trades were made pursuant to a 10b5-1 trading plan, she had only implemented that plan one month prior, on October 6, 2021, well after Defendants already knew that demand was waning substantially as the pandemic receded, and around the time that Gaylor , as CFO, was aware of or recklessly disregarded DocuSign's alarming internal financial forecasts, which rendered its prior record billings growth unsustainable.  Indeed, as described above in § IV.E., *supra*, by October 2021, Defendants were aware of a significant decline in demand for the Company's products as the COVID-19 pandemic subsided, which was also reflected in numerous internal financial metrics, such as a 30% decline in usage and a "horrible" 70% retention rate.  For example, as detailed above, in CW 3's opinion, bookings in the third quarter of 2021 were alarming.  CW 3 explained that every forecast iteration that the Company ran and all booking numbers were shared with the senior leaders, including Defendant Gaylor who would then meet with and report such numbers to Defendant Springer.   CW 3 also recalled that additional internal financial analyses were given to Defendant Gaylor, which Gaylor then relayed to Defendant Springer, showing that **by September 2021**, the Company's internal financial forecasts were in decline in comparison to historical data.  Accordingly, Springer's and Gaylor's massive insider stock sales during the Class Period, which provided a motive for them to keep DocuSign's stock price artificially inflated in order to enrich themselves, support a strong inference of scienter.

**B.     The Demand for DocuSign's Products and Its Billings Growth Were Critical to the Company's Core Operations**

376. The Individual Defendants' knowledge of the demand for DocuSign's products and the Company's billings growth and issues related thereto can be inferred because these facts were critical to DocuSign's core operations.

377. In particular, eSignature made up the vast majority of the Company's revenues and was its most important flagship product.  Indeed, DocuSign generates revenues from two segments: (1) subscriptions; and (2) professional services.  The subscriptions segment accounted for over *94 percent* of the Company's revenues for the past three fiscal years.  Significantly, DocuSign's eSignature product accounts for *substantially all* its subscriptions segment revenue and is the primary source of its professional services segment revenue.  Further, in the Company's 2020 and 2021 10-Ks, DocuSign explained that it "derive[s] a significant majority of [its] revenue from [] e-Signature solutions."

378. Defendants admitted as much at multiple points prior to and throughout the Class Period.  For example, during the Company's June 4, 2020 Earnings Call and September 3, 2020 Earnings Call, Springer described eSignature as the Company's "core" offering.

379. Further, in light of the fact that DocuSign was not profitable immediately preceding the COVID-19 pandemic and received a surge in demand as businesses were forced to operate in a remote environment, the demand for DocuSign's products and the Company's billings growth were particularly crucial to the Company's continued financial success.

380. Moreover, while the Company's CLM software represented only a small fraction of DocuSign's overall revenue, it was a key part of the Company's growth story, including its "land and expand" strategy, as discussed above.  Indeed, as Defendants touted throughout the Class Period, the Company's TAM for CLM was $20 to $25 billion dollars, essentially the same as eSignature.  Further, as CLM was more expensive and needed to be integrated into a customer's CRM software—meaning that a customer would not easily be able to switch CLM products once they were installed—thus guaranteeing DocuSign a more stable source of recurring revenue.  For example, on the June 4, 2020 Earnings call, Springer explained with regard to CLM that "[w]e've got years of signature customers that are sort of a pent-up opportunity for us to bring the

Agreement Cloud, and ***that's where we're really focused today***." Similarly, in the Company's 2020 10-K, DocuSign noted that eSignature and CLM were its "key Agreement Cloud Products[.]" Likewise, on the Company's September 3, 2020 Earnings Call, Springer explained that "the evolution of COVID-19 and the impact we're seeing on our business" and "the essential role that eSignature and the Agreement Cloud continue to play in the digital transformation of our customers' businesses around the world" were "key areas" of DocuSign's business.

381. In addition, with respect to sustained demand, the 2020 10-K explained that "[f]or our business to succeed, it is important that our existing customers, especially our enterprise customers, increase their use of our products and solutions through the purchase of new products, additional subscriptions and our enhanced products and solutions." In the same 10-K, the Company also noted that "[w]e believe billings is ***a key metric*** to measure our periodic performance."

382. Analysts following DocuSign also understood that sustained demand for the Company's core eSignature product and its billings growth were critical to the Company's success. For example, during the Company's June 4, 2020 Earnings Call one analyst referred to eSignature as the Company's "core" product—echoing Defendants statements on that same call. Further, a September 4, 2020 Oppenheimer report stated that **"**[w]e think the ***Agreement Cloud and the flagship eSignature product will drive durable growth for the foreseeable future*** that will result in DocuSign becoming a much bigger and more profitable business."

383. In addition, analysts understood that the Company's CLM product was also critical to DocuSign's future growth strategy. For example, on June 18, 2021, Wedbush issued a report noting that "[w]ith the DocuSign Agreement Cloud as well as its ***CLM*** offering (SpringCM) providing many additional use cases beyond just signing a contract, ***DocuSign is continuing to expand throughout the entire deal process which is a major differentiator in this environment***"

and "we believe that DOCU is in a sweet spot to continue to receive significant customer spending given its unique solution set with an eSignature shift that has likely permanently changed among enterprises moving forward."

384. Given the critical importance of eSignature, including that it represents substantially all of the Company's revenue, to DocuSign's business, knowledge of the issues associated with waning demand for this "flagship" product, including that customers were returning to pen and paper processes once they returned to the office, can therefore be imputed to Defendants. Further, given that CLM represented the Company's most significant future growth opportunity, knowledge of the issues associated with the Company's failing CLM sales can also therefore be imputed to Defendants.

### C. Defendants' Close Personal Monitoring of DocuSign's Demand and Billings Growth Metrics Supports That They Had Actual Knowledge or Were Reckless in Not Knowing About Waning Demand and Slowing Billings Growth

385. The Individual Defendants were responsible for DocuSign's efforts to sustain demand during the COVID-19 pandemic, including through personally overseeing the sales team's efforts to sell eSignature and CLM, which further supports a strong inference of scienter. In particular, Alhadeff, as CRO, was primarily responsible for leading the Company's sales and customer success functions. Likewise, Gaylor , as CFO, had primary responsibility for the Company's financial forecasting, including sales and billings metrics.

386. Indeed, the Individual Defendants were directly and personally involved in monitoring DocuSign's sales efforts and billings forecasts during the Class Period, including efforts to retain new customers who purchased DocuSign products during the COVID-19 pandemic, including through review of sales and customer metrics in internal databases and discussion at regular internal meetings that they participated in. In particular, multiple CWs corroborate the fact that the Individual Defendants had access to Salesforce, which contained granular data on all of

DocuSign's sales and reports showing that DocuSign was experiencing waning demand during the Class Period.

387. For example, CW 13 stated that the entire sales organization, including executives as senior as the CRO, had access to information in Salesforce.  CW 13 commented that "there were *no blind spots*."  CW 13 explained that at DocuSign, all customer and prospective customer data lived in Salesforce, including information about renewals and revenue.

388. Notably, Defendants had access to key performance metrics such as customer product usage rates, which declined significantly during the Class Period.  For example, as discussed above, CW 6 recalled seeing *low usage rates* across government and education clients when she joined the Company (before the Class Period began).  CW 6 explained that usage rates were tracked in an application within Salesforce that could have been accessed by executives, including Springer.

389. In addition, CW 1 recalled that customer product usage levels for DocuSign's products had declined approximately *30%* year-over-year by December 2020, based on internal analyses at the time.  As discussed above, CW 1 accessed all the data through spreadsheets and, later, through a data warehouse tool called Snowflake.  According to CW 1, *the C-Suite would have seen information derived from Snowflake and converted into reports or slide decks for their consumption*.  Moreover, CW 1 explained that such usage data was linked to Salesforce.

390. Further, according to CW 3, *every forecast iteration that the Company ran and all booking numbers were shared with the senior leaders, including Gaylor  who would then meet with and report such numbers to Springer.*  In addition, CW 3 recalled that Alhadeff was familiar with the booking numbers and was updated on them regularly.  CW 3 also recalled that additional internal financial analyses were given to Gaylor , which Gaylor  then relayed to Springer, showing that by September 2021, the Company's internal financial forecasts were in

decline in comparison to historical data.  Thus, all three Individual Defendants closely tracked DocuSign's financial forecasts.

391. Similarly, with respect to sales performance tracking in Salesforce, CW 10 recalled that DocuSign had dashboards that tracked everyone's sales performance, so you could see how you compared to other account executives on the team or versus others across the country.  CW 10 believes that senior management knew that sales were not going well because they had access to Salesforce, which provided detailed information about sales.  CW 10 explained that the dashboards in Salesforce showed who entered new pipeline each week, who closed certain deals, and what stage the deals were in.

392. CW accounts also confirm that DocuSign management closely monitored such sales information in Salesforce and, thus, knew about sales declines during the Class Period.  For example, CW 10 further explained that the second-, third-, and fourth-line managers were always looking at sales deals in various Salesforce dashboards.  According to CW 10, they could see from such sales dashboards when there were no strong pipelines or that sales were not closing or falling out of the pipeline, which would provide indicators of negative sales performance.  CW 10 added that one dashboard showed data about customer renewals, which was important because renewals were among the best upsell opportunities and because DocuSign did not want to lose existing customers.  According to CW 10, based on such sales information in the Salesforce dashboards, management could tell sales "were not going so well" at the end of the first quarter of calendar year 2021.

393. In particular, CW 10 explained that she knew management was concerned about sales problems due to waning demand for DocuSign's products *in early 2021*, because management began to "***micromanage" sales data in Salesforce***.  As an example, CW 10 explained what she referred to as the "Red Weekend," which she believes took place sometime between February

and early April 2021, when management "went crazy" looking through every single sales deal in Salesforce and "came down hard on everyone" across the board, including sales personnel in the SLED vertical in other regions of the country.  Specifically, CW 10 related how management made all the account executives across the country in the SLED vertical work over the weekend to update Salesforce metrics and ensure that data about every single deal was populated correctly. CW 10 personally recalled working that entire Sunday updating the relevant sales metrics in Salesforce.

394. For example, CW 10 recalled that management wanted to know which deals were CLM deals and wanted account executives to present updates in a specific way.  CW 10 recalled that management went into a "hysteria" about the sales personnel properly filling out the various sales data in Salesforce.  CW 10 added that she likely coined the term "Red Weekend" to refer to this project because she felt like it was a "blood bath" for sales personnel.  *CW 10 also described this "Red Weekend" as a "top-down" directive from senior management*, rather than just from her direct managers.

395.  Similarly, CW 8 explained that she spoke with Alhadeff by phone and through Slack starting a few months into CW 8's tenure about the issues selling CLM.  During one of the calls, Alhadeff *acknowledged to CW 8 around June 2020 that DocuSign was struggling to sell CLM*.

396. Further, CW 13 recalled that sales leadership, including *Alhadeff*, discussed all throughout her tenure that 2021 was an "unprecedented down year."  CW 13 recalled that those statements began as early as June 2021, when she started at DocuSign, and continued until she left in April 2022.  CW 13 recalled that the statements were made at team meetings and Alhadeff's were made at town halls.

397. Moreover, Salesforce allowed Defendants to specifically track the differences between customers who purchased DocuSign before and during the pandemic.  CW 1 explained that from

the time she started at DocuSign, in November 2020, the company actively tracked pre-COVID customers separately from customers who signed on to DocuSign during the COVID-19 pandemic.  CW 1 explained that there was a specific "flag" in Snowflake, which identified pre- and post-COVID customers.  CW 1 explained that post-COVID customers referred to those that purchased DocuSign products after the COVID-19 pandemic started.  CW 1 further recalled that at least since she started at DocuSign, the Company was actively tracking whether customers who signed up before the pandemic or during the pandemic had higher renewal or usage rates.  CW 10 also recalled that there was a "radio button" in Salesforce to designate COVID or not COVID deals.  CW 10 explained that a COVID deal would have been driven by a COVID-related use case, such as applications for COVID relief-funded housing.

398. Further, as the Company's internal metrics showed that demand was decreasing amongst post-COVID customers, DocuSign shifted how it approached those customers when their contracts came up with renewal, focusing on trying to get them to stay rather than upselling them with additional envelopes or products as they would normally have under the land and expand business model.  Specifically, CW 1 recalled that the renewal rate for post-pandemic customers was lower than for pre-pandemic customers.  According to CW 1, she shared the reports with the "warning signs" about product usage and renewal rates as early as January and February 2021 and possibly as early as December 2020 with Vice President of Global Success Operations, Jeremy Scheffel, and SVP of Customer Success, Lambert Walsh, who then probably sent the reports to Springer.

399. Moreover, Defendants' own public statements confirm that they closely monitored demand for the Company's eSignature and CLM products, including related sales, billings, and other customer metrics.  For example, on the September 3, 2020 Earnings Call, Sheridan  stated: "And so we are endeavoring to stay ahead of the trends that we're seeing.  ***We're looking at the***

---

*demand data very carefully to try to forecast the trends and get ahead of that* with capacity across the business." Further, Defendants repeatedly told investors that they had good visibility into DocuSign's billings growth due to their focus on how consumers were using their product. For instance, on the March 11, 2021 Earnings Call, Gaylor touted that their "subscription-based model given [them] a certain level of visibility[.]"  Similarly, when discussing the Company's guidance, Gaylor  noted that "[w]e guide to what we can see.  And *it's largely data-driven*[,]" explaining that "*we use everything from pipeline and demand trends to close rates* to looking at kind of the net new that we added during the year and looking at kind of the up-sell trends and expansion trends within there."  In addition, on the September 2, 2021 Earnings Call, Gaylor reiterated that they have "*visibility into customer consumption and how they're using the products*, how they're consuming it through the life cycle of their contracts" and emphasized that consumer consumption "*is something that we track*" and "*watch very closely*."  Such statements by Defendants confirm CWs' accounts that Defendants not only had access to (for example, through internal databases such as Salesforce and information derived from Snowflake) but personally tracked such granular sales and customer metrics, including *declining customer usage (also known as consumption) and retention rates*, during the Class Period, which alerted them to the waning demand for DocuSign's products as the pandemic receded, and thus further supports that their statements were knowingly or recklessly false.

400. Similarly, with regard to CLM during the Company's June 4, 2020 Earnings Call, Springer stated that "we've got years of Signature customers that have sort of a pent-up opportunity for us to bring the Agreement Cloud, and *that's where we're really focused today.*" Given Defendants' admitted close focus on CLM as a way of sustaining growth from the beginning of the Class Period, such statements further support their knowledge or reckless

disregard of CLM sales struggles, which further jeopardized the Company's ability to sustain its unprecedented COVID-fueled growth after the pandemic.

401. Defendants' direct involvement in the sales of and monitoring of key metrics for DocuSign's core products thus supports a strong inference of scienter.

### D. Defendants' Statements Themselves Support Scienter

402. Throughout the Class Period, Defendants spoke repeatedly to investors about the long-term sustainability of the demand that DocuSign experienced as a result of the COVID-19 pandemic. In particular, they repeatedly assured that once DocuSign customers adopt eSignature they "don't go back to pen and paper," leading investors to believe that there would not be a drop off in demand as the pandemic subsided and customers returned to an in-person work environment. However, Defendants omitted material, adverse information, such as declining customer usage and retention rates, showing that this prior high demand would not continue once customers returned to their offices. These false and misleading statements themselves provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing that DocuSign was seeing demand wane as the pandemic subsided. Accordingly, Defendants breached their duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant information while doing so.

403. For instance, during the Company's June 4, 2020 Earnings Call, on the first day of the Class Period, Springer stated that "*when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes . . . they rarely go back.*" Sheridan later doubled down on this statement explaining that "[w]e believe this accelerated growth in new customers and expansion within our installed base was driven by a sudden prioritization of our products*, but we also believe that these customers will remain with us[.]*" Similarly, during the same call, Springer stated that one off COVID use cases represented the

"***extreme minority***" of the additional demand as a result of the pandemic.  In addition, with regard to CLM he touted that "***we expect the adoption of our core eSignature offering by new customers and the expansion of use cases by existing ones to continue.  This also acts as the on-ramp for the adoption of other agreement cloud products***, sometimes at the same time and sometimes as follow-ons."

404. Defendants repeated these assurances throughout the Class Period.  On September 3, 2020 Springer stated that "[i]t is our view that . . . there's a greater awareness of need to digitize the business.  ***And we believe that, that's going to be sustained even after things return to whatever normal looks like in the future . . . we don't see trends that things are going to return to the way they looked and trended pre-COVID***."  During the Company's December 3, 2020 Earnings Call Springer further assured that "***[w]e don't see customers going back to pen and paper***" and "[w]hen customers go from paper-based processes to digital agreement processes, ***they do not go back.  We believe that trend will hold when the pandemic subsides,*** and DocuSign's value will persist no matter how the future of work unfolds."

405. Similarly, on January 11, 2021, at the Needham Virtual Growth Conference Gaylor spoke about the increased demand for DocuSign's eSignature product and reiterated its sustainability, stating that "we kind of ***continue to see that accelerated demand.  But we believe it's kind of once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience***" and "***[a]s I said, people, once they move on to our platform and into kind of our product portfolio, they don't tend to go back to pen and paper.***"

406. Additionally, during DocuSign's Virtual Financial Analyst Day on March 24, 2021 Alhadeff downplayed competition from Adobe, stating that "I think in general, ***we don't see a big change in the competitive dynamic with Adobe***."  Further, on March 31, 2021 Alhadeff

released a tweet with a link to a news article discussing the surge in demand for DocuSign's eSignature product and stated "***I don't see levels of adoption @DocuSign changing significantly post-pandemic.  Once a company sees the benefits of a digital process, there's multiple reasons to stay with it.***"

407. Defendants' repeated assurances to investors that the demand DocuSign experienced during the COVID-19 pandemic was sustainable—when they already knew of or recklessly disregarded indications of waning demand during the Class Period—demonstrate that they either knew that their statements were false and misleading or were reckless in not knowing so.  In either scenario, there is a strong inference that Defendants made these statements with scienter.

###### E.  The Departures of Defendants Sheridan, Alhadeff, and Springer at Key Points in the Class Period Support Scienter

408. The resignations of Defendants' Sheridan, the CFO, Alhadeff, the CRO, and Springer, the CEO, senior executives primarily responsible for sales and setting financial guidance and achieving billings targets, at key points in the Class Period support an inference of scienter.  Indeed, these resignations are temporally connected to the disclosures of the Company's fraud, given that they occurred on or near to one of the corrective disclosure dates.

409. Specifically, on December 2, 2021, the date of the first partial corrective disclosure, DocuSign announced the departure of former long-time CFO and then-President, International, Sheridan.  Sheridan  had served as the Company's CFO from the time of its IPO in April 2018 to September 2020, when he was moved to the sales organization to lead the Company's small international business.  As CFO, Sheridan had primary oversight over the Company's financial performance, including forecasting of sales, revenue, billings growth, and other such metrics, and thus played a key role in the Company's decision to raise billings guidance as a result of the increased billings the Company experienced as the COVID-19 pandemic skyrocketed demand

for its product.  Notably, DocuSign announced Sheridan 's departure from DocuSign on the same day it announced it second-lowest ever billings growth, significantly lower than what the Company had experienced before the pandemic.

410. In addition, on March 10, 2022, the date of the second partial corrective disclosure when the Company reported a second consecutive quarter of poor billings growth, DocuSign also announced the planned departure of Alhadeff at the end of the fiscal year, explaining that the effective date of his resignation has not been finalized but was expected to occur before the end of fiscal year 2023.  As CRO, Alhadeff was primarily responsible for leading the Company's sales and customer success functions, including ensuring that the Company was meeting or exceeding its revenue and billings targets throughout the Class Period.  DocuSign announced the departure of Alhadeff at the same time that the Company announced, what at the time was its lowest ever billings growth and reduced its billings guidance moving forward.

411. Further, on June 21, 2022—less than two weeks after DocuSign reported its second straight quarter of record-low billings growth and drastically reduced billings guidance—the Company announced the resignation of Springer.  In DocuSign's June 21, 2022 press release addressing Springer's departure, the Company explained that Springer "agreed to step aside" as CEO, effective immediately, which demonstrates that this departure was not voluntary.  Moreover, DocuSign's Chairman Maggie Wilderotter immediately took over as the Company's interim CEO, indicating that Springer's departure was abrupt and hasty, before DocuSign could even line up a potential replacement.  Indeed, in an article entitled "DocuSign CEO Dan Springer resigns in wake of weak earnings and outlook," Seeking Alpha, a financial news outlet, described Springer's departure as "sudden and unexpected," directly linking it to the Company's June 9, 2022 disclosures of disappointing growth and reduced guidance.  As the primary architect of DocuSign's supposed growth strategy during the pandemic who repeatedly, falsely assured

investors that such demand and growth were not temporary COVID-fueled blips, Springer's suspicious "resignation" on the heels of the final corrective disclosure revealing the exact opposite to investors further supports his scienter.

412. The resignations of three key executives responsible for setting and achieving billings growth targets, who repeatedly assured investors throughout the Class Period of DocuSign's ability to achieve such growth long-term based on sustainable demand and denied seeing any adverse trends to the contrary, directly after the Company announced it dramatically missed those same targets thus supports a strong inference of their scienter.

### F.     Corporate Scienter

413. Further, DocuSign knowingly and/or with deliberate recklessness made, controlled, or had ultimate authority over the materially false and/or misleading statements and omissions alleged herein based on the fact that Individual Defendants knew and/or were deliberately reckless in not knowing or disregarding that the Company's statements set forth in § V. were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.  Each of the Individual Defendants was among the most senior employees of the Company throughout the Class Period, was acting within the scope of their authority, and was a member of the Company's senior management.  Their scienter may therefore be imputed to the Company.

414. Further, the scienter of other senior-level executives, including SVP Walsh, may be imputed to DocuSign under agency principles.  Finally, the scienter of any other employees who ordered or approved the misstatements or their making or issuance, or who furnished information or language for inclusion therein, or the like, may be imputed to the Company.

## VIII.   CONTROL PERSON ALLEGATIONS

415. The Individual Defendants, by virtue of their high-level and controlling positions at DocuSign, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

416. Defendants Springer, Sheridan, Gaylor, and Alhadeff as senior executive officers of DocuSign—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of DocuSign's publicly traded common stock would be based on accurate information.  Each of the Individual Defendants violated these requirements and obligations during the Class Period.

417. Defendants Springer, Sheridan, Gaylor, and Alhadeff because of their positions of control and authority as senior executive officers of DocuSign, were able to and did control the content of DocuSign's SEC filings, press releases, and other public statements issued by or on behalf of DocuSign during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

418. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of DocuSign common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts.   The scheme deceived the investing public regarding DocuSign's business, operations, and management, and the intrinsic value of DocuSign's common stock, and caused Lead Plaintiffs and members of the Class to purchase DocuSign common stock at artificially inflated prices.

## IX.    CLASS ACTION ALLEGATIONS

419.  Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of DocuSign during the Class Period and were damaged thereby.   Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of DocuSign during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) DocuSign's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

420. The members of the Class are so numerous that joinder of all members is impracticable. According to public reports filed with the SEC, during the Class Period, DocuSign had over 180 million outstanding shares of common stock and was actively traded on the NASDAQ under the ticker symbol "DOCU."  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed

geographically.  Record owners and other members of the Class may be identified from records maintained by DocuSign and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

421. Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

422. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

423. Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

  a. Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

  b. Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

  c. Whether, and to what extent, the market price of DocuSign common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

  d. Whether Defendants acted with the requisite level of scienter;

  e. Whether the Individual Defendants were controlling persons of DocuSign; and

  f. Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

424. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

425. To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   the Company's securities traded in an efficient market;

d.   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

e.   Lead Plaintiffs and other members of the Class purchased DocuSign's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

f.   DocuSign's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

g.   as a regulated issuer, DocuSign filed periodic public reports with the SEC and the NASDAQ;

h.   DocuSign regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

i.   DocuSign was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, RBC Capital Markets, Oppenheimer & Co. Inc., Wells Fargo Securities, LLC, FBN Securities, Inc., Evercore ISI Institutional Equities, Deutsche Bank AG, and J.P. Morgan Chase & Co., all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

426. As a result of the foregoing, the market for DocuSign's securities promptly digested current information regarding DocuSign from publicly available sources and reflected such information in DocuSign's securities price(s).   Under these circumstances, all persons and entities who or which purchased or otherwise acquired DocuSign common stock during the Class Period suffered similar injuries through their purchase of DocuSign common stock at artificially inflated prices and thus, the presumption of reliance applies.

427. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of DocuSign common stock.

428. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of DocuSign common stock between

the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

429. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to DocuSign's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.    NO SAFE HARBOR

430. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.  First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

431. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

432. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement."    15 U.S.C.  §  78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

433. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, DocuSign was experiencing waning demand for its products as businesses returned to in-person work environments thus leading to declining billings growth.

434. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of DocuSign who knew that the statement was false when made.

## XII.   CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5(b) Promulgated Thereunder
Against DocuSign and the Individual Defendants**

435. Lead Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

436. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against DocuSign and the Individual Defendants.

437. As alleged herein, throughout the Class Period, DocuSign and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities

exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  DocuSign and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of DocuSign common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase DocuSign common stock at artificially inflated prices.

438. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

439. As set forth above, DocuSign and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased DocuSign common stock during the Class Period.

440. In ignorance of the false and misleading nature of DocuSign's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for DocuSign common stock, Lead Plaintiffs and other members of the Class purchased DocuSign common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have purchased DocuSign common stock at such artificially inflated prices.  As set forth herein, when

the true facts were subsequently disclosed, the price of DocuSign common stock declined precipitously, and Lead Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of DocuSign common stock at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

441. By virtue of the foregoing, DocuSign and the Individual Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

442. Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

443. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

444. The Individual Defendants had control over DocuSign and made the materially false and misleading statements and omissions on behalf of DocuSign within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive leadership positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

445. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

446. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.  Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Lead Counsel for the Class;

B.  Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY DEMAND

Lead Plaintiffs demand a trial by jury.

1

2  DATED: July 8, 2022

Respectfully submitted,

3

**LABATON SUCHAROW LLP**

4

*/s/ James W. Johnson*
James W. Johnson (admitted *pro hac vice*)

5  Michael H. Rogers (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)

6  Robert S. Rowley (admitted *pro hac vice*)
140 Broadway

7  New York, NY 10005
Tel: (212) 907-0700

8  Fax: (212) 818-0477
jjohnson@labaton.com

9  mrogers@labaton.com
ivasilchenko@labaton.com

10  rrowley@labaton.com

11  *Counsel for Proposed Lead Plaintiff
and Proposed Lead Counsel for the Class*

12

**KESSLER TOPAZ MELTZER**

13  **& CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)

14  One Sansome Street, Suite 1850
San Francisco, CA 94104

15  Tel: (415) 400-3000
Fax: (415) 400-3001

16  jjoost@ktmc.com

17  *Liaison Counsel for the Class*

18

**DRRT**

19  Joseph Gulino (admitted *pro hav vice*)
340 West Flagler Street, 2nd Floor

20  Miami, Florida 33130
Tel: 1 (305) 760-8030

21  Fax 1 (305) 760-8030
jgulino@drrtcom

22

*Additional Counsel for Lead Plaintiff DIL*

23

**KLAUSNER KAUFMAN JENSEN &**

24  **LEVINSON**
Robert D. Klausner (*pro hav vice* forthcoming)

25  7080 Northwest 4th Street
Plantation, Florida 33317

26  Tel: (954) 916-1202
Fax: (954) 916-1232

27  bob@robertdklausner.com

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 22-CV-00824-WHO

163

**RISCH PISCA, PLLC**
Jason S. Risch (*pro hav vice* forthcoming)
407 W. Jefferson St.
Boise, ID 83702
Tel: (208) 345 9929
jrisch@rischpisca.com

*Additional Counsel for Lead Plaintiff PERSI*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 8, 2022 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ James W. Johnson*
James W. Johnson (admitted *pro hac vice*)