1
2
3
4                           UNITED STATES DISTRICT COURT
5                          NORTHERN DISTRICT OF CALIFORNIA
6
7    RICHARD R. WESTON,                          Case No.  22-cv-00824-WHO
                    Plaintiff,
8
                                                 **ORDER DENYING MOTION TO**
9          v.                                    **DISMISS**

10   DOCUSIGN, INC., et al.,                     Re: Dkt. No. 68
                    Defendants.
11

12

13         The lead plaintiffs in this securities fraud class action allege that the defendants, DocuSign,

14   Inc., and several of its then-senior executives, Daniel Springer, Michael Sheridan, Cynthia Gaylor,

15   and Loren Alhadeff ("the individual defendants") (collectively, "DocuSign"), made false and

16   misleading statements to investors about the sustainability of DocuSign's COVID-19 pandemic-

17   driven growth.  DocuSign moves to dismiss, arguing that many of the challenged statements are

18   not actionable because they were forward-looking and protected by the Private Securities

19   Litigation Reform Act ("PSLRA")'s safe-harbor provision, were not false, or amounted to

20   opinions, corporate optimism, or puffery.  It also contends that the complaint fails to allege

21   scienter or loss causation, as required to support the plaintiffs' claim under section 10(b) of the

22   Securities Exchange Act.

23         DocuSign's motion is DENIED.  Although many of the statements at issue were forward-

24   looking, they were not accompanied by adequately cautionary language, placing them beyond safe

25   harbor.  Moreover, the plaintiffs have sufficiently alleged that the defendants had actual

26   knowledge of their falsity.  The plaintiffs have also plausibly shown a strong inference of scienter;

27   multiple confidential witnesses state that DocuSign tracked usage and retention rates among

28   customers who signed up during the pandemic, that those numbers waned during the class period,

United States District Court
Northern District of California

and that the individual defendants had access to those metrics.  This, coupled with certain defendants' stock sales, supports scienter, at least with respect to the statements about customer demand.  The plaintiffs have also pleaded loss causation.  Their claims may proceed.

## BACKGROUND

### I.    DOCUSIGN

DocuSign, a software company, offers customers an "electronic signature solution" or "eSignature" product that allows users to sign and send documents digitally, without needing paper copies or "wet" signatures.  First Am. Compl. ("FAC") [Dkt. No. 59] ¶¶ 1, 3.  This is DocuSign's "flagship product"; according to the FAC, its sales are "the largest single contributor" to DocuSign's revenues.  *Id.* ¶¶ 1, 3.

The onset of the COVID-19 pandemic in March 2020 "ushered in a much more rapid and dramatic growth opportunity for DocuSign," as "nearly every U.S. state issued lockdown or shelter-in-place orders requiring people to stay in their homes and businesses to close in order to mitigate the spread of COVID-19."  *Id.* ¶ 7.  With many businesses operating remotely and employees working from home, DocuSign's eSignature product "represented a crucial alternative" to accomplishing tasks previously done in person—signing documents, for example.  *See id.* ¶ 8.  As a result, the FAC alleges, the demand for the eSignature product "skyrocket[ed] to unprecedented levels" between March and June 2020, with revenue up 27% and billings up 59% from a year earlier.  *See id.*

Some background information about DocuSign is helpful in understanding the allegations at hand.  According to the FAC, a "key performance metric" for DocuSign is "billings," which "measures the amounts invoiced to customers over a particular time period."  *Id.* ¶ 6.  ("Revenue" measures the money the company actually receives from customers.)  *See id.*  Billings is allegedly the "primary metric that DocuSign uses to track performance and growth."  *Id.* ¶ 85.

In order to grow its sales and billings, DocuSign uses what the FAC describes as a "land and expand" business model, where the company would first "land" with a customer—typically by selling its eSignature product for a specific use—and then "expand" by selling additional eSignature products or other products.  *Id.* ¶ 6.  Those other products include the company's

2

"contract lifecycle management" product, known as "CLM," a software that "allowed businesses to manage and track contracts through negotiations with multiple parties." *Id*.

## II.    DOCUSIGN'S STATEMENTS

As the pandemic continued, the FAC alleges, DocuSign "assured investors that DocuSign would continue on the same growth trajectory even after the pandemic subsided." *Id*. ¶ 16.  But DocuSign allegedly "knew and concealed from investors numerous adverse material facts indicating that this COVID-19-fueled demand was unsustainable." *Id*. ¶ 2.  Specifically, the FAC alleges that DocuSign knew that "much of this new business influx was for one-time" COVID-related uses and that customers told the company that they would stop using its eSignature product once they returned to their offices. *Id*.  Internal metrics allegedly confirmed this.  *Id*.

The FAC states that DocuSign made a number of false and misleading statements or omissions, which are detailed below.  *See id*. ¶¶ 228-324.  I have separated them for clarity.

### A.  June 4, 2020 Press Release and Earnings Call

On June 4, 2020 (the first day of the class period), DocuSign held an earnings call to discuss the company's financial results in the first quarter of fiscal year ("FY") 2021.  *Id*. ¶ 230.  During that call, Springer (then DocuSign's Chief Executive Officer) attributed the company's 59% year-over-year billings growth to pandemic-driven demand.  *See id*. ¶¶ 43, 230.  "That said," he continued, "even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes.  Once they take their first digital transformation steps with us and they realize the time, cost, and customer experience benefits, they rarely go back." *Id*. (Statement 1).  In response to a question about one-time COVID use cases on DocuSign's billings growth, Springer said: "We see that as the extreme minority." *Id*. ¶ 231. (Statement 2).

Springer also spoke to the increase of eSignature sales and its impact on sales of the company's "Agreement Cloud," of which CLM was the largest product. *Id*. ¶ 234.  He stated: "[W]e expect the adoption of our core eSignature offering by new customers and the expansion of use cases by existing ones to continue.  This also acts as the on-ramp for the adoption of other Agreement Cloud products, sometimes at the same time and sometimes as follow-ons." *Id*.

United States District Court
Northern District of California

3

1    (Statement 3).  Later, he added: "[W]e've got years of Signature customers that have sort of a

2    pent-up opportunity for us to bring the Agreement Cloud, and that's where we're really focused

3    today." *Id*. ¶ 235. (Statement 4).

4           During the same call, Sheridan (then DocuSign's Chief Financial Officer) discussed the

5    durability of the company's billings growth, stating that "we also believe that these customers will

6    remain with us" (Statement 5) and that DocuSign's "situation is not analogous to Zoom" (a

7    company that provides video conferencing software) because "we think [the 'churn' of customers

8    is] going to remain pretty stable because we think that the value propositions, again, we're

9    delivering are sustainable, whether it's a work-from-home environment or not." *See id*. ¶¶ 44,

10   232-233. (Statement 6).

               **B.  June 10, 2020 Conference**

11          On June 10, 2020, Springer discussed the pandemic's impact on DocuSign's billings

12

13   growth at the William Blair Growth Stock Conference. *Id*. ¶ 243.  When asked about the

14   sustainability of that growth, he said: "While there are some COVID-19 very specific use cases . .

15   . the majority of the things that we've seen has just been an acceleration." *Id*. (Statement 7).

16          **C.  September 3, 2020 Earnings Call**

17          DocuSign held another earnings call on September 3, 2020, to discuss company's financial

18   results from the second quarter of FY 2021.  *Id*. ¶ 246.  During that call, Springer said that the

19   greater adoption of DocuSign's offerings was "something we believe will persist beyond the

20   crisis.  Because in our experience, it's very rare to see anyone go back to paper once they've gone

21   digital."  *Id*. (Statement 8).  Springer also stated that "the trends that emerged in the latter half of

22   [the first quarter] have continued throughout [the second quarter]" and "[w]e've seen a sustained

23   rise in demand for our core eSignature offering."  *Id*. ¶ 247. (Statement 9).  He later discussed the

24   "need to digitize the business," saying that "we believe that, that's going to be sustained even after

25   things return to whatever normal looks like in the future . . . we don't see trends that things are

26   going to return to the way they looked and trended pre-COVID."  *Id*. ¶ 248. (Statement 10).

27          **D.  September 9, 2020 Conference**

28          Springer attended the DA Davidson Software and Internet Conference on September 9,

2020.  *Id.* ¶ 252.  There, he discussed the competition from another company, Adobe, saying "[t]here has been virtually no change since we've been a public company, 10 quarters in, and we're just not seeing it" (Statement 11) and that instead of any other eSignature provider, "our biggest competitor is paper."  *Id.* (Statement 12)

### E.  September 14, 2020 Conference

Less than a week later, Springer participated in the Deutsche Bank Virtual Technology Conference, where he again discussed the sustainability of DocuSign's billings growth.  *Id.* ¶ 254. When asked whether DocuSign's demand was beginning to "normalize" to pre-pandemic levels, Springer stressed that after people switch from paper to digital processes, "they don't go back.  No one's going to." *Id.* (Statement 13).  "It just doesn't happen," he added.  *Id.* (Statement 14). "[T]hey're here for the long term."  *Id.* (Statement 15).

Springer also mentioned Adobe and other eSignature providers, saying "we haven't seen a lot of change" in competition.  *Id.* ¶ 255. (Statement 16).

### F.  September 15, 2020 Conference

On September 15, 2020, Springer attended the Jefferies Software Virtual Conference and was asked about the "durability of the digital transformation many businesses had experienced because of COVID-19."  *Id.* ¶ 257.  "I feel very strongly the answer is people don't go back," (Statement 17) he said, adding: "[W]e don't feel there's a sense of stuff that's accelerated this year would disappear."  *Id.* (Statement 18).

### G.  December 3, 2020 Earnings Call

DocuSign discussed the company's financial results from the third quarter of FY 2021 during a December 3, 2020, earnings call.  *Id.* ¶ 259.  Springer again expressed confidence about the sustainability of the company's billings growth, saying that DocuSign's value remained strong "whether customers began using our product before or after the pandemic began," adding: "We don't see customers going back to pen and paper."  *Id.* (Statement 19).  Later, he reiterated this sentiment, saying that customers "do not go back" and that "[w]e believe that trend"—the move by customers from paper to digital processes—"will hold when the pandemic subsides."  *Id.* ¶ 260. (Statement 20).

United States District Court
Northern District of California

Springer was also asked whether the demand for DocuSign's eSignature product was "'pulled forward' by the pandemic, such that demand in later quarters would decrease." *Id*. ¶ 261. He denied the proposition, saying that "we've accelerated that growth not because we're sort of robbing from the future, but we're just getting closer towards that $25 billion TAM opportunity." *Id*. (Statement 21).[1]  He also continued to tout DocuSign's CLM product, stating that "Agreement Cloud is right back where we want it to be in terms of top of mind with our customers" (Statement 22) and that "I think that's what we're going to see throughout the next few quarters." *Id*. ¶ 262. (Statement 23).

**H.  January 11, 2021 Conference**

On January 11, 2021, Gaylor (who replaced Sheridan as DocuSign's Chief Financial Officer in September 2020), participated in the Needham Virtual Growth Conference, where she discussed the increased demand for DocuSign's eSignature product. *Id*. ¶¶ 45, 266.  Gaylor said that "the pandemic really accelerated what people were otherwise going to do.  And so it's not kind of a one and done sort of mentality.  It's really a kind of progression of things that were going to happen over a period of time." *Id*. ¶ 266 (Statement 24).  She further stated that the company "continue[s] to see that accelerated demand.  But we believe it's kind of once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience and are in the kind of more digitized experience." *Id*. (Statement 25).  "We also believe that, that demand will continue," she added.  *Id*. (Statement 26).

Gaylor reiterated this later at the conference, stating that "people, once they move on to our platform and into kind of our product portfolio, they don't tend to go back to pen and paper." *Id*. (Statement 27).

**I.  March 1, 2021 Conference**

Springer attended the Morgan Stanley Technology, Media and Telecom Conference on March 1, 2021, where he again discussed the sustainability of DocuSign's demand.  *Id*. ¶ 268.

---

[1] "TAM" stands for "Total Addressable Market," a "business term used to describe a business' revenue potential, or the total amount of revenue that a product or service could possibly generate for the business."  FAC ¶ 72.  "In other words, it is the total amount of market demand for a product or service in a given year."  *Id*.

United States District Court
Northern District of California

"[N]o one's going back to paper and manual process," he said.  *Id.*  (Statement 28).  "Going back to paper, going back to the manual processes and the time lags and the cost increases, we just don't see people going back in use cases." *Id.* (Statement 29).

### J.    March 11, 2021 Earnings Call

DocuSign held another earnings call on March 11, 2021, this time to discuss the company's financial results in the fourth quarter of FY 2021.  *Id.* ¶ 272.  Springer again reiterated that "we don't believe our new and expanded customers will be going back to paper even after the pandemic recedes." *Id.* (Statement 30).

In response to a question about whether DocuSign was seeing any change in demand given the rollout of the COVID-19 vaccine, Springer said: "We haven't seen anything" (Statement 31) and "we haven't seen anything in our business that suggests that, that will change." *Id.* ¶ 273. (Statement 32).  Regarding customers, he said: "[T]hey're not going back.  People aren't going back to paper.  They're not going back to manual processing." *Id.* (Statement 33).  He then reiterated that, "[w]e haven't seen any change yet" (Statement 34) and "at this point, yes, we haven't seen a change yet." *Id.* (Statement 35).

Springer was also asked about whether DocuSign had seen any changes in competition from other companies offering eSignature products.  *Id.* ¶ 274.  "[W]e don't think there's been any change," he said, adding: "We always say very aggressively, when we think about competition, we fundamentally think about paper, when we think about paper and manual processes." *Id.* (Statement 36).  Later during the call, he reiterated that "the competition . . . is paper." *Id.* (Statement 37).

### K.    March 24, 2021 "Analyst Day"

On March 24, 2021, DocuSign hosted an "Analyst Day," where Gaylor interviewed Springer about several topics.  *Id.*  When asking her first question to Springer, Gaylor stated that "the permanence of these trends we've been seeing across the business look like they're really here to stay." *Id.* ¶ 278. (Statement 38).  Later, in response to a question from Gaylor about the demand for non-eSignature products, Springer "touted CLM as a significant driver of DocuSign's future growth," stating that CLM and CLM+ (an advanced CLM product) are "going to be a real

growth area for us.  And I think we're going to see that really kick off in fiscal year '22 to start to reaccelerate, and that will become noticeable as a growth driver in our business literally this year." *Id*. ¶ 279 (Statement 39).

During another portion of the interview, Springer was asked "how investors should think about DocuSign post-pandemic" and about the sustainability of the company's growth.  *Id*. ¶ 280. In response, he said: "[T]his is not a short-term thing.  This is not something that just sort of happened because of the pandemic." *Id*. (Statement 40).  "[W]e believe it's going to continue to happen for years," he said (Statement 41), adding that "we've seen sort of a one-time step-up where people actually accelerated their transformation at a faster rate." *Id*. (Statement 42).

Also during the event, Alhadeff (then DocuSign's Chief Revenue Officer) was asked "whether there was a change in the competitive landscape with regard to DocuSign's competition with Adobe," to which he replied: "[W]e don't see a big change in the competitive dynamic with Adobe." *Id*. ¶¶ 46, 281. (Statement 43).

Later, during a question-and-answer session, Gaylor stated that CLM "is a huge part of our future in terms of how we're going to grow revenue over time [a]nd kind of sustain our growth over a long period of time." *Id*. ¶ 282. (Statement 44).

**L. March 31, 2021 Tweet**

On March 31, 2021, Alhadeff sent a tweet with a link to a news article discussing the increased demand for DocuSign's eSignature product and wrote: "I don't see levels of adoption @DocuSign changing significantly post-pandemic." *Id*. ¶ 284. (Statement 45).

**M. June 3, 2021 Earnings Call**

During DocuSign's June 3, 2021, earnings call discussing the company's financial results from the first quarter of FY 2022, Springer reiterated his statements about the company's growth. *Id*. ¶ 286.  Specifically, he said that "once businesses digitally transform their agreement processes, they simply don't go back.  We believe this trend will only accelerate as the anywhere economy continues to emerge." *Id*. (Statement 46).  Later, he added that "once [customers] see the benefits of the digital transformation, particularly around the Agreement Cloud from having opportunity to grow their business with us, they don't go back.  In fact, they look for additional

opportunities to expand." *Id*. (Statement 47).

**N.  June 10, 2021 Conference**

Gaylor participated in the Robert W. Baird Global Consumer, Technology & Services Conference on June 10, 2021, where she was asked whether DocuSign was experiencing "any 'moderation' in demand as the COVID-19 pandemic waned." *Id*. ¶ 288.  She "denied any slowdown," saying that once people moved to a digital platform "they're not going to go back and move to pen and paper, right?" *Id*. (Statement 48).  Later, when asked about the impact of competition on DocuSign's business, Gaylor responded: "I'd say there hasn't been really a changing dynamic[]." *Id*. ¶ 289. (Statement 49).

**O.  September 2, 2021 Earnings Call**

DocuSign held another earnings call on September 2, 2021 to discuss the company's financial results from the second quarter of FY 2022.  *Id*. ¶ 293.  During that call, Gaylor stated that "regardless of whether people go back to the office, we don't see them going back to pen and paper." *Id*. (Statement 50).  Later, Springer denied seeing any slowdown in demand: "I don't think there's a perspective we have that the business has some significant slowdown . . . we're not seeing any differences in churn rates in any meaningful way . . . customers very rarely leave us." *Id*. ¶ 294. (Statement 51).

**P.  September 8, 2021 Conference**

On September 8, 2021, Gaylor attended the Wolfe Research Inaugural TMT Conference, where she was asked about the durability of DocuSign's growth and reiterated what has become a familiar refrain in this case: "[P]eople are not going to go back to pen and paper."  *See id*. ¶ 297. (Statement 52).  Later, when asked about the impact of COVID-related one-time use cases, Gaylor responded: "I would say that's the vast minority versus the majority of the motion." *Id*. ¶ 298. (Statement 53).

**III.   WARNING SIGNS**

Although DocuSign expressed confidence about customer demand with investors, in reality, the FAC alleges, the company saw internal warning signs that the pandemic-related boom would not last.  *See id*. ¶ 94.  Most relevant to this motion, those signs included the following.

First, the FAC alleges that between March and June 2020 (the months preceding the class period), customers told DocuSign that they did not intend to renew their eSignature contracts once the pandemic waned and they could return to their offices. *Id.* ¶¶ 95-99, 102-107. The complaint describes these as "one-time use cases" or "one-off uses." *See id.* In addition, customers declined to sign three-year contracts with DocuSign, instead opting for one-year contracts that "allowed them the flexibility to opt out of DocuSign once the pandemic subsided." *Id.* ¶¶ 112-115. The FAC points to statements from multiple confidential witnesses ("CWs") in support of these allegations. *See id.* ¶¶ 96-99, 102-107, 112-115.

Toward the end of 2020, as COVID-19 vaccines began to roll out, the FAC alleges that internal metrics proved out those initial warning signs. *See id.* ¶ 135. It alleges that DocuSign tracked customer and sales data through a database called "Salesforce," which the company's executives had access to. *See id.* ¶ 63. Another repository, "Snowflake," stored all of the company's data, including that within Salesforce. *See id.* ¶ 49. In those databases, DocuSign "actively tracked pre-COVID-19 customers separately from customers who signed on to DocuSign during the COVID-19 pandemic," and tracked key metrics such as product usage and retention rates separately for the latter. *Id.* ¶¶ 138-139. According to the FAC, this data began to show that pandemic customers "used and retained DocuSign at lower rates than customers who purchased DocuSign before the pandemic began." *Id.* ¶ 140. Multiple confidential witnesses discussed lagging metrics, including those showing that customers who signed up during the pandemic had a "higher churn rate and a steeper drop off in usage" and lower renewal rates. *See id.* ¶¶ 140, 144, 146. For example, CW 1 recalled that by December 2020, usage levels had dropped by about 30% year-over-year. *Id.* ¶ 140. The FAC alleges that that trend continued throughout the class period, and that various confidential witnesses reported these and other metrics to supervisors who reported to the individual defendants. *See, e.g.*, *id.* ¶¶ 141, 148.

The FAC also alleges that DocuSign saw increased competition from other companies, primarily Adobe, "further reducing demand for DocuSign's eSignature product." *Id.* ¶ 160. DocuSign was allegedly struggling to sell CLM during the class period, also contrary to what the company said. *Id.* ¶ 168.

## IV.    DISCLOSURES

According to the FAC, statements made during DocuSign's next earning calls revealed that the company was "experiencing dramatically slowed billings growth as a result of waning demand for its products as customers began returning to their offices and resumed in-person signature processes," with the "full truth" revealed in June 2022.  *See id.* ¶¶ 300, 312, 318.

### A.  December 2, 2021 Earnings Call

After the market closed on December 2, 2021, DocuSign released its financial results for the third quarter of FY 2022, revealing that its year-over-year billings growth had decreased to 28% for the quarter.  *Id.* ¶ 300.  The FAC alleges this was the "second lowest billings growth that DocuSign had ever reported as a public company" and represented a 35% decrease from the same quarter a year earlier, along with an 8% decrease from the same quarter immediately preceding the pandemic.  *Id.*  According to the FAC, this means "that not only was DocuSign far from sustaining the high growth that it had experienced during the pandemic, but it was actually performing even lower than it had before the pandemic."  *Id.*  DocuSign also announced Sheridan's departure from the company.  *Id.* ¶ 301.

DocuSign held an earnings call on December 2, 2021, to discuss the company's financial results.  *Id.*  During that call, Springer stated that the company "saw demand slow and the urgency of customers' buying patterns temper," describing those as "primary contributors" to the billings miss.  *Id.* ¶ 302.  He also stated that DocuSign had "always" expected that demand would decrease after the pandemic subsided:

> [W]e always expected there to be a reduction of that really heightened COVID buying, which drove our growth rates dramatically higher than they had ever been even as we got bigger.  So we expected that.  I think the piece that we didn't expect are really the other two factors.  So the one is while we would expect people to sort of return to sort of normalcy in purchasing, we didn't realize that they had been sort of well stocked with DocuSign, if you will.  And we saw some of that purchasing behavior where people were, as you said, in that heightened demand model, probably purchasing more aggressively than we would have seen in the past.

*Id.*  However, Springer insisted that even as the pandemic receded and people began to return to their offices, "they are not returning to paper" and "eSignature and the broader Agreement Cloud are clearly here to stay."  *Id.* ¶ 304. (Statement 54).

11

In response to these disclosures, the FAC alleges, DocuSign's stock price dropped "dramatically" on December 3, 2021, falling $98.73 per share (more than 42%) to close at $135.09.  *Id*. ¶ 306.

**B.   March 10, 2022 Earnings Call**

After the market closed on March 10, 2022, DocuSign released its financial results for the fourth quarter of FY 2022, showing that the company's year-over-year billings growth had again dropped, this time to 25% for the quarter.  *Id*. ¶ 312.  This was "the lowest billings growth DocuSign had ever experienced as a public company," and was "far short" of the 59% growth it reported at the beginning of the pandemic and the 40% growth reported a year prior.  *See id.*

DocuSign also said that its billings guidance for the fiscal year ending on January 31, 2023, would be between $2.71 and $2.73 billion, "representing a substantial slowdown in billings growth."  *Id*.  In addition, DocuSign announced Alhadeff's resignation.  *Id*.

DocuSign also held an earnings call on March 10, during which Springer attributed the fourth quarter results and lower billings guidance to "waning demand for the company's product as companies returned to in-person work environments."  *Id*. ¶ 313.  He said:

> We saw a diminished level of urgency in [customers'] buying patterns. . . . As we saw urgent demand wane, we have just begun to shift our sales motion back to a demand generation mode of cross-sell, upsell and departmental expansion.

*Id*.  Still, Springer reiterated that as people began to return to their offices, "they are not returning to paper" and "eSignature is clearly here to stay."  *Id*. ¶ 317 (Statement 55).

The next day, DocuSign's stock price fell $18.87 per share, or more than 20%, closing at $75.01.  *Id*. ¶ 314.  According to the FAC, this was the "lowest price per share for DocuSign stock since March 2020, thereby erasing the entirety of DocuSign's stock gains during the COVID-19 pandemic."  *Id*.

**C.   June 9, 2022 Earnings Call**

The FAC alleges that on June 9, 2022, "the full truth concerning the temporary nature of that COVID-driven demand was fully revealed through disclosures of a third consecutive quarter of poor billings growth."  *Id*. ¶ 318.  On that day, after the market closed, DocuSign released its

financial results for the first quarter of FY 2023, showing that its year-over-year billings growth was at 16% for the quarter—"the lowest billings growth DocuSign had ever experienced as a public company." *Id*. DocuSign also lowered its billings guidance for the second quarter of FY 2023 by approximately $200 million, "representing even lower growth moving forward." *Id*.

DocuSign held an earnings call the same day, during which Springer attributed the lower billings growth and guidance to waning customer demand. *Id*. ¶ 319. At one point, he stated that much of the demand that DocuSign experienced during the pandemic was the result of single use cases that no longer existed. *Id*. Specifically, he said:

> I would agree with the assessment that initially, probably underestimated, I underestimated sort of the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was. Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like, six, seven quarters. So it wasn't that we were not aware of the dramatic economics of it. I think we just didn't understand what portion of that would be things like one-time use cases or an acceleration where people bought in a more fulsome way.

*Id*.

On June 10, 2022, the price of DocuSign stock fell again, this time by $21.43 (or more than 24.5%) per share, closing at $65.93. *Id*. ¶ 321. According to the FAC, this was DocuSign's lowest share price since October 2019. *Id*.

This suit was filed in February 2022. Dkt. No. 1. After I appointed the lead plaintiffs, they filed the FAC alleging two counts: violations of section 10(b) and 20(a) of the Securities Exchange Act. Dkt. Nos. 42, 59.[2]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

---

[2] After this motion was argued and taken under submission, the parties filed a joint stipulation seeking leave to file statements of recent decision without argument to alert me to two recent decisions they believe are relevant. Dkt. No. 85. The request is GRANTED. I considered both cases—*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) and *Golubowski v. Robinhood Markets, Inc.*, No. 21-CV-09767-EMC, 2023 WL 1927616 (N.D. Cal. Feb. 10, 2023)—in my decision.

United States District Court
Northern District of California

1  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff

2  pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for

3  the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There

4  must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts

5  do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to

6  "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

7      In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

8  court accepts his allegations as true and draws all reasonable inferences in his favor.  *Usher v. City*

9  *of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as

10  true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

11  inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

12      A complaint alleging a violation of section 10(b) of the Securities Exchange Act "must

13  meet both the heightened pleading requirements for fraud" under Federal Rule of Civil Procedure

14  9(b) and the "exacting pleading requirements" of the PSLRA.  *In re Quality Sys., Inc. Sec. Litig.*,

15  865 F.3d 1130, 1140 (9th Cir. 2017) (citations omitted).  This requires that the complaint "state

16  with particularity the circumstances constituting fraud" (to satisfy Rule 9(b)) and "state with

17  particularity facts giving rise to a strong inference that the defendant acted with the required state

18  of mind" (to meet the PSLRA's standard).  *See id*. (same).

19                          **DISCUSSION**

20  **I.      JUDICIAL NOTICE AND INCORPORATION BY REFERENCE**

21      I begin with DocuSign's request that I consider 46 exhibits, totaling 510 pages, as

22  judicially noticeable facts, documents incorporated into the FAC by reference, or documents

23  properly considered under the PSLRA.  *See* RJN [Dkt. No. 70] 1:5-15; *see also* Bretan Decl. [Dkt.

24  No. 69] Exs. 1-46.  The plaintiffs oppose, arguing that DocuSign's request is abusive and attempts

25  to use these documents to "impermissibly establish their alternative version of facts" in a

26  "summary judgment-style evidentiary attack[.]"  *See* Oppo. to RJN [Dkt. No. 72] 2:21, 4:26-5:1.

27      Generally, a district court may not consider material outside the pleadings when

28  considering a Rule 12(b)(6) motion to dismiss.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688

1    (9th Cir. 2001).  Otherwise, the motion is converted into one for summary judgment.  *See* Fed. R.

2    Civ. P. 12(d).  There are two relevant exceptions to this rule: "documents incorporated into the

3    complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v.*

4    *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

5         The Ninth Circuit has identified a "concerning pattern in securities cases": parties

6    "exploiting these procedures improperly to defeat what would otherwise constitute adequately

7    stated claims at the pleading stage."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th

8    Cir. 2018).  Although these doctrines "do have roles to play at the pleading stage," the court noted

9    that the "overuse and improper application of judicial notice and the incorporation-by-reference

10   doctrine . . . can lead to unintended and harmful results," including "premature dismissals of

11   plausible claims that may turn out to be valid after discovery."  *See id.*  The court specifically

12   referenced the "alluring temptation" defendants face "to pile on numerous documents to their

13   motions to dismiss to undermine the complaint."  *Id.*

14        On its face, DocuSign's request seems to be such a pile-on, given the number of exhibits

15   proffered and pages within.  The size of DocuSign's request is more akin to the amount of

16   evidence submitted on summary judgment, not alongside a motion to dismiss.  I share the Ninth

17   Circuit's concern about prematurely dismissing the plaintiffs' claims based on those extrinsic

18   documents, particularly because Rule 9(b) and the PSLRA already demand a heightened pleading

19   standard and because DocuSign has "materials to which the plaintiffs do not yet have access."  *See*

20   *id.*  That said, my takeaway from *Khoja* is that courts must examine such requests carefully, and

21   determine "when it is proper to take judicial notice of facts in documents, or to incorporate by

22   reference documents into a complaint, and when it is not."  *See id.* at 999.

23        A court may take judicial notice of a fact "that is not subject to reasonable dispute because

24   it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

25   and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

26   Evid. 201(b).

27        "Although mere mention of the existence of a document is insufficient to incorporate the

28   contents of a document, the document is incorporated when its contents are described and the

United States District Court
Northern District of California

document is integral to the complaint." *Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir. 2018) (citation and quotations omitted). The Ninth Circuit thoroughly considered this doctrine in *Khoja*, writing that it "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." 899 F.3d at 1002. But, the court cautioned, it "is not a tool for defendants to short-circuit the resolution of a well-pleaded claim," for example, by attempting to use a document that is not mentioned in the complaint "to insert their own version of events into the complaint to defeat otherwise cognizable claims." *See id.* at 1002-03. Although a court may assume the contents of an incorporated document are true for the purposes of a motion to dismiss (unlike judicial notice), "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *See id.* at 1003 (citations omitted).

   With this guidance in mind, I turn to the documents at hand. I will take judicial notice of the earnings call transcripts (Exhibits 4, 9, 16, 21, 25, 30, 34, 38, and 41); Forms 10-Q (Exhibits 5, 10, 17, 26, 31, 35, and 42); Forms 8-K and accompanying exhibits (Exhibits 2, 3, 8, 15, 20, 24, 29, 33, 37, and 40); and Forms 10-K (22 and 39), as DocuSign filed these documents with the Securities Exchange Commission ("SEC") or they are otherwise publicly available, and they are "sources whose accuracy cannot reasonably be questioned." *See Khoja*, 899 F.3d at 999-1000 (affirming that courts may take notice of certain facts within investor call transcripts); *see also Wochos v. Tesla, Inc.* ("*Wochos I*"), No. 17-CV-05828-CRB, 2019 WL 1332395, at *2 (N.D. Cal. Mar. 25, 2019) (taking notice of documents filed with the SEC and earnings call transcripts because they were publicly filed). It is also worth noting that the plaintiffs do not object to using the earnings call transcripts or SEC filings "for the limited purpose of determining what information was disclosed to investors during the class period, including the full language of any alleged misstatements made therein or any cautionary statements accompanying a forward-looking statement," which is how I intend to use them. *See* Oppo. to RJN at 6 n.3. That caveat is important. I will only take notice of facts within these documents that show what representations DocuSign made to the market. I will not consider them for the truth of any of the facts asserted. *See Wochos I*, 2019 WL 1332395, at *2 (drawing the same distinction).

The analyst reports (Exhibits 7, 11, 28, and 36) are also subject to judicial notice, "not for the truth of their contents, but to determine the information available to the market." *See Yaron v. Intersect ENT, Inc.*, No. 19-CV-02647-JSW, 2020 WL 6750568, at *4 (N.D. Cal. June 19, 2020). I will consider facts within these reports only to that extent. I will also take notice of Exhibit 46, which is a table "reflecting the daily closing stock prices for DocuSign common stock from December 1, 2021 to December 31, 2021." *See* Bretan Decl. ¶ 47. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) ("Information about the stock price of publicly traded companies [is] the proper subject of judicial notice.").

I will also consider transcripts from the conferences and DocuSign's Analyst Day, which are mentioned in the FAC (Exhibits 6, 12, 13, 14, 18, 19, 23, 27, and 32). The FAC alleges certain statements made by DocuSign at these conferences, which are integral to the plaintiffs' claims because they were allegedly false and misleading. *See, e.g.,* FAC ¶¶ 243, 252, 288-89. The full transcripts are therefore incorporated by reference. However, a similar caveat exists as before. Although I may assume the contents of these transcripts to be true, I will not to the extent that "such assumptions only serve to dispute facts stated" in the FAC. *See Khoja*, 899 F.3d at 1003.

That leaves Exhibits 1, 43, 44, and 45. Exhibit 1 is a copy of "charts summarizing DocuSign's publicly disclosed quarterly and fiscal year financial guidance and actual results" during the class period compiled by DocuSign's counsel. *See* Bretan Decl. ¶ 2. I will not consider this exhibit. It cannot be judicially noticed because it is subject to reasonable dispute (as evidenced by the plaintiffs' objections). *See* Oppo. to RJN at 7:11-18. As for incorporation by reference, this veers toward an attempt by DocuSign to insert its "own version of events into the complaint," which is impermissible. *See Khoja*, 899 F.3d at 1002. Finally, I will not consider the remaining exhibits (SEC filings from Zoom and Slack, and Springer's Forms 4) because they are not relevant to my analysis. *See* Bretan Decl., Exs. 43-45.

## II.      SECTION 10(B) CLAIM

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary

United States District Court
Northern District of California

or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, prohibits any person from "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted).

DocuSign argues that the plaintiffs have not adequately alleged an actionable misrepresentation, scienter, or loss causation. *See* Mot. to Dismiss ("MTD") [Dkt. No. 68] 1:12-15. Because DocuSign argues that the challenged statements are not actionable, I begin there.

**A. Actionable Statements**

DocuSign contends that the FAC fails to allege any actionable misrepresentation because the challenged statements are shielded by the PSLRA's safe-harbor provision, are not shown to be false, or amount to opinions, puffery, or corporate optimism. *See id.* at 9:13-17:19. I address each contention in turn.

**1. Safe Harbor**

The PSLRA protects certain "forward-looking" statements from liability. *See* 15 U.S.C. § 78u-5(c). The safe-harbor provision is "designed to protect companies and their officials when they merely fall short of their optimistic projections." *Wochos v. Tesla, Inc.* ("*Wochos II*"), 985 F.3d 1180, 1189 (9th Cir. 2021) (citation and quotations omitted). Relevant here, the provision applies to (1) forward-looking statements that are identified as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," and (2) forward-looking statements that were not made with "actual knowledge" by the speaker "that the statement was false or misleading." 15 U.S.C. §§ 78u-5(c)(1)(A)-(B).

United States District Court
Northern District of California

A forward-looking statement is statutorily defined as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

*Id*. § 78u-5(i)(1).

The Ninth Circuit has held that the safe-harbor provision "does not apply in an all-or-nothing fashion, because some statements about the future may combine non-actionable forward-looking statements with separable—and actionable—non-forward-looking statements." *Wochos II*, 985 F.3d at 1190 (citing *Quality Sys.*, 865 F.3d at 1142). When "mixed" statements such as these are at issue, "only the forward-looking aspects could be immunized from liability, because the safe harbor is not 'designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.'" *Id*. (quoting *Quality Sys.*, 865 F.3d at 1141-42).

Whether a statement is forward-looking and protected by the PSLRA's safe harbor "turns on particular language" and therefore requires an individualized analysis of each statement. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 736 (N.D. Cal. 2022).

### i. Forward-Looking Statements

The threshold question is whether any of the statements at issue are forward-looking. DocuSign argues that statements about "future demand, future billings, future revenue, and future

growth are indisputably forward-looking." MTD at 11:1-2. It specifically points to "predictions about demand for DocuSign products in light of the pandemic" (Statements 1-3, 5-8, 10, 13, 17-20, 24-30, 40-42, 45-48, 50-55); "predictions regarding demand for CLM" (Statements 3, 22-23, 39, 44); and "further statements concerning DocuSign's growth and future economic performance" (Statements 21, 26, 38, 40-42).[3] *See id.* at 10:15-25. In response, the plaintiffs assert that the "vast majority of the misstatements are non-forward-looking representations about 'current or past facts,' or at the least, 'mixed' statements that include such embedded representations, which are 'not protected.'" Oppo. [Dkt. No. 71] 13:21-14:2 (citing *Quality Sys.*, 865 F.3d at 1142).

The answer lies in the middle. As alleged, some of these statements are more clearly—and only—about "current or past facts," which are not forward-looking. *See Quality Sys.*, 865 F.3d at 1142. For example, when Springer discussed one-time COVID use cases in Statement 2, he allegedly said, "We see that as the extreme minority," indicating that he was speaking about the current impact of such cases on DocuSign's billings growth. *See* FAC ¶ 231. The same is true for Statement 7, when Springer was asked about the sustainability of DocuSign's pandemic-related growth, and responded: "While there are some COVID-19 very specific use cases . . . the majority of the things that we've seen has just been an acceleration." *See id.* ¶ 243. Similarly, when Springer discussed whether there was any slowdown in demand during the September 2, 2021, earnings call, he discussed current facts about DocuSign's business in Statement 51: "[W]e're not seeing any difference in churn rates in any meaningful way . . . customers very rarely leave us." *See id.* ¶ 295. Of the statements identified by DocuSign, Statements 2, 7, 19, 21-22, 24, 27, 38, 40, 42, 47, 51, and 53 are not forward-looking, as they are about current or past facts regarding DocuSign's business. *See id.* ¶¶ 231, 243, 259, 261-262, 266, 278, 280, 286, 294, 298.

---

[3] There is some discrepancy between the statements that the FAC alleges were false or misleading and those that DocuSign argues fall within the safe-harbor provision. For example, DocuSign argues that a statement in Paragraph 266—"We've certainly been a beneficiary of that [COVID-19] demand, but we also believe that . . . demand will continue. It may just not continue at the pace that we saw earlier this year."—is forward-looking. *See* MTD at 10:23-25. But according to the FAC, the plaintiffs only allege that the phrase "we also believe that, that demand will continue" was false and misleading. *See* FAC ¶ 266; *see also* ¶ 228 (explaining that statements in bold and italicized font are alleged to be false and misleading).

United States District Court
Northern District of California

United States District Court
Northern District of California

Other statements *are* forward-looking, largely because they are predictions about customer behavior and serve as an assumption underlying or relating to DocuSign's future revenue and earnings. *See* 15 U.S.C. § 78u-5(i)(1)(A), (D). By way of example, this includes Statement 5 ("[W]e also believe that these customers will remain with us."); Statement 26 ("[W]e also believe that, that demand will continue."); Statement 30 ("[W]e don't believe our new or expanded customers will be going back to paper even after the pandemic recedes."); Statement 41 ("[W]e believe it's going to continue to happen for years."); Statement 45 ("I don't see levels of adoption @DocuSign changing significantly post-pandemic."); and comments about customers going "back to pen and paper," including Statement 48 ("[T]hey're not going to go back and move to pen and paper, right?") and Statement 50 ("[R]egardless of whether people go back to the office, we don't see them going back to pen and paper."). *See* FAC ¶¶ 232, 266, 272, 280, 284, 288, 293.

Some of the statements about customer behavior are more ambiguous on their face, as they do not clearly show on their own whether they are forward-looking. The context in which these statements were made provides the necessary clarity. Statements 28 and 29, made by Springer at the March 1, 2021, conference, serve as an example. *See id.* ¶ 268. There, Springer said:

> [W]hen I think about going forward, we think two big things. One, people are going to continue to accelerate on their digital transformations because they're seeing the incredibly high—higher ROI. So that's for sure one. Second is *no one's going back to paper and manual process*. Once you transform your business that way, seeing the value, sort of done the work, right. *Going back to paper, going back to the manual processes and the time lags and the cost increases, we just don't see people going back in use cases.*

*Id.* Although the plaintiffs only challenge the italicized statements as false or misleading, the entirety of Springer's comments—namely, his thoughts on "going forward"—indicate that they are forward-looking statements about anticipated customer behavior. Statements 13, 28-29, and 52 are forward-looking based on their surrounding context. *See id.* ¶¶ 254, 268, 297.

Additional statements are forward-looking because they speak to the "plans and objectives of management for future operations, including plans or objectives relating to" DocuSign's products or services. *See* 15 U.S.C. § 78u-5(i)(1)(B). That includes Statement 23, where Springer said during the December 3, 2020, earnings call that a "very large customer" told him they were

"ready to reaccelerate with CLM.  *And I think that's what we're going to see throughout the next few quarters.*"  *See* FAC ¶ 262 (emphasis added).  It also includes Statement 39, when Springer again said that CLM and CLM+ were "going to be a real growth area for us.  And I think we're going to see that really kick off in fiscal year '22 to start to reaccelerate, and that will become noticeable as a growth driver in our business literally this year."  *Id.* ¶ 279.  Statement 44, where Gaylor described CLM as "a huge part of our future in terms of how we're going to grow revenue over time," is forward-looking for the same reason.  *See id.* ¶ 282.  In all, Statements 5, 13, 17-18, 23, 26, 28-30, 39, 41, 44-45, 48, 50, and 52 are forward-looking.

Of the remaining statements, Statements 1, 3, 6, 8, 10, 20, 25, 46, and 54-55 are mixed, with portions that are forward-looking and others that are not.  Accordingly, only the forward-looking statements may be shielded from liability.  *See Quality Sys.*, 865 F.3d at 1141-42.  For ease of reference, I will list these statements in their entirety and italicize the portions that are forward-looking.

- Statement 1: "*That said, even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes.*  Once they take their first digital transformation steps with us and they realize the time, cost, and customer experience benefits, they rarely go back."  FAC ¶ 230.

- Statement 3: "*[W]e expect the adoption of our core eSignature offering by new customers and the expansion of use cases by existing ones to continue.*  This also acts as the on-ramp for the adoption of other Agreement Cloud products, sometimes at the same time and sometimes as follow-ons."  *Id.* ¶ 234.

- Statement 6: "[DocuSign's] situation is not analogous to Zoom [because] *we think [the 'churn' of customers is] going to remain pretty stable because we think the value propositions, again, we're delivering are sustainable, whether it's a work-from-home environment or not.*"  *Id.* ¶ 233.

- Statement 8: "[The greater adoption of DocuSign offerings is] *something we believe will persist beyond the crisis.*  Because in our experience, it's very rare to see anyone go back to paper once they've gone digital."  *Id.* ¶ 246.

- Statement 10: "*[W]e believe that [the need to digitize], that's going to be sustained even after things return to whatever normal looks like in the future . . . we don't see trends that things are going to return to the way they looked and trended pre-COVID.*"  *Id.* ¶ 248.

- Statement 20: "[When customers move from paper- to digital-based processes] they do not go back. *We believe that trend will hold when the pandemic subsides*." *Id.* ¶ 260.

- Statement 25: "[DocuSign] continue[s] to see that accelerated demand. *But we believe it's kind of once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience and are in the kind of more digitized experience*." *Id.* ¶ 266.

- Statement 46: "[O]nce businesses digitally transform their agreement processes, they simply don't go back. *We believe this trend will only accelerate as the anywhere economy continues to emerge*." *Id.* ¶ 286.

In addition, the full context of Statements 54 and 55 show that they are also mixed. The transcripts of the earning calls reveal that when Springer made these comments, he was discussing DocuSign's market potential. *See* Bretan Decl., Exs. 34, 38.

- Statement 54: "Even as the pandemic subsides and people begin to return to the office] they are not returning to paper. *eSignature and the broader Agreement Cloud are clearly here to stay*." FAC ¶ 304.

- Statement 55: "[As the pandemic subsides and people begin to return to the office], they are not returning to paper. *eSignature is clearly here to stay*." *Id.* ¶ 317.

To recap: Of the statements that DocuSign specifically challenges as forward-looking, Statements 1, 3, 5-6, 8, 10, 13, 17-18, 20, 23, 25-26, 28-30, 39, 41, 44-46, 48, 50, 52, and 54-55 are either forward-looking or are mixed statements with forward-looking portions.

### ii.   Cautionary Language

The next question is whether any of the forward-looking statements were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" that would place them within the first prong of the safe-harbor provision. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil." *QuantumScape*, 580 F. Supp. 3d at 737 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). The caution "must precisely and directly address the alleged misrepresentations." *Id.* (citations omitted and cleaned up).

DocuSign argues that its quarterly earnings releases, conference calls, and Forms 10-Q and

10-K provided such cautionary language by "expressly stat[ing] the array of factors that could adversely impact its business, specifically including the global pandemic and resulting rapid changes to business conditions." MTD at 11:21-24. The plaintiffs respond that many of these statements were not identified as forward-looking nor accompanied by any cautionary language, and thus are not protected by the safe-harbor provision. Oppo. at 15:1-3. They further argue that "[a]ny other forward-looking statements were not accompanied by meaningful cautionary language sufficient to invoke safe harbor protection." *Id*. at 15:3-4.

At the outset, Statements 13, 17-18, 25-26, 28-29, 45, 48, and 52, do not meet the requirements of the first prong of the safe-harbor provision. These statements were made at conferences, DocuSign's Analyst Day, or in Alhadeff's tweet, and there is no indication from the relevant transcripts or text of the tweet that any were identified as forward-looking when they were made.[4] *See* Bretan Decl., Exs. 13-14, 18-19, 27, 32; FAC ¶ 284 (Alhadeff tweet). DocuSign argues that it "repeatedly noted," including at some of these conferences, that the pandemic had "accelerated adoption of DocuSign eSignature," that "growth rates would decline from peak pandemic levels," and that the "new normal" was unclear. MTD at 12:20-13:5. Even if this language precisely and directly addressed the alleged misrepresentations, the statements at issue were not identified as forward-looking in the first place. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

Statements 5, 23, 30, and 50, and the forward-looking portions of Statements 1, 3, 6, 8, 10, 20, 46, 54, and 55, were made during DocuSign's earnings calls. *See* FAC ¶¶ 230, 232-35, 246, 248, 260, 262, 272, 286, 293, 304, 317. The transcripts show that at the start of each call, DocuSign cautioned that some of the statements made "are forward-looking." *See* Bretan Decl., Exs. 4, 9, 16, 21, 25, 30, 34, 38. The transcripts also show that DocuSign used substantially similar cautionary language, specific to the COVID-19 pandemic, during the calls held on June 4, September 3, and December 3, 2020:

---

[4] Although the conference transcripts include generic language about forward-looking statements, it appears that this was a standard disclaimer added by the company that owns and distributes transcripts, not DocuSign. *See, e.g.,* Bretan Decl., Ex. 13 at 8; Ex. 14 at 7. Regardless, this language does not precisely or directly address any statements about COVID-19's impact on DocuSign's business, rendering it insufficient. *See QuantumScape*, 580 F. Supp. 3d at 737.

> Now let me remind everyone that some of our statements on today's call are forward-looking. We believe our assumptions and expectations related to these forward-looking statements are reasonable, but they are subject to known and unknown risks and uncertainties that may cause our actual results or performance to be materially different. In particular, our expectations around the impact of the COVID-19 pandemic on our business, financial condition and results of operations are subject to change. Please read and consider the risk factors in our filings with the SEC, together with the content of this call.

*See id*., Ex. 4 at 1 (June 4 call), Ex. 9 at 1 (September 3 call), Ex. 16 at 1 (December 3 call).

During the next two earnings calls, held on March 11 and June 3, 2021, that language varied slightly with respect to the pandemic, stating that "[i]n particular, our expectations regarding the effects of the COVID-19 pandemic on our business, including the potential effects of the pandemic subsiding, are based on our best estimates at this time and are therefore subject to change." *See id*., Ex. 21 at 1 (March 11 call), Ex. 25 at 1 (June 3 call). The pandemic-related language again varied slightly in the September 2, 2021, and March 10, 2022, calls. *See id*., Ex. 30 at 1 ("In particular, our expectations regarding the effects of the evolving COVID-19 pandemic on our business, including the potential effects of the pandemic on our customers' businesses and the pace of digital transformation, are based on our best estimates at this time and are therefore subject to change."); Ex. 38 at 1 ("In particular, our expectations regarding the pace of digital transformation and factors affecting customer demand, including as a result of the pandemic, are based on our best estimates at this time and are, therefore, subject to change."). Although the December 2021 earnings call included similar language about forward-looking statements, it did not expressly mention the pandemic. *See id*., Ex. 34 at 1.

Courts have recognized substantially similar language as sufficiently cautionary. *See, e.g., Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059-60 (9th Cir. 2014) (finding that a disclaimer made at the start of an earnings call, which warned that some comments "may be deemed to contain forward-looking statements," that "[a]ctual results may differ materially" because of "certain risks and uncertainties," and directing investors to consult the company's SEC filings was sufficient cautionary language); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994 (N.D. Cal. 2017) (finding sufficient cautionary language that was "substantially similar" to that in *Police Retirement*). Moreover, except for the December 2021

call, each of these disclaimers expressly mentioned the uncertain impact of the COVID-19 pandemic on DocuSign's business. This precisely and directly addresses the alleged misrepresentations by DocuSign, which speak to COVID-19's impact on customer behavior and the demand for DocuSign's products. *See QuantumScape*, 580 F. Supp. 3d at 737.[5]

However, "[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (citation omitted and cleaned up); *see also Glazer*, 63 F.4th at 781 (applying this to the context of the safe-harbor provision and finding that "cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized."). The plaintiffs contend that DocuSign's disclosures were inadequate because they "misleadingly warned of potential risks . . . related to the pandemic that 'could' or 'may' impact its business . . . when those risks had already come to pass." Oppo. at 15:11-13. They allege that from the start of the class period on June 4, 2020, DocuSign was "aware of multiple red flags indicating the pandemic-generated demand was unsustainable," and by early 2021, "knew of not only plummeting usage rates, but also declining retention rates and disappointing sales as customers returned to in-person work and refused to renew" their one-year contracts. *See id.* at 15:13-18.

At this stage of the litigation, the plaintiffs have sufficiently alleged enough to plausibly show that DocuSign's disclosures about the pandemic's impact did not alert investors that some of those risks may have already come to fruition. *See Alphabet*, 1 F.4th at 703. The FAC alleges that from the start of the class period (and thus the first earnings call on June 4, 2020), DocuSign was aware that demand for its products "would not last, based on multiple internal warnings signs."

---

[5] The same cannot be said for the cautionary language used at the start of DocuSign's Analyst Day, where Statements 39, 41, and 44 were allegedly made. *See* FAC ¶¶ 278, 280, 282. Although DocuSign stated at the start of the presentation that "some of our statements . . . are forward-looking," the transcript does not detail what cautionary language was stated. *See* Bretan Decl., Ex. 23. Instead, DocuSign's vice president said she would "flash our safe harbor statement." *See id.* at 1. DocuSign does not appear to specifically discuss this in its motion, nor does it provide any detail about what was included in the safe harbor statement that was shown. *See generally* Mot. Without more, I cannot determine whether the language was sufficient so as to place Statements 39, 41, and 44 within the ambit of the safe-harbor provision. I will consider them actionable until shown otherwise.

United States District Court
Northern District of California

FAC ¶ 94.  One of those signs, it alleges, came from new customers who told DocuSign sales employees between March and June 2020 that they would not renew their eSignature contracts once the pandemic receded and they were able to return to their offices.  *Id*. ¶¶ 95-96; *see also* ¶ 98 (alleging that "many customers" told CW 7 "they would not renew their contracts after they returned to the office"); ¶ 103 (alleging that "some of" CW 8's "customers had one-off use cases that would not exist after the pandemic subsided.").

In addition, the FAC alleges that by the start of the class period, DocuSign was already aware that new customers were opting for shorter, one-year contracts instead of the three-year contracts offered.  *See id*. ¶¶ 112-115.  As the pandemic continued, the FAC alleges, DocuSign— which was "actively tracking whether customers who signed up before the pandemic or during the pandemic had higher renewal or usage rates"—saw a decline in product usage and higher churn rate among the latter.  *See id*. ¶¶ 139-140.

The FAC includes enough detail about what DocuSign allegedly knew at the start of the pandemic and as it progressed to plausibly show that the pandemic-related risks the company warned investors about during the earnings call had already come to fruition, meaning their disclosures were inadequate.  *See Alphabet*, 1 F.4th at 703.  Whether DocuSign actually was aware of these risks will prove out as this case progresses.  For now, however, the plaintiffs have sufficiently alleged otherwise.  As a result, none of the forward-looking statements fall under the PSLRA's safe-harbor provision, at least with respect to the first prong.

### iii.  Actual Knowledge

Cautionary language is not the sole method by which to invoke the PSLRA's safe harbor.  The provision also shields forward-looking statements that were not "made with actual knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i).  Although courts had previously collapsed considerations of falsity and scienter into a single inquiry, the Ninth Circuit recently instructed that this approach "was abrogated by subsequent Supreme Court decisions that treated falsity and scienter as separate requirements."  *Glazer*, 63 F.4th at 766.  The court clarified that the two have distinct pleading standards: "Falsity is subject to a particularly requirement and the *reasonable inference* of plausibility set out in *Twombly* and

*Iqbal*, and scienter is subject to a particularly requirement and a *strong inference* standard of plausibility." *Id*. That said, the court acknowledged that "some facts might be used to support both an inference of scienter and an inference of falsity." *See id*.

The FAC sets forth the allegedly false and misleading statements in significant detail, and certain facts alleged support both an inference of scienter and an inference of falsity. Given scienter's higher standard, I explain those facts in greater detail when analyzing that issue below. They include confidential witness statements alleging waning demand in DocuSign products, as evidenced by customer usage and retention metrics that were accessible to the individual defendants, and alleged statements by individual defendants that plausibly show they tracked that data. *See* FAC ¶¶ 60, 63, 138-139, 399. This is enough to plausibly allege that the defendants had actual knowledge that their statements were false or misleading. At this point, all of the challenged statements remain actionable.

### 2. Whether the Statements are Otherwise Not Actionable

DocuSign next argues that certain statements are not actionable on other grounds. It contends that "statements of belief about customer demand"—for example, statements that "we believe . . . once people move from manual processes, pen and paper, they're not going to go back"—are statements of opinion or puffery. *See* MTD at 15:24-16:5 (citing Statement 25).

The Supreme Court has noted in the securities context that

> [a] fact is a thing done or existing or an actual happening. An opinion is a belief, a view, or a sentiment which the mind forms of persons or things. Most important, a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not.

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (citations omitted and cleaned up). There are "three different standards for pleading falsity of opinion statements," with respect to section 10(b) and Rule 10b-5 claims. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). The third theory, which the plaintiffs argue applies here, relates to omissions. *See* Oppo. at 11:1-9. "[W]hen a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading

United States District Court
Northern District of California

1    to a reasonable person reading the statement fairly and in context.'" *Dearborn Heights*, 856 F.3d

2    at 616 (citation omitted).

3            Even if any statements about customer demand constitute opinions, the plaintiffs have

4    plausibly alleged such facts.  The FAC alleges that by June 2020, new customers told DocuSign

5    that they would not renew their eSignature contracts after they could return to in-person work, and

6    that they were opting for shorter, one-year contracts.  *See* FAC ¶¶ 95-96, 98, 103, 112-115.  It

7    further alleges that as the pandemic continued, DocuSign saw a decline in product usage and

8    higher churn rate among customers who signed up for the company's services during the

9    pandemic.  *See id*. ¶¶ 139-140.  These alleged facts go to the basis for statements about customer

10   demand, and their omission makes any opinions about such misleading to a reasonable person who

11   would hear or read that statement fairly and in context.  This is enough, at this stage of the

12   litigation, to plead around any opinions that would otherwise not be actionable.

13           Finally, to the extent that any of these statements are corporate optimism or puffery, "even

14   general statements of optimism, when taken in context, may form a basis for a securities fraud

15   claim when those statements address specific aspects of a company's operation that the speaker

16   knows to be performing poorly."  *Quality Sys.*, 865 F.3d at 1143 (citation and quotations omitted).

17   That is what is alleged here.

18           In sum, the plaintiffs have plausibly shown that the challenged statements are actionable. [6]

19           **B.   SCIENTER**

20           The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong

21   inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

22   This "is a mental state that not only covers intent to deceive, manipulate, or defraud, but also

23   deliberate recklessness."  *Quality Sys.*, 865 F.3d at 1144 (citation and quotations omitted).

24   "Deliberate recklessness" is "more than mere recklessness or a motive to commit fraud," but "an

25

26   ───────────────

27   [6] The same is true for statements about DocuSign's CLM product, which DocuSign also argues
     are not actionable.  *See* MTD at 16:6-17:3.  The FAC alleges that beginning in June 2020,
     DocuSign struggled to sell CLM (as acknowledged by Alhadeff to CW 8) and continued to do so
28   throughout the pandemic.  *See* FAC ¶¶ 168-179.  This undercuts DocuSign's arguments that any
     statements about CLM demand or growth were opinions or optimism.

United States District Court
Northern District of California

United States District Court
Northern District of California

extreme departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (same).

To evaluate scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. The court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. The inference of scienter "need not be irrefutable," but "must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations." *Id.* The question is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

### 1. Confidential Witnesses

If, as here, a plaintiff relies on statements from confidential witnesses to show scienter, "the complaint must also pass two additional hurdles." *See Quality Sys.*, 865 F.3d at 1144. First, the confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 995 (9th Cir. 2009). Second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

DocuSign first argues that the plaintiffs have not shown that their confidential witnesses were "in a position to know the asserted facts," because: (1) there is inadequate information about these witnesses in the FAC; and (2) some were not employed by DocuSign during "critical portions of the class period." MTD at 18:5-19:22.

In general, the FAC provides sufficient information about the confidential witnesses to establish their reliability and personal knowledge. The critical question is "whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge," considering "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and

plausibility of the allegations, the number of sources, the reliability of the sources, and similar

indicia." *Zucco*, 552 F.3d at 995 (citations omitted).

The FAC does this with respect to most of the confidential witnesses, describing their roles

within DocuSign, how long they were employed there, the nature of their responsibilities, and, in

some circumstances, their exact titles and who they reported to. *See, e.g.*, FAC ¶¶ 49-64; *see also*

*In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (finding sufficient allegations about job

descriptions and responsibilities, exact titles, and reporting chains). The number of confidential

witnesses, their overlapping job responsibilities, and their corroborating allegations also support

their reliability and personal knowledge of what is alleged. Many worked in sales-related

positions (including CW 7, CW 9, CW 10, CW 11, and CW 13) and described similar trends about

customers about one-off uses and contract renewals, or about lagging internal metrics. *See, e.g.,*

FAC ¶¶ 98-99, 103-104, 113-115, 147-153. Taken together, the FAC alleges enough to establish

these witnesses' reliability and personal knowledge.[7]

The FAC, however, falls short with respect to CW 3, CW 6, and CW 14. The FAC alleges

only that CW 3 was employed by DocuSign "in the Finance department during the class period"

and "had access to the forecasting models and generated reports relating to such information

during her tenure at the company." *See* FAC ¶ 53. The allegations about CW 6 are similarly

sparse; the FAC states that she was employed by DocuSign "as an Account Executive from before

the class period began until the spring of 2022" and "was based in San Francisco" with customers

"primarily in middle America." *Id*. ¶ 56. All that is alleged about CW 14 is that this person was

"formerly employed by DocuSign from summer 2020 through winter 2022" and "worked as an

Enterprise Account Executive." *Id*. ¶ 64. As pleaded, these descriptions do not sufficiently

---

[7] I am not persuaded by DocuSign's temporal argument; as alleged, all but one of the confidential witnesses were clearly employed by the company during the class period. *See* FAC ¶¶ 49-64. Although CW 7 allegedly left DocuSign at some point in June 2020, it is plausible that she remained employed for at least some part of the month after the class period began on June 4, 2020, or had sufficient knowledge of relevant allegations regardless. *See* FAC ¶ 57; *see also Quality Sys.*, 865 F.3d at 1145 (finding that a confidential witness had sufficient knowledge of executive-level management's access to forecasting reports even though she was not at the company during the class period).

establish the reliability and personal knowledge of these confidential witnesses.[8]  Accordingly, I will not consider the statements of CW 3, CW 6, and CW 14.

The next question is whether the statements reported by the confidential witnesses are themselves indicative of scienter.  *See Zucco,* 552 F.3d at 995.  DocuSign contends that the "vast majority" do not mention the individual defendants and to the extent that they do, the confidential witnesses only speculate that the defendants knew or received information contradicting their allegedly false or misleading statements.  MTD at 20:7-21:21.

According to the plaintiffs, the confidential witness statements show that "eSignature and CLM demand issues . . . were reported to the individual defendants and other senior executives," along with "other analyses showing that DocuSign's internal financial forecasts were in decline compared to historical data."  Oppo. at 18:23-19:1, 19:17-19.  They further contend that the defendants "likely received internal reports reflecting alarming key performance metrics by no later than early 2021," and that their comments at internal meetings "confirm that, contrary to their repeated public assurances, they knew that the company's pandemic-fueled demand was unsustainable."  *Id*. at 19:7-9, 20:3-5.

As alleged, multiple confidential witnesses stated that DocuSign customers had one-off use cases, said they did not intend to use the company's eSignature product after the pandemic subsided, and would only sign one-year contracts.  *See, e.g.*, FAC ¶¶ 98-99, 103-104, 107-108, 113-114.  Multiple confidential witnesses also talked about lagging internal metrics, including declining usage and retention rates among customers who signed up during the pandemic.  *See, e.g.*, *id.* ¶¶ 100, 147.  The question is whether the plaintiffs have sufficiently shown that the defendants knew this, too.

---

[8] Although the plaintiffs have offered additional information about these witnesses via *in camera* review, they do not point to any case law permitting this at the pleading stage.  *See* FAC ¶¶ 53 n.8, 56 n.12, 64 n.15.  At least two courts within this Circuit have rejected such an offer.  *See Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 2793463, at *15 (N.D. Cal. May 29, 2020) (rejecting the plaintiff's offer to provide additional information about a confidential witness via *in camera* inspection because "the PSLRA imposes pleading requirements" and "[p]laintiff may not sidestep these requirements by providing the necessary details to the court *in camera*"); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1162 (S.D. Cal. 2008).

United States District Court
Northern District of California

*Quality Systems* provides useful framework.  There, the Ninth Circuit held that, "[t]aken collectively, statements by confidential witnesses establish that members of the executive-level management, including individual defendants, had access to and used reports documenting in real time" the company's decline in sales.  *See* 865 F.3d at 1145 (quotations omitted).  The court noted that the complaint included "multiple statements from confidential witnesses with personal knowledge of [the company's] declining sales during the Class Period"; statements that sales reports and forecasts were available to executives; that those reports were "automatically delivered to the management team"; and that senior executives "were in the habit of continually monitoring the company's revenue and earnings."  *See id.* (cleaned up).  This, the court determined, constituted "particularized allegations that defendants had actual access to the disputed information," which raises a "strong inference of scienter."  *See id.* (citing *Dearborn Heights*, 856 F.3d at 620).  The allegation that company executives "told investors they had real-time access to, and knowledge of, sales information" further supported such a showing.  *See id.*

Similarly, the FAC includes statements from confidential witnesses with personal knowledge that customers did not plan to continue to use DocuSign's products after the pandemic subsided.  *See* FAC ¶¶ 98-99, 103-104, 107-108, 113-114.  Multiple confidential witnesses (beyond those whose statements I will not consider) also spoke to executives' ability to access Salesforce, which contained customer data.  *See, e.g., id.* ¶ 60 ("According to CW 10, senior management had access to Salesforce."); ¶ 63 ("CW 13 recalled that the entire sales organization, including executives as senior as the [Chief Revenue Officer], had access to information in Salesforce," which contained "all" customer data, "including information about renewals and revenues").  They further stated that DocuSign identified customers as "pre- and post-COVID-19 customers" in the Salesforce and Snowflake databases, and tracked metrics including product usage and retention separately for customers who purchased DocuSign products after the pandemic began.  *See id.* ¶¶ 138-139.

Sheridan and Gaylor also allegedly made statements on different earnings calls that indicate that they closely tracked customer demand data.  *See id.* ¶ 399.  The FAC alleges, for example, that Sheridan said during the September 3, 2020, call that, "[w]e're looking at the

demand data very carefully to try to forecast the trends"; that during the March 11, 2021, call, Gaylor said that DocuSign's guidance was "largely data-driven" and used "everything from pipeline and demand trends to close rates"; and that during the September 2, 2021, earnings call, she said that consumer consumption was "something that we track" and "watch very closely." *Id.* As in *Quality Systems*, taken collectively, these statements plausibly show that the individual defendants had access to and monitored data indicating DocuSign's decline in customer demand.

This is further supported by additional allegations from CW 4, a leader in DocuSign's "Customer Success group" who reported to the then-Senior Vice President of Customer Success, Lambert Walsh, who reported to Springer. *See id.* ¶ 54. CW 4 described a February 2021 quarterly meeting where she "presented that DocuSign was exceeding its customer churn numbers and struggling with consumption, i.e., missing its consumption targets," which were at only 20% instead of the 44% targeted growth. *Id.* ¶ 148. She further stated that "this was only getting worse as they looked at forecasts further out in the future, i.e., for the next fiscal year." *Id.* ¶ 149. According to CW 4, Walsh was one of the highest-ranking employees at these quarterly meetings, and attended the one in February 2021. *See id.* ¶¶ 148, 150. CW 4 "believed that Walsh likely then presented a roll-up of the information that he received at these [quarterly] meetings to the Executive Leadership Team, which included executives like the CEO and CFO"—i.e., Springer, Sheridan, and Gaylor—as Walsh met with them "regularly to update them on the business" and "manage expectations based on what he was hearing" in the meetings. *Id.* ¶ 200. These allegations sufficiently trace Walsh's knowledge to Springer via the reporting structure and CW 4's belief that information from the quarterly meetings was regularly relayed to Springer, Sheridan, and Gaylor via Walsh. *See Robb v. Fitbit Inc.*, No. 16-CV-00151-SI, 2017 WL 219673, at *6 n.6 (N.D. Cal. Jan. 19, 2017). The same is true for CW 1's statements that by December 2020, customer usage levels had declined by approximately 30% year-over-year, and that she shared "reports with the 'warning signs' about product usage and renewal rates" with her supervisor and Walsh, who "then probably sent the reports to Springer." *See* FAC ¶¶ 140-143.

Taken together, the confidential witness statements support a showing of scienter by the individual defendants, at least with respect to their statements about customer demand.

United States District Court
Northern District of California

### 2. Stock Sales

There are other indicia of scienter that, coupled with the confidential witness statements, lead to a "strong inference" of scienter, namely Springer and Gaylor's stock sales.

As the Supreme Court has explained, "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. But "stock sales by corporate insiders are suspicious only when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Dearborn Heights*, 856 F.3d at 621 (citation and quotations omitted). To determine this, courts consider three factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id*. (same).

The FAC alleges that on February 1, 2021, when DocuSign stock was trading at approximately $230 per share—"almost three times its price immediately before the class period"—Springer sold more than 19% of his stock in the company, or 356,479 shares, earning more than $81.85 million. FAC ¶ 365. This was allegedly the first time that Springer had sold any DocuSign shares in the open market since the company went public in April 2018. *Id*. He also disposed of almost 12% of his DocuSign stock, or 354,598 shares, through Code F transactions worth over $71.5 million. *Id*. ¶ 366. In all, the FAC alleges, Springer sold 711,077 shares—almost 24% of his DocuSign stock—earning over $153 million. *Id*. ¶ 367.

The FAC further alleges that on November 8, 2021, "less than one month before defendants' first partial corrective disclosure" and when DocuSign stock was trading at about $270 per share, Gaylor sold nearly 36% of her DocuSign stock, or 5,983 shares, earning more than $3.31 million. *Id*. ¶ 372. Like Springer, the FAC alleges, this was allegedly the first time Gaylor had sold any DocuSign shares in the open market. *See id*. She also disposed of 9,070 shares (or almost 42%) of DocuSign stock through Code F transactions worth more than $2.13 million. *Id*. ¶ 373. In all, Gaylor sold 15,053 shares (more than 69%) of her DocuSign stock during the class period, earning more than $5.45 million. *Id*. ¶ 374.

The amount and percentage of shares sold, along with the timing and novelty of those

1   sales, plausibly support that the sales were "dramatically out of line" with Springer and Gaylor's

2   prior trading practices "at times calculated to maximize their personal benefit." *See Dearborn*

3   *Heights*, 856 F.3d at 621.  Although the open market sales were allegedly made pursuant to a

4   10b5-1 plan, which would "lessen the implication that they were improper," "concealing the

5   negative information before the sale" and setting the sales for certain dates (for Springer, at

6   allegedly the same time he learned of adverse internal reports and other information showing

7   waning demand, and for Gaylor, a month prior to the first partial corrective disclosure and "well

8   after defendants already knew that demand was waning substantially") "were discretionary

9   choices," which is sufficient, at this stage, to support scienter.  *See* FAC ¶¶ 368, 375; *see also In re*

10  *BioMarin Pharms. Inc. Sec. Litig.*, No. 20-CV-06719-WHO, 2022 WL 164299, at *14 (N.D. Cal.

11  Jan. 6, 2022) (rejecting argument that trades were "nondiscretionary and pre-planned" because

12  "concealing the negative information before the sale and setting the sale" for a certain date "were

13  discretionary choices" and thus "sufficient at the pleadings stage to contribute to the plausibility of

14  the scienter allegations").

15          DocuSign argues that a competing inference—"that the company acted in good faith in

16  unprecedented circumstances"—"is far more reasonable."  MTD at 24:10-11.  I disagree.  "The

17  inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun'

18  genre, or even the most plausible of competing inferences."  *Tellabs*, 551 U.S. at 324 (citations

19  and quotations omitted).  But viewed holistically, the statements from multiple confidential

20  witnesses about the internal information available to the defendants, which allegedly showed that

21  demand for DocuSign was lagging, and Springer and Gaylor's stock sales, support an inference of

22  scienter that is "more than merely reasonable or permissible."  *See id*.  It is "cogent and at least as

23  compelling as any opposing inference one could draw from the facts alleged," including the one

24  that DocuSign puts forth.  *See id*.  It is therefore strong enough for the claim to proceed.[9]

25  _____

26  [9] To the extent that the plaintiffs' claim specifically relies upon the alleged misstatements about
    the demand for DocuSign's CLM product or competition with Adobe, they have not sufficiently

27  shown scienter.  Although multiple confidential witnesses discuss competition from Adobe and
    struggles to sell CLM, the FAC does not sufficiently connect their statements and observations to

28  the individual defendants and their states of mind.  *See* FAC ¶¶ 160-179.  Although the FAC

United States District Court
Northern District of California

United States District Court
Northern District of California

### C. LOSS CAUSATION

To bring a claim under the PSLRA, a plaintiff also has the burden of "proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This "requires no more than the familiar test for probable cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied." *Id.* (citations and quotations omitted). It is a "context-dependent inquiry, as there are an infinite variety of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (same). Revelation of fraud in the marketplace is one way to show proximate cause, but not the only one. *See Mineworkers*, 881 F.3d at 753-54. "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210.

DocuSign argues that the plaintiffs have not adequately pleaded loss causation because they have not pleaded the "revelation of a 'fraud,' i.e., new information correcting a prior misstatement." MTD at 24:16-19. But "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Mineworkers*, 881 F.3d at 754 (citing *Lloyd*, 811 F.3d at 1210). "A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *See id.*

The heart of DocuSign's argument is that all the plaintiffs have alleged is that the company missed its billings guidance, which is not actionable. *See* MTD at 3:4-21. But under

---

plausibly alleges that the individual defendants had access to and monitored DocuSign's internal metrics showing lagging customer demand, it does not appear to allege that data specific to Adobe or CLM was available. Nor does it allege other indicia of scienter. At most, the FAC alleges that CW 8 spoke to Alhadeff about issues selling CLM, and that in June 2020 he "acknowledged . . . that DocuSign was struggling to sell" the product. *See id.* ¶ 169. This is not enough to create a strong inference of scienter, particularly when Alhadeff's alleged false and misleading statements (Statements 43 and 45) discussed competition with Adobe and the general adoption of DocuSign products. *See id.* ¶¶ 281, 284.

1    *Mineworkers*, the plaintiffs may show loss causation by showing that DocuSign's stock price fell

2    upon the revelation of an earnings miss.  *See* 881 F.3d at 754.  The FAC alleges that DocuSign's

3    stock dropped after the company revealed billings misses on December 2, 2021; March 10, 2022;

4    and June 9, 2022.  FAC ¶¶ 300-303, 306, 312-314, 318-321.  This plausibly shows loss causation

5    under *Mineworkers*.

6            Moreover, during the final corrective disclosure in June, Springer allegedly "attributed the

7    company's poor billings growth and lower billings guidance to waning demand for the company's

8    products as businesses return to in-person work," specifically stating that he had underestimated

9    "the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was,"

10   along with the impact of one-time use cases.  *Id.* ¶ 319.  After this revelation, DocuSign's stock

11   fell nearly 25% to close at $65.93 on June 10, 2022—"the company's lowest share price since

12   October 2019."  *Id.* ¶ 321.  As the Ninth Circuit has explained, "[t]hat a stock price drop comes

13   immediately after the revelation of fraud can help to rule out alternative causes."  *Mineworkers*,

14   881 F.3d at 754.  It is plausible, at this point, that the June 9, 2022, disclosure, which allegedly

15   revealed that DocuSign's statements about customer demand were fraudulent and misleading,

16   caused DocuSign's stock price to drop.  This also supports loss causation.

17           In sum, the plaintiffs have plausibly alleged their section 10(b) claim.

18   **III.     SECTION 20(A) CLAIM**

19           The plaintiffs also allege that each individual defendant is liable as a control person under

20   section 20(a) of the Securities Exchange Act.  FAC ¶¶ 442-446.  To state a prima facie section

21   20(a) claim, a plaintiff must plead: (1) a primary violation of federal securities laws; and (2) that

22   the defendant exercised actual power or control over the primary violator.  *Howard v. Everex Sys.*

23   *Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted).  Without a primary violation, there

24   can be no control person liability.  *See Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be

25   dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of

26   section 10(b).").

27            DocuSign's sole argument against the section 20(a) claim is that it fails because the

28   section 10(b) claim does.  See MTD at 25 n.22.  For the reasons explained above, the section 10(b)

United States District Court
Northern District of California

claim may proceed, meaning the section 20(a) claim may as well.

## CONCLUSION

The motion to dismiss is DENIED.  A Case Management Conference is scheduled for May 23, 2023, at 2:00 p.m.  A Joint Case Management Statement is due by May 16, 2023.

**IT IS SO ORDERED.**

Dated: April 18, 2023



William H. Orrick
United States District Judge

United States District Court
Northern District of California