1  **KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**
2  Jennifer L. Joost (Bar No. 296164)
   Stacey M. Kaplan (Bar No. 241989)
3  One Sansome Street, Suite 1850
   San Francisco, CA 94104
4  Tel: (415) 400-3000
   Fax: (415) 400-3001
5  jjoost@ktmc.com
   skaplan@ktmc.com
6
   *Liaison Counsel for the Proposed Class*
7

**LABATON SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
Lisa Strejlau (admitted *pro hac vice*)
David Saldamando (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
ivasilchenko@labaton.com
lstrejlau@labaton.com
dsaldamando@labaton.com

8       *Counsel for Lead Plaintiffs*
        *and Lead Counsel for the Proposed Class*
9

## UNITED STATES DISTRICT COURT
10      ## NORTHERN DISTRICT OF CALIFORNIA
        ## SAN FRANCISCO DIVISION
11

12  RICHARD R. WESTON, Individually and on
    Behalf of All Others Similarly Situated,
13                                                Civil Action No. 3:22-cv-00824-WHO
                        Plaintiff,
14                                                **LEAD PLAINTIFFS' NOTICE OF**
    v.                                            **MOTION AND MOTION TO CERTIFY**
15                                                **CLASS, APPOINT CLASS**
                                                  **REPRESENTATIVES, AND APPOINT**
    DOCUSIGN, INC., DANIEL D. SPRINGER,           **CLASS COUNSEL; MEMORANDUM OF**
16  MICHAEL J. SHERIDAN, CYNTHIA                  **POINTS AND AUTHORITIES IN**
    GAYLOR, and LOREN ALHADEFF,                   **SUPPORT THEREOF**
17
                        Defendants.               DATE: March 27, 2024
18                                                TIME: 2:00 p.m.
                                                  COURTROOM: 2, 17th Floor
19                                                JUDGE: Hon. William H. Orrick
20

21

22

23

24

25

26

27

28

---

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS
REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF ISSUES TO BE DECIDED ................................................................................1

I.    PRELIMINARY STATEMENT .........................................................................................2

II.   STATEMENT OF FACTS ................................................................................................4

    A.    DocuSign's Business and Unprecedented eSignature Demand During
        COVID-19 ................................................................................................................4

    B.    Defendants Were Aware That DocuSign's Record-High Demand Was
        Temporary and Unsustainable .................................................................................5

    C.    Defendants Falsely Assured Investors That DocuSign's Demand and Growth
        Was Sustainable ......................................................................................................7

    D.    In December 2021, the Truth about DocuSign's Slowing Demand Began to
        Emerge .....................................................................................................................7

III.  ARGUMENT ....................................................................................................................8

    A.    Legal Standard ........................................................................................................8

    B.    The Proposed Class Satisfies the Requirements of Rule 23(a) ...............................9

        1.    The Class Is So Numerous That Joinder Is Impracticable ..............................9

        2.    This Action Presents Common Questions of Law and Fact .........................11

        3.    Lead Plaintiffs' Claims Are Typical of the Class ........................................12

        4.    Lead Plaintiffs Will Fairly and Adequately Protect the Interests of the
            Class .............................................................................................................14

    C.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ...........................17

        1.    Common Questions of Law and Fact Predominate ......................................17

            a.    Lead Plaintiffs Are Entitled to the Fraud-On-The-Market
                Presumption of Reliance ...................................................................18

            b.    Damages Can Be Calculated on a Class-Wide Basis .........................22

        2.    This Proposed Class Is Superior to Alternative Methods for Resolving
            This Dispute .................................................................................................23

i

D.     The Court Should Appoint Lead Counsel as Class Counsel Under Rule 23(g).........25

IV.     CONCLUSION ...................................................................................................25

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS
REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................. 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ............................................................................... 9, 17, 18

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ............................................................................ 12

*In re Banc of Cal. Sec. Litig.*,
   326 F.R.D. 640 (C.D. Cal. 2018) ............................................................... 13, 22

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................... 3, 13, 17, 18

*Bee, Denning, Inc. v. Cap. All. Grp.*,
   310 F.R.D. 614 (S.D. Cal. 2015) ..................................................................... 13

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ............................................................................ 23

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) .......................................................................... 24

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................... 18, 19, 20, 21

*In re Celera Corp. Sec. Litig.*,
   No. 5:10-CV-02604-EJD, 2014 WL 722408 (N.D. Cal. Feb. 25, 2014) .............................. 12

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
   No. CV 11-2768 PSG (SSx), 2013 WL 5789237 (C.D. Cal. Oct. 25, 2013) ............. 10, 14, 15

*City of Providence v. Aeropostale, Inc.*,
   No. 11 Civ. 7132(CM) (CWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ..................... 16

*In re Comput. Memories Sec. Litig.*,
   111 F.R.D. 675 (N.D. Cal. 1986) ....................................................................... 9

*In re Diamond Foods, Inc. Sec. Litig.*,
   295 F.R.D. 240 (N.D. Cal. 2013) ............................................................... 20, 21

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ....................................................................... 14-15

*Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*,
    563 U.S. 804 (2011) ............................................................................................ 13

*In re Extreme Networks, Inc. Sec. Litig.*,
    No. 15-CV-04883-BLF, 2019 WL 3290770 (N.D. Cal. July 22, 2019) ................................ 16

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    288 F.R.D. 26 (S.D.N.Y. 2012) ........................................................................... 16

*Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*,
    573 U.S. 258 (2014) ............................................................................................ 18

*Hanlon v. Chrysler Corp*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................... 24

*Harris v. Palm Springs Alpine Ests., Inc.*,
    329 F.2d 909 (9th Cir. 1964) ............................................................................. 9

*Hatamian v. Advanced Micro Devices, Inc.*,
    No. 14-CV-00226 YGR, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ............... 9, 10, 11, 12

*Hodges v. Akeena Solar, Inc.*,
    274 F.R.D. 259 (N.D. Cal. 2011) ................................................................. 19, 24

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ........................................................................... 23

*In re Juniper Networks, Inc. Sec. Litig.*,
    264 F.R.D. 584 (N.D. Cal. 2009) ..................................................................... 20

*Kanawi v. Bechtel Corp.*,
    254 F.R.D. 102 (N.D. Cal. 2008) ..................................................................... 12

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................... 21

*In re LDK Solar Sec. Litig.*,
    255 F.R.D. 519 (N.D. Cal. 2009) ..................................................................... 12

*In re Lendingclub Sec. Litig.*,
    282 F. Supp. 3d 1171 (N.D. Cal. 2017) ....................................................... 10, 22

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) ....................................................................... 23

*Luna v. Marvell Tech. Grp., Ltd.*,
    No. C 15-05447 WHA, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ................... 21

*In re Lyft Inc. Sec. Litig.*,
    No. 19-CV-02690-HSG, 2021 WL 3711470 (N.D. Cal. Aug. 20, 2021) ................... 10, 12

iv

*Maliarov v. Eros Int'l PLC*,
   Nos. 15-CV-8956 (AJN), 16-CV-223 (AJN),
   2016 WL 1367246 (S.D.N.Y. Apr. 5, 2016) ........................................................................ 16

*Malriat v. QuantumScape Corp.*,
   No. 3:21-CV-00058-WHO,
   2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) (Orrick, J.) ........................................... *passim*

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
   No. 17-CV-0554-YGR, 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ................................. 23

*In re NetSol Techs., Inc. Sec. Litig.*,
   No. CV 14-5787 PA (PJWx), 2016 WL 7496724 (C.D. Cal. July 1, 2016) ............................ 8

*Nguyen v. Radient Pharms. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ..................................................................................... 19

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .......................................................................................... 9

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ........................................................................................... 11

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ........................................................................................... 23

*In re Scorpion Techs., Inc. Sec. Litig.*,
   No. C 93-20333 RPA, 1994 WL 774029 (N.D. Cal. Aug. 10, 1994) ................................. 8-9

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020) ..................................................................................... 14

*In re Silver Wheaton Corp. Sec. Litig.*,
   No. 2:15-CV-05146-CAS (JEMx), 2017 WL 2039171 (C.D. Cal. May 11, 2017) ........... 22-23

*Stockwell v. City & Cnty. of S.F.*,
   749 F.3d 1107 (9th Cir. 2014) ......................................................................................... 11

*In re Twitter Inc. Sec. Litig.*,
   326 F.R.D. 619 (N.D. Cal. 2018) ................................................................................ 12, 24

*In re UTStarcom, Inc. Sec. Litig.*,
   No. C 04-04908 JW, 2010 WL 1945737 (N.D. Cal. May 12, 2010) ................................... 24

*In re VeriSign, Inc. Sec. Litig.*,
   No. C 02-02270 JW, 2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) .............................. 24, 25

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ......................................................................................... 25

v

**Statutes & Rules**

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b)..................................................*passim*

Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t(a) ................................................ 2, 13

Fed R. Civ. P. 23 ...................................................................................................................*passim*

Fed R. Civ. P. 23(a)..............................................................................................................*passim*

Fed R. Civ. P. 23(b) .............................................................................................................*passim*

Fed R. Civ. P. 23(g) .............................................................................................................*passim*

Fed R. Civ. P. 26 ......................................................................................................................... 15

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5...................................................................................... 2

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

**PLEASE TAKE NOTICE** that on March 27, 2024, at 2:00 p.m., before the Honorable William H. Orrick, United States District Judge, at the United States District Court, Northern District of California, San Francisco Division, 450 Golden Gate Avenue, Courtroom 2, 17th Floor, San Francisco, California 94102, Lead Plaintiffs Deka International S.A. Luxembourg ("DIL") and Public Employee Retirement System of Idaho ("PERSI") (collectively, "Lead Plaintiffs") hereby move this Court, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for an Order: (i) certifying this matter as a class action; (ii) appointing the Lead Plaintiffs as Class Representatives; (iii) appointing Labaton Sucharow LLP ("Labaton Sucharow") as Class Counsel; and (iv) appointing Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") as Liaison Counsel on behalf of the Class.

Lead Plaintiffs' Motion is based on this Notice of Motion, the Memorandum of Points and Authorities in Support Thereof, the Declaration of Irina Vasilchenko ("Vasilchenko Decl."),[1] the Report on Market Efficiency of Chad Coffman, CFA ("Coffman Report") (Ex. A), Labaton Sucharow's Firm Résumé (Ex. B), Kessler Topaz's Firm Résumé (Ex. C); Defendants' Responses and Objections to Lead Plaintiffs' First Set of Requests for Admission (Ex. D), the [Proposed] Order filed herewith, and any additional materials and arguments that may be submitted by Lead Plaintiffs in further support of this Motion, the pleadings and filings herein and such other evidence, written or oral, as may be presented.

### STATEMENT OF ISSUES TO BE DECIDED

1.      Whether this Court should certify the proposed Class when it satisfies all of the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3).

2.      Whether this Court should appoint Lead Plaintiffs as Class Representatives.

3.      Whether this Court should appoint Lead Counsel Labaton Sucharow as Class Counsel.

4.      Whether this Court should appoint Kessler Topaz as Liaison Counsel on behalf of the Class.

---

[1] All "Ex. __" citations herein are to the Vasilchenko Decl., filed concurrently herewith.

## I.    PRELIMINARY STATEMENT

Pursuant to Federal Rule of Civil Procedure ("Rule") 23(a) and (b)(3), Lead Plaintiffs respectfully move the Court for certification of a class of purchasers of DocuSign, Inc. common stock to pursue claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Defendants.[2]   The proposed Class is defined as:

> All persons and entities who or which, during the period from June 4, 2020 through June 9, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of DocuSign and were damaged thereby.[3]

Lead Plaintiffs also respectfully move this Court for an order appointing Lead Plaintiffs as Class Representatives and, pursuant to Rule 23(g), appointing Lead Counsel Labaton Sucharow as Class Counsel, and Kessler Topaz as Liaison Counsel on behalf of the Class.

Under Rule 23(a), an action may be certified for class treatment where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Where an action additionally presents "common" issues of law or fact that "predominate over any questions affecting only individual members," and a class action is "superior" to other methods of adjudication, class certification is appropriate. Fed R. Civ. P. 23(b)(3).

This Action is ideally suited for class treatment under Rule 23. ***First***, this Class is sufficiently numerous—far exceeding the minimum presumptive threshold of forty (40) geographically dispersed investors, with over 183,500,000 shares of common stock outstanding during the Class Period. *See*

---

[2] "Defendants" are DocuSign, Inc., ("DocuSign" or the "Company") and "Individual Defendants" are former Chief Executive Officer Daniel D. Springer, former Chief Financial Officer ("CFO") Michael J. Sheridan, former CFO Cynthia Gaylor, and former Chief Revenue Officer Loren Alhadeff.

[3] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of DocuSign during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) DocuSign's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, subsidiaries, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

2

*infra* III(B)(1). **Second**, this Action involves countless common questions of law and fact, including: (i) whether the federal securities laws were violated by Defendants' acts; (ii) whether statements made by Defendants during the Class Period misrepresented and/or omitted material facts about the business and operations of DocuSign; (iii) whether Defendants acted with scienter; (iv) whether the price of DocuSign's common stock during the Class Period was artificially inflated or artificially maintained because of Defendants' misconduct; and (v) the proper method of calculating damages. These questions are subject to common evidence and proof. *See infra* III(B)(2). **Third**, Lead Plaintiffs' claims are "typical" of the claims of the Class because, like all other Class members, Lead Plaintiffs purchased DocuSign common stock at market prices artificially inflated or artificially maintained by Defendants' materially false and misleading statements and/or omissions. Additionally, Lead Plaintiffs and all other Class members suffered the same injuries arising from the same misconduct— the losses incurred as a result of the revelation of the relevant truth concealed by Defendants' fraud and the resulting declines in DocuSign's stock price. *See infra* III(B)(3). **Fourth**, Lead Plaintiffs will "fairly and adequately" protect the interests of the Class. Lead Plaintiffs have retained experienced counsel to represent their interests and those of the proposed Class. *See infra* III(B)(4).

This Action also satisfies Rule 23(b)(3). Pursuant to Rule 23(b)(3), predominance is satisfied in this Action because common questions of law and fact overwhelmingly predominate over any individualized issues. *See infra* III(C)(1). The primary elements of the claims in this Action—falsity, materiality, scienter, loss causation, and damages are issues that affect all Class members equally and are subject to common proof. Reliance, the only possible individualized issue, is uniformly addressed through the fraud-on-the-market presumption set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 240-42 (1988). Finally, maintaining this Action as a class action is superior to any alternate means of dispute resolution because: (1) thousands of investors suffered damages as a result of Defendants' misconduct; (2) it is unlikely that investors would file individual actions due to litigation costs; (3) it is efficient to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action. *See infra* III(C)(2).

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

1      For these reasons, Lead Plaintiffs respectfully request that the Court grant this Motion, appoint

2 Lead Plaintiffs as Class Representatives, appoint Lead Counsel Labaton Sucharow as Class Counsel,

3 and appoint Kessler Topaz as Liaison Counsel on behalf of the Class.

4 **II.    STATEMENT OF FACTS**

5     **A.    DocuSign's Business and Unprecedented eSignature Demand During COVID-19**

6      In 2003, DocuSign pioneered the concept of eSignatures, allowing customers to sign and send

7 documents electronically without the need for a fax machine or mail service. Amended Class Action

8 Complaint, ECF No. 59 ("Amended Complaint," cited herein as "¶__") ¶65. Since DocuSign's

9 founding, eSignature has been DocuSign's core product, generating the vast majority of the

10 Company's revenue. ¶66. Despite its leading position in the eSignature market, DocuSign remained

11 unprofitable before the Class Period and thus relied primarily on its quarterly "billings" growth—"a

12 key [performance] metric" that essentially measures the amounts invoiced to customers over a

13 particular time (as opposed to revenue, which measures money actually received from customers)—

14 to attract investors. ¶¶70-71, 85-86.

15      Demand for DocuSign's eSignature product (and thus the Company's billings and revenue)

16 grew at unprecedented levels after the COVID-19 pandemic began in early 2020, as businesses were

17 forced to operate remotely and adapt to remote work processes, including software like eSignature.

18 ¶82. For example, in the first fiscal quarter after the onset of the pandemic (March through June 2020),

19 the Company's total revenue grew almost 27% and its billings skyrocketed by a record ***59%***,

20 compared to the same quarter one year earlier. ¶84.[4]

21      During the Class Period, investors were highly focused on DocuSign's ability to maintain this

22 dramatic growth long-term after the COVID-19 pandemic receded. ¶¶70-71. Defendants repeatedly

23 sought to allay such concerns, including by trying to differentiate DocuSign from other "work from

24 home" technology companies like Zoom and Slack that also benefitted from the pandemic but took

25 more conservative approaches towards their guidance. ¶¶90-91. For example, on June 4, 2020, the

26

27 [4] DocuSign's fiscal year begins on February 1 and ends on January 31. ¶4. The Company identifies
each fiscal year based on the year in which it ends. *Id.* For instance, DocuSign's fiscal year 2019
28 ended on January 31, 2019. *Id.*

first day of the Class Period, one analyst directly asked Defendants about this issue on the Company's earnings call, noting that "Zoom's guidance was pretty flat . . . because of their concern that those smaller customers that signed up for Zoom might churn off as we open back up." ¶91. In response, Defendants assured that "[DocuSign's] situation is not analogous to Zoom" as DocuSign's demand growth was "sustainable." *Id.* Defendants also reassured that this demand growth was not a temporary blip because once customers adopt eSignature "they rarely go back." ¶230. In response to another analyst's question on this earnings call, Defendants also downplayed one-time COVID-19 use cases as the "extreme minority" of DocuSign's sales, thus conveying they had minimal impact on the Company's financial performance. ¶231. On September 3, 2020, Defendants again publicly assured investors, *e.g.*, that "we don't see trends that things are going to return to the way they looked and trended pre-COVID." ¶248; *see also* ¶¶246-47.

### B. Defendants Were Aware That DocuSign's Record-High Demand Was Temporary and Unsustainable

During the Class Period, however, Defendants knew that DocuSign's unprecedented growth during the COVID-19 pandemic was not sustainable long-term. ¶¶10, 87. For example, former employees of DocuSign stated that its customers informed the Company by the start of the Class Period that they did not intend to renew their contracts once they were able to return to their offices, and that they were only using DocuSign's products to function remotely during COVID-19. ¶¶54-61, 96-99, 104-05, 107-08, 111. Indeed, according to CW 4, in the summer of 2020, internal analyses showed a "prevalence" of one-time use cases that would not extend beyond the pandemic, as Defendant Alhadeff was directly informed, but he brushed off such feedback. ¶¶104-06. Key internal performance metrics confirmed that customers were unlikely to renew their contracts once they returned to in-person work—for example, many customers had low usage rates—*i.e.*, they were not using the full capacity of their DocuSign subscriptions. ¶¶12, 100. Further, many of DocuSign's customers were signing up for short-term, one-year eSignature contracts (as opposed to three-year contracts) that they did not renew, and the resulting decline in customer retention rates was apparent internally as early as February 2021. ¶¶10, 112-16.

Indeed, by early 2021, as COVID-19 vaccines rolled out and businesses began returning to in-person work, customers followed through on their prior warnings that they would not renew their contracts, as reflected in key internal metrics showing slowing demand. For example, according to CW 1, customer product usage levels had declined approximately **30% year-over-year** by December 2020, based on internal analyses at the time. ¶¶17, 140. CW 1 further explained that by February 2021 (when the first wave of post-COVID-19 customers' one-year contracts, signed in March 2022, would expire), internal analyses showed not only that product usage was declining, but also that customer renewal rates were declining for all segments and all customers. ¶¶18, 144. Similarly, CW 4 recalled that DocuSign was exceeding its customer churn numbers and struggling with consumption (*i.e.*, usage) in February 2021, *i.e.*, missing its consumption targets—as shown in data analytics that CW 4 presented at a quarterly internal meeting at this time, which was attended by key senior executives. ¶¶19, 147-50. CWs 5, 7, 9 and 10, sales representatives across the Company, recounted similarly alarming demand trends known internally by February 2021—including, for example, that demand was on a "downward slide," with fewer deals closed and management greatly concerned about sales. ¶¶151-59. Notably, on February 1, 2021, Defendant Springer sold over **$81 million** of his stock—his *first ever* open market sale. ¶365.

According to many CWs, DocuSign's demand issues only worsened in the summer of 2021 as vaccines became more widely available and businesses increasingly returned to in-office work. ¶¶196-204. For example, not only did internal customer churn and consumption/usage rates continue to deteriorate (¶199), but growing, cheaper competition from Adobe was increasingly taking key business from DocuSign at this time—prompting Defendant Alhadeff to acknowledge internally, by June 2021, that 2021 was an "unprecedented down year." ¶¶197-202.[5] In fact, in the third quarter of

---

[5] Defendants' assurances of sustainable demand and growth were also undermined by this increased competition from Adobe and problems selling CLM, a new product that was supposed to be another growth driver for DocuSign—additional key material facts that Defendants omitted. ¶¶22-23. While alleged misstatements regarding competition and CLM were dismissed on scienter grounds in the Court's Order Denying Defendants' Motion to Dismiss (*see* ECF No. 88, at 36-37, n.9), DocuSign's demand problems due to increased competition and CLM sales struggles remain relevant to establishing Lead Plaintiffs' claims regarding the ***upheld*** demand misstatements. For example, these omitted, material facts are relevant to establishing falsity and scienter for the upheld statements touting the sustainability of the strong demand for DocuSign's products and billings growth post-COVID because they provide additional reasons why these statements lacked a reasonable basis. *See, e.g.*, ¶236 (listing, in

Footnote continued on next page.

6

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA NO. 3:22-CV-00824-WHO]

calendar year 2021, the Company's low bookings numbers became alarming, as the Individual Defendants were directly informed through financial forecasts that were shared with them no later than September 2021. ¶¶203-04. Soon afterwards, on November 8, 2021, Defendant Gaylor sold $3.3 million of her DocuSign stock—her *first ever* open market sale. ¶372.

### C.    Defendants Falsely Assured Investors That DocuSign's Demand and Growth Were Sustainable

Despite these facts, Defendants continued to publicly assure investors that the demand and growth generated during the COVID-19 pandemic were sustainable. ¶24. For example, on December 3, 2020, Defendants falsely told investors that "[w]e don't see customers going back to pen and paper." ¶259. Similarly, on March 11, 2021, in response to an analyst question about "any change in the demand environment" given the vaccines, Defendants repeatedly insisted: "We haven't seen anything. . . . We haven't seen any change yet." ¶190. On March 24, 2021, when asked about the sustainability of DocuSign's growth by an analyst on an earnings call, Defendants responded: "[T]his is not a short-term thing. This is not something that just sort of happened because of the pandemic." ¶¶25, 280. Despite the Company's internal metrics showing a drop-off in demand, on September 2, 2021, Defendants, for example, publicly denied any "significant slowdown" in demand, claiming that "we're not seeing any differences in churn rates in any meaningful way." ¶294. Likewise, Defendants reiterated to investors on September 8, 2021 that "people are not going to go back to pen and paper," and further minimized the impact of "customers who came to us for a specific COVID use case that they no longer have" as "the vast minority" of DocuSign's business. ¶¶30, 208, 298.

### D.    In December 2021, the Truth About DocuSign's Slowing Demand Began to Emerge

On December 2, 2021, DocuSign released its fiscal third quarter 2022 financial results, revealing that the Company had missed its billings guidance and that quarterly billings growth had dropped to 28%—*half* of the prior 59% rate (at the Class Period start after the pandemic began)—and that Defendant Sheridan was departing. ¶¶335-36. On this news, which analysts described as "a debacle quarter from DOCU," the Company's stock price plummeted more than 42%, as investors

---

subsections (iv) and (v), CLM and competition sales issues as among the "multiple adverse sales conditions" undermining such demand misstatements).

1  began to learn that DocuSign's COVID-19 era growth was not sustainable and Defendants' prior

2  statements to the contrary were false and misleading. ¶¶33, 213, 306, 308, 340-41. At the same time,

3  however, Defendants continued to reassure investors that "[e]ven as the pandemic subsides and

4  people begin to return to the office, they are not returning to paper. eSignature . . . [is] clearly here to

5  stay." ¶215.

6        On March 10, 2022, DocuSign reported a second consecutive quarter of disappointing billings

7  growth (which had decreased further to 25%), lower-than-expected billings guidance due to "urgent

8  demand wan[ing]" as the pandemic abated, and Defendant Alhadeff's planned resignation. ¶¶35, 216-

9  17, 313, 345-47. DocuSign's stock price dropped 20%, and analysts recognized, for example, that

10  "DocuSign's Q4 underscored that the growth scare of Q3 was not a one quarter event." ¶¶35, 219,

11  314-16, 350-51. Defendants, however, again sought to allay investor concerns, repeating that

12  customers "are not returning to paper. eSignature is clearly here to stay." ¶¶34-35, 220.

13        Finally, on June 9, 2022, the truth about DocuSign's demand unsustainability was fully

14  revealed when the Company reported a third consecutive quarter of poor billings growth, which had

15  now dropped to just 16% (a record low), and again reduced its billings guidance. ¶¶36, 221.

16  Defendants also admitted that DocuSign's growth slowdown was the result of "coming off the sort of

17  very aggressive buying that we had during COVID" and "onetime use cases" ending. ¶¶222, 319,

18  354; *see also* ¶¶36, 347, 352. As a result, DocuSign's stock price fell more than 24.5% on Friday,

19  June 10, 2022, and another 10% on Monday, June 13, 2022. ¶¶36, 223. Analysts described the

20  disclosures as revealing, *i.e.*, "the end of DOCU's core growth story." ¶¶357-58, 360. Two weeks

21  later, DocuSign announced Defendant Springer's abrupt departure, effective immediately. ¶¶36, 227.

22  **III.    ARGUMENT**

23        **A.    Legal Standard**

24        Class certification is warranted when a putative class satisfies the four requirements of Rule

25  23(a)—numerosity, commonality, typicality, and adequacy—and also meets the requirements of at

26  least one of Rule 23(b)'s subsections. The Ninth Circuit has "established that the requirements of

27  Rule 23 should be liberally construed in favor of class action cases brought under the federal securities

28  laws." *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016); *see also*

8

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS
REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

1    *In re Scorpion Techs., Inc. Sec. Litig.,* 1994 WL 774029, at *3 (N.D. Cal. Aug. 10, 1994) ("[T]he

2    Ninth Circuit favors a liberal use of class actions to enforce federal securities laws."); *In re Comput.*

3    *Memories Sec. Litig.*, 111 F.R.D. 675, 679 (N.D. Cal. 1986) ("The Ninth Circuit and this District in

4    particular have taken a liberal view of class certification motions brought in securities cases."). This

5    is because, as courts in this Circuit (and across the country) recognize, securities actions alleging

6    violations of Section 10(b) of the Exchange Act are well-suited to class treatment. *See Comput.*

7    *Memories*, 111 F.R.D. at 679 ("securities litigation is particularly well-suited for class action

8    treatment"); *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) ("[c]lass actions

9    are a particularly appropriate and desirable means to resolve claims based on the securities laws").[6]

10   Moreover, "[w]hile the class-certification analysis 'may entail some overlap with the merits

11   of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits

12   inquiries at the certification stage.'" *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *2 (N.D.

13   Cal. Dec. 19, 2022) (Orrick, J.) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455,

14   465-66 (2013)). Indeed, the Supreme Court has confirmed that "[m]erits questions may be considered

15   to the extent—***but only to the extent***—that they are relevant to determining whether the Rule 23

16   prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66.

17   **B.    The Proposed Class Satisfies the Requirements of Rule 23(a)**

18   **1.    The Class Is So Numerous That Joinder Is Impracticable**

19   Rule 23(a)(1) weighs in favor of class certification where "the class is so numerous that joinder

20   of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, "'impracticability' does not mean

21   'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris*

22   *v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). "While no specific minimum

23   number of potential class members exists, a proposed class of at least forty members presumptively

24   satisfies the numerosity requirement." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL

25   1042502, at *4 (N.D. Cal. Mar. 16, 2016).

26

27   _____

     [6] Unless otherwise indicated, all emphasis is added, and all internal quotations and citations are
28   omitted.

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS
REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

Courts in this Circuit agree that, for the purposes of class certification in securities actions, numerosity is presumed "when a corporation has millions of shares trading on a national exchange, [and] more than 40 individuals purchased stock over the course of more than a year." *Hatamian*, 2016 WL 1042502, at \*4; *see also QuantumScape*, 2022 WL 17974629, at \*3 ("courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members"). "And courts may infer that, when a corporation has millions of shares trading on a national exchange, the numerosity requirement is met." *Id.*; *see also In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1178 (N.D. Cal. 2017) (numerosity satisfied where company had 394 million shares outstanding).

Here, according to Lead Plaintiffs' expert, Chad Coffman, CFA, throughout the Class Period, shares of DocuSign common stock were actively traded on the NASDAQ. *See* Vasilchenko Decl. Ex. A, Expert Report of Chad Coffman, CFA ("Coffman Report") ¶28. Throughout the Class Period, DocuSign had a minimum of 183.5 million shares of common stock outstanding. *Id.* ¶71. *See QuantumScape*, 2022 WL 17974629, at \*3 (that company had between 189.5 million and 233.6 million shares outstanding was "sufficient to show the number of putative class members is so numerous that joinder would be impracticable"). Therefore, the proposed Class here is likely to contain at least hundreds (and likely thousands) of investors, making joinder impracticable. *See In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at \*3 (N.D. Cal. Aug. 20, 2021) ("Given the number of shares traded . . . the putative class members are sufficiently numerous to make joinder impracticable."). Moreover, "because this is a securities action involving a publicly-traded stock, it is highly likely that the members of the Class are geographically diverse, making joinder impractical." *See In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2013 WL 5789237, at \*4 (C.D. Cal. Oct. 25, 2013).

While the exact number of Class members is currently unknown, Lead Plaintiffs believe that there are at least hundreds (and likely thousands) of members in the proposed Class. Indeed, Defendants have made related factual admissions, which support a finding of numerosity here. *See* Vasilchenko Decl. Ex. D, Defendants' Responses & Objections to Lead Plaintiffs' First Set of Requests for Admission ("RFA R&Os"), RFA R&Os Nos. 1-2, 24, at 7-8, 19) (admitting that: (i) the proposed Class contains more than 100 members "to the extent that it relates to numerosity under Federal Rule of Civil Procedure 23(a)(1)[;]" (ii) there were more than 1,000 purchasers of DocuSign

10

common stock during the Class Period; and (iii) as of the date of filing the Amended Complaint, on July 8, 2022, DocuSign had over 199 million shares outstanding). Members of the Class may be identified from DocuSign's records, the records of its transfer agent, or shareholder acquisition records. Moreover, Class members can be notified of the pendency of this Action by mail and publication using forms of notice similar to those customarily used in securities class actions. Accordingly, the numerosity prerequisite for class certification is satisfied here.

### 2.    This Action Presents Common Questions of Law and Fact

Rule 23(a)(2) requires a showing that "questions of law or fact" are common to the class. Fed. R. Civ. P. 23(a)(2). "Plaintiffs need not show, however, that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014); *see also Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1112 (9th Cir. 2014) ("[A] common contention need not be one that 'will be answered, on the merits, in favor of the class.' Instead, it only 'must be of such a nature that it is capable of classwide *resolution*–which means that determination of its *truth or falsity* will resolve an issue that is central to the validity of each one of the claims in one stroke.'" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011))). In securities actions, courts have recognized that "public disclosures alleged to contain material misrepresentations and omissions, . . . present common questions of law and fact[.]" *Hatamian*, 2016 WL 1042502, at *4. "Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable." *Id.*

This Action raises several common questions of law and fact, including: (i) whether the federal securities laws were violated by Defendants' acts, as alleged in the Amended Complaint; (ii) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of DocuSign; (iii) whether Defendants acted with scienter; (iv) whether the price of DocuSign's common stock during the Class Period was artificially inflated or artificially maintained because of Defendants' conduct, complained of in the

11

Amended Complaint; and (v) the proper measure of damages. These common questions establish commonality. *See QuantumScape*, 2022 WL 17974629, at *4 (commonality satisfied where "questions depend on common contentions that are capable of class wide resolution," such as, *inter alia*, "whether Defendants omitted or misrepresented material facts," and "whether Defendants violated the Securities Exchange Act of 1934"); *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (commonality prerequisite met where plaintiffs alleged that the "investors were defrauded by the same misleading statements over the same period of time, and suffered similar losses as a result"); *Lyft*, 2021 WL 3711470, at *3 (whether the registration statement "contained untrue statements of material fact or omitted to disclose material facts, whether public sources of information could have revealed the purportedly untrue statements or omissions, and whether Defendants violated the Securities Act . . . are sufficient [questions] to satisfy" commonality).

### 3.    Lead Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) requires that the class representative's claims or defenses be "typical" of the claims or defenses of the prospective class. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *QuantumScape*, 2022 WL 17974629, at *4. "[T]he typicality requirement is met" where all "claims are based upon the same course of events as the claims of all class members, and all claims are based on the same theories and will be proven by the same evidence[.]" *In re Celera Corp. Sec. Litig.*, 2014 WL 722408, at *3 (N.D. Cal. Feb. 25, 2014). To satisfy typicality, courts "do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 868-69 (9th Cir. 2001); *see also In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 532 (N.D. Cal. 2009) (even "potentially conflicting incentives regarding the calculation of damages do not preclude certification of the proposed class"). Importantly, in assessing typicality, a court's "focus should be on the ***defendants'*** conduct . . . ." *Hatamian*, 2016 WL 1042502, at *5; *see also Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) ("[F]ocus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff[.]").

1    Lead Plaintiffs' claims are "typical" of, if not identical to, the claims of all other absent Class

2    members. Here, Lead Plaintiffs' and the proposed Class's claims arise from Defendants' common

3    course of misconduct, are based on identical legal theories—violations of Sections 10(b) and 20(a) of

4    the Exchange Act—and will be proven by the same evidence on a class-wide basis. Specifically, as

5    discussed above, Lead Plaintiffs allege that Defendants misrepresented and/or omitted material facts

6    concerning the sustainability of the increased demand for DocuSign's products, and related billings

7    and revenue growth, which the Company experienced after the onset of the COVID-19 pandemic.

8    *See, e.g.*, ¶¶246-48, 268, 286, 293-94, 304, 317. Lead Plaintiffs, like other Class members, purchased

9    DocuSign common stock during the Class Period at prices artificially inflated or artificially

10   maintained by Defendants' misconduct, and suffered damages when the relevant truth, concealed by

11   Defendants' misrepresentations, was disclosed to the market on three alleged disclosure dates,

12   causing DocuSign's stock price to decline. ¶426; ECF Nos. 59-1, 59-2 (Lead Plaintiffs' executed

13   certifications declaring the same).

14   This alignment of factual allegations, and legal and remedial theories, establishes typicality

15   under Rule 23(a)(3). *See Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 626 (S.D. Cal. 2015)

16   ("Typicality is satisfied when each class member's claim arises from the same course of events, and

17   each class member makes similar legal arguments to prove defendant's liability."); *QuantumScape*,

18   2022 WL 17974629, at *4 (typicality satisfied where putative class member were "uniformly

19   damaged as a result of acquiring [the securities at issue] at artificially inflated prices which was

20   revealed when the stock price fell following the corrective disclosures"); *In re Banc of Cal. Sec. Litig.*,

21   326 F.R.D. 640, 647 (C.D. Cal. 2018) ("Here, all putative class members allegedly suffered injuries

22   based on Defendants' misrepresentations . . . . There's nothing to suggest that the [Lead Plaintiffs']

23   injury is unique in any way, or that Defendants may have affirmative defenses against the [Lead

24   Plaintiffs] that wouldn't apply to the rest of the [C]lass. That's enough for typicality."). Both Lead

25   Plaintiffs and Class members are also presumed to have relied on Defendants' misrepresentations and

26   omissions. *See Basic*, 485 U.S. at 240; *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*,

27   563 U.S. 804, 811 (2011). Thus, Lead Plaintiffs' claims are typical of the proposed Class.

28

1

### 4.    Lead Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

2

To satisfy adequacy, Rule 23(a)(4) requires that "representative parties will fairly and

3

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether a

4

plaintiff will adequately serve the class, courts consider two questions: '(1) do the named plaintiffs

5

and their counsel have any conflicts of interest with other class members[,] and (2) will the named

6

plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *SEB Inv. Mgmt.*

7

*AB v. Symantec Corp.*, 335 F.R.D. 276, 284-85 (N.D. Cal. 2020) (citing *Hanlon v. Chrysler Corp*,

8

150 F.3d 1011, 1020 (9th Cir. 1998)).

9

Lead Plaintiffs satisfy both prongs of the adequacy requirement here. Lead Plaintiffs' interests

10

are neither antagonistic to, nor in conflict with, the interests of the other proposed Class members.

11

Lead Plaintiff PERSI is a public pension fund with approximately $22 billion in assets under

12

management that provides retirement, disability, survivor, and other benefits to more than 170,000

13

members in the State of Idaho. ¶40. PERSI purchased DocuSign's common stock during the Class

14

Period and suffered damages as a result of Defendants' fraud. *Id*. Lead Plaintiff DIL is an investment

15

fund management company established under the laws of Luxembourg and is a 100% subsidiary of

16

DekaBank. ¶41. DIL is a Luxemburg fund management company of fonds commun de placement

17

("FCPs"), the French term for investment funds, which have no legal personality and must be

18

managed by a Luxembourg management company under Luxembourg law; as such, DIL has

19

exclusive authority to make investment decisions for the FCPs it manages and to bring suit to recover

20

any losses incurred by those FCPs. *Id*. DIL purchased DocuSign's common stock during the Class

21

Period and suffered damages as a result of Defendants' fraud. *Id*.

22

Lead Plaintiffs are committed to safeguarding the best interests of the Class and do not have

23

interests that conflict with those of the Class. *See* Joint Declaration of Carla Zinkand and Cheryl

24

George in support of DIL and PERSI's Motion for Appointment as Lead Plaintiffs (ECF No. 14-4 at

25

4-5); *China Intelligent*, 2013 WL 5789237, at *5 (crediting plaintiffs' "assert[ion] that there are no

26

conflicts of interest between them and the absent members of the [c]lass . . . because the claims of the

27

[c]lass members are based almost entirely on common issues of law and fact, and because . . .

28

14

[p]laintiffs' interests appear to be closely bound to those of the absent [c]lass members"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) ("Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees.").

Lead Plaintiffs are well-suited to monitor and oversee the litigation to ensure that the best-interests of the Class are protected. To date, Lead Plaintiffs have actively supervised and monitored the progress of this litigation, including through regular communications with Lead Counsel, and will continue to do so, and take all necessary steps to ensure that they fulfill their fiduciary obligations. For example, through their experienced counsel, Lead Plaintiffs have, *inter alia*: (i) sought appointment as Lead Plaintiffs under the Private Securities Litigation Reform Act ("PSLRA"); (ii) investigated the alleged claims, including by interviewing numerous DocuSign former employees; (iii) prepared and filed the Amended Complaint; (iv) briefed, argued, and defeated Defendants' motion to dismiss; (v) prepared this motion for class certification; and (vi) propounded numerous discovery requests on Defendants. Lead Plaintiffs have also diligently complied with their own discovery obligations by serving Rule 26 Initial Disclosures and responding to Defendants' numerous interrogatories and document requests. Further, Lead Plaintiffs have undertaken an extensive document search to produce documents in response to Defendants' document requests and begun to produce documents on a rolling basis. Lead Plaintiffs will also provide testimony during their depositions. Moreover, as set forth in their previously filed PSLRA certifications, Lead Plaintiffs: (i) understand the duties and responsibilities of lead plaintiffs under the PSLRA; and (ii) have reviewed the Amended Complaint against Defendants and authorized the filing of the pleading. *See* ECF Nos. 59-1, 59-2. Lead Plaintiffs have also reviewed the motion to dismiss briefs and other major case documents, and participated in discovery to date, including in connection with the Parties' initial disclosures, interrogatories, document requests, and requests for admission. Lead Plaintiffs will continue to actively participate in and supervise the litigation through trial. Lead Plaintiffs' interests and actions thus clearly fulfill the adequacy requirement under Rule 23(a)(4). *See, e.g.,* *China Intelligent*, 2013 WL 5789237, at *5 (adequacy satisfied where Lead Plaintiffs "diligently prosecuted th[e] case since they were appointed as Lead Plaintiffs").

1        Lead Plaintiffs are also adequate because they have retained attorneys with considerable

2  experience in securities class actions and complex litigation. *See* Rule 23(g) (requiring courts to assess

3  adequacy of proposed class counsel). Lead Counsel is competent and qualified to lead this Action on

4  behalf of the Class. *See* Vasilchenko Decl. Ex. B, Labaton Sucharow Firm Résumé. Labaton

5  Sucharow has served or is serving as lead counsel in many of the largest and most significant

6  securities class actions,[7] and by appointing Labaton Sucharow as Lead Counsel, this Court has already

7  made a preliminary (and proper) determination that Labaton Sucharow will fairly and adequately

8  protect the interests of the Class. *See* ECF No. 42. Lead Counsel has committed substantial time and

9  resources to representing the Class, has worked vigorously to prosecute this Action, and has and will

10 continue to zealously and competently represent the interests of all Class members. *QuantumScape*,

11 2022 WL 17974629, at *6 (adequacy satisfied where, *inter alia*, "[c]lass counsel are experienced class

12 action litigators who have dedicated a substantial amount of time and resources to this case and intend

13 to continue to do so").

14       Likewise, Kessler Topaz is a highly respected law firm whose attorneys have a proven track

15 record of successfully litigating securities class actions and other complex litigation, and extensive

16 experience litigating within the Northern District of California. *See* Vasilchenko Decl. Ex. C, Kessler

17 Topaz Firm Résumé. Each firm is undoubtedly qualified, experienced, and capable of prosecuting

18 this litigation on behalf of the Class. *See, e.g.*, *QuantumScape*, 2022 WL 17974629, at *5-6. Thus,

19 the adequacy requirement is satisfied here.

20

21

22

---

[7] *See, e.g.*, *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *5 (N.D. Cal. July 22,
23 2019) ("The Court has no reservations regarding [Labaton Sucharow's] abilities . . . or their zeal in
representing the class[.]"); *Maliarov v. Eros Int'l PLC*, 2016 WL 1367246, at *7 (S.D.N.Y. Apr. 5,
24 2016) ("Labaton Sucharow's extensive involvement in complex securities class action litigation
demonstrates that the firm is qualified, experienced, and generally able to conduct the litigation.");
25 *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *16 (S.D.N.Y. May 9, 2014) ("This
favorable Settlement is attributable to the diligence, determination, hard work, and reputation of
26 [Labaton Sucharow], who developed, litigated, and successfully negotiated the settlement of this
Action, an immediate cash recovery in a very challenging case."); *In re Facebook, Inc. IPO Sec. &
27 Derivative Litig.*, 288 F.R.D. 26, 41 (S.D.N.Y. 2012) (Labaton Sucharow has "substantial experience
in the prosecution of securities class actions" and "has served as lead counsel in numerous securities
28 actions . . . in which it recently achieved settlements totaling" $1 billion).

C.    **The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

In addition to Rule 23(a)'s requirements, Lead Plaintiffs and the proposed Class must also satisfy at least one of the conditions imposed by Rule 23(b). Rule 23(b)(3) requires: (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, both requirements are readily satisfied.

1.    **Common Questions of Law and Fact Predominate**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). To satisfy this inquiry, "*questions* of law or fact common to the class [must] 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (italics in original) (quoting Fed. R. Civ. P. 23(b)(3)).  Securities class actions routinely satisfy Rule 23(b)(3)'s predominance requirement. *See Amchem*, 521 U.S. at 625; *Basic*, 485 U.S. at 224.  Finally, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof[,]'" but rather just "that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen*, 568 U.S. at 469 (italics and alternations in original) (quoting Fed. R. Civ. P. 23(b)(3)).

This Action presents clear questions of law and fact common to every Class member, including whether: (i) Defendants made false and misleading statements and/or omitted adverse facts; (ii) Defendants' misleading statements and omissions were material; (iii) Defendants acted with scienter; (iv) DocuSign common stock traded at artificially inflated or artificially maintained prices; (v) Defendants' misrepresentations and omissions proximately caused Class members' losses; (vi) the proper measure of Class members' damages; and (vii) whether the Individual Defendants were control persons. Each one of these questions is susceptible to common proof on a Class-wide basis. *See Amgen*, 568 U.S. at 467-68. Indeed, the Supreme Court has clearly found that materiality and loss causation are "'common questio[ns]' for purposes of Rule 23(b)(3)." *Id.* at 459-60, 467 (explaining these elements can be proven on a class-wide basis based on common evidence).

1

### a.    Lead Plaintiffs Are Entitled to the Fraud-On-The-Market Presumption of Reliance

2

Nor will reliance present individual questions here. Rather, Lead Plaintiffs may invoke the

3

fraud-on-the-market presumption because DocuSign common stock traded in an efficient market. As

4

a result, all purchasers of DocuSign common stock are uniformly presumed to have relied on all

5

available public information. *Amgen*, 568 U.S. at 458; *see Halliburton Co. v. Erica P. John Fund, Inc.,*

6

*(Halliburton II)*, 573 U.S. 258, 272 (2014) ("Even the foremost critics of the efficient-capital-markets

7

hypothesis acknowledge that public information generally affects stock prices."). Because all Class

8

members may invoke the fraud-on-the-market presumption, there are no individual reliance issues to

9

be considered here. *See Basic,* 485 U.S. at 241-42.

10

To invoke the *Basic* presumption of reliance, a plaintiff must demonstrate: "(1) that the alleged

11

misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an

12

efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations

13

were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. "[W]ith the exception

14

of materiality"—which is a common question of fact reserved for a jury—the elements of publicity,

15

market efficiency, and market timing "must be satisfied before class certification." *Id.* at 276; *see also*

16

*Amgen*, 568 U.S. at 469-70 (materiality need not be established at the class certification stage because

17

it is a question common to the Class). Here, Lead Plaintiffs establish these factors, so the presumption

18

applies. There is no dispute that the alleged misrepresentations in this Action were publicly issued, or

19

that Lead Plaintiffs traded in DocuSign common stock between the misrepresentations and the

20

ultimate revelation of the truth. *See, e.g.*, Amended Complaint, Section V; ¶425 (alleging that all

21

Class members "purchased DocuSign[] securities between the time Defendants misrepresented or

22

failed to disclose material facts and the time the true facts were disclosed[.]"); ECF Nos. 59-1, 59-2.

23

Finally, for the reasons stated below, DocuSign common stock traded in an efficient market.

24

Mr. Coffman's expert report demonstrates that DocuSign common stock traded in an efficient

25

market. Coffman Report ¶¶24-78. Moreover, where a company's stock trades on an open and

26

developed exchange, courts need not conduct any further analysis to determine whether market

27

efficiency exists. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). Here, DocuSign

28

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS
REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

common stock was widely traded on the NASDAQ—a developed exchange—which alone establishes market efficiency. *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) ("[p]laintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because [p]laintiffs sufficiently established that [defendant]'s stock was actively traded on an efficient market – the NASDAQ"); *see also* RFA R&Os No. 17 at 16-17 (admission that DocuSign's common stock traded on the NASDAQ throughout the relevant time period).

Where plaintiffs cannot make this showing, courts apply the five-factor analysis set forth in *Cammer,* 711 F. Supp. at 1286-87, to determine whether stock is traded in an efficient market. The factors are: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file United States Securities and Exchange Commission ("SEC") Registration Statement Form S-3; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.*

For the reasons stated above, a *Cammer* analysis is not necessary. However, even if the Court conducted a *Cammer* analysis, Lead Plaintiffs demonstrate that DocuSign common stock satisfies all five factors, and thus that the market for DocuSign common stock was efficient.

**First**, DocuSign's common stock trading volume supports a showing of market efficiency. Coffman Report ¶¶29-34. "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286. During the Class Period, the average weekly trading volume of DocuSign common stock was approximately 11.04% of shares outstanding, which is significantly greater than the threshold that courts commonly apply. Coffman Report ¶31; *Nguyen v. Radient Pharms. Corp*., 287 F.R.D. 563, 571 (C.D. Cal. 2012) ("'[A]verage weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.'" (quoting *Cammer*, 711 F. Supp. at 1286)). It is also far higher than the

2.51% average weekly trading volume on both the NYSE and NASDAQ exchanges. Coffman Report ¶31.

**Second**, analyst coverage of DocuSign provides strong support for finding market efficiency here. *Id.* ¶¶35-40. "The existence of securities analysts following [a company's] stock during the class period would imply that the market would rapidly and fully incorporate information into the stock price because analyst reports would likely be 'closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.'" *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 248 (N.D. Cal. 2013) (quoting *Cammer*, 711 F. Supp. at 1286); *QuantumScape*, 2022 WL 17974629, at *8 (finding seventeen analyst reports and seven firms covering issuer during relevant period sufficient to support market efficiency). Here, "there were at least 535 reports [on DocuSign] issued during the Class Period by 31 separate firms, including major financial companies such as Citigroup, UBS, and J.P. Morgan." Coffman Report ¶37; *see also* RFA R&Os No. 25 at 19-20 (admitting that "several analysts issued analyst reports and commentary on DocuSign during the alleged Class Period").

**Third**, the existence of 136 market makers for DocuSign's common stock easily supports a finding that the market was efficient. Coffman Report ¶45. Under *Cammer*, the existence of "[t]en market makers for a security" is sufficient to invoke the "presumption that the market for the security is an efficient one[.]"711 F. Supp. at 1293. Thus, the existence of 136 market makers far exceeds *Cammer's* requirement. Coffman Report ¶¶41-42, 44-45; *see also QuantumScape*, 2022 WL 17974629, at *9 (finding that 107 market makers satisfied this *Cammer* factor). Further, DocuSign's listing on the NASDAQ is strong evidence of market efficiency. Coffman Report ¶¶41-45. Throughout the Class Period, DocuSign's common stock was listed and traded on the NASDAQ, the second largest securities exchange by total market capitalization in the world. *Id.* ¶¶43-44. As stated above, the fact that DocuSign's stock traded on the NASDAQ is itself a strong indicator of market efficiency. *See In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) ("Plaintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because [the p]laintiffs sufficiently established that [the defendant]'s stock was actively traded on an efficient market – the NASDAQ.").

**Fourth**, DocuSign's eligibility to file Form S-3 Registration Statements is a strong indicator of market efficiency because the SEC only allows certain issuers to do so. Coffman Report ¶¶46-48. Specifically, Form S-3 Registration Statements are reserved for issuers that are generally deemed to be widely followed. *Id*. ¶47. According to the Coffman Report, DocuSign filed a Form S-3ASR and Form S-3/A during the Class Period, on August 12, 2020 and April 22, 2022, respectively, and there was no evidence found to suggest that DocuSign was deemed ineligible to file Form S-3 Registration Statements thereafter. *Id*. ¶48. Thus, DocuSign common stock satisfies this *Cammer* factor.

**Fifth**, DocuSign's price reaction to new material information demonstrates market efficiency. *Id*. ¶¶49-69. The fluctuation of a stock price in reaction to corporate news is an indicator of market efficiency. *See Cammer*, 711 F. Supp. at 1287. This factor is routinely demonstrated through an "event study." *Diamond Foods*, 295 F.R.D. at 247; *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27, 2017) (an event study "is a feature of virtually every securities action"). Lead Plaintiffs' expert, Chad Coffman, conducted an event study to demonstrate the causal connection between new Company-specific events and movements in DocuSign's common stock price. Coffman Report ¶52. In conducting this event study, Mr. Coffman used statistical analysis to isolate the impact of such information on market prices—*i.e.*, "whether DocuSign Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no DocuSign-related news." *Id*. ¶¶49-52. For the reasons stated in Mr. Coffman's report, there is "a clear cause-and-effect relationship between new material news and changes in the market price of DocuSign Common Stock during the Class Period." *Id*. ¶¶49-69.

**Krogman Factors:** In addition to the *Cammer* factors, which demonstrate an efficient market for DocuSign stock, courts also consider the three *Krogman* factors. *See QuantumScape*, 2022 WL 17974629, at *13 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)). The three factors examine a company's market capitalization, the bid-ask spread, and the percentage of stock not held by insiders (the float). *Id*. Each of these factors further supports a finding that the market for DocuSign's stock was efficient. During the Class Period, DocuSign had an average market capitalization of $39 billion (Coffman Report ¶71; *see also* RFA R&Os No. 20 at 18 (admitting same)), approximately 98% of which were held by non-insiders. Coffman Report ¶75. DocuSign's

21

1  average bid-ask spread was narrow—estimated to be between only 0.012% and 0.07% per month

2  during the Class Period. *Id.* ¶74. Together, these facts satisfy the three additional *Krogman* factors

3  and support a finding of market efficiency here. *See QuantumScape*, 2022 WL 17974629, at *13

4  (finding market capitalization and bid-ask spread factors "easily meet" where market capitalization

5  averaged $11.8 billion and the bid-ask spread was even narrower than the acceptable 0.034% to

6  0.078% range).

7      Lead Plaintiffs' expert considered two additional factors that further support a finding of

8  market efficiency for DocuSign's common stock. Coffman Report ¶¶76-80. First, Mr. Coffman

9  analyzed institutional ownership, stating that "2,050 separate institutions owned DocuSign Common

10 Stock during the Class Period, holding on average 75.3% of public float. The substantial level of

11 institutional ownership of DocuSign Common Stock during the Class Period coupled with the high

12 trading volume further supports a conclusion of market efficiency." *Id.* ¶76. Second, Mr. Coffman

13 conducted an autocorrelation analysis, which determines whether "price movements of a security

14 have the ability to predict future price movements[.]" *Id.* ¶77. After running a regression analysis (a

15 well-accepted methodology to test for autocorrelation), Mr. Coffman determined that there was no

16 evidence of autocorrelation, which further supports the existence of market efficiency here. *Id.* ¶¶77-

17 80. Finally, Lead Plaintiffs' expert also discussed an additional factor—the considerable option

18 trading in DocuSign common stock during the Class Period—which, in his expert opinion, as

19 supported by academic literature, further demonstrates that DocuSign common stock traded in an

20 efficient market. *Id.* ¶81.

21          **b.    Damages Can Be Calculated on a Class-Wide Basis**

22      Proof of damages is not a prerequisite to class certification. *See LendingClub*, 282 F. Supp. 3d

23 at 1184. Moreover, the damages calculation does not present individual issues that predominate over

24 Class-wide considerations. *Banc of Cal.*, 326 F.R.D. at 651. Lead Plaintiffs intend to prove damages

25 and economic loss through the "out-of-pocket" damages methodology (*i.e.*, "that damages are equal

26 to the artificial inflation in the share price at the time of purchase minus the artificial inflation per

27 share at the time of sale"), a well-settled methodology that can be easily applied to all Class members

28 using a common formula. Coffman Report ¶¶82-87; *see also In re Silver Wheaton Corp. Sec. Litig.*,

22

2017 WL 2039171, at *15 (C.D. Cal. May 11, 2017) ("Damages for every class member can be mechanically calculated according to [expert's] proposed [event study] methodology and are therefore subject to class wide proof."). Indeed, as the Ninth Circuit explained in its seminal *Blackie v. Barrack* decision, "we are confident that should the [Section 10(b)] class prevail the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a ***mechanical task***." 524 F.2d 891, 905 (9th Cir. 1975). The out-of-pocket method is a widely accepted method of measuring damages in Exchange Act cases, such as this one. *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b)[] class action.") (citing *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018)). For the reasons set forth in the Coffman Report, Lead Plaintiffs clearly demonstrate that damages can be calculated on a Class-wide basis here. Coffman Report ¶¶82-87.[8]

### 2. This Proposed Class Is Superior to Alternative Methods for Resolving This Dispute

To be certified, a class must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The test for superiority turns on four factors: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

---

[8] While Lead Plaintiffs' proffer of a Class-wide approach to calculating damages further supports predominance, the Ninth Circuit has repeatedly held that "differences in damages calculations is not sufficient to defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-87 (9th Cir. 2015); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014) ("So long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed did not defeat class certification."); *accord In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 147 (C.D. Cal. 2007) ("even if [the defendants'] criticisms are valid and the calculation of the amount of damages requires the analysis of some individual issues, this does not preclude class certification").

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]

Securities class actions, like this Action, are routinely found to meet these superiority factors. *See Twitter*, 326 F.R.D. at 630-31; *In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *10 (N.D. Cal. May 12, 2010) ( "The court has previously found class treatment superior to individual actions in the context of securities litigation."); *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005) ("Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants.").

Here, all four of Rule 23(b)(3)'s factors weigh in favor of class certification. ***First***, there is no indication that any member of the Class would control the prosecution of these claims individually, especially because recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1023 ("In most cases, litigation costs would dwarf potential recovery."). Indeed, the proposed Class consists of countless geographically dispersed shareholders, making the costs and logistics of individually pursuing these claims impracticable. *See VeriSign*, 2005 WL 7877645, at *9. In the unlikely event that some individuals seek to litigate on an individual basis, they will have the option to opt out of the Class. ***Second***, counsel is unaware of any other litigation against these Defendants asserting these claims. ***Third***, concentration of this litigation in one forum is desirable to promote efficiency—a key consideration of Rule 23(b)(3)—and to avoid inconsistent adjudication. *See Hodges*, 274 F.R.D. at 271 ("Where thousands of identical complaints would have to be filed, it is superior to concentrate claims through a class action in a single forum."). ***Fourth***, there are no anticipated difficulties in maintaining this Action as a class action.[9] All members of the proposed Class purchased the publicly traded Class A common stock of DocuSign and were damaged when the relevant truth concealed by Defendants' misrepresentations and omissions was revealed to the market.

For these reasons, a class action is superior to any other method of resolving the claims at issue here.

---

[9] Regardless, the Ninth Circuit has recognized that "courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015)).

### D.      The Court Should Appoint Lead Counsel as Class Counsel Under Rule 23(g)

Labaton Sucharow should be appointed as Class Counsel pursuant to Rule 23(g). Fed. R. Civ. P. 23(g)(1) ("a court that certifies a class must appoint class counsel"). When appointing class counsel, a court "must consider" the following factors: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Labaton Sucharow, in its capacity as Lead Counsel, and Kessler Topaz, in its capacity as Liaison Counsel, have performed substantial work identifying and investigating the claims asserted in this Action, have substantial experience handling class actions asserting claims of this type, have committed and will continue to commit substantial resources to representing the Class, and have worked vigorously to prosecute this Action. *See supra* III(B)(4); Vasilchenko Decl. Exs. B-C. In appointing Lead Counsel and Liaison Counsel, this Court already made a preliminary (and proper) determination that Labaton Sucharow and Kessler Topaz will fairly and adequately protect the interests of the putative Class. *See* ECF No. 42. For these reasons, Labaton Sucharow will fairly and adequately represent the Class and should be appointed Class Counsel, and Kessler Topaz should be appointed as Liaison Counsel on behalf of the Class, pursuant to Rule 23(g).

## IV.      CONCLUSION

For the reasons addressed above, Lead Plaintiffs request that the Court: (i) certify the Class pursuant to Rules 23(a) and 23(b)(3); (ii) appoint Lead Plaintiffs as Class Representatives; and (iii) appoint Labaton Sucharow as Class Counsel, and Kessler Topaz as Liaison Counsel on behalf of the Class, pursuant to Rule 23(g); and (iv) grant Lead Plaintiffs any such further relief as the Court deems just and proper.

1  | DATED: September 15, 2023          Respectfully submitted,

2

3  **LABATON SUCHAROW LLP**
CAROL C. VILLEGAS (admitted *pro hac vice*)
IRINA VASILCHENKO (admitted *pro hac vice*)
4  LISA STREJLAU (admitted *pro hac vice*)
DAVID SALDAMANDO (admitted *pro hac vice*)

5

6  */s/ Irina Vasilchenko*
IRINA VASILCHENKO
7  140 Broadway
New York, NY 10005
8  Tel: (212) 907-0700
Fax: (212) 818-0477
9  cvillegas@labaton.com
ivasilchenko@labaton.com
10  lstrejlau@labaton.com
dsaldamando@labaton.com

11

*Counsel for Lead Plaintiffs*
12  *and Lead Counsel for the Proposed Class*

13  **KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
14  Jennifer L. Joost (Bar No. 296164)
Stacey M. Kaplan (Bar No. 241989)
15  One Sansome Street, Suite 1850
San Francisco, CA 94104
16  Tel: (415) 400-3000
Fax: (415) 400-3001
17  jjoost@ktmc.com
skaplan@ktmc.com

18

*Liaison Counsel for the Proposed Class*
19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS
REPRESENTATIVES, AND APPOINT CLASS COUNSEL [CA No. 3:22-CV-00824-WHO]