**Pages 1 - 23**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

RICHARD R. WESTON, )
)
Plaintiff, )
)
VS. ) **NO. 3:22-CV-00824-WHO**
)
DOCUSIGN, INC., et al., )
)
Defendants. )
)

San Francisco, California
Wednesday, May 15, 2024

**TRANSCRIPT OF REMOTE ZOOM PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
LABATON, KELLER, SUCHAROW, LLP
140 Broadway, Suite 34th Floor
New York, NY 10005
**BY: IRINA VASILCHENKO**
**LISA M. STREJLAU**
**CAROL C. VILLEGAS**
**ATTORNEYS AT LAW**

KESSLER, TOPAZ, MELTZER AND CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
**BY: JENNIFER L. JOOST**
**ATTORNEY AT LAW**

(Appearances Continued on Page 2.)

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**APPEARANCES VIA ZOOM (CONT.'D):**

For the Defendants:

FENWICK & WEST, LLP
801 California Street
Mountain View, CA 94041

**BY: FELIX SHIH-YOUNG LEE**
**ATTORNEY AT LAW**

FENWICK & WEST, LLP
555 California Street, 12th Floor
San Francisco, CA 94104

**BY: JENNIFER C. BRETAN**
**ATTORNEY AT LAW**

**Wednesday - May 15, 2024 2:46 p.m.**

**P R O C E E D I N G S**

**---o0o---**

**THE COURTROOM DEPUTY:** We'll get underway in Case Number 22-824, Weston versus DocuSign, et al. Counsel, if you would please state your appearance for the record.

**MS. VASILCHENKO:** Good afternoon. Irena Vasilchenko from Labaton, Keller, Sucharow on behalf of lead plaintiffs in the class, and with me here today I have my colleague, Lisa Strejlau, also from Labaton, Keller, Sucharow.

**MS. VILLEGAS:** Hello, Your Honor. Carol Villegas from Labaton, Keller, Sucharow, as well, for the plaintiffs.

**MS. JOOST:** Good afternoon, Your Honor. Jennifer Joost from Kessler, Topaz, Meltzer and Check on behalf of plaintiffs.

**MR. LEE:** Felix Lee of Fenwick & West on behalf of defendants.

**MS. BRETAN:** And good afternoon, Your Honor. Jennifer Bretan also on behalf of defendants, Fenwick & West.

**THE COURT:** Great. Good afternoon to everybody.

So Mr. Lee, I'm inclined to grant this -- the motion. Fundamentally, I think the out-of-pocket theory of damages fits the corrective disclosure theory. And the materialization of the risk theory, as Judge Alsup said, is a loss causation theory and not a liability theory, and so I don't need to

address it now. And I think the other Rule 23 requirements are fairly directly satisfied.

So that's how I'm reading everything, but I'm happy to hear from you. So, please go ahead.

**MR. LEE:** Sure.

Well, let me start with the *Comcast* argument, and in particular how it relates to materialization of risk.

And, yeah, and I certainly acknowledge that we have cases in this district that go both directions when it comes to materialization of risk. We've got the *Amyris* case, you know, from Judge Gonzalez Rogers that did decertify a class, you know, to the extent it relied on materialization of risk. And then you've also got, you know, a case from Judge Alsup that went the opposite direction. And I'd like to address that, and then also I can talk about the underlying theories.

**THE COURT:** Yeah. Well, so, and Mr. Lee, tell me why I should care at this point; why I couldn't deal -- if I'm going to certify on an out-of-pocket, then maybe that's where you want to get to.

**MR. LEE:** Sure.

**THE COURT:** But that's -- if I'm certifying there, then whether I deal with materialization of the risk now or at trial really doesn't make -- or close to trial really shouldn't make too much difference, and I -- I'm inclined to follow Judge Alsup.

So, but tell me why you care.

**MR. LEE:** Sure.

So if you look at the way that the out-of-pocket measure is going to be used in this case -- and, in fact, the plaintiffs I think were quite candid and explicit as to how they would do that in the reply brief.

If you look at page 1 and page 2 of their reply brief, they were saying specifically the way they're gonna try and do this is through use of an event study. So, and I'll read you the exact language: "Plaintiffs' proposed method for measuring out-of-pocket damages using an event study easily satisfies *Comcast*," and they're going to do that on multiple occasions.

Now, the reason why that matters is that we've got case law, you know, both from the *BP* case going, you know, years back, but also the *Amaris* case that says when you have a case that involves materialization of risk, an event study will not accurately capture price inflation and, by extension, damages. Okay. And I'll elaborate that that's even admitted to by their expert.

Okay. So if you've got a situation where the way that they propose to use the out-of-pocket damages measure is to use an event study, and we have testimony from Professor Grenadier that says that when you've got a situation like this -- he uses the term "uncertainty," but it essentially captures the same theme of materialization of risk. The event study that looks

at post-class period declines in the stock price cannot be used to accurately measure inflation during the class period. Okay? And just, and it probably bears some explanation as to why that might be the case.

The *BP* case I think did a good job of this. *BP* noted that if you're in a situation where what you're saying is early or in the class period you should have -- you know, it's not that you knew something like, for instance, an oil spill was going to happen. But what you should have done is you should have been more explicit about the risks that were going to be faced.

Well, even if you are -- even if the company had been completely candid about the level of risk, if that risk eventuates and, you know, at the end of the class period, the stock price is still going to fall, right? Like even if British Petroleum had been very candid about just how likely it was that the oil rig was going to blow up, when it blows up the stock price still falls, and obviously that is not cognizable damages. And so that stock price drop cannot be used to measure damages in that way.

So Professor Grenadier, you know, applying, you know, you know, his academic and I think, you know, economic analysis to it, agreed with that. He said, yeah, why would you expect that that stock price drop at the end would accurately reflect the amount of inflation, and thereby damages, during the class period?

And Mr. Kaufman's response to this, to this observation, was very telling, and I think this is one place where, you know, where the facts of this case really highlight why you should go with *Amyris* and not with *Geron*, because Mr. Kaufman, in trying to defend the use of the event study -- and this is in paragraph 20 of his rebuttal report. What he says is he admits Dr. Grenadier is obviously correct that DocuSign could not have disclosed the specific financial results that did not occur later. Okay? So he admits that.

But then he says the assertion that event studies provide no relevant information is incorrect. And then he says, here is when it would be right. He says, for example, if the proper set of information about what DocuSign knew about customer -- if that was disclosed properly, he then says, and I'll quote this: "Why would the market necessarily be wrong about projecting the ultimate billings and other financial results?"

So he is saying, the proposal that I am submitting may not necessarily be wrong. That clearly is not a standard that can meet *Comcast*, saying, well, what I'm proposing might not be wrong. And then he goes on to elaborate, well, this is when it might be right. He says, well, if half of the investors that were aware of a concealed demand metrics overestimate the demand, then half of them underestimate the demand by the same amount, well, then in that case, the event study would then accurately capture the amount of marketplace decline and price

inflation. But then his report gives you no reason to believe that those very narrow conditions would ever take place. He is simply saying, at the end of the day, my methodology may not necessarily be wrong under certain conditions.

Now, I mean, a random number generator may not necessarily be wrong if certain conditions are met, but remember that their burden under *Comcast* is to -- is for them to set forth a methodology that can be applied on a class-wide basis and is tied to their theory of liability. And I think that Mr. Kaufman's report, in trying to explain how he would do it, actually undermines the strength of their argument.

And, you know, and to go back to the case law, the reason why I think *Amyris* is better reasoned in this regard compared to *Geron* is that Judge Alsup, in *Geron*, basically said -- he tried to draw a bright-line distinction between materialization of risk as a loss causation theory and then the plaintiffs' theory of liability under *Comcast*. He said, materialization risk is loss causation, and it's not their theory of liability; whereas Judge Rogers felt the -- you know, said the opposite.

Now, if you just think about, well, what is your theory of liability, the only way you can have -- the only way that there can be any finding of liability is if you meet all of the prima facie elements of a 10(b)(5) claim. That's how you establish liability. What is one of the elements of a 10(b)(5) claim? It's loss causation, right?

And I would even dispute the notion that materialization of risk is solely loss causation, because remember, the reason why plaintiffs put materialization of risk into their complaint -- and they unquestionably did. It's -- you saw in their papers. They talk about it over and over again. The reason why they had to put that in there and make reference to it was because of the massive amount of uncertainty that was being faced because of the COVID-19 pandemic. Right? And so they had to come up with ways of tying what the company should or should not have said during the pandemic, with what happens almost two years later, right?

And not even they are bold enough to argue that the defendant should have predicted or disclosed what was going to happen two years ago. What they're saying is, as a matter of truth or falsity, you should have said something more about the risks you face. Well, if that's the case, the materialization of risk also impacts falsity, right? Because they're saying the reason why what you said was false was you didn't disclose the risk that eventually materialized.

Same thing with respect to scienter, right? Why are they arguing that the defendants knew or should have known that what they were saying was false? Well, because they knew about potential risks and were allegedly not candid about them. So, you know, I won't dispute that materialization of the risk touches upon loss causation, but it certainly touches upon

other prima facie elements of their claim, as well.

And so, and the reason why all of this matters, you know, as Your Honor is aware, is that the *Halliburton* decision says that you don't have to prove loss causation at the class certification stage. Well, no one's asking them to prove it, right? What we are asking is give us a methodology for calculating damages that is tied to your theory of liability. Your theory of liability, in turn, has to incorporate loss causation, because it is a prima facie element to the claim. And if you're going to do that, right, then you have to give us some idea about how you are going to take materialization of risk into account, and they did not do that here.

That is why I think, you know, it is more appropriate to follow cases like *Amyris* or the *AAC* case that say it's their burden to do it. They try to throw it back on us and say, well, your expert didn't prove it wasn't possible, but that's really not the way that *Comcast* frames that burden. They --

**THE COURT:** I get your point.

Let me hear from the plaintiff, and then I'll let you argue other points as we go along.

**MR. LEE:** Sure.

**THE COURT:** Ms. Vasilchenko.

**MS. VASILCHENKO:** Hello. Thank you, Your Honor.

So to respond to some of the arguments that Mr. Lee just made, I think one of the first points that he made was that

there are cases in this district and in this circuit that go both ways or in both directions, and he cited only the *Amyris* case and the *Geron* case by Judge Alsup.

Well, he completely ignored, you know, multiple other decisions that have also been issued within this district and within this Ninth Circuit that we cited in our reply brief. Primarily the *Fibrogen* case by Judge Chen in the Northern District of California, which directly cited the *Geron* case by Judge Alsup in rejecting this exact same argument about materialization of the risk as a *Comcast* problem at class certification. And Judge Chen agreed that Judge Geron's (sic) reasoning in *Geron* was well reasoned and thoughtful, and he followed Judge Alsup in rejecting this exact same argument on class cert. So that's the *Fibrogen* case.

There's also the *Acadia* case that also just came out in March of this year, and that was in the Southern District of California, and that was by Judge Hayes. Exactly the same argument, also citing *Amyris* and disagreeing with *Amyris* and following Judge Alsup in rejecting this materialization of the risk *Comcast* argument.

There's also the *Bayer* case, which is a Judge Seeborg case in the Northern District of California. I believe that one was last year and didn't directly cite Judge Alsup's decisions, but it followed the same reasoning and logic, and essentially the Court held that, you know, these kinds of arguments about the

specifics of the damages methodologies, how to calculate inflation, how to deal with time-varying inflation, confounding information, desegregation, and that there's some kind of fundamental mismatch between plaintiffs' liability theory versus the out-of-pocket damages methodology, that all of these really are, at bottom, loss causation arguments, and that it was premature to get into all of these nitty gritty details at this stage under the Supreme Court's clear precedent in *Halliburton I*, as well as *Amgen*, which I know Your Honor has also recognized in the *Malriat versus QuantumScape* case, where I believe it's the only securities class action that I've seen where Your Honor has addressed a *Comcast* argument.

And there, defendants made similar loss causation-type arguments in saying that plaintiffs had not put forth a sufficiently detailed or specific damages methodology, and they kind of regurgitated a lot of the same loss causation arguments about how the corrective disclosures were not really corrective. And Your Honor correctly acknowledged that these are all premature loss causation arguments that are not appropriate at this stage, where the central issue under *Comcast* is is the damages model put forth by plaintiffs capable of being applied by a class-wide basis ultimately on the merits, right? We don't have to actually prove that it applies class-wide at this stage. So is it capable of assessing, measuring damages for the class ultimately, and is it

consistent with the plaintiffs' liability theory.

So this consistency, this fit under *Comcast*, is I think what defendants are really challenging here. But Your Honor I think has also recognized that that is not an extremely difficult standard under the Ninth Circuit case law. I think the Ninth Circuit has repeatedly made clear, including in the cases that we cited in our opening brief, that there does not have to be this direct clear link as defendants are insisting. What matters, the Ninth -- and I'm quoting the *Hatamian versus AMD* decision, which I believe is also by Judge Rogers, and she said: "The Ninth Circuit leads *Comcast* to demand only that plaintiffs be able to show that their damages stem from defendant's actions that created the legal liability."

And here, as in all Section 10(b) securities fraud cases, there is a clear obvious link between the damages methodology and the plaintiffs' theory of liability. The plaintiffs have one single liability theory in this case, and that's that defendant's misstatements and omission about demand during the class period inflated or maintained inflation in the stock price that was removed at the end of the class period when the truth was revealed to investors, and they suffered damages as a result of that inflation dissipation. That's it.

And we cited multiple cases in our reply brief that have recognized this in rejecting this exact same, you know, materialization of the risk mismatch argument. Judge Alsup

clearly recognized it, the *Acadia* case by Judge Hayes in the Southern District of California, as well as multiple other cases where they've repeatedly rejected this attempt to analogize securities fraud cases like this one, to *BP*. Because *BP* was the one case that a lot of defendants have been trying to hang their hat on and trying to squeeze all of these Section 10(b) cases into the materialization of the risk mold that *BP* represented. But as the *Geron* case by Judge Alsup and multiple other decisions that we cited in our reply brief all recognize, *BP* was very much unique in its set of facts and has been repeatedly distinguished by these courts because it applied nontraditional damages methodology, consequential damages, which was very different from the out-of-pocket damages methodology that we proposed and proceed under.

And that consequential damages theory, which was nontraditional and controversial, created problems for the plaintiffs there, because it injected individualized reliance issues. So essentially the plaintiffs were trying to recover the full amount of the stock price drop after the oil spill happened based on the theory that investors would not have invested in *BP*'s stock at all if they had been told the truth about the hypothetical future risk of an oil spill.

And therefore, the judge in that case, and the Fifth Circuit agreed that this was antithetical to the basic fraud on the market presumption, which rests on the fundamental premise

that investors rely on the integrity of the market price. Whereas plaintiffs' damages theory there, this consequential damages theory essentially relied on investors' individual risk assessments of whether or not they would have invested had they known about this risk.

So that created a big problem for plaintiffs, because it essentially prevented them from lying on the basic presumption of reliance that plaintiffs typically need to be able to show that reliance, and a central element of the 10(b)(5), can also be established on a class-wide basis, and that would introduce a real predominance problem under Rule 23(b)(3).

So *BP* has been very much distinguished by multiple decisions in this district and elsewhere, and it just doesn't fit here.

It also doesn't fit here because, as we clearly establish in our reply brief, we are not proceeding on the materialization of the risks theory. It is a loss causation theory, as Judge Alsup correctly found. So it's really premature to make us commit to a specific loss causation theory at this point, but as of now, we are not currently proceeding on a materialization of risk theory because we don't need to, Your Honor.

We pled both theories as alternatives in the complaint, which was very much explicitly made clear by the "and/or" language that defendants quoted but then completely ignored.

So we pled both, as plaintiffs often do in such securities cases. But at the motion to dismiss stage, when we were arguing with defendants about loss causation, you know, we primarily focus on the traditional corrective disclosure theory in arguing why loss causation was adequately pled, and we devoted one sentence to our alternative --

**THE COURT:** Right. No, I read that. I read that.

**MS. VASILCHENKO:** You remember that, Your Honor.

And then in the motion to dismiss order, Your Honor did not address this alternative materialization of the risk theory because you didn't need to, because the events at the end of the class period, you know, whether you call them corrective disclosures, materialization of risk ultimately didn't matter, but you refer to them as corrective disclosures, and you agreed that under the *First Solar* decision by the Ninth Circuit, these disclosures qualify as correctives, because only in cases like this, that reveal that demand was not going as well as defendants had previously let on and was not sustainable, there was a clear causal link between the misstatements and these corrective disclosures.

So we don't need to rely on a materialization theory going forward, and we do not currently. So defendants' reliance on *BP* and these other cases, *Amyris* and *AHC*, you know, that kinda falls away by the wayside.

Also, our report by Mr. Kaufman I think makes clear, and

as other courts have also repeatedly found, even if we were proceeding on a materialization of the risk theory, that an out-of-pocket event study damages methodology can account for these complications going forward. You know, courts have repeatedly held that. We cited, you know, the *Barrick Gold* decision; the *Junge* case, I think, you know -- *Geron*, I'm sorry. I think people refer to it in different ways. The *Acadia* decision. Those also all involved Mr. Kaufman, where he similarly gave hypothetical examples about how he could deal with all of these loss causation arguments and properly calculate inflation in a way that it wouldn't overstate the class of damages.

So these are kind of the main points I wanted to hit.

And, oh, another point that I wanted to mention that, yeah, defendants try to argue that we're trying to turn the burdens on them with respect to those *Comcast* arguments. We understand that the burden is on us to establish the elements of 23(b)(3), we're not disputing that, but our citations to their expert's admissions in his deposition testimony, where he repeatedly said that he was not opining that it's impossible to calculate class-wide damages here given these uncertainty, or whatever you want to call them, issues that he raises. He just said it might be difficult. It's no simple task. Right?

And if you look at the case law, it's pretty clear. All we have to do at this stage is establish that there is a

reliable damages methodology that's capable, quite possible to calculate damages at the proper time after discovery's completed. We don't have to prove damages right now. We don't have to get into the nitty gritty of calculating inflation or committing to a specific method of calculating inflation.

We cited multiple cases in the Northern District of California from this point, the *SEB versus Symantec* case. The *Brannon (phonetic) Construction* case, where it clearly says that you don't have to calculate the inputs, the inflation formula, into the out-of-pocket damages formula, because ultimately that is going to be a class-wide issue that affects all members equally. And defendants don't dispute that. Their expert doesn't dispute that. They're just trying to generate that we're not providing enough details at this stage.

But again, we cited multiple cases in the Northern District of California and throughout the country that have repeatedly rejected this argument, these details that the defendants keep insisting are a quintessential loss causation analysis that you need fact discovery and expert discovery to be able to properly opine on how to calculate inflation in this case. So ...

**THE COURT:** All right. I think you've got it. Thank you.

Mr. Lee, do you want to respond briefly to that and then make any other points that you think I ought to think about?

And you are muted at the moment.

**MR. LEE:** Sure. Happy to, and I will try and be brief.

I will note on the last point about, you know, it is telling that the main argument, you know, in their reply brief that they started with on materialization of risk was to say, we're not proceeding under it. You know, I think that made it very clear that they understood how much purchase this theory can get, you know, on class certification by saying, we don't need to do it anymore.

But note they have not amended their complaint to remove those allegations. That's actually what the *Bayer* case, which they are citing, that's what the plaintiffs there did, you know, to ensure that they would not run into these issues. They haven't done that, and I don't think that they have the courage of their convictions when it comes to that, because it would have, I think, real detrimental effects in particular on the length of the class period, which is another one of the arguments that we've made. If they were going to say all statements that relate to just risk that materialized at the end of the class period, that they're going to essentially take all of that out, then I think it would actually strengthen our argument that the class period should not start for at least a year after -- you know, because they, themselves, said in their complaint nobody could have known. Not DocuSign. Nobody could

have known until the end of these one-year contracts how many customers were going to choose not to renew.

And again, there is -- these are sophisticated plaintiffs counsel that we're dealing with here. They did not gratuitously put the materialization of risk allegations in their complaint. They knew that they had to do that because of the nature of the misstatements that they were claiming at the beginning. But, so again, they have not taken those out of the complaint; they are still there.

Now, with respect to the case law, we did make this notation in our surreply, but I do think it merits repeating. Every single one of the cases that they -- that opposing counsel just cited to, in every instance, the plaintiffs did not claim that they were proceeding under a materialization of risk theory. In each instance, the defendants tried to characterize the case as materialization of the risk, and in each instance the plaintiffs disputed that. In *Bayer* they literally took those allegations out.

And what I would argue, Your Honor, is is that because in each of those instances they tried to take a set of facts, you know, that really didn't fit materialization of risk, and tried to get it to fit because they knew that that would be a powerful argument if they could make it fit, you know, I think that accounts for a large reason for why they got denied, because they weren't really materialization of risk cases.

Whereas here, I can't imagine a factual situation where every person on this call lived through the pandemic. Every person here understood the sorts of uncertainties that were being faced in mid 2020, and that nobody could accurately have predicted what was going to happen, and so everything had to be framed in terms of uncertainty and risk. This one fits precisely, whereas all those other cases defendants tried to jam, you know, a square peg into a round hole and they ended up losing. And I don't -- and I think part of it was just because of the weakness of the facts that they were trying to pursue.

But look at what you've got here. And I'll note the next point that opposing counsel made was the point about is the damages model capable of being applied class-wide. Well, I didn't hear any addressing of the fact that Mr. Kaufman talked about, this is how I would use an event studies to actually calculate damages. And his own admission that it only works if certain specified criteria are met, and he gave no indication or reason to believe that those criteria would be met.

And again, you don't have to take my word for it. This is what their expert said. Essentially said it wouldn't necessarily be wrong. I just don't see how --

**THE COURT:** You've made these arguments. Is there anything else that you'd like to make?

**MR. LEE:** So the only other point I would make goes back to *BP*, and they -- the argument is that this is not --

this is not the same issue because of the consequential damages argument. That misses the point of *BP* entirely.

The point that we cited *BP* for, and it's one that I think Kaufman himself acknowledges, because he was in that case, is that an event study does not accurately measure inflation and damages in the presence of materialization of risk. In that case Mr. Kaufman admitted that, you know, and actually he admits that also in paragraph 21 of his new report. He admits even under the out-of-pocket damages measure, the -- when you've got materialization of risk, an event study won't accurately capture it.

So in that case they said, well, let's try consequential damages. So we get all of those. Even though it's not accurately capturing inflation, we'll use a consequential damages method to try and get all of it, and the Court rejected that. But that doesn't take away the baseline finding of *BP* that you can't use an event study when materialization of risk is at play. That finding remains completely untouched, and in fact in paragraph 21 of Mr. Kaufman's report, reply report, he acknowledges that fact.

And so this is why we think *Amyris* is better reasoned than these other cases that did go the other direction, but weren't expressly dealing with plaintiffs saying, we're proceeding under a materialization of risk theory.

**THE COURT:** Okay. Thank you all very much for your

argument, I appreciate it, and I will get an order out as soon as I can.

**MS. VASILCHENKO:** Thank you, Your Honor.

**MR. LEE:** Thank you, Your Honor.

(Proceedings concluded at 3:18 p.m.)

**---o0o---**

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, May 17, 2024



Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court