United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD R. WESTON,
Plaintiff,

v.

DOCUSIGN, INC., et al.,
Defendants.

Case No. 22-cv-00824-WHO

**ORDER CERTIFYING CLASS**

Re: Dkt. No. 111

Plaintiffs move to certify a class in this putative securities fraud lawsuit against DocuSign, Inc. and several executives. They seek appointment of Deka International S.A. Luxembourg ("DIL") and Public Employee Retirement System of Idaho ("PERSI") (together, "Lead Plaintiffs") as class representatives, and Labaton Sucharow LLP ("Labaton Sucharow") as class counsel and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") as liaison counsel on behalf of the Class. The motion is GRANTED.[1]

**BACKGROUND**

Plaintiffs claim that e-signature company DocuSign "falsely reassured" investors that the increase in sales of DocuSign's product in early 2020 stemmed from a "sustained rise in demand" and was "not a short term thing," which violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. Amended Class Action Complaint ("AC") [Dkt. No. 59] ¶ 1. I detailed plaintiffs' allegations in my order denying the defendants' motion to dismiss and incorporate that discussion here. *See* Dkt. No. 88.

In brief, plaintiffs allege that DocuSign misled investors into believing that its growth

[1] Both parties have filed accompanying motions to seal. Good cause shown, the motions to seal appearing at at Dkt. Nos. 126, 128, 139, and 140 are GRANTED.

would remain far above pre-COVID levels once the pandemic was over. They say that the defendants knew of and concealed from investors several indicators suggesting that the rise in demand for its product was attributable to the COVID-19 pandemic and would not continue when it subsided. AC ¶¶ 2, 7-16. They claim that these misrepresentations fueled a spike in DocuSign's stock price, allowing DocuSign executives to make an undeserved profit from selling stock at inflated prices. *Id.* ¶¶ 1-2, 17-19, 22-23. Later, over the course of 2021 and 2022, DocuSign made three disclosures that showed that DocuSign had missed its targets on billings growth and that demand for its product had depressed as the pandemic resolved. *Id.* ¶¶ 33-36. As a result, DocuSign's share price dropped, causing losses for shareholders. *Id.* ¶ 36.

On February 8, 2022, Richard Weston filed suit. *See* Initial Complaint [Dkt. No. 1]. Three movants filed motions to be appointed lead plaintiff and counsel. *See* Dkt. Nos. 14, 20, 24. I appointed DIL and PERSI as lead plaintiffs, Labaton Sucharow as lead counsel, and Kessler Topaz as liaison counsel. *See* Dkt. No. 42.

Plaintiffs now move for (1) certification of a class defined as: "All persons and entities who or which, during the period from June 4, 2020 through June 9, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of DocuSign and were damaged thereby"[2]; (2) appointment of DIL and PERSI as Class Representatives; and (3) appointment of Labaton Sucharow as Class Counsel and Kessler Topaz as liaison counsel. *See* Lead Plaintiffs' Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel ("Class Cert. Mot.") [Dkt. No. 111]. Defendants oppose certification, arguing that predominance is not met for damages, and that the Lead Plaintiffs are both atypical and inadequate. They ask that the class period be narrowed if I do certify the class.

---

[2] As provided by the plaintiffs, "excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of DocuSign during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) DocuSign's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, subsidiaries, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such." *See* Class Cert. Mot. 2, n. 3

**LEGAL STANDARD**

Federal Rule of Civil Procedure 23 governs class actions. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022), *cert. denied sub nom. Starkist Co. v. Olean Wholesale Grocery*, No. 22-131, 2022 WL 16909174 (U.S. Nov. 14, 2022). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its putative class. *Olean*, 31 F.4th at 663. "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." *Id*. (quoting Fed. R. Civ. Proc. 23(a)). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157). "Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). *Olean*, 31 F.4th at 663. Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). In deciding this, courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id*.

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three bases for certification under Rule 23(b) are established. *See Dukes*, 564 U.S. at 350, 131 S.Ct. 2541. While

the class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (internal citations and quotation marks omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. (citation omitted). In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Hanni v. Am. Airlines*, No. C-08- 00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010). A trial court has broad discretion in deciding whether to grant or deny a class certification motion. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).

**DISCUSSION**

Plaintiffs seek certification for a class of purchasers of DocuSign common stock so that they may pursue claims against defendants under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10-b-5. The defendants oppose on three grounds: (1) the Lead Plaintiffs are atypical because they are subject to unique defenses; (2) the Lead Plaintiffs are not adequate class representatives because their 30(b)(6) witnesses were unfamiliar with the case; and (3) the plaintiffs fail to articulate a theory of classwide damages that is consistent with their theory of liability. I will address those three arguments and each element of class certification as part of the "rigorous analysis" required by the Supreme Court.

## I. RULE 23(a)

### A. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of members required for

numerosity." *In re Rubber Chems. Antitrust Litig*., 232 F.R.D. 346, 350 (N.D. Cal. 2005). However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members. *Villalpando v. Exel Direct Inc*., 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig*., 282 F.R.D. 446, 452 (N.D. Cal. 2012).

Defendants do not contest that the class is so numerous that joinder is impracticable. Throughout the Class Period, shares of DocuSign common stock were traded on the NASDAQ. *See* Declaration of Irina Vasilchenko ("Vasilchenko Decl.") [Dkt. No. 138-1] Ex. A (Expert Report of Chad Coffman, CFA ("Coffman Report")) ¶ 28. According to the plaintiff's expert, during the Class Period, DocuSign had a minimum of 183.5 million shares of common stock outstanding. *Id.* ¶ 71. "The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009). Plaintiffs satisfy the numerosity requirement.

**B. Commonality**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. (a)(2). "A common contention need not be one that 'will be answered, on the merits, in favor of the class.' It only 'must be of such nature that it is capable of class-wide resolution.' " *Alcantar v. Hobart Servs*., 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) and *Wal-Mart Stores*, 564 U.S. at 350)). "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)).

Plaintiffs identify several questions of law and fact that will be determined on a common basis based on classwide evidence and proof, including:

- Whether the defendants violated federal securities laws;
- Whether the defendants made statements to the investing public throughout the Class Period that misrepresented or omitted material facts about the business and operations of DocuSign;
- Whether the defendants acted with scienter;
- Whether the price of DocuSign's common stock during the Class Period was

artificially inflated or maintained as a result of the defendants' conduct that the plaintiffs' complain of in the Amended Complaint; and

- What is the proper measure of damages.

Defendants do not dispute that some significant common, classwide questions are raised by the operative class complaint. Plaintiffs satisfy the commonality requirement.

**C. Typicality and Adequacy**

Defendants challenge DIL's and PERSI's typicality and adequacy as class representatives. Courts in this circuit consider the two together, as they are "[t]he due process touchstone" for class actions. *See Blackie v. Barrack*, 524 F.2d 891, 910 (9th Cir. 1975).

As for typicality, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020). A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. However, "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 985 n. 9 (9th Cir. 2011) (citing *Hanon*, 976 F.2d at 508).

As for adequacy, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine whether the Lead Plaintiffs are adequate class representatives, I consider: (i) whether the Lead Plaintiffs and their counsel have "any conflicts of interest with other class members"; and (ii) whether the Lead Plaintiffs and their counsel can "vigorously prosecute the action on behalf of the class." *See Ellis*, 657 F.3d at 985.

Plaintiffs contend that DIL and PERSI have claims that are typical of the class because their claims arise from the defendants' "common course of misconduct, are based on identical

legal theories [. . .] and will be proven by the same evidence on a class-wide basis." Class Cert. Mot. 12-13. DIL and PERSI allege that the defendants "misrepresented and/or omitted material facts concerning the sustainability of the increased demand for DocuSign's products, and related billings and revenue growth, which [DocuSign] experienced after the onset of the COVID-19 pandemic." *Id.* 13:1-13. Further, DIL and PERSI purchased DocuSign common stock during the Class Period at prices that the plaintiffs contend were "artificially inflated or artificially maintained" by DocuSign's misrepresentations or misconduct. *See* AC ¶ 426; Dkt. Nos. 59-1, 59-2 (declarations). As for their adequacy, the plaintiffs argue that DIL and PERSI are adequate class representatives because they meet the low threshold of familiarity with the case.

The defendants disagree because they believe that the Lead Plaintiffs are "subject to unique defenses that render them atypical," particularly the defense of "non-reliance." *See* Def's Opposition to Class Cert. Mot. ("Oppo.") [Dkt. No. 129] 19:7-13; *see also Hanon*, 976 F.2d at 508. According to the defendants, "DIL, PERSI, and PERSI's investment manager, Peregrine, each admitted that, from the beginning of the putative class period, DocuSign disclosed the very issue that the AC claims [DocuSign] lied about – i.e. that its growth rate was expected to decline once the pandemic ended." Oppo. 19:23-26 (citing Deposition of Michael Hampton ("Hampton Dep.") [Dkt. No. 129-9] at 163-175, 233-34; Deposition of Carla Zinkand ("Zinkand Dep.") [Dkt. No. 128-5] at 189-94 (sealed); Deposition of Brian Donohue ("Donohue Dep.") [Dkt. No. 128-12] at 108-24 (sealed)). They say that DIL and Peregrine in its capacity as PERSI's advisor "acknowledged" that they expected a "'slow down'" or "'flattening of growth'" in DocuSign's business after the pandemic subsided. *See* Oppo. 19:26-20:1. Defendants also contend that Peregrine "admitted that it did not believe that DocuSign or its executives had ever lied about demand for DocuSign's products, customers' usage of eSignature, eSignature company churn, or the impact of COVID-19 on DocuSign's business." *Id.* 20:3-7 (citing Donohue Dep. at 208-09). Finally, they say that the Lead Plaintiffs' 30(b)(6) witnesses were unfamiliar with basic aspects of the case, rendering them inadequate class representatives. *See* Oppo. 19-20.

Defendants' arguments about typicality are unpersuasive for two reasons. First, they rely

United States District Court
Northern District of California

on out-of-context quotes that misrepresent the testimony in the depositions of PERSI and DIL's 30(b)(6) witnesses. Second, even if the Lead Plaintiffs *were* subject to a unique non-reliance defense, that would not be a basis for denying class certification unless they had engaged in unique types of trading. *See Hanon*, 976 F.2d at 508-09. The defendants' protestations regarding adequacy are unpersuasive for the same reasons.

**1. PERSI Witnesses Michael Hampton and Brian Donohue**

Under Rule 30(b)(6), PERSI designated Michael Hampton as its person most knowledgeable about this litigation and about its investments in DocuSign. Hampton testified in his capacity as Deputy Director at PERSI, a role he has held since 2016. *See* Hampton Dep. at 22. The relevant part of the Hampton deposition that the defendants offer as evidence of PERSI's atypicality is an exchange between defense counsel and Hampton about the role of PERSI's investment manager, Peregrine, where defense counsel presses Hampton about whether Peregrine saw the part of the DocuSign investment package "risk factors" that said it would be difficult for DocuSign to accurately predict the effect that COVID would have on its value. The defendants offer this exchange for the theory that "DocuSign disclosed the risk" to PERSI through its investment manager, Peregrine, and therefore DocuSign has a unique defense against PERSI's claims. *See* Oppo. 6-7.

It is not apparent from Hampton's deposition that DocuSign "disclosed" the relevant risks to PERSI in the way that the defendants suggest. Hampton testified that there were "risk disclosures" in DocuSign's publicly filed forms that Peregrine reviewed on PERSI's behalf but denied that the defendants were "forthright about the uncertainty of sustained growth" or that the forms Peregrine reviewed "disclos[ed] certain risks that DocuSign thought might impact its business." *See* Hampton Dep. 163-165, 233-34. The extent to which DocuSign revealed relevant risks to PERSI remains a merits question. The defendants provide no analysis how this alleged disclosure would meaningfully distinguish PERSI from other class members. There is no reason to believe that other class members would *not* have been aware of the same risk disclosures in

public forms.[3]

Hampton's testimony also did not suggest that PERSI is an *inadequate* class representative. The defendants contend that Hampton's inability to remember whether the Lead Plaintiffs were going to rely upon confidential witnesses at summary judgment and at trial demonstrated a lack of familiarity with the case. *See* Oppo. 23:13-18; *see also* Hampton Dep. at 255-58 (Q: "[D]id counsel make an offer to not rely on the [confidential witnesses] going forward including at summary judgment and at trial?" A: "Frankly, I don't remember this conversation . . . we hired an attorney to put that complaint together and determine what we could rely on"). This is not something Hampton needed to know to be an adequate class representative. The worst that this testimony showed was that Hampton relied on attorneys. As I have observed before, "it is hardly a badge of inadequacy" to rely heavily upon the expertise of attorneys. *See Malriat v. QuantumScape Corp.*, 2022 WL 17974629-WHO, at *5 (N.D. Cal. Dec. 19, 2022) (citing *In re Facebook Biometric Info. Priv. Litig*., 326 F.R.D. 535, 543 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc*., 932 F.3d 1264 (9th Cir. 2019)).

Defendants also deposed Brian Donohue as Peregrine's person most knowledgeable about PERSI's transactions in DocuSign stock. *See generally* Donohue Dep. The defendants refer to parts of his testimony as further evidence that PERSI would be subject to the unique defense of non-reliance because it knew, through Peregrine, about the risk that DocuSign's business might be impacted by the pandemic subsiding and suffered a slowdown in DocuSign's business when that happened. *See* Oppo. 7-8. Donohue testified that Peregrine was aware of the general risk disclosures that DocuSign included in its October 31, 2020, 10-Q form, which is filed publicly with the SEC. *See* Donohue Dep. 103-110. This testimony suggests that PERSI is *not* subject to a

[3] Even if PERSI (or DIL) *were* subject to a unique non-reliance defense, that would not by itself justify denying class certification. *See Hanon*, 976 F.2d at 508 (citing *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 22 (N.D. Cal. 1986) (lack of reliance is a defense; it goes to the merits of the case and cannot be considered in a certification motion)). Only when a potential class representative's unique situation makes it "predictable that a major focus of the litigation will be on a defense unique to him" does the non-reliance defense justify denying class certification. *See id.* That is not the situation here.

unique non-reliance defense because, presumably, any investor who looked up DocuSign's 10-Q form for the same quarter would be subject to the same defense. And again, even if it were subject to such a defense, that by itself would not preclude class certification. *See Hanon*, 976 F.2d at 508; *see supra* n. 2.

**2. DIL Witness Carla Zinkand**

Under Rule 30(b)(6), DIL designated Carla Zinkand as its person most knowledgeable about this litigation and its investments in DocuSign. The defendants again misconstrue her testimony and apply an overly harsh standard for adequacy.

Defendants first argue that Zinkand's deposition testimony shows that DIL is atypical from class members because she said that "a flattening of growth with an increased return to office was to be expected[.]" *See* Zinkand Dep. 256-65. The defendants say that this statement shows that DIL knew more about DocuSign's anticipated downturn in growth than other investors and is thus in a " 'uniquely different situation than the other class members' that 'threatens to become the focus of the litigation'." Oppo. 19-20 (quoting *Amyris*, 340 F.R.D. at 582). Not so.

Zinkand explained during her deposition that the statement in question was in reference to information that DIL obtained *during* DocuSign's December 2, 2021, earnings call, *not* a reflection of what DIL knew *prior* to the earnings call. *See* Zinkand Dep. at 260-61. The defendants claim that this explanation is not credible because Zinkand "admitted" a "lack of familiarity" with Exhibits E and F, which are transcripts of the same earnings calls. *See* Oppo. 20, n. 13. This again misconstrues what Zinkand said at her deposition. Zinkand's testimony, in context, indicates that she refused to speculate about what another person on the call knew or did not know prior to getting on the call, not that she was unfamiliar with the earnings calls themselves. *See* Zinkand Dep. at 259-265 (Q: "What part of this paragraph is . . . Mr. Heinze's conclusion versus what he learned from the call?" A: "It's . . . the information he received from the call."; Q: "And then Mr. Heinze says, 'After the indexed 30 percent price drop, DocuSign then trades at just under 14x sales.' Was that something that was communicated on the call?" A: "As I said before, those are the conclusions he received, he made out of the call. Those are [sic] the

information[] he got from the call."; Q: "Did Mr. Heinze hear the words 'flattening of growth' from the earnings call from DocuSign?" A: "I did not ask him directly if he heard it . . . I did not know what he heard."). Zinkand was sufficiently familiar with the earnings calls to explain the context of her statement about what DIL expected before and after the December 2, 2021, earnings call. Nothing about her testimony suggests that DIL is in a "uniquely different situation" from other class members that "threatens to become the focus of litigation." *See Amyris*, 340 F.R.D. at 582.

The defendants also contest Zinkand's adequacy as a 30(b)(6) witness, and, through that, DIL's adequacy as a class representative. They say that Zinkand initially stated that she was prepared to testify on all noticed deposition topics, but at her deposition "she was either unable or unwilling to testify about basic facts relevant to DIL's claims[.]" Oppo. 22. In the Ninth Circuit, courts have historically only found a class representative to be inadequate "if she is 'startlingly unfamiliar' with the case." *In re Twitter Inc. Securities Litig.*, 326 F.R.D. 619, 628 (9th Cir. 2018) (citing cases). A plaintiff's lack of credibility can weaken the class's case, *see Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010), and some out-of-circuit courts have determined that class representatives who cannot produce sufficient answers on noticed topics at depositions are inadequate, *see Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 533-34 (N.D. Tex. 2005) and *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 200–01 (S.D.N.Y. 2015). But that is not what happened here.

Zinkand was not "startlingly unfamiliar" with the case nor were her answers on noticed topics so weak as to render her uncredible. The portions of her deposition that the defendants point out as evidence of her supposed inadequacy show that she was able to answer questions on behalf of DIL. Unlike the proposed Lead Plaintiff in *Harris v. Vector Mktg. Corp.*, for example, who was unable to produce critical evidence and had severe credibility issues, *see Harris*, 753 F. Supp. 2d at 1015, Zinkand was able to answer most questions about the case on behalf of DIL and demonstrated a breadth of knowledge about the claims that the plaintiffs assert, who the defendants are, and what the proposed class period is.

This exchange is illustrative:

> Q: "Do you understand that this case is a class action?"
> Zinkand: "Yes"
> Q: "What is a class action?"
> Zinkand: "DIL acts . . . for all persons who bought DocuSign within the relevant period. So it's not that DIL is only acting for itself, but it's acting . . . on fiduciary duty . . . for all investors.";
> Q: "[W]ho are the defendants in this case?"
> Zinkand: "It's DocuSign, the company, as well as individual defendants named Mr. Springer, Mr. Sheridan, Ms. Gaylor, and Mr. Alhadef."
> Q: "What claims are you bringing on behalf of the class?
> Zinkand: "We're bringing claims . . . Section 10(b) claims for DocuSign as well as the 20(a) claims on behalf of the . . . individual claimants. I'm not an attorney, I hope I get that right.

*See* Zinkand Dep. at 115-18. This testimony showed that Zinkand understood what this case is about, *see id.* at 117:8-19, understood the role of DIL as a lead plaintiff representing DocuSign investors, *see id.* at 116:18-117:2, and who the defendants are, *see id.* at 117:4-7. Contrary to the defendants' assertions, DIL's 30(b)(6) witness did not demonstrate that she was "unable or unwilling to testify about basic facts relevant to DIL's claims."

**3. Post-Disclosure Purchases**

Defendants also argue that the Lead Plaintiffs are atypical because they purchased DocuSign stock after the corrective disclosures. Many courts in this circuit have held that the proposed class representative's purchases of stock after adverse disclosures do not destroy typicality. *See In re Connetics Corp. Securities Litigation*, 257 F.R.D. 572, 577 (N.D. Cal. 2009) (collecting cases). While some courts have reached the opposite conclusion, *see e.g. Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. (S.D.N.Y. 2007) and *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, *5 (N.D. Cal. Mar. 14 1996), the weight of authority "favors the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement." *In re Connectics*, 257 F.R.D. at 577 (citing *Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005)).

I will follow the weight of authority. The Lead Plaintiffs' claims arose from the same course of conduct that gave rise to other class members' claims. *See Hanon*, 976 F.2d at 508. Defendants do not explain why the Lead Plaintiffs' purchase of DocuSign stock after the

United States District Court
Northern District of California

corrective disclosures would make them unique; they provide no evidence that other class members behaved differently. And even if the Lead Plaintiffs were the only two plaintiffs in the whole class who did make such purchases, the defendants have also not shown why that would create a defense that would "threaten to become the focus of the litigation." *See id.*

**4. Other Unique Defenses**

The defendants also briefly argue that DIL is an atypical plaintiff because it lacks standing to sue. Oppo. 21. This argument comes up short; I have already evaluated whether DIL would have standing to sue on behalf of class members and found that it does. *See* Order Appointing Lead Plaintiff and Lead Counsel [Dkt. No. 42] 7-8. The defendants protest that DIL's "say-so" that it has standing is insufficient to establish the same, but DIL does not rely on its own "say-so"; it relies on my order. I found, and find, that DIL "manages mutual and special funds formed under the laws of Luxembourg, and has the exclusive statutory right and obligation, pursuant to the laws of Luxembourg, to bring legal claims, in its own name, to recover losses incurred by the funds[,]" and that this was, and still is, enough to establish a "sufficiently close relationship between DIL and the funds at issue" to satisfy standing requirements. *Id.* 8.[4]

[4] The defendants make two other arguments. They point out that DIL seeks to recover on behalf of multiple funds. *See* Oppo. 21:10-17. They say that these "individualized facts" add to a list of issues with which DIL would be "preoccupied," making them inadequate class representatives. But the defendants point to no authority supporting this argument.

They also contest the Lead Plaintiffs' adequacy on the grounds that DIL and PERSI retained additional counsel without my approval; they contend this was in violation of the Private Securities Litigation Act, 15 U.S.C. § 78u-4, specifically the provision that provides "[t]he most adequate plaintiff, shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Courts in this circuit have observed that "the PSLRA [does not] speak to whether lead counsel may associate additional counsel to assist in the prosecution of a case, subject to the control of lead counsel." *See Hunt v. Bloom Energy Corp*., 2021 WL 1110260-HSG, at *1 (N.D. Cal. Mar. 23, 2021). I agree with the Hon. Haywood Gilliam, Jr.: the PSLRA does not prohibit lead plaintiffs from retaining counsel besides those explicitly approved by the court so long as that counsel does not act as lead. *Id.* There is nothing improper about DIL retaining its familiar counsel, DRRT, or with PERSI retaining Robert Klausner as fiduciary counsel or Jason Risch as local counsel, so long as the Class sees no additional fees and the additional counsel acts in a supportive, rather than executive, role.

## II. RULE 23(b)

### A. Predominance and Damages

The predominance requirement for class certification demands that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. Rule 23(b)(3); *see also Comcast v. Behrend*, 569 U.S. 27, 133 S.Ct 1426 (2013). The defendants argue that the plaintiffs fail to provide a damages methodology that is both measurable on a classwide basis and consistent with their theory of liability, and as a result fail to meet the predominance requirement under *Comcast*. *See* Oppo. 9-18. I disagree.

#### 1. Corrective Disclosure Theory

The plaintiffs assert a "corrective disclosure" theory of liability: misstatements by DocuSign inflated or maintained inflation for its stock price, which declined upon corrective disclosures at the end of the Class Period. Numerous courts have held that similar out-of-pocket damages methodologies can calculate damages on a classwide basis under a corrective disclosure theory of liability.[5]

Defendants insist that an out-of-pocket damages methodology applied to this theory of liability "runs contrary to the dictates of *Comcast*," but they misunderstand *Comcast*'s requirements for class certification. There, the Supreme Court clarified that as part of the predominance inquiry under Rule 23, plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 28, 133 S.Ct. 1426. The certifying court must conduct a "rigorous analysis" to determine whether the proposed damages model is consistent with the plaintiffs' theory of liability, but "[c]alculations need not be exact." *Id.* at 35, 133 S.Ct. 1426 (citations omitted).

Interpreting *Comcast*, the Ninth Circuit has held that to meet the predominance requirement, "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability" using the proposed damages model. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 569 U.S. at 38, 133 S.Ct. 1426);

[5] Later I discuss why I find that plaintiffs' materialization of risk theory is a theory of loss causation, the merits of which need not be evaluated at this stage. *See infra* Section II(A)(2).



United States District Court
Northern District of California

*see also Lytle v. Nutramax Laboratories, Inc.*, 99 F.4th 557 (9th Cir. 2024) (reaffirming *Levya*). If the plaintiffs have proposed a "valid method" for calculating damages, then "uncertainty regarding class members' damages does not prevent certification of a class." *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (quotations omitted).

The out-of-pocket damages model that the Lead Plaintiffs propose is valid. Plaintiffs' expert Chad Coffman explains why. *See* Coffman Report ¶¶ 82-87. Coffman says that the out-of-pocket method is a "standard and well-accepted method for calculating damages in cases under Section 10(b)." Coffman Report ¶ 82. The method "states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale," or, if the share remains unsold prior the full revelation of the alleged fraud, then "damages are equal to the artificial inflation at the time of purchase, subject to the [Private Securities Litigation Reform Act]'s 90-day lookback provision." *Id.* He explains that he can perform an event study to quantify this artificial inflation, which would consider whether and to what extent "confounding information" (i.e., non-fraud related information) contributed to the observed price movement, and then disaggregate the price impact of corrective disclosures from the confounding information. *Id.* ¶ 85.

Coffman says that this method has been used in "virtually every matter" in which he has "observed or participated in as a consulting, testifying, or neutral expert." *Id.* "Once the inflation per share has been quantified on each day during a class period, the computation of damages for each class member is formulaic, based upon information collected in the claims process[]", making it a well-accepted method to compute damages in Section 10(b) cases like this one. *See id.* And regardless of what technique is ultimately used to disaggregate confounding information from the sought-after information about the price impact of corrective disclosures, "it is performed on a class-wide basis," meaning that "the specific methodology applies regardless of the identity or circumstances of any individual class member." *Id.*

Coffman is correct about prevalence: The out-of-pocket method of damages calculation is common for § 10(b) actions like this one. "Courts regularly reaffirm that the out-of-pocket, or

event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action." *City of Miami General Employees' & Sanitation Employees' Retirement Trust v. RH, Inc.*, No. 17-CV-554 (YGR), 2018 WL 4931543, at *4 (N.D. Cal. Oct. 11, 2018).[6]

The defendants contend that Coffman does not adequately explain how the out-of-pocket damages method applies *specifically to this case*; they point out that the class certification brief devotes only one paragraph to the assertion that damages can be calculated on a classwide basis. *See* Oppo. 10-11; *see also* Class Cert. Mot. 22-23. They argue that this makes the plaintiffs' damages methodology insufficient under *Comcast*. Oppo. 10:8-13 ("[a]t no point … do plaintiffs provide any explanation as to how the out-of-pocket method will be applied to specific facts or theories of liability in this case, as *Comcast* demands."). But *Comcast* was a different case than this, one the circuit courts have interpreted in a way that is favorable to the plaintiffs' position.

In *Comcast*, the district court certified *only one* of four theories of antitrust liability alleged by the plaintiffs but permitted a damages model that encompassed *all four* theories. On appeal, the defendants argued that class certification was improper because the plaintiffs had "failed to attribute damages to the sole remaining theory in the case." *See Comcast*, 569 U.S. at 31, 133 S.Ct. 1426. The Supreme Court ultimately agreed with the defendants' position, holding that the proposed damages model did not meet the Rule 23(b)(3) predominance standard because it was not capable of measuring damages on a classwide basis.

The damages model in *Comcast* was invalid for a particular reason not at play in this case. As Judge Alsup explained in an order certifying a securities class not dissimilar to this one, the *Comcast* model was deficient because "three quarters of [it] could not apply to class members,"

---

6 *See e.g.*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket method is "the correct measure of damages" in Exchange Act case); *see also*, *Hatamaian v. Advanced Micro Devices, Inc.*, No.: 14-cv-00226, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016); *In re SanDisk LLC Sec. Litig*, 2018 WL 4293336, at *2 (N.D .Cal. Sept. 4, 2018) ("The out-of-pocket method is widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."). And the event study method is an "accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *See In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250-51 (N.D. Cal. 2013) (cleaned up).

and the plaintiffs there provided "no apparent way to isolate the one quarter that could." *Luna v. Marvell Technology Group, Ltd.*, 2017 WL 4865559, at *5 (N.D. Cal. Oct. 27, 2017). That is not the situation here, where Coffman has clearly explained that the out-of-pocket damages methodology he proposes is not only well-matched to the plaintiffs' theory of liability, but is widely accepted as the proper damages methodology for securities cases like this one. *See* Coffman Report ¶¶ 82-87; Coffman Reply ¶¶ 7-12.

In sum, as the Ninth Circuit has recently held, *Comcast* stands for the principle that "where an expert's damages model is untethered from the plaintiff's theory of liability such that it has no possibility of demonstrating the amount of damages in a particular case . . . a plaintiff may not rely upon it to show that damages are 'capable of measurement on a classwide basis.'" *Lytle*, 99 F.4th at 573. But all a class plaintiff must do is show that they will be able to prove their case through common proof at trial, *see id.*, so all the plaintiffs must do at the class certification stage is propose a damages methodology that will be able to "reliably calculate damages in a manner common to the class at trial." *Id.* Coffman's proposed method is not "untethered" from the plaintiffs' corrective disclosure theory of liability. *See Lytle*, 99 F.4th at 573. It is valid.

**2. Materialization of the Risk**

The defendants dedicated much of their papers and their time at oral argument discussing how the proposed damages methodology comports with what the defendants frame as the plaintiffs' " 'materialization of the risk' theory of liability." *See* Oppo. 11-18. The defendants object that the out-of-pocket damages model "fails to account for the materialization of risk theory pleaded in the amended complaint." Oppo. 11. They assert that the "issues raised by the materialization of risk theory at the class certification stage have been well-known since the Fifth Circuit's ruling in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (2015)[,]" where the court rejected an out-of-pocket damages methodology that was offered to address materialization of the risk because it did not comply with *Comcast*. Oppo. 11; 13:14-22. But their argument misses the mark.

As a threshold matter, materialization of the risk, at least as it is asserted here, is a theory of loss causation, not liability, meaning it is the plaintiffs' burden to prove at the merits stage, not

United States District Court
Northern District of California

at class certification. My conclusion is consistent with Judge Alsup's decision in *Junge v. Geron Corporation*, 2022 WL 1002446-WA (N.D. Cal. Apr. 2, 2022), and the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), along with many other district court cases around the country. *See e.g.*, *Baker v. SeaWorld Entm't, Inc.*, No. 14cv2129-MMA (AGS), 2017 WL 5885542, at *14 (S.D. Cal. Nov. 29, 2017) (rejecting claim that plaintiffs asserted a materialization of the risk theory of damages and finding that out-of-pocket damages methodology sufficiently linked to theory of liability); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 692 (D. Md. 2018) (finding that the defendants "mischaracterize[d]" the plaintiffs' theory of liability as " 'materialization of the risk'" and certifying the class). The materialization of the risk theory provides "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Geron*, at * 7 (quoting *Lentell*, 396 F.3d at 173). It articulates a loss-causation theory, and, as Judge Alsup stated, "[a]ny approach to loss causation . . . remains plaintiffs' burden to prove at the merits stage." *Geron*, at *8. The same is true here. Coffman's sparse commentary up until this point on how an out-of-pocket damages methodology could be used to calculate classwide damages arising from materialization of the risk is acceptable.

Second, the defendants' analogy to *Ludlow v. BP* is not persuasive. *BP* was a securities class action litigation that followed the Deepwater Horizon oil spill disaster, where British Petroleum shareholders sued the company for understating the level of risk associated with their operation. *See BP*, 800 F.3d at 674-80. The Fifth Circuit rejected the out-of-pocket damages methodology presented by the same expert, Coffman, explaining that the methodology was incompatible with *Comcast* to calculate classwide damages for a subclass proceeding *solely* under a materialization of the risk theory. *See id.* at 688-89. But, critically, the Fifth Circuit affirmed the district court's decision to certify the subclass that proceeded under a corrective disclosure theory of liability using the *same damages model*. *See id.* Here, of course, the plaintiffs intend to proceed under a corrective disclosure theory of liability, and their proposed damages methodology does appear capable of calculating classwide damages under that theory. *See supra* Section

United States District Court
Northern District of California

II(A)(1). The concerns that motivated the Fifth Circuit in *BP* do not exist here.

Finally, the defendants argue that the proposed damages methodology "fails to account for mismatch between alleged misstatements and corrective disclosures." Oppo. 18-19. They contend that the three corrective disclosures that the plaintiffs single out could not have disclosed the categories of allegedly corrective information that the plaintiffs identify in their complaint. *See* Oppo. 18:3-10; AC ¶¶ 327-55. They say that none of this corrective information could have been disclosed at the start of the class period because DocuSign "could not have disclosed billings growth, guidance, or executive departures that were 18-24 months in the future." Oppo. 18:8-12. But this is not an issue for class certification, as many courts have already noted. An "attack [like this] on the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement … [is just] an attack on loss causation, which plaintiff need not show as a condition of class certification." *See In re Apple Inc. Securities Litigation*, 2022 WL 354785-YGR, at *13 (N.D. Cal. Feb. 4, 2022) (quoting *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016)); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811, 131 S.Ct. 2179, 2186 (2011).

Whether the plaintiffs' materialization of the risk theory of loss causation succeeds on the merits is a question for another day. Coffman offers a methodology that appears capable of calculating classwide damages consistent with *Comcast*. He will calculate damages associated with any false or misleading statements that the plaintiffs can prove at the merits stage, where the plaintiffs will be required to establish loss causation, along with all other elements of their claims. If the plaintiffs ultimately cannot establish loss causation, then their class may be decertified. Until then, they may proceed.

**B. Superiority**

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations and quotations omitted). In considering whether a class action is superior to other available methods, courts consider class members'

United States District Court
Northern District of California

interests in individual litigation, the extent and nature of other litigation that is already begun by members of the class, the forum, and manageability. *See* Rule 23(b)(3)(B). This class action is superior to other types of litigation because it would be challenging for individual class members to litigate these kinds of resource-intensive claims, the federal forum is appropriate, there are no state actions identified by the parties, and there are no known special manageability issues that risk confounding case resolution. This satisfies the superiority element of Rule 23(b).

**III. RULE 23(g)**

Plaintiffs request that I appoint Labaton Sucharow as Class Counsel pursuant to Rule 23(g). Rule 23(g)(1) requires courts to appoint class counsel that will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (4). In appointing class counsel, courts consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

Labaton Sucharow has devoted significant time and resources to litigating the claims at issue. The firm has experience in the area of securities litigation and class actions. *See* Declaration of Irina Vasilchenko [Dkt. No. 111-1, 2, 3] Exs. B-C. Defendants do not dispute appointing Labaton Sucharow as class counsel or Kessler Topaz as liaison counsel. They both appear satisfactory under Rule 23(g).

**IV. CLASS PERIOD**

Finally, the defendants ask that if I do certify the class, I limit the class period. The proposed class period is June 4, 2020, through June 9, 2022.

Regarding the start date, for the same reasons I expressed in the order denying the motion to dismiss, I am unpersuaded by the defendants' attempts to drive it forward. The defendants have plausibly alleged that from the first earnings call on June 4, 2020, DocuSign was aware that demand for its products "would not last, based on multiple internal warning signs." AC ¶ 94.

This is sufficient to justify starting the Class Period on June 4, 2020.

Regarding the end date, the defendants propose that the Class Period end "no later than December 2, 2021," which is the date of the first disclosure, because they say that disclosure fully revealed the fraud. *See* Oppo. 25. But as the Hon. Yvonne Gonzalez Rogers observed, "any inquiry as to precisely when the truth was fully disclosed to the market is best reserved for resolution on the merits" and should not result in the Court's narrowing of the class period at class certification unless the defendant "unequivocally" disclosed the alleged prior representation. *See Mulderrig*, 240 F.R.D. 575, 583 (citing *In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 225 (C.D. Cal. 2019) (refusing to shorten class period to end on date that lawsuit was revealed because, after that date, it was alleged that defendant "continued to make misrepresentations regarding the lawsuit")); *see also SEB Investment Management AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. May 8, 2020) (rejecting the defendants' argument that loss causation issues should be decided at the class certification stage). And as the Supreme Court has held, the question of whether "the [truth] credibly entered the market and dissipated the effects of [prior] misstatements" based on those statements should be left to trial or a motion for summary judgment. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013).

The defendants have not proven that the final disclosure on December 2, 2021, was fully corrective, so I will not decide this issue now. Whether a disclosure "actually cured a prior misrepresentation" should not be decided at class certification unless there is "no substantial doubt" as to the disclosure's curative effect. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009) (quoting *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & "ERISA" Litig*., 247 F.R.D. 32, 39 (D.D.C. 2008)). The plaintiffs allege either that the first disclosure only partially revealed the fraud or there is a factual dispute about the extent to which the first disclosure revealed the fraud; their expert found large stock drops correlated with the last two disclosures, creating at least a dispute about whether they did. In other words, there is doubt here about the curative effect of the December 2, 2021, disclosure. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. at 529. It will be resolved on the merits.

**CONCLUSION**

Lead Plaintiffs have satisfied the requirements of Rules 23(a) and (b). Their proposed Class Counsel is suitable, as is their proposed Class Period, at least for now. They have shown that class certification is appropriate. The plaintiffs' motion for class certification is GRANTED. The following class is CERTIFIED:

> "All persons and entities who or which, during the period from June 4, 2020 through June 9, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of DocuSign and were damaged thereby"

Explicitly excluded from the class are " (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of DocuSign during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) DocuSign's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, subsidiaries, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such." *See* Class Cert. Mot. 2, n. 3.

I will APPOINT DIL and PERSI as class representatives, Labaton Sucharow as class counsel, and Kessler Topaz as liaison counsel. Within three weeks of the date of entry of this order, all parties shall submit jointly an agreed-upon form of notice. The parties shall also submit a joint proposal for dissemination of the notice, as well as their proposed timeline for opting out of the action. The Lead Plaintiffs shall bear the costs of the notice, including the cost of mailing it by first-class mail.

**IT IS SO ORDERED.**

Dated: May 28, 2024

William H. Orrick
United States District Judge