**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

*Liaison Counsel for the Class*

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
Matthew J. Grier (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
ivasilchenko@labaton.com
mgrier@labaton.com

*Counsel for Class Representatives and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

RICHARD R. WESTON, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

DOCUSIGN, INC., DANIEL D. SPRINGER, MICHAEL J. SHERIDAN, CYNTHIA GAYLOR, and LOREN ALHADEFF,

Defendants.

Case No. 3:22-cv-00824-VC (SK)

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

CLASS ACTION

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 4

III. PARTIES ..... 4

A. Lead Plaintiffs and Class Representatives ..... 4

B. Defendants ..... 5

IV. SUBSTANTIVE ALLEGATIONS ..... 6

A. Background ..... 6

B. Defendants Misrepresented eSignature Demand and Growth Sustainability ..... 9

1. Demand Red Flags Before the First Misrepresentations ..... 10

2. June 2020 Demand and Growth Misrepresentations ..... 19

3. June – September 2020: Information Continued Accumulating, Confirming Docusign's Pandemic-Era Growth Was Unsustainable ..... 23

4. September 2020 Demand and Growth Misrepresentations ..... 29

5. September 2020 – January 2021: Red Flags Mounted, Particularly as Docusign's Sales Pipeline Slowed Down ..... 31

6. December 2020 and January 2021 Demand and Growth Misrepresentations ..... 35

7. January – March 2021: Demand Slowed Further as Pandemic Growth Gave Way to Moderating Sales and Rising Churn ..... 37

8. March 2021 Demand and Growth Misrepresentations ..... 40

9. March – June 2021: As the Pandemic Ebbed and "Churn Heat[ed] Up," Docusign Insiders Predicted a Looming "Blood Bath" for Sales ..... 43

10. June 2021 Demand and Growth Misrepresentations ..... 49

11. June – September 2021: Defendants Were Well Aware That Docusign's COVID-Fueled Demand Boost Was at an End ..... 51

12. September 2021 Demand and Growth Misrepresentations ..................... 56

13. September 2021 – End of Class Period: Docusign's Tailspin Continued ..................... 58

C. Defendants Misrepresented Docusign's Competitive Environment..................... 59

1. Competition Red Flags Before the First Such Misrepresentations........... 59

2. September 2020 Competition Misrepresentations ..................... 61

3. September 2020 – March 2021: [redacted] Continued Its "Full Strategic Blitz," as Docusign's "Competitive Challenges" Mounted....... 62

4. March 2021 Competition Misrepresentations..................... 63

5. Summer 2021 and Beyond: Docusign – "Losing [Its] Competitive Edge"..................... 64

6. June 10, 2021 Competition Misrepresentation ..................... 65

D. Defendants Misrepresented Docusign's CLM Success ..................... 66

1. Before and Early in the Class Period, Docusign Struggled to Sell CLM..................... 66

2. June 2020 CLM Misrepresentations ..................... 68

3. July 2020 – December 2020: Docusign's CLM Problems Continued..................... 69

4. December 3, 2020 CLM Misrepresentations..................... 70

5. December 2020 – March 2021: As CLM Sales Continued to Flounder, Docusign Reversed Course to Reprioritize Its Sales Efforts ..................... 71

6. March 24, 2021 CLM Misrepresentations..................... 73

7. Spring – December 2021: CLM "Lack of Progress" Was So Poor That the Board Wondered if Docusign "[redacted]"..................... 74

E. The Truth Was Revealed and Investors Suffered Losses ..................... 75

1. December 2, 2021: Docusign Revealed Poor Billings Growth, But Continued Misrepresenting eSignature and CLM Demand..................... 75

2. March 10, 2022: Docusign Revealed Continued Poor Billings Growth, But Still Misrepresented eSignature Demand Sustainability ........ 78

3. June 9, 2022: The Relevant Truth Was Fully Revealed ........ 80

V. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 81

A. Defendants' Large and Suspicious Docusign Stock Sales ........ 82

B. The Fraud Concerned Docusign's Core Operations ........ 85

C. Defendants Closely Monitored Relevant Information and Metrics ........ 85

D. The Focus and Specificity of Defendants' Public Statements ........ 87

E. The Departures of Defendants Sheridan, Alhadeff, Springer, and Gaylor ........ 88

F. Defendants Springer and Gaylor's Spoliation of Text Messages ........ 91

VI. CONTROL PERSON ALLEGATIONS ........ 92

VII. CLASS ACTION ALLEGATIONS ........ 92

VIII. PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 94

IX. NO SAFE HARBOR ........ 95

X. CAUSES OF ACTION ........ 96

Lead Plaintiffs Deka International S.A. Luxembourg ("DIL") and Public Employee Retirement System of Idaho ("PERSI," and together with DIL, "Plaintiffs" or "Class Representatives") bring this action individually and on behalf of a class of those who purchased Docusign, Inc. ("Docusign" or the "Company") common stock from June 4, 2020 through June 9, 2022 (the "Class Period," *see* ¶281 (full Class Definition)), against Defendants Docusign and its former Chief Executive Officer ("CEO") Daniel D. Springer, former Chief Financial Officer ("CFO") Michael J. Sheridan, former CFO Cynthia Gaylor, and former Chief Revenue Officer ("CRO") Loren Alhadeff (the "Individual Defendants," together with Docusign, "Defendants").

Plaintiffs bring these claims based on, *inter alia*: (1) documents filed with the Securities and Exchange Commission ("SEC"); (2) analyst reports about Docusign; (3) Defendants' public statements; (4) other publicly available information concerning Docusign; and (5) internal Docusign documents and other information obtained through discovery. Plaintiffs believe that evidentiary support for these claims will continue to be revealed through discovery, as both document discovery and depositions are not yet complete.

On April 18, 2023, Judge Orrick largely sustained (ECF No. 88) the then-operative complaint in this action (ECF No. 59, the "AC"), only dismissing the competition and CLM-related misstatements, realleged herein, on scienter grounds. Discovery commenced, a Class was certified (ECF No. 158), and Defendants' petition to appeal that certification was denied (ECF No. 170).

After Defendants' insistence that the AC be updated to match the evidence obtained in discovery—which overwhelmingly strengthens the allegations—Plaintiffs amended the AC (ECF No. 251-3, the "SAC"). The SAC alleged the same fraud as the AC, bolstered the pleading with evidence from discovery, updated certain confidential witness ("CW") allegations based on deposition testimony, and removed one CW, primarily based on credibility concerns.

Due to the wealth of evidence, the SAC was lengthy. On April 29, 2025, the Court issued an Order (ECF No. 263) encouraging Plaintiffs to file a shorter pleading. Thus, this filing streamlines the allegations, including by removing CWs' accounts and other corroborative material that have factual basis but are rendered less probative by other documentary evidence.

## I. INTRODUCTION

1. This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of all investors that purchased Docusign stock during the Class Period. Defendant Docusign is a software company that provides an electronic signature solution ("eSignature"), its core product, accounting for over 90% of revenue. During the Class Period, Defendants falsely reassured investors that the massive surge in customer demand in early 2020 brought on by the COVID-19 pandemic—which forced companies to work remotely and turn to digital processes like eSignature—was a "sustained rise in demand" and "not a short-term thing" because, once customers switch to eSignature, "they rarely go back." Defendants also assured that "we don't see trends" and "we haven't seen anything" signaling that this COVID-driven demand was unsustainable. Defendants thus misled investors into believing that Docusign's explosive billings growth would continue well above pre-COVID levels even once the pandemic receded.

2. In reality, however, Defendants knew and concealed from investors many adverse material facts indicating that this COVID-fueled demand was unsustainable post-pandemic. Indeed, Defendants knew by the start of the Class Period that, *inter alia*, much of this new business influx was for COVID-related one-time uses and customers were signing shorter-term deals, as they wanted the flexibility to not renew or downsize their contracts once they returned to the office. By June 2020, Defendants also already observed a slowdown in the "demand numbers" from the

initial COVID-driven frenzy based on sales pipeline metrics and admitted internally no later than July 2020 that they knew "things will 'cool off' in the months to come." Indeed, by November 2020, Defendants internally discussed the "trend" that the "growth rates . . . seem to have decelerated" as "COVID impact has slowed dramatically impacting [sales] lead[s]." This was also confirmed by other internal key performance indicators ("KPIs") that Defendants closely tracked, *e.g.*, COVID-related customers' eSignature consumption levels, which declined significantly by late 2020 from their initial COVID-fueled spikes—leading to a broad consumption growth drop beginning in April 2021—and customer churn, which surged during the Class Period.

3. Defendants' representations of durable growth were also undermined by their knowledge of increased eSignature competition, primarily from Adobe's cheaper product, during the Class Period. Indeed, while Defendants publicly downplayed the impact of competition—claiming, *e.g.*, that "we don't see a big change in the competitive dynamic with Adobe" and that "there hasn't been really a changing dynamic[]" in the competitive landscape—internally, they knew of severe "pricing pressures from Adobe" and that Docusign was "losing [its] competitive edge in eSign[ature]." Defendants' growth sustainability claims were further belied by Docusign's poor sales of its CLM product, which they falsely touted as a key growth driver. But, in reality, Defendants knew all along that Docusign struggled to sell CLM during the Class Period, due to its complexity, integration problems with customers' platforms, and other issues. Indeed, CLM's "lack of progress" was so poor during the Class Period that Docusign's Board Chair told Springer in June 2021 that "the Board [was] struggling with whether we should even be in this business."

4. As a result of Defendants' material misrepresentations and omissions, Docusign's stock price soared to all-time highs during the Class Period, which allowed Defendants, including CEO Springer, to sell over $193 million worth of Docusign stock at artificially inflated prices.

Notably, Springer sold $81.8 million of stock in his first ever open market sale, on February 1, 2021—just five days after he emailed other Defendants that Docusign was in a “transition to the new normal where we will have tougher quarter closes” due to “the incredible Covid boom coming back to earth.” Investors gradually learned the truth through three corrective disclosures—on December 2, 2021, March 10, 2022, and June 9, 2022—of disappointing billings growth, in three consecutive quarters, due to a major sales slowdown after COVID-fueled demand subsided as the world reopened from the pandemic. On such news, Docusign’s share price plummeted, including over 42% on the first disclosure, resulting in billions of dollars of losses for its shareholders.

## II. JURISDICTION AND VENUE

5. These claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Docusign transacts business in California (including in this District), and its securities are publicly traded. In connection with the acts alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs and Class Representatives

7. PERSI is a public pension fund that provides retirement, disability, survivor, and other benefits to more than 170,000 members in Idaho. PERSI has over $20 billion assets under management. PERSI purchased Docusign’s common stock during the Class Period and suffered damages due to the fraud. *See* Exhibit A.

8. DIL is an investment fund management company established under the laws of Luxembourg and is a 100% subsidiary of DekaBank. DIL is a Luxemburg fund management company of fonds commun de placement ("FCPs"), the French term for investment funds, which have no legal personality and must be managed by a Luxembourg management company under Luxembourg law; as such, DIL has exclusive authority to make investment decisions for the FCPs it manages and to bring suit to recover losses incurred by those FCPs. DIL purchased Docusign's common stock during the Class Period and suffered damages due to the fraud. *See* Exhibit B.

**B. Defendants**

9. Docusign is the largest provider of eSignature products in the world. The Company is incorporated in Delaware, and its principal place of business is in San Francisco, California. Docusign's common stock trades on the NASDAQ under the symbol "DOCU."[1]

10. Daniel D. Springer ("Springer") was Docusign's CEO from January 2017 to June 21, 2022, and served on its Board of Directors (the "Board") throughout the Class Period.

11. Michael J. Sheridan ("Sheridan") was Docusign's CFO from August 2015 to September 2020, and its President of International from September 2020 to December 2021. During the Class Period, Sheridan reported directly to Springer.

12. Cynthia Gaylor ("Gaylor") was Docusign's CFO from September 2020 (after Sheridan) to June 2023. During the Class Period, Gaylor reported directly to Springer.

13. Loren Alhadeff ("Alhadeff") was Docusign's CRO from February 2019 to October 2022. Alhadeff reported to Springer until approximately December 2, 2021, and then he reported to the Chief Operating Officer ("COO"), Scott Olrich.

---

[1] Docusign is liable for the acts of the Individual Defendants and its employees under principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment. Each misrepresentation is properly attributable to Docusign by virtue of the speaker's role at Docusign and the context in which those statements were made.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background[2]

14. In 2003, Docusign began selling its core eSignature product, which allows customers to sign and send documents virtually. Docusign has disclosed that a "significant majority" of its revenue is derived from eSignature—by some estimates, over 90%. (*See, e.g.*, J.P. Morgan March 10, 2023 analyst report; DOCU_00111003).[3]

15. Docusign's eSignature software operates on a Software as a Service ("SaaS") model. Docusign sells a subscription and provides the customer with a license to use Docusign's software for a period of time, typically one to three years. Docusign's eSignature customers also purchase a certain number of "envelopes"—which function as a "container for documents that you send to a recipient to sign"—that the customer may use over the duration of their subscription.

16. As the pioneer in digital signatures, Docusign was able to grow exponentially over its first fifteen years in operation. Indeed, following Docusign's Initial Public Offering ("IPO") in 2018, the Company was valued at over $4.4 billion and continued to report significant revenue growth. But Docusign was not yet profitable, reporting net losses each year before and during the Class Period. Thus, Docusign's stock valuation depended on investors' belief that Docusign would continue to grow substantially and had a path towards profitability. For example, as Citi noted on February 27, 2020, Docusign's "'hyper-growth' status . . . is likely the most important driver of [its] valuation." Docusign claimed it was poised to take advantage of the worldwide Total Addressable Market ("TAM") for eSignature, estimated to be about $25 billion in annual revenue.

---

[2] Docusign's fiscal year ("FY") begins on February 1 and ends on January 31. Docusign identifies each fiscal year based on the year in which it ends. For instance, references to "FY2021" refer to February 1, 2020 through January 31, 2021. All references herein in the form "#Q####" refer to quarters of Docusign's FY. For example, 1Q2021 refers to the period beginning February 1, 2020.

[3] Allegations based on documents that Defendants produced in discovery are cited with reference to the Bates number they were stamped with when produced to Plaintiffs.

17. Docusign employed a "land and expand" business model, which it touted as the way to capture a significant portion of the untapped, multi-billion dollar TAM. Thus, Docusign sought to first "land" with a customer—*e.g.*, sell eSignature to one department or for one use—and then "expand" by upselling that customer more envelopes or other products.

18. Docusign expanded its product portfolio beyond eSignature, notably by acquiring SpringCM and its Contract Lifecycle Management product ("CLM") in fall 2018. CLM is complex software allowing customers to track and manage contracts. Docusign publicly refers to its suite of products, consisting primarily of eSignature and CLM, as the "Docusign Agreement Cloud."

19. **Docusign's Sales Structure:** Docusign's sales organization is categorized into different segments, including by geographical regions, industry (*i.e.*, vertical), and customer size.

20. First, Docusign sells in five regions globally: North America ("NA") is the largest (*e.g.*, DOCU_00331924), and the others are Latin America; Europe, Middle East/Western Asia, and Africa; East/Central Asia, Australasia, and New Zealand; and Japan. (DOCU_00041517).

21. Second, Docusign also organizes its customers and thus sales organization by various "verticals," which are based on the customer's industry. The verticals include Education, Financial Services ("Finserv" or "FS"), Healthcare and Life Sciences ("HLS"), Insurance, Legal, Not-for-Profit, Public Sector, and Real Estate. (*Id.*).

22. Third, Docusign categorizes its customers by size. The Enterprise business unit ("Enterprise") focuses on sales to the largest companies (*e.g.*, in NA, those with over [redacted] in revenue), the Commercial business unit ("Commercial") refers to companies smaller than Enterprise, and "Digital" or "Web" sales are made to the smallest customers, such as individual users or businesses with 1 to 5 employees. Commercial customers are further segmented into:

Small and Medium Businesses ("SMB"), those with 6 to 125 employees; Mid-Market ("MM"), those with 126 to 500 employees; and Majors, those with more than 500 employees. (*Id.*).

23. Additionally, Docusign uses the term "Direct" to refer to sales made through Docusign's sales force of Account Executives ("AEs") across its field offices around the world, as opposed to the Digital business, which focused on sales through web-based self-service purchasing (*i.e.*, without AEs). Thus, Commercial and Enterprise customers are generally referred to as "Direct" customers.[4] The Direct business accounted for 85% of Docusign's FY2021 revenue. (*Id.*)

24. **Demand and Growth Indicators:** Docusign tracked multiple KPIs that were relevant to customer demand and the Company's financial growth.

25. "Billings" is a central growth KPI that Docusign reported to the market. It measures the amounts invoiced to customers over a time period. Investors closely monitored billings, as Defendants touted billings as "a key metric to measure [the Company's] periodic performance."

26. "Bookings" is another important metric that Docusign closely monitored, but did not publicly disclose. Bookings refers to the total value of signed customer contracts over a period of time, representing the future revenue that the Company anticipates receiving. In simple terms, bookings eventually turns into billings, which then turns into revenue.

27. Docusign tracked several revenue-related KPIs that it did not publicly disclose. Monthly Recurring Revenue ("MRR") reflects the revenue Docusign expected from a customer to recur each month. Non-Recurring Revenue ("NRR") refers to revenue that Docusign receives that it does not believe will recur after the contract term. Gross New Monthly Recurring Revenue ("GNMRR") is the new amount of MRR from newly onboarded customers or renewing customers.

[4] Some Enterprise or Commercial sales were made with "Partner-assisted sales" (*i.e.*, sold through strategic partnerships with other companies) or other less prominent practices. But generally, the term "Direct" refers to all customers, except "Digital" customers. (DOCU_00299646).

28. Docusign also closely tracked "churn," which occurs when an *existing* customer downsized their contract amount (partial churn) or did not renew (full churn). "Retention" is the inverse of churn and measures customer renewals. (DOCU_00163270).

29. "Sales Qualified Opportunities" or "SQOs" were another critical sales pipeline metric and demand KPI tracked internally to assess *new* customer acquisition. An SQO is a potential sales opportunity that "has been accepted and qualified by an AE and has MRR attached." (DOCU_00583957). In other words, it "is really close to an order." (DOCU_00728687).

30. Another important internal KPI was "consumption" (also known as "usage"), which is measured by the number of eSignature envelopes customers used. (DOCU_00036985).

31. SQOs and consumption were critical indicators of demand and growth. In an April 2021 call, Springer stated that the "first" indicator he looked to was "consumption," as "a huge [] portion of our growth comes from our existing customers." (DOCU_00727799). Indeed, "a strong correlation" exists "between [r]enewal [o]utcome and consumption trend"—*i.e.*, low usage correlates with churn. (DOCU_00750139). Springer stated that a "healthy pipeline" of SQOs is the "second biggest" indicator of future growth (*i.e.*, from new customers). (DOCU_00727799).

### B. Defendants Misrepresented eSignature Demand and Growth Sustainability

32. The COVID-19 ("COVID") pandemic (the "pandemic") that began in early 2020 drove explosive demand for eSignature and related growth. By April 7, 2020, many governments had issued shelter-in-place orders, pushing businesses to shift to remote work. Businesses needed to perform many tasks remotely, including signing documents. Thus, demand for Docusign's eSignature product skyrocketed beginning in March 2020. Indeed, for 1Q2021 (ending on April 30, 2020), Docusign reported year-over-year ("YOY") billings growth of 59%, its highest billings growth rate since its IPO. While other "work from home" technology companies (*e.g.*, Zoom, a

videoconferencing provider, and Slack, which offered instant messaging) cautioned of uncertainty, Docusign assured investors that its growth was durable and reflected lasting customer preferences.

### 1. Demand Red Flags Before the First Misrepresentations

33. Defendants knew or recklessly disregarded that Docusign's astounding growth reflected a surge in COVID-related one-time use cases and the temporary shift to remote work, and was thus unsustainable because it would recede post-pandemic, once in-person operations resumed. Indeed, many customers' eSignature one-time use cases were driven by activities that only existed due to the pandemic, *e.g.*, government loans as pandemic relief, such as the Payroll Protection Program ("PPP") and COVID-era relief programs by the Small Business Administration ("SBA"). Further, many customers who signed up for eSignature during the pandemic did so out of a temporary need to function remotely and informed Docusign that they did not plan to keep using eSignature after the pandemic receded.

34. **<u>COVID One-Time Use Cases and Other Customer Feedback</u>:** Many customers who signed up or expanded their use of eSignature after COVID began told Docusign that their need would diminish or evaporate once the pandemic receded. Customers stated that they had COVID-specific one-time uses for eSignature or were purchasing the product only to work remotely. Indeed, Defendants knew by the start of the Class Period that a substantial portion of Docusign's sales in spring 2020 was due to temporary, pandemic-related business. For example:

(a) On March 18, 2020, a Sales employee emailed noting that "a barrage of nonprofits who are accelerating their DocuSign projects" created opportunity "during this pandemic," and recognizing the "possibility of one time use cases . . . ultimately creat[ing] churn." (DOCU_00007700). One example was the "[redacted], which has to have paperwork signed by up to [redacted] in need of services with school out and jobs lost." (*Id.*).

(b) On April 11, 2020, Alhadeff sent Springer and Sheridan a presentation titled "COVID Deal Trends and Use Cases," which reported that "22% of bookings to date are COVID related opportunities" and that such "deals make up a significant portion of NewCo [new customer business]." (DOCU_00628499; DOCU_00628504). Indeed, the presentation's drafter elaborated that "globally, COVID deals make up 34% of bookings in NewCo," and noted "an uptick in deals described as 'SBA' [*i.e.*, COVID-related SBA loans] or 'remote work' opportunities" and that they would "need to monitor . . . to better understand if the trend is due to temporary or permanent process change[s]." (DOCU_00012064). Alhadeff requested "the % of one time use cases that we are booking, vs ones that we believe we can renew/expand," adding that he would "review this data with the exec[utive] team" to "plan for all of these to avoid potential churn." (*Id.*).

(c) Indeed, on April 18, 2020, Docusign sales employees emailed internally that deals were "just falling from the skies for Pub[lic] Sector and FinServ[]" customers, but "[i]t's all the Gov't SBA Loans which are one-time use cases," adding that "hopefully it keeps bolstering DOCU stock price come June when we announce Q1 results." (DOCU_00028300).

(d) On April 9, 2020, an AE in Major Accounts emailed COO Olrich (who reported to Springer) that [redacted] "is hesitant to purchase a large footprint of [eSignature] envelopes as they still believe that they will go back to their normal paper processes once the COVID19 situation comes to an end." (DOCU_00028979).

(e) On April 16, 2020, Vice President ("VP") of Global Success Operations Jeremy Scheffel and VP of Revenue Operations Chris Harris (who reported to Sheridan) were told: "[W]ith the current COVID-19 crisis we have seen an uptick in customers that need immediate additional capacity but aren't willing to commit to a new renewal term." (DOCU_00057401).

(f) On May 18, 2020, a Senior Director in Customer Success ("CS") Analytics received a deck stating that Docusign's HLS and government verticals "host a disproportionately large share of COVID-related accounts." (DOCU_00075989; DOCU_00075991). The deck noted that "COVID accounts have substantially increased their share of [eSignature] envelopes sent" after COVID began and featured a chart showing the same. (DOCU_00075991).

(g) On May 27, 2020, a VP emailed her vertical leadership team regarding "COVID Use Case Examples for [Alhadeff]'s All hands," stating that Alhadeff "wants a few more examples . . . [of] Covid Use Cases from Q1." (DOCU_00056918). This email listed COVID one-time use cases in the Public Sector, including large deals with the New York State Department of Labor for unemployment benefits and with [redacted]. (*Id.*).

(h) On June 4, 2020, a VP in Enterprise Financial Services, Tony Spensieri, emailed Senior Director in Renewal Management ("RM"), Melissa Erickson, asking if a customer was "showing all churn next year?" (DOCU_00082733). A Lead Global Account Manager responded that "[t]his is one that we need to have risk slapped on it for sure because this is 100% COVID related," explaining that "[w]hen the COVID and SBA loan requests slow[] down we can't expect them to renew at the numbers that they have currently purchased." (*Id.*). Spensieri added later: "We all understand the risk and the company is looking at ALL of them." (*Id.*).

35. Other documents also confirm that Defendants and other executives closely tracked the impact of the pandemic on Docusign's business. For example:

(a) On March 25, 2020, Alhadeff requested a "weekly scorecard/review of how [we] are doing from a sales perspective related to the increase in COVID-19 demand," including information regarding sales "[p]ipeline [c]hanges," "COVID-19 [i]ncreases and decreases," and "[c]hurn [i]mpact, by region and segment." (DOCU_00004053). Alhadeff made clear that "[t]his

[was] important information for us to review as a leadership team"—indicating that Defendants would be actively monitoring such COVID-related demand trends going forward. (*Id.*).

(b) In a March 31, 2020 email, COO Olrich directly acknowledged to Lambert Walsh, Senior VP ("SVP") of CS (who reported to Springer), and Chief Marketing Officer ("CMO") Rob Giglio that "this increased demand and sense of urgency to support the act of virtually doing business will not last forever." (DOCU_00012765).

(c) In an April 2020 email chain regarding a global sales forecast update, Springer, Alhadeff, and Sheridan were apprised that "[t]he trend of strong weeks [after the pandemic began] continue[d] w[ith] the strongest yet," and provided them with a breakdown of the "impact Covid-19-related opportunities had on the business," including that 22% of its total closed sales the preceding week were "Covid Related." (DOCU_00044200). The percentage was almost double in Enterprise NA, with 40% of closed sales pipeline flagged as "Related to Covid." (*Id.*). Alhadeff told Sheridan and Springer that "[t]he sales leaders have not seen anything like this before." (*Id.*). Springer replied: "While assignment to Covid-19 is obviously not an exact science, [he] was surprised that it is not an even bigger piece of the increased [sales] pipe[line]." (*Id.*).

(d) On May 3, 2020, Alhadeff received an updated internal presentation concerning 1Q2021 titled "Sales Trending with COVID-19," which detailed that (i) "by deal count, most of the [sales] volume is skewed towards one-time use cases comparing to long-term deals"; (ii) "54% of COVID GNMRR is potentially one-time use"; (iii) "25% of Q1 bookings listed COVID-19 as the major event"; and (iv) "35% of COVID bookings have listed 'Remote' or 'Work from home' as selling reasons." (DOCU_00047136; DOCU_00047137).

(e) On May 20, 2020, a VP in Sales Finance, Greg Sells, a VP in FP&A, Howard Fu (who reported to Gaylor), and Finance Manager Michael Avecilla emailed regarding

a draft slide showing that 25% of 1Q2021 global bookings and 42% of Enterprise NA's bookings were "identified as COVID-19 related opportunities." (DOCU_00048797). The email chain indicated this analysis was being performed for a presentation by Sheridan to the Board, and that Sheridan requested slides showing "the ins/outs related to COVID." (*Id.*). Avecilla commented that 50% of 1Q2021 overperformance "was due to COVID"; he proposed the same assumption of 50% overperformance in 2Q2021 "since we currently don't have any additional insights into the COVID impact on Q2." (*Id.*). Fu replied: "Methodologically this makes sense to me." (*Id.*).

36. Thus, Defendants knew that a substantial portion of increased eSignature demand was driven by COVID one-time use cases, and that there was a substantial risk these deals would evaporate or diminish when the pandemic waned. Indeed, on April 11, 2020, Springer responded to an email by Alhadeff about Docusign's "strong growth in bookings," commenting: "I am also wondering about being more deliberate on longer term churn issues. Do you see opportunities to work with customers this month where we know we have a bomb coming." (DOCU_00044274).

37. Notably, Defendants recognized the internal expectation that this demand boom would "inevitabl[y] decelerat[e]" after the pandemic subsided. (DOCU_00758930). Specifically, on April 15, 2020, Sheridan texted Springer and COO Olrich that his "sense" was that Docusign was "seeing the massive increase in bookings as something to behold and observe as a phenomenon that is happening to us" and, "[b]y extension, we will get comfortable thinking we won't be able to control the inevitable deceleration of a year from now any more tha[n] we controlled the influx." (*Id.*). Sheridan argued for a "shift [in] attitude" by Docusign personnel to "preserve and extend" the pandemic growth, imagining the "default conversation a year from now" may be "oh well you know, Covid last year"—*i.e.*, a conversation blaming a later demand reversal on 2020 just being a temporary COVID-driven surge. (*Id.*). Springer "completely agree[d]." (*Id.*).

38. **Underreporting of COVID One-Time Use Cases:** While the above examples highlight the prevalence and magnitude of COVID one-time use cases, the true situation was even more alarming, as Docusign was substantially underestimating the full extent of the trend. Indeed, numerous internal documents show that Sales personnel were likely underreporting COVID deals.

39. For example, on August 7, 2020, Head of Global Sales Strategy and Operations Wes Rudsenske (who reported to Alhadeff) received an email following up on a call with Alhadeff—to "flag that the 1-time use cases for COVID will start hitting us soon." (DOCU_00207143). The email noted that Sales was "directed to book all the sales we have had in the last 2 quarters as GNMRR"—*i.e.*, *recurring* revenue—but "a global pandemic would qualify as a one-time event," such that these sales "should have sold as NRR"—*i.e.*, *non-recurring*. (*Id.*).

40. Docusign's compensation structure disincentivized Sales representatives from accurately tagging COVID one-time use cases. Sales representatives received greater compensation based on how much MRR they brought in, meaning that an AE "has zero incentive to want to document anything as a one-time use case," and that "[t]his is creating incentive for the AE to NOT do discovery" on the deal. (DOCU_00625631). SVP Walsh described Sales personnel's incentive to "inflat[e] MRR, that they know will end up being churn," as the "fuck [Walsh] plan," because the inevitable churn of these customers would reflect poorly on his CS team and affect their compensation. (DOCU_00681223). These incentives were problematic, as "COVID tagging [in Salesforce, a sales database to which Defendants and other executives had access] is subjective" and susceptible to manipulation. (DOCU_00306692).[5]

41. **Contract Length:** A major undisclosed red flag indicating that Docusign's record-breaking growth was unsustainable was a material decline in customers' contract length after the

[5] This was discussed at Docusign's highest levels, including with Alhadeff. *See infra* ¶68(b).

pandemic began, which indicated short-term needs (*e.g.*, COVID one-time use cases), as opposed to a long-term adoption of eSignature. In other words, COVID-related customers refused to enter into longer-term contracts with Docusign because they wanted to have flexibility to stop or reduce their use of eSignature when returning to in-person work or their COVID use cases ended.

42. Historically, multi-year deals were [redacted]. (DOCU_00059082). Head of Investor Relations ("IR") Annie Leschin (who reported to Sheridan and later Gaylor) told an analyst in June 2020 that "[t]ypically . . . Ent[erprise] [customers] hav[e] multi-year" contracts. (DOCU_00185225). On July 16, 2020, GVP of Enterprise Sales Jim Holscher (who reported to Alhadeff) emailed his direct reports that, in "[redacted]." (DOCU_00162888).

43. However, multi-year deals declined after the pandemic began. For example, Docusign's assessment in April 2020 indicated that "COVID deals . . . have a lower % of multi-year contracts (10%)"—*i.e.*, only [redacted] of such deals have multi-year contracts. (DOCU_00012064). Further, on April 11, 2020, Alhadeff sent Springer and Sheridan a deck titled "COVID Deal Trends and Use Cases," which noted that the "contract length is generally shorter" for "COVID deals." (DOCU_00628499; DOCU_00628504). On April 20, 2020, VP Scheffel emailed SVP Walsh, Rudsenske, and RM Head Brian Smith (who reported to Alhadeff) to "scan for churn risks in out quarter," observing that "[s]hort term renewals are not slowing down" and "1 YR Term deals are at all time high [redacted]." (DOCU_00325403).

44. Further, a May 2020 document titled "Preliminary Deal Term Breakdown for COVID Cohort," *i.e.*, COVID-related customers, from VP Scheffel's files, showed that the rate of multi-year contracts in Enterprise NA fell from [redacted] in 4Q2020 to just [redacted] in 1Q2021. (DOCU_00059082). It also showed that the decline in multi-year contracts was "especially"

apparent in large deals (with [redacted]), where the rate fell from [redacted] in 4Q2020 to [redacted] in 1Q2021. (*Id.*). Moreover, it showed a "[m]aterial decline" in multi-year contracts for all deal tiers from 4Q2020 to 1Q2021, with the rate being cut in half, from [redacted] to [redacted]. (*Id.*).

45. When Docusign executives reviewed data showing contract length was shortening, they drew the obvious conclusions. For example, Rudsenske explained in a May 4, 2020 email that contract length was a "proxy for" "[o]ne time use case data," as "a spike in shorter contracts could indicate[] higher risk of non-recurring business/use cases." (DOCU_00058445). VP Scheffel responded that he "expect[ed] the shift [to shorter contracts] is heavily driven by COVID," and Rudsenske "agree[d]," as "[t]hat's what we're seeing, as well." (*Id.*).

46. As another example, a March 25, 2020 email to VP Harris regarding "Deals < 12 month term length" noted that "it's become a bit of a theme with this COVID situation—some customers are understandably hesitant to commit to a normal term while this [pandemic] is going on." (DOCU_00010887). Likewise, a Revenue Operations Senior Director emailed VP Scheffel on April 16, 2020 regarding "the data set showing an increase in short-term deals," stating: "[W]ith the current COVID-19 crisis we have seen an uptick in customers that need immediate additional capacity but aren't willing to commit" longer-term. (DOCU_00057401).

47. **<u>Consumption/Usage</u>:** The reality of Docusign's unsustainable pandemic-fueled growth was also highlighted in internal consumption/usage metrics. "Consumption is a leading indicator for customer behaviors and renewal outcomes. Consumption growth drives upsell and mitigates churn." (DOCU_00000802). "[C]onsumption numbers correlate to the actual [sales] performance" in the future. (DOCU_00678215). While current consumption reflected the pandemic growth, underlying trends signaled Docusign's growth would not last.

48. For instance, a presentation about eSignature consumption in 1Q2021 that was sent on May 29, 2020 to senior executives, including SVP Walsh, noted that "Q1 has benefitted from a COVID-related consumption boost that is likely to wane in the months ahead, which may be masking more fundamental issues in the broader portfolio." (DOCU_00117180; DOCU_00117181). The presentation stated that "[s]eparating major declining accounts, [redacted], the remainder of the portfolio is still falling slightly short of Target (96% attainment)," and that "[t]his is a source of concern," as it was still underperforming targets despite the "COVID-related consumption boost." (*Id.*). This presentation also showed that Docusign was at only "94%" of its 1Q2021 "Global Consumption Target."[6] (*Id.*).

49. **<u>Digital Segment</u>:** The unsustainability of Docusign's growth was also evident in the Digital segment, which was notable because Digital was a predictor of trends in Direct. As described internally, Digital "may be an early indicator of future shifts in the Direct Business," as it was "heavily weighted towards NewCo [new customers] (80% historically) [such that] shifts in market demand have an immediate impact on bookings"—in other words, trends in this segment essentially provided a real-time view of demand. (DOCU_00066501). On March 31, 2020, in discussing the demand influx in Digital with Alhadeff, COO Olrich, and CMO Giglio, Head of Digital Robin Joy "remind[ed] everyone that [redacted] and even in the best of times, the [redacted]" which created the specter of "a massive churn issue later in the year and into FY22." (DOCU_00004196). On the same day, a Digital VP emailed others, stating that "there is a lot of

[6] This presentation also showed that government and education verticals were below consumption targets for the quarter. (*Id.*).

concern by me, Robin [Joy], and other senior leadership that we are going to see a large spike in churn in the coming months & quarters." (DOCU_00024643).

50. **Sales Pipeline:** By the start of the Class Period, Defendants were already seeing signs—based on internal sales-pipeline metrics—that Docusign's "inevitable deceleration" in demand (*see supra* ¶ 37) was already beginning. For example, on June 2, 2020, two days before the Class Period, Alhadeff emailed Rudsenske discussing whether certain anticipated hiring to account for Docusign's recent growth still made sense, given that he was "seeing the inbound demand slow," asking: "[A]re we sure we need the number of [sales representatives] we asked for? Especially now with the inbound demand showing a noticeable slowdown?" (DOCU_00078494). Likewise, in a June 8, 2020 email providing an update on the 2Q2021 sales forecast, Alhadeff wrote to Sheridan and Springer that, while he was "still seeing strength in the bookings forecast," "the demand numbers are beginning to trend down week over week." (DOCU_00154819).

**2. June 2020 Demand and Growth Misrepresentations**

51. Throughout the Class Period, Defendants made false and misleading statements regarding the sustainability of Docusign's high demand and billings growth post-pandemic that artificially inflated or maintained the price of Docusign's common stock and operated as a fraud or deceit on all persons who purchased such stock during the Class Period.

52. **June 4, 2020 Earnings Call:** On June 4, 2020, the start of the Class Period, Docusign released its 1Q2021 financial results, *e.g.*, 39% revenue growth and 59% billings growth YOY. Defendants made the following misrepresentations during the earnings call that day.

53. During his opening remarks, Springer stated: "***[E]ven when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based***

***processes. Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, they rarely go back***."[7]

54. In response to an analyst's question about the effect of COVID one-time use cases, Sheridan downplayed their impact: "There definitely will be some examples that are use cases that are more project-oriented or onetime in nature. ***We see that as the extreme minority***."

55. Further, in his opening remarks, Sheridan stated: "We believe this accelerated growth in new customers and expansion within our installed base was driven by a sudden prioritization of our products, ***but we also believe that these customers will remain with us*** because they are realizing the value that our solutions deliver in any working environment."

56. In response to an analyst's question regarding churn rates for customers who signed up with Docusign during the pandemic in comparison to Zoom (which was cautioning uncertainty), Sheridan assured: "***[Docusign's] situation is [not] analogous to Zoom*** . . . [because] ***[w]e think [churn is] going to remain pretty stable because we think that the value propositions, again, we're delivering are sustainable, whether it's a work-from-home environment or not***."

57. These statements falsely conveyed that Docusign's increased billings growth and demand for eSignature were sustainable beyond the pandemic. They concealed that Docusign's results were, in fact, driven by anomalous pandemic-era events and were not sustainable, as Defendants acknowledged internally.

58. Although investors were informed that the pandemic played a role in Docusign's strong growth, Defendants spun a narrative that the pandemic provided only a nudge to accelerate long-term trends toward adoption of digital signature technology, contrary to internal information. For example, as Defendants knew, COVID one-time use cases were a significant driver of

[7] Plaintiffs allege that Defendants' statements emphasized in bold and italics herein were knowingly and materially false and misleading and/or omitted to disclose material information.

Docusign's growth. *See* ¶¶34-40. These COVID one-time use cases did not reflect sustainable growth or an acceleration in any longer-term shift in demand for digital signature technology. Instead, they largely represented demand for eSignature that only existed due to the pandemic, which would fade post-pandemic. For example, customers using eSignature to process pandemic-era SBA loans (*e.g.*, ¶34) reflected a business need that only existed due to the pandemic, as opposed to any long-term adoption of eSignature. Likewise, Defendants knew that a large portion of the COVID-related demand influx was due to remote work reasons (*e.g.*, ¶¶34-35).

59. Additionally, Sheridan's statement that COVID one-time use case customers were an "***extreme minority***" (¶54) was also false because COVID one-time use cases were highly prevalent and constituted a substantial portion of Docusign's business. *E.g.*, ¶35 ("25% of Q1[2021] bookings" were listed as COVID-related; "most of the [sales] volume is skewed towards one-time use cases"; "54% of COVID" GNMRR was "potentially one time use").

60. Beyond the internally obvious accumulation of COVID one-time use case customers, Defendants knew and omitted to disclose many other internal warning signs that Docusign's growth did not reflect a sustainable increase in demand, including that (a) the length of customer contracts materially declined after the pandemic began, particularly among COVID-related customers and in larger deals, indicating the growth was temporary (*e.g.*, ¶¶41-46); (b) though Docusign "benefitted from a COVID-related consumption boost," global eSignature consumption was still falling short of 1Q2021 internal targets, demonstrating that growth would not persist when the pandemic subsided (*e.g.*, ¶¶47-48); (c) Docusign personnel worried that demand in Digital, an early indicator of future shifts in Direct, was transient and would result in "massive churn" later (*e.g.*, ¶49); and (e) internal sales pipeline metrics signaled a deceleration in

demand, as Defendants were already "seeing the inbound demand slow" and "demand numbers [were] beginning to trend down week over week" (*e.g.*, ¶50).

61. In addition, as thoroughly explained *infra,* throughout the Class Period and at the time of these misstatements, the unsustainability of Docusign's growth was known internally because it was losing substantial eSignature business to Adobe and other competitors (*see* Section IV.C, *infra*), and sales of its CLM product were struggling too (*see* Section IV.D, *infra*).

62. Analysts were convinced by Defendants' assurances regarding the sustainability of Docusign's growth. For example, on June 4, 2020, RBC commented: "[W]e believe demand trends are durable and pipeline [is] strong," and paraphrased Springer's assurance that "[o]nce a customer starts DocuSigning, they don't go back to paper." That same day, Piper Sandler noted that "[w]e believe that these trends will continue to benefit the company moving forward and into the post-COVID environment." On June 5, 2020, Deutsche Bank noted that "[e]ven more encouraging is DocuSign's messaging that the quarter was strong excluding the tailwinds from the pandemic and that new customers and expansions realized in this environment are here to stay."

63. **June 10, 2020 Conference:** On June 10, 2020, Springer participated in the William Blair Growth Stock Conference, where he spoke about the effect of the pandemic on Docusign's billings growth. In response to an analyst's question regarding the "sustainability of growth" that Docusign experienced since the onset of the pandemic, Springer assured: "***While there are some COVID-19 very specific use cases*** that we could imagine that might happen to, ***the majority of the things that we've seen has just been an acceleration***."

64. This statement conveyed that the Company's billings growth and increased demand for Docusign's eSignature product were sustainable and that COVID one-time use cases were rare,

which was false and misleading for the same reasons as the June 4, 2020 statements addressed earlier in this Section. *See* ¶¶58-61.

65. Analysts believed Docusign's growth was sustainable. For example, on June 24, 2020, Oppenheimer wrote: "We believe . . . organizations that adopt DocuSign will never revert to old workflows" and, "as work begins to normalize, the usage of some of these [work-from-home] applications may taper back . . . . We believe DocuSign will be mostly immune to this."

### 3. June – September 2020: Information Continued Accumulating, Confirming Docusign's Pandemic-Era Growth Was Unsustainable

66. Defendants knew by the start of the Class Period that Docusign's explosive growth was driven by COVID one-time use case customers whose need for eSignature would diminish or evaporate once the pandemic receded. Information confirming this reality continued to accumulate within Docusign in the wake of Defendants' June 2020 misrepresentations.

67. **COVID One-Time Use Cases:** In summer 2020, COVID one-time use cases continued to drive growth, particularly in the FinServ, HLS, and Public Sector verticals. For example, on July 9, 2020, VP Peretti and others received notes from a presentation they attended, listing as an action item: "Flag one-time use cases for FinServ due to SBA (where it won't continue and might see churn next year)." (DOCU_00162475). When discussing a processor of COVID Economic Injury Disaster Loans, Alhadeff wrote, on July 11, 2020: "[W]e are already seeing a lift in shorter term deals in Enterprise which is boosting near term results and will also cause heartburn in [the Enterprise] business within the next 6-9 months." (DOCU_00165830). In response to a July 14, 2020 email about a "New Big Deal" involving a FinServ customer with a PPP one-time use case, Alhadeff emailed a Commercial Sales GVP: "Another short term add-on….nice size deal but these will hurt next year." (DOCU_00171426; DOCU_00756674).

68. One key example of a large COVID one-time use deal that raised internal concerns about churn involved the [redacted], and specifically its subagency, the [redacted]. For example:

(a) On June 10, 2020, a VP told Alhadeff and GVP Holscher of a "very large transaction with [redacted]" that was "primarily being driven by COVID." (DOCU_00116312). Holscher forwarded this email to Peretti and Walsh, noting "these new deals" created "future churn risk." (*Id.*). Peretti replied, conveying that the deal was "100% COVID related at the moment and tied directly to CARES[8], . . . [w]ithout CARES . . . this use case doesn't exist." (*Id.*).

(b) On June 15, 2020, GVP Holscher emailed Peretti that he would be "catching up with [Alhadeff] . . . to discuss how . . . to treat [redacted] from a bookings perspective"—*i.e.*, whether the [redacted] deal should be treated as recurring revenue. (DOCU_00116375). Peretti replied that "[t]hese [redacted] opportunities are labeled COVID-19 and are 1x use cases, thus it should not be booked in its entirety as GNMRR"—*i.e.*, recurring revenue, given its temporary nature—as it was important to "call[] this for what it is currently, a 1x use case." (*Id.*).

(c) On June 29, 2020, a CS director emailed Peretti that the "[redacted] account" represented over 85% of revenue derived from [redacted] but that "[a]ll volume" within that account "is allocated to [a] COVID dependent use case" that relies on "CARES funding." (DOCU_00205341). Peretti forwarded the email to SVP Walsh, noting her "concern" about this account, as the "[l]argest use case is the 1x use case." (*Id.*). In a later email on this chain, Peretti stated that Walsh was "aware and underst[ood] the risk," *i.e.*, the risk of churn. (*Id.*).

[8] "CARES" refers to the Coronavirus Aid, Relief, and Economic Security Act, which was enacted in March 2020 and temporarily provided emergency assistance in the wake of the pandemic.

(d) Ultimately, Docusign booked revenue from the [redacted] account as recurring revenue despite the above-mentioned concerns. A May 3, 2021 email by a CS director detailed how, in summer 2020, her team raised the issue to "sales leadership," who decided to book the deal as recurring revenue despite it being a "one-time COVID use case." (DOCU_00755194). The CS director summarized: "What we ultimately did, was bring it up with sales leadership last summer; we tried to negotiate a different booking (NRR instead of MRR). Leadership determined to keep it MRR but what it did was provide the visibility across all teams and e-staff that we were going to have a problem." (*Id.*). "E-staff" or "eStaff" referred to executive staff, and Docusign's executive staff would include the Individual Defendants, among others.

(e) In August 2020, an SVP emailed IR Head Leschin about customer examples in a draft script for the 2Q2021 earnings call to "support[] the story that not only have we gotten a boost from COVID, but the needs are durable." (DOCU_00251091). Leschin replied that "Mike [Sheridan] & I would like a good example," proposing [redacted]. (*Id.*). But the SVP pushed back: "It's one-time. This does not support the narrative that our COVID wins will have lasting impact." (*Id.*).

69. Consistent with internal documents citing numerous examples of COVID one-time use cases, Defendants and other executives closely monitored this ongoing trend. For example, on July 15, 2020, Peretti was warned of a "[s]ignificant increase in overall business due to COVID / Wave 1 / Emergency response," that "[a] significant amount of this is happening to our key verticals, namely, Public Sector, FS, and HLS," and of "[v]alid concerns that shorter term contracts (e.g. 1yr in pub[lic] sec[tor]) and potentially one-time use case scenarios create forward looking churn risk in the cohort of customers we have recently onboarded." (DOCU_00753174).

70. Similarly, a Public Sector Quarterly Business Review deck sent to GVP Holscher, VP Peretti, and others, on August 5, 2020, noting that Docusign's "goal is to take any single use

case accounts from COVID, and increase their use case awareness. We're specifically targeting 3,000 FinServ, HLS, and the Public Sector accounts in North America" so that Docusign could "mitigate [such] flash and crash customers." (DOCU_00210073, DOCU_00210074). Thus, Docusign knew that there were at least 3,000 COVID one-time use case customers in just three verticals and had begun scrambling to try to avoid the inevitable churn after the pandemic receded.

71. **Sales Metrics:** Indeed, in a July 9, 2020 email about a 2Q2021 sales forecast, Alhadeff told Springer that he was "aware that things will 'cool off' in the months to come" when this COVID "tailwind[]" subsides. (DOCU_00154819). In the same email chain, Springer had also indicated that Docusign's strong sales at the time were due to the "COVID bump [that will] subside[]," while Alhadeff later noted that "COVID [was] covering some blemishes." (*Id.*). In fact, by August 25, 2020, sales and marketing leaders internally discussed that, based on SQL and SQO metrics, sales personnel were "[c]learly . . . having a tough [time] drumming up new business now"; and that they needed, but did not have, a "plan for Q3" to hit their targets before "this becomes something we can't recover from in the [second half] of the year." (DOCU_00708661).

72. **Consumption/Usage & Churn:** While the risk of churn driven by the accumulation of COVID one-time use case customers demonstrated that growth would not be sustained, this risk was also shown by the continuation of alarming consumption/usage trends.

73. For example, a June 18, 2020 deck concerning churn risk sent to VP Scheffel and others highlighted a "New Trend: New Account Consumption"—that Docusign was "[c]oncern[ed] about upcoming renewals near term that will be impacted by accounts with consumption decline and flash & c[r]ash trends from COVID," *i.e.*, that the "[m]ajority of the new accounts that booked single-year contracts are displaying a significant spike and decline" in consumption and thus were likely to churn later. (DOCU_00117783; DOCU_00117785). The deck

also stated that "[m]ajor industries such as Financial Services and Technology display Spike & Decline Consumption behavior." (DOCU_00117785). It further warned that "[f]irst time renewals for a new customer cohort [*e.g.*, since COVID began] [redacted]." (*Id.*).

74. In a July 15, 2020 email about a meeting with COO Olrich, a Finance team member noted: "Churn: [Walsh] and [Scheffel] have concerns about churn in FY22 due to the accounts we acquired in FY21 related to [C]ovid, they think our churn may be higher." (DOCU_00157022).

75. **Digital:** Likewise, the Digital business, which, as noted above, was a harbinger for the Direct business, continued to exhibit red flags. For example, on July 17, 2020, Alhadeff received a Digital business sales forecast update revealing a declining bookings trend: "We have seen a 10% decline in New GNMRR booking month-over-month, and unfortunately, the trend has yet to flatten out." (DOCU_00173828). Further, a September 14, 2020 slide deck regarding the "Web" (Digital) business performance noted that there had been a significant increase in monthly plans in Digital, raising alarm bells because "[c]ustomers opting for monthly plans . . . will likely result in greater churn in future quarters." (DOCU_00300595). The deck explained that "[t]he share of plans that are on monthly billing went from [redacted] in [2Q2020] to [redacted] in [2Q2021]," and that "[a]lthough this dynamic is a revenue tailwind in the short term, down the road we will likely experience higher churn." (*Id.*). Indeed, this slide deck featured the following image (*id.*):




76. **Contract Length:** The unsustainability of Docusign's growth also continued to be apparent internally in the alarming trend of shorter length contracts. For example, the June 18, 2020 deck regarding "Long Term and Short Term Churn Risk" warned that "Q1 bookings trend

shows an uptick in new customer deals that are shorter in contract length." (DOCU_00117783; DOCU_00117785). The deck noted this new trend "[r]esult[ed] in more new business[] deals with single year contract length," with contracts of one-year or less increasing from [redacted] in FY2020 to [redacted] in 1Q2021. (DOCU_00117785). It also showed this trend affecting "top industries." (*Id.*).

77. This trend continued into 2Q2021. For example, IR Head Leschin and Rudsenske received an email on August 31, 2020 noting that the "[n]umber of deals >12 months seems to be down too this quarter" based on "Global" data. (DOCU_00267629). In response, Director of Sales Intelligence Leif Jacobsen provided data confirming the continued trend and concluded: "The 12 month contract trend in Q2 is consistent with that of Q1." (*Id.*). The following day, a Senior Manager commented on "the shift away from multi-year contracts in the past few quarters." (*Id.*). Leschin asked, "WHY is that happening," to which Jacobsen responded that "the downward trend in our dollar weighted multi-year contracts is being drive[n] by Public Sector," a vertical where Docusign's business had grown due to an influx of COVID one-time use cases, such as "SBA." (*Id.*). Jacobsen also warned that "[i]t looks like this trend will continue" and provided a chart showing the "multi-year trends" by GNMRR for various segments, including for "Global Direct," which indicated that the latter had dropped from [redacted] for multi-year contracts in 4Q2020 to just [redacted] in 1Q2021, [redacted] in 2Q2021, and was trending at [redacted] for 3Q2021. (*Id.*).

78. On September 1, 2020, Leschin emailed Alhadeff and Walsh regarding "[their] discussion on contract length yesterday and Zoom's comments last night about [its] increased churn + shorter contract duration," providing a data table showing significantly shorter contracts in 1Q2021 and 2Q2021 for Docusign's key divisions. (DOCU_00268551). Leschin noted that "we're seeing [this trend] across the board [] with new and existing customers," hypothesizing several scenarios: "more customers simply aren't sure what THEIR businesses will look like in 6

or 12 mo[nth]s, nevermind 2 or 3 yrs, so they're unwilling to make that bet? OR is it that they just see DocuSign as they do Zoom – a temporary phenomenon related to [work from home]?" (*Id.*).

### 4. September 2020 Demand and Growth Misrepresentations

79. **September 3, 2020 Earnings Call:** On September 3, 2020, Docusign released its 2Q2021 financial results, including 61% YOY billings growth that quarter. During Docusign's earnings call that day, Defendants made the following misrepresentations.

80. During his opening remarks, Springer stated that the pandemic was "causing greater adoption of our offerings, ***something we believe will persist beyond the crisis. Because in our experience, it's very rare to see anyone go back to paper once they've gone digital***."

81. In discussing Docusign's "heightened demand," Springer also assured: "As is evident from these numbers, ***the trends that emerged in the latter half of Q1 have continued throughout Q2. We've seen a sustained rise in demand for our core eSignature offering***, not only from new customers, but also those expanding across use cases, departments and borders."

82. In response to an analyst's question, Sheridan later stated: "It is our view that . . . there's a greater awareness of need to digitize the business. ***And we believe that, that's going to be sustained even after things return to whatever normal looks like in the future . . . we don't see trends that things are going to return to the way they looked and trended pre-COVID***."

83. These statements conveyed that Docusign's high billings growth and demand for eSignature were sustainable post-pandemic. As previously explained, these statements were false and misleading because they concealed that Docusign's results were driven by anomalous pandemic-era events and were not sustainable. *See* ¶¶34-40 (relevant facts); ¶¶57-58 (explanation). At this time, COVID accounts, including one-time use cases, remained a core driver of Docusign's growth. *See* ¶¶67-70. The previously described and still undisclosed warning signs remained clear

signals that eSignature demand would not last. *See* ¶60. In addition, between June 2020 and September 2020, internal red flags continued to accumulate, confirming this reality. *See* Section IV.B.3. Notably: (a) SQL and SQO metrics indicated underlying demand problems that the "COVID bump" was covering up (¶71); (b) Docusign recognized a significant spike and decline "trends from COVID" and thus recognized that churn would increase (¶¶72-74); (c) Digital saw a trend of declining GNMRR and more short-term contracts, which meant Docusign would "likely experience higher churn" (¶75); and (d) Docusign's contract duration decline persisted, signaling short-term demand and churn risk (¶¶76-78).

84. **September 14, 2020 Conference:** On September 14, 2020, Springer spoke at the Deutsche Bank Virtual Technology Conference, making the following misrepresentations. In response to an analyst's question about whether demand was beginning to "normalize" back to pre-COVID levels, Springer stated: "[W]e feel very strongly that once people have gone digital from their paper-and manual-based processes, ***they don't go back. No one's going to***." He added: "When you get back in the office, you don't go, 'Yes, I'd love to go back to that thing again where I typewrite a letter and mail it out.' ***It just doesn't happen***, yes, so we feel pretty confident that those use cases that have accelerated, as you articulated it, ***they're here for the long term***."

85. These statements, which again conveyed that Docusign's increased billings growth and eSignature demand were sustainable long-term, were false and misleading for the same reasons as the September 3, 2020 statements addressed earlier in this Section. *See* ¶83.

86. **September 15, 2020 Conference:** On September 15, 2020, Springer spoke at the Jefferies Software Virtual Conference, where he made the following misrepresentations. In response to an analyst's question regarding the "durability" of the "digital transformation" many businesses had experienced because of COVID, Springer responded with an "incredibly high

degree of confidence" that "for the transformation we've had to date, there's been a lot of questions about if people brought stuff into the DocuSign world, that once we're in a -- whatever a new normal might look like, not everyone's working from home, will somewhat pull back. ***And I feel very strongly the answer is people don't go back*** " and "***we don't feel there's a sense of stuff that's accelerated this year would disappear***."

87. These statements, which again conveyed that Docusign's increased billings growth and eSignature demand were sustainable post-pandemic, were false and misleading for the same reasons as the September 3, 2020 statements addressed earlier in this Section. *See* ¶83.

**5. September 2020 – January 2021: Red Flags Mounted, Particularly as Docusign's Sales Pipeline Slowed Down**

88. By fall 2020, as the world began to adapt to the pandemic, many states lifted stay-at-home orders and businesses began to reopen, the urgent demand for eSignature seen at the outset of the pandemic began to dissipate. Indeed, by November 2020, the end of the pandemic appeared imminent with the arrival of COVID vaccines. Thus, in late 2020 and early 2021, the reality that Docusign's pandemic-fueled growth would not last came into even clearer focus as its global sales pipeline began to dry up with the pandemic beginning to subside.

89. **SQOs Slowdown:** As discussed above, SQOs were a critical sales pipeline metric and demand KPI, which Springer recognized internally. *See supra* ¶¶29, 31. By November 2020, a wealth of internal documents highlighted the decline in Docusign's SQO pipeline. For example:

(a) On November 6, 2020, Alhadeff received slides for a Global Sales Pipeline Council meeting discussing 3Q2021 metrics, showing that Docusign "[f]ell short on SQOs"; New Customer SQO YOY "growth rates [] started to decline towards pre-COVID levels"; and there were "[c]hanges in macro demand"—*i.e.*, that Docusign's "Covid Uptick subsided and led to lower volume of inbound leads." (DOCU_00662823; DOCU_0066283).

(b) On November 10, 2020, Alhadeff messaged Sales VP Pedro Martins about weak new customer growth: "This is quite alarming"—"It[']s not even close to plan." (DOCU_00682091). Martins replied that new customer growth is "our biggest challenge again," noting that NA Commercial Sales "in Q3 already did less newco than in Q2 or Q1." (*Id.*).

(c) A November 12-13, 2020 4Q2021 "Global Sales Business Review" deck by Alhadeff stated that "level[ing]-off of COVID-induced demand" was leading to "performance against revised SQO targets [that] has been soft in several segments." (DOCU_00188540).

(d) On November 13, 2020, Springer emailed Gaylor and Alhadeff about a "Q4FY21 Global Forecast" for bookings, noting that the "over achievement of sales plan and the growth rates . . . seem to have decelerated from the prior 3 quarters," asking if it was "a trend, or is this a one off?" (DOCU_00110225). Alhadeff replied: "It's not a one off, as you know, COVID impact has slowed dramatically impacting [sales] lead volumes, etc." (*Id.*).

(e) On November 20, 2020, an employee in Go-To-Market Strategy, a team responsible for sales pipeline metrics, informed his supervisor that he met with Springer, who was "[w]alked . . . through" a slide deck, which showed "Newco SQOs" dropping 1% per week for 16 weeks and plans to address "[Springer's] concerns about Q1 FY22," prompting Springer to ask "[h]ow do we close [such] gaps?" (DOCU_00120770; DOCU_00120771).

(f) On December 1, 2020, that same Go-To-Market Strategy employee emailed CMO Giglio, noting the "[t]he overriding theme" from sales teams was: "[N]o to low growth in the organic channels, particularly inbound call, chat and contact us. We know the trends have been declining and we have challenging growth off of the peak demand from Covid . . . we need to figure out the organic growth or FY22 is in trouble." (DOCU_00120788). CMO Giglio responded their job was "to find growth and create demand where we don't anticipate it being." (*Id.*).

(g) On December 14, 2020, Gaylor, Leschin, and others received a bookings summary for 4Q2021, which showed a notable deceleration in Docusign's bookings numbers versus prior quarters. (DOCU_00136707). In response, Leschin separately emailed a Finance employee, stating "clearly things have slowed vs. last quarter at this time." (*Id.*). Leschin further questioned the Finance employee: "Comparing this to where we were at a similar time in Q2 & Q3, [it] looks like we're returning to more 'normalized' levels, pre-COVID?" (DOCU_00136714).

(h) On January 5, 2021, an email attaching a slide deck was sent to Alhadeff and others, including VP of Sales Finance Greg Sells (who reported to Gaylor), stating that sales of eSignature to new customers "continue[d] to show weakness across SQOs and Pipe $" and sales to existing customers "continue[d] to slow down." (DOCU_00166139; DOCU_00166141).

90. **Consumption/Usage:** During this time, Docusign also saw further concerning spike-and-decline consumption trends in the COVID cohort of customers. For example, on September 21, 2020, Rudsenske received an email regarding "COVID-19: Renewal Rates/Churn Impact [FY 2022] follow up," attaching a slide deck. (DOCU_00306692; DOCU_00750140). That deck stated that "[f]or the 2020 COVID cohort we see a steep incline in consumption in the first 120 days with sustained consumption till August followed by a declining consumption in the last couple of months." (DOCU_00750140). It also made clear that, "[i]n the 2020 COVID cohort we see a higher risk [of churn] with declining consumption in 33% of the cohort representing twice the MRR compared to the 2020 Non COVID cohort." (*Id.*).

91. This trend continued later in 2020. A December 2020 deck titled "Consumption Summary" from the files of VP Scheffel discussed eSignature FY2021 consumption data through November 2020. (DOCU_00630456). It included a slide with graphs comparing the consumption levels of "New Co (COVID Flag)" customers, also referred to as the "2020 COVID Cohort,"

versus "2020 – New Co (No COVID Flag)," also referred to as the "2020 Non-COVID cohort" in the slide, from February 2020 through November 2020. (*Id.*). The graph for the 2020 COVID Cohort customers showed that the consumption of such customers, after initially spiking to a peak of 115% in May 2020, declined approximately 30% to 85% in November 2020 (*Id.*):




92. **<u>Churn</u>:** At this time, Defendants also were already aware of serious churn concerns. For example, on September 16, 2020, VP Scheffel emailed Springer, Alhadeff, Gaylor, COO Olrich, and others a slide deck regarding long-range planning for CS goals. (DOCU_00726674, DOCU_00726675). These slides showed that (i) "COVID Cohort renewals" and "1x use case[s]" were risks that may impede Docusign's lower churn goals; (ii) Docusign was able to upsell more to its customers in FY2021 because of a "surg[e] with COVID demand," but projected that this upsell percentage would then steadily decrease to pre-COVID levels by FY2025; and (iii) "[n]et retention [would] trend[] downwards" from FY2021 through FY2025, returning to pre-COVID levels. (DOCU_00726675). The deck concluded with a set of "Next Steps," including the need to "[f]ollow-up on COVID Churn head winds for FY22." (*Id.*).

93. On October 28, 2020, Erickson messaged with RM Head Smith about COVID-related "one time use cases," asking how they should be booked "[i]f the AEs openly admit to it," alluding to the disincentive for AEs to tag deals as COVID one-time use cases (*see* ¶¶38-40).

(DOCU_00670398). Smith noted that "[Alhadeff] is all over this right now," and Erickson added that Alhadeff was "highlighting what will happen upon renewal" of such deals—*i.e.*, churn. (*Id.*).

94. An October 29, 2020 "FY22 Churn Outlook" deck in VP Scheffel's files warned that Docusign's "churn risk for FY22 is most likely higher than the LRP [Long-Range Plan] churn plan." (DOCU_00704020). This deck included data showing that first-time customers (like Docusign's COVID-era customers) were significantly more likely to churn. (*Id.*).

95. A November 2020 "Scorecard" slide in a "Renewal KPIs" deck for Enterprise NA showed that such KPIs for 3Q2021 were below target, with most graded "C," one "F," and only two "B." (DOCU_00174724). Notably, Enterprise NA received a "C" for its 20% churn rate (well above its target of less than [redacted]) and a "C" for its 80% gross retention rate (below the 90% benchmark targeted by SaaS companies). (*Id.*).[9] Several NA Enterprise verticals had gross retention rates of only 71% and 73%, far below the [redacted]. (DOCU_00174724).

### 6. December 2020 and January 2021 Demand and Growth Misrepresentations

96. **<u>December 3, 2020 Earnings Call</u>:** On December 3, 2020, Docusign released its 3Q2021 financial results, including a 63% YOY billings growth that quarter. During Docusign's December 3, 2020 earnings call, Defendants made the following misrepresentations.

97. During her opening remarks, Gaylor stated that "DocuSign's value proposition remains strong, ***whether customers began using our product before or after the pandemic began. We don't see customers going back to pen and paper***."

[9] *E.g.*, DOCU_00171147 (CS leader telling her team that "[i]deally, we will land with a [gross retention rate] number [redacted].").

98. Springer also stated that "when customers go from paper-based processes to digital agreement processes, ***they do not go back. We believe that trend will hold when the pandemic subsides***, and that DocuSign's value will persist no matter how the future of work unfolds."

99. In response to an analyst's question asking whether the demand for the Company's eSignature product had been "pulled forward" by the pandemic, such that demand in later quarters would decrease, Springer assured that this was not the case: "We're just executing at a higher rate today. ***And so we've accelerated that growth not because we're sort of robbing from the future, but we're just getting closer towards that $25 billion TAM opportunity***."

100. These statements conveyed that Docusign's high billings growth and demand for eSignature were sustainable post-pandemic. As previously explained, these statements were false and misleading because they concealed that Docusign's results were driven by anomalous pandemic-era events and were not sustainable. *See* ¶¶34-40, 67-70 (relevant facts); ¶¶57-58 (explanation). The previously described and still undisclosed warning signs remained clear signals that eSignature demand would not last. *See* ¶¶60, 83. In addition, between September 2020 and January 2021, internal red flags continued to accumulate, confirming this reality. *See* Section IV.B.5. Notably: (a) SQO metrics indicated growth rates were beginning to decline to pre-COVID levels, and sales forecasts similarly showed an obvious "trend" that "growth rates . . . seem to have decelerated from the prior 3 quarters," as "COVID impact has slowed dramatically impacting [sales] lead volumes" (¶89); (b) Docusign saw a continuing spike-and-decline consumption trend in the COVID cohort of customers, which signaled an increased risk of churn (¶¶90-91); and (c) Docusign documented worse-than-target churn rates, expected net retention to trend downwards, and anticipated "COVID Churn head winds for FY22" (¶¶92-95).

101. Defendants' false narrative reassured the market about the durability of Docusign's growth. For example, a December 3, 2020 RBC analyst report stated: "What is even more impressive in our minds is that this is being driven almost entirely by an acceleration of the core e-signature business with the company being confident . . . that they can maintain growth above pre-pandemic levels in a post-pandemic world." A J.P. Morgan report on the same day noted that "DOCU remains the best positioned company in our coverage to retain the momentum gained during the pandemic if vaccines finally lead to a more open economy and return to office."

102. **January 11, 2021 Conference:** On January 11, 2021, Gaylor participated in the Needham Virtual Growth Conference, where she made the following misrepresentations. In response to an analyst's question about business acceleration from the pandemic, Gaylor stated:

> I think the great news for DocuSign is we believe that the acceleration to digital is, it's just ***the pandemic really accelerated what people were otherwise going to do. And so it's not kind of a one and done sort of mentality. It's really a kind of progression of things that were going to happen over a period of time*** . . . . We saw that kind of in mid-Q1 into Q2 and some in Q3 as well, and ***we kind of continue to see that accelerated demand. But we believe it's kind of once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience and are in the kind of more digitized experience***. So we've certainly been a beneficiary of that demand, but ***we also believe that, that demand will continue***. It may just not continue at the pace that we saw earlier this year.

103. These statements touting Docusign's growth and demand sustainability were false and misleading for the same reasons as the December 3, 2020 statements addressed earlier in this Section. *See* ¶100.

### 7. January – March 2021: Demand Slowed Further as Pandemic Growth Gave Way to Moderating Sales and Rising Churn

104. In early 2021, as COVID vaccines began reaching the wider population, businesses increasingly reopened. In turn, the sales slowdown that began in fall 2020 became more apparent

internally in early 2021. Indeed, demand further normalized as COVID one-time use cases began to end and pandemic-related customers returned to the office.

105. **<u>Sales Slowdown</u>:** Defendants and other senior executives were apprised of internal data further confirming a major demand slowdown. For example, on January 27, 2021, Alhadeff emailed Springer and Gaylor a "Q4 Forecast Update," which showed that Docusign was below its sales forecast just a few days before 4Q2021 ended. (DOCU_00703839). Springer warned that "Q4 is the transition to the new normal where we will have tougher quarter closes and have to push harder to achieve our goals," due to "the incredible Covid boom coming back to earth." (*Id.*).

106. As another example, a slide deck sent to COO Olrich on February 9, 2021 noted that, for FY2021, "[d]emand uptick due to COVID-19 drove most of the trends in this deck," and that salespeople "exceeded [their] targets but declining productivity is approaching pre-COVID levels." (DOCU_00242995; DOCU_00242996).

107. On March 5, 2021, Leschin messaged another IR employee, writing that she had discussed with Gaylor that "customer demand" likely would "not [be] in the frenzied zone of Q1-3" and would "moderate[]." (DOCU_00665079). The other IR employee replied that "it sounds like [it is] no longer the case" "that customer demand will be higher than pre-COVID levels," adding that "it seems like we are trying to stay away from those comments." (*Id.*).

108. **<u>Churn</u>:** Docusign's churn problems also persisted in early 2021, as the internal evidence mounted indicating that Docusign's COVID-era new customers already were not, or would not be, renewing, or that they were diminishing their use of eSignature. For example:

(a) On January 21, 2021, RM Head Smith received an email and attachment discussing "the churn situation we are seeing specifically for healthcare companies that have already notified us they will not be renewing in FY22," including customers who purchased in

"the initial phase of the pandemic for patient intake forms." (DOCU_00192446; DOCU_00192447). The email warned that "this problem + a few known churn accounts . . . in Q1 are causing our churn forecast for Q1/Q2 next year to look bleak." (DOCU_00192446).

(b) On January 21, 2021, an HLS vertical employee emailed Smith, noting that they were seeing something "unique" that quarter: "[W]e have many customers coming to us with advanced notice of non-renewal, stopping usage, etc." (DOCU_00702660).

(c) On January 21, 2021, Smith received a similar email from a FinServ Sales VP with a stark warning: "We continue to see some rather unusual activity with churn this quarter. . . . Our first three quarters [of FY2021] had us trending around 18% churn, but we are pushing 26% churn number this quarter . . . our churn number should raise a red flag right now . . . this is becoming problematic." (DOCU_00192464). The email noted that "[w]e have spoken with the other SMB leaders and this seems to be aligned with what they're seeing." (*Id.*).

(d) On January 28, 2021, Smith received a "FY22 Global Churn Planning" deck warning of "Churn Headwinds," due to, *e.g.*: "Increase in one-time use cases" and "[i]ncrease in 1st time renewals (COVID[]), which have higher churn." (DOCU_00192507; DOCU_00192509).

(e) A February 9, 2021 deck that was sent to Alhadeff, SVP Walsh, and Smith sought to "assess[] account risk in 1x/simple use cases" and found that "29%[] of renewing accounts have known risk associated due to lack of stickiness"—*i.e.*, they were considered "[h]igher [r]isk," as they had a "[s]ingle use case." (DOCU_00242061; DOCU_00242063). These included many large NA Enterprise customers with "COVID single use cases," *e.g.*, "PPP." (*Id.*).

(f) On March 1, 2021, Digital Head Joy messaged VP Scheffel: "Churn $ in March and April will be higher than Feb[ruary] because we have big cohorts of annual plan

subscribers renewing for the first time in March and April. The Digital business forecast represents the renewal risk of these first Covid cohorts." (DOCU_00662483).

(g) On March 24, 2021, Smith messaged Erickson that Alhadeff was "pushing VERY hard behind the scenes . . . to make sure we don't let non-renewable deals get even out the door . . . it's been a fast escalating push over the past 3 days as he sees all the inflated MRR churn, short renewals where we took growth, etc." (DOCU_00671184).

109. Finally, in an arbitration filed by Springer against Docusign—which he launched after being removed from the Company (*infra*, Section V.E)—Defendants admitted that Docusign's problems in sustaining its COVID-driven growth were known at the highest levels of the Company by early 2021. For example, Chair of the Board Maggie Wilderotter submitted a sworn declaration in the arbitration, stating that "[b]eginning in early 2021, [] DocuSign began to face challenges sustaining and scaling its growth." (DOCU_00743991). Indeed, Springer admitted in his FY2021 self-evaluation, on January 28, 2021, that Docusign's "extraordinary" performance that year was driven by the pandemic: "I do believe we received a substantial tailwind from this horrible pandemic." (DOCU_00744768). At the same time, he joked that "the stock went up a ton, any questions?" (*Id.*). Further, at his deposition in the arbitration, Springer admitted that "there's no question we [were] going to have [a] . . . post-COVID drop." (DOCU_00744062).

**8. March 2021 Demand and Growth Misrepresentations**

110. **March 1, 2021 Conference:** On March 1, 2021, Springer spoke at the Morgan Stanley Technology, Media and Telecom Conference, misrepresenting that: "***[N]o one's going back to paper and manual process***. . . . ***Going back to paper, going back to the manual processes and the time lags and the cost increases, we just don't see people going back in use cases***."

111. This statement conveyed that Docusign's increased billings growth and demand for eSignature were sustainable post-pandemic. As previously explained, these statements were false and misleading because they concealed that Docusign's results were driven by anomalous pandemic-era events and were not sustainable. *See* ¶¶34-40, 67-70 (relevant facts); ¶¶57-58 (explanation). The previously described, and still undisclosed, warning signs remained clear signals that eSignature demand would not last. *See* ¶¶60, 83, 100. Further, between January and March 2021, internal red flags continued to accumulate, confirming this reality. Notably: (a) Sales slowed while Defendants anticipated tougher quarter closes as the "COVID boom" subsided (¶¶105-07); (b) Docusign saw COVID customers churning, and projected "bleak" churn forecasts (¶¶108-09).

112. **March 11, 2021 Earnings Call:** On March 11, 2021, Docusign released its 4Q2021 financial results, including 46% YOY billings growth for the quarter. During Docusign's March 11, 2021 earnings call, Springer made the following misrepresentations.

113. In his opening remarks, Springer again assured investors that "***we don't believe our new or expanded customers will be going back to paper even after the pandemic recedes***."

114. In response to an analyst's question about whether Defendants were seeing "any change in the demand environment based on more of a return to normalcy" given the COVID vaccine campaign that began in late 2020, Springer repeatedly denied any such adverse trends:

> ***We haven't seen anything***. I don't know whether we would be a leading or a lagging indicator, Pat. But ***we haven't seen anything in our business that suggests that, that will change***. Now if you recall, we've said this about -- starting about 3/4 ago, that our forecast on this is that the people that have come with new customers or new use cases to DocuSign that are COVID-19-centric, ***they're not going back. People aren't going back to paper. They're not going back to manual processing***. So, the real question, I think, is interesting in your question is, will that rate of new people coming to us change with -- as we start to move into some sort of return to "normalcy". ***We haven't seen any change yet***. And maybe that the change isn't

> enough and there's not enough new activity to have driven the change in the demand environment. ***But at this point, yes, we haven't seen a change yet***.

115. These statements, which again touted Docusign's post-pandemic demand and growth sustainability and specifically denied seeing any contrary demand trends, were false and misleading for the same reasons as the March 1, 2021 statements addressed above. *See* ¶111.

116. Analysts again were comforted by Defendants' reassurances. For example, on March 12, 2021, William Blair stated that "we believe DocuSign's recently added customers are likely to continue expanding usage of eSignature and CLM solutions moving forward. While customers in other industries may churn following the pandemic, we do not believe DocuSign will experience any uptick to its normal churn cadence." That same day, a Morgan Stanley report noted that "we see a sustainable growth trajectory ahead with plenty of room for beat/raise quarters."

117. **<u>March 24, 2021 Analyst Day</u>:** On March 24, 2021, Docusign hosted its first Virtual Financial Analyst Day, during which Gaylor interviewed Springer about a variety of topics impacting Docusign's business, and Defendants made the following misrepresentations.

118. While posing her first question to Springer, Gaylor stated that "***the permanence of the trends we've been seeing across the business look like they're really here to stay***."

119. In response to an analyst's question about "how investors should think about DocuSign post-pandemic" and the "sustainability of [the Company's] growth," Springer assured:

> [T]he transformation that our customers are undergoing and leveraging DocuSign to drive, ***this is not a short-term thing***. ***This is not something that just sort of happened because of the pandemic***. This is something that was happening and it's been happening for years, and ***we believe it's going to continue to happen for years***. We think that what we've seen happen, because of the pandemic, is that ***we've seen sort of a onetime step-up where people actually accelerated their transformation at a faster rate***.

120. These statements, which touted the "permanence" of Docusign's increased growth and denied that it was "a short-term thing" that "just [] happened because of the pandemic," were false and misleading for the same reasons as the March 1, 2021 statements. *See* ¶111.

121. **March 31, 2021 Tweet:** On March 31, 2021, Alhadeff issued a public "tweet," or post, on the social media platform formerly known as "Twitter," now "X." The tweet included a link to a news article discussing the surge in demand for Docusign's eSignature, with Alhadeff remarking, "***I don't see levels of adoption @DocuSign changing significantly post-pandemic***. Once a company sees the benefits of a digital process, there's multiple reasons to stay with it."

122. This statement, which touted Docusign's long-term demand and growth sustainability, was false and misleading for the same reasons as the March 1, 2021 statements above. *See* ¶111.

#### 9. March – June 2021: As the Pandemic Ebbed and "Churn Heat[ed] Up," Docusign Insiders Predicted a Looming "Blood Bath" for Sales

123. Between March 2021 and June 2021, Defendants grew more concerned about churn risk from COVID one-time use cases and the return to in-person work as the pandemic further subsided. During this period, Docusign's pandemic-fueled eSignature consumption growth plummeted, as Defendants had anticipated based on the prior "spike and decline" consumption trends in COVID customers. Churn rates exceeded internal benchmarks, providing further indications that the COVID-era growth was coming to an end.

124. **COVID One-Time Use Cases:** On May 17, 2021, Gaylor and Alhadeff received a deck discussing "High Risk Customers" with "50%+ use case driven by PPP," noting that "[s]ince the PPP program rollout, we've seen a significant increase in demand across Banks & Financial Technology Companies." (DOCU_00635011; DOCU_00635013). It showed that in the Financial Technology ("FinTech") vertical, "95% of their envelopes are PPP use cases," and for banks, 18%

of their envelopes were tied to PPP. (DOCU_00635013). It also "identified 240 accounts that have PPP use cases," including "42 accounts, representing 84% of PPP Use Case MRR"; such PPP-related customers represented 5.4% and 4.4% "of total NA renewal MRR" in FY2022 and FY2023, respectively. (*Id.*) Thus, Defendants knew that just a portion of the "high risk" customers for just one of many COVID one-time use cases were a significant portion of upcoming potential renewals.

125. One particularly prominent example of such FinTech companies that had significant COVID one-time use case business with Docusign at this time—and posed a major future churn risk—was Teslar, which processed over 20% of all PPP loans. For instance, in a May 3, 2021 email, a CS leader flagged that Teslar was likely to be a "[redacted] churn bomb that you see coming in less than one year." (DOCU_00334064). In this email chain, the leader informed VP Scheffel and others that the "concern is massive churn in FY23," as "[w]ith the deal executed on 4/29/21, Teslar purchased [redacted] envelopes for limited time cases (PPP & loan forgiveness) [redacted]," and "finding enough additional use cases to consume [redacted] envelopes is a massive/near impossible ask." (*Id.*). The email also acknowledged that such "one-time/limited use cases [] have been so prevalent during the pandemic." (*Id.*). Indeed, the Teslar deal was important enough to get the personal attention of "Loren [Alhadeff] and Cynthia [Gaylor]," who had requested an analysis of the "churn risk for Teslar" as well as a broader analysis of "the larger FinTech/Commercial landscape to understand how these risks are evolving." (*Id.*).

126. **<u>Consumption</u>:** April 2021 marked the beginning of a major decline in Docusign's COVID-driven consumption growth. For example, a presentation from later in the Class Period showed that eSignature consumption growth in the Direct segment (essentially, the entire Company, except Digital) markedly changed course beginning in April 2021, dropping to 48%

from its peak of 65% in March 2021, and continued to deteriorate thereafter. (DOCU_00325710). The following graphic, derived from data in that deck, shows this undisclosed adverse trend (*Id.*):




127. Documents also confirm that these troubling consumption trends were known within the Company during this time period. For example, on April 23, 2021, Scheffel messaged Peretti regarding "some 'rough' signals in the COVID vs. Non-COVID Cohort" of customers. (DOCU_00717066). He described seeing a "pig in the python" consumption pattern for the COVID cohort, which "appear to have a hangover looming." (*Id.*). The phrase "pig in the python" here refers to a large spike in consumption, working its way through Docusign's business. He also advised that he was "expecting this to be a big issue[] for the long tail"—*i.e.*, the period in which Docusign was working through the consumption spike. (*Id.*). Scheffel added that he was "concerned enough to get a bigger plan for a plan built," and Peretti agreed that they needed to "get on this right away . . . Mobilize a team… 'Team Churn Mobilization' . . . and get all over this otherwise we will get crushed." (*Id.*). That day, Scheffel messaged SVP Walsh that consumption was "pacing slow in [C]ommercial"—*i.e.*, that it was behind target. (DOCU_00681160).

128. On April 30, 2021, Peretti messaged Scheffel and VP Valenti that she was "getting pinged by Lambert [Walsh] on the consumption #s and need to start pulling the narrative together

here on the consumption miss . . . both in [CS Management] and in overall." (DOCU_00661781). Valenti provided more details, including that "Commercial shows as the miss at 91%." (*Id.*).

129. On May 3, 2021, Scheffel sent Walsh a Slack message noting that the CSM Pool accounts (*i.e.*, large customers not categorized within a specific vertical) "are off consumption plan for sure." (DOCU_00678215). Walsh responded that "[w]e will need to be ready to speak to that." (*Id.*). Indeed, IR Head Leschin's notes for a May 24, 2021 meeting attended by Gaylor, Alhadeff, and Scheffel, stated, under the heading "Consumption," that "conditions on [the] ground have changed/changing," and it was "a tougher environment." (DOCU_00064344).

130. Similarly, on June 3, 2021, a VP in Global Success sent an email, stating: "[W]e missed our consumption target for Q1 and May has landed well below target, therefore assuming we likely will miss our Q2 consumption target." (DOCU_00099273).

131. **Churn:** During this time period, it also became increasingly clear internally that Docusign customers were churning, due in large part to COVID one-time use cases ending.

132. For example, RM Head Smith received an email on April 7, 2021 discussing "the high amount of churn we're seeing in SMB"—leading it to "miss our Q1 churn target"—primarily due to "prior short term renewal and/or add-on(s)" for COVID-driven uses that were not conducive to "sustainable growth." (DOCU_00709627). Likewise, a preliminary analysis of 1Q2022 churn sent to Smith on May 3, 2021 showed that "[g]lobally" churn for the quarter was "105% of plan" and detailed excessive churn in many segments. (DOCU_00709887).

133. On April 23, 2021, Scheffel messaged SVP Walsh that "we have a huge work out to do [*i.e.,* a lot of work to do] in understanding the impact of COVID on the [c]hurn numbers coming up." (DOCU_00681160). Scheffel added that "this is not a sky is falling note, but I'm

seeing some mixed signals — not shocking at all." (*Id.*). Walsh replied that "[w]e expected mixed signals, and we expected the first pass of this to hit in the next 2 quarters." (*Id.*).

134. Looking to 2Q2022, on May 19, 2021, Scheffel messaged Smith about early renewals "dr[ying] up" in 2Q2022 "as the impact from COVID tapers off," noting the "possibility it doesn't taper off but sharply falls back to a normal level" if "there's no other macro event [like the pandemic]"—*i.e.*, the potential churn cliff that was looming before them. (DOCU_00663707).

135. Further, documents confirm that the end of COVID one-time use cases and widespread returns to the office drove Docusign's churn at this time. For example, on April 6, 2021, Erickson received a deck about the [redacted] account, which noted that they are "going to go back to mostly wet signatures." (DOCU_00308784). A June 8, 2021 "LOST Deal Alert" informed Smith that Docusign lost another account because it was "moving most of their operations back to in office and no longer have a need for DocuSign." (DOCU_00104486).

136. Defendants were, of course, apprised of this reality. For example, in a May 25, 2021 email to CMO Giglio and COO Olrich, Alhadeff explained that he shared feedback with "Dan [Springer], Scott [Olrich], and Cynthia [Gaylor]" to "level set on the new reality." (DOCU_00048104). In that same email chain, Giglio told Alhadeff that there was a "notable" "decline" and that the "slowing" business" may be related to the fact that "[customers] are 'back to business' and the need has subsided." (*Id.*). Similarly, a June 4, 2021 email sent to Giglio from Digital Head Joy referenced a meeting with Springer, Alhadeff, Gaylor, and Olrich about churn in the Digital segment; Joy directed them to "tighten up the story" about churn. (DOCU_00121004). Later in the email thread, a Marketing VP noted: "a few weeks into Q2, we can see that we not only [did] not g[et]t the trajectory that we wanted but [it] got worse." (*Id.*).

137. On June 6, 2021, a CS senior director emailed colleagues to advise them of a meeting with Smith because "[a]s expected[,] concern around [C]ommercial churn is heating up." (DOCU_00099246). Indeed, on June 1, 2021, Erickson messaged Smith that her churn forecast for 1Q2023 "[i]s real bad . . . we just finished forecasting and there are massive duds[.] A lot of [C]ovid churn." Smith replied: "Doesn't overtly surprise me." (DOCU_00758226).

138. **<u>Global Sales Pipeline Slowdown</u>:** The troubling trends in consumption and churn during this period naturally dovetailed with similar issues in Docusign's sales pipeline.

139. For example, in a May 20, 2021 Slack exchange, senior employees discussed that the boost in demand from COVID was subsiding. (DOCU_00663043). Digital Head Joy stated: "Last year in Q2 we had tremendous tailwinds. We no longer have those tailwinds in our biggest markets." (*Id.*). Another employee commented that he "absolutely agree[d] with [Joy] that new customer growth is slowing." (*Id.*). Marketing VP Marco Castillo commented on draft slides for the Board that "the message . . . is pretty much we no longer have the [C]ovid boost." (*Id.*). CMO Giglio responded that he wanted to "signal caution around the growth rates and churn risks while highlighting that we understand them and are initiating plans to address them." (*Id.*).

140. Likewise, Leschin's May 24, 2021 notes from a meeting with Alhadeff and Gaylor about "Early Renewals" stated "Q2 will be rough," and under the header "LOREN," *i.e.*, likely recounting Alhadeff's view, read: "Q2: nervous; think will miss sales plan." (DOCU_00064344). On May 25, 2021, Alhadeff emailed Springer, Gaylor, and COO Olrich stating that CMO Giglio "is concerned about top of funnel [marketing quality leads] . . . it[']s been flat QoQ [quarter-over-quarter] which is far from what we planned." (DOCU_00110551). Olrich replied: "Your instincts that things are going to get harder . . . is right." (*Id.*). Alhadeff replied: "I want to be sure the senior team is aware and is focusing on the priorities . . . [to] help us bridge the gap." (*Id.*).

141. Indeed, on June 2, 2021, CMO Giglio messaged Marketing VP Castillo, about 2Q2022 sales: "This is an ugly quarter. We should have been more conservative/thoughtful about the plan given how uncertain the future was/is. . . . The summer months are gonna [sic] be a blood bath for sales velocity." (DOCU_00663047). CMO Giglio also noted a "big slowdown in customer urgency and willingness to pull the trigger. Deals are stalling all over the place." (*Id.*). Indeed, a June 4, 2021 internal list of employee questions for an "upcoming All Hands" meeting with Defendants included the following comments, to be addressed by Springer and/or Alhadeff:

- "I worry when DocuSign talks about its long term growth plans and goals looking beyond the pandemic, that we are operating under the assumption that 'no one is going to go back to paper' without showing research to support that assumption";

- "Coming out of the growth of last year, . . . there were so many COVID use cases that are not sustainable business so many people on both sides [AEs and in RM] are falling short [of targets]"; and

- "Lot[s] of Sales Reps feel like the pendulum has swung back in the other direction from a demand perspective yet our quotas have grown." (DOCU_00111002; DOCU_00111003).

142. The Digital segment was also underperforming bookings forecasts. For example, in a June 6, 2021 email with Springer, Alhadeff, Gaylor, and Olrich, a Digital VP noted: "[A]s I signaled on the last forecast call, the decline in NewCo GNMRR we started to see in April, as Covid restrictions lifted, followed us into May. Despite the programs we put in place . . . to improve [such] trends, we closed May . . . 35% below the monthly forecast." (DOCU_00111044).

### 10. June 2021 Demand and Growth Misrepresentations

143. **June 3, 2021 Earnings Call:** On June 3, 2021, Docusign held an earnings call discussing the Company's 1Q2022 financial results, including 54% billings growth. Springer made the following misrepresentations on this call. In his opening remarks, he stated that "***once***

***businesses usually transform their agreement processes, they simply don't go back. We believe this trend will only accelerate as the anywhere-economy continues to emerge***."

144. In response to an analyst question, Springer stated that "***once [customers] see the benefits of the digital transformation, particularly around the Agreement Cloud from having opportunity to grow their business with us, they don't go back. In fact, they look for additional opportunities to expand***."

145. These statements conveyed that Docusign's increased billings growth and demand for eSignature were sustainable post-pandemic. As previously explained, these statements were false and misleading because they concealed that Docusign's results were driven by anomalous pandemic-era events and were not sustainable. *See* ¶¶34-40, 67-70 (relevant facts); ¶¶57-58 (explanation). The previously described and still undisclosed warning signs remained clear signals that eSignature demand would not last. *See* ¶¶60, 83, 100, 111. In addition, between March and June 2021, internal red flags continued to accumulate, confirming this reality. *See* Section IV.B.9. Notably: (a) Docusign recognized that COVID one-time use cases, which had been a core growth driver, made up a significant portion of upcoming potential renewals, and thus posed a major churn risk (¶¶124-25); (b) in April 2021, Docusign began to see a precipitous and months-long decline in consumption growth, and consumption missed targets (¶¶126-30); (c) Docusign exceeded churn targets and COVID customers increasingly churned, as they returned to in-office work and one-time use cases ended (¶¶131-37); and (d) and new customer growth slowed as COVID "tailwinds" subsided (¶¶138-42).

146. **<u>June 10, 2021 Conference</u>:** On June 10, 2021, Gaylor spoke at the Robert W. Baird Global Consumer, Technology & Services Conference, making the following misrepresentation. In response to an analyst question asking whether Docusign saw any "moderation" in demand as

the pandemic waned, Gaylor denied such a slowdown, assuring: "[O]nce people move to the platform and they see the value, ***they're not going to go back and move to pen and paper, right***?"

147. This statement touting Docusign's demand and growth sustainability post-pandemic was false and misleading for the same reasons as the June 3, 2021 statements. *See* ¶143.

148. Analysts were misled by these reassurances. For example, on June 10, 2021, an RBC Capital Markets analyst report stated: "DocuSign was arguably one of the biggest beneficiaries (after Zoom) of the sudden shift to remote work and saw business meaningfully accelerate. We view these changes as irreversible and the tailwinds as sustainable, as companies adopting e-signatures and digital agreements are unlikely to go back to manual processes." Likewise, a June 18, 2021 Wedbush analyst report noted that "we believe that DOCU is in a sweet spot to continue to receive significant customer spending given its unique solution set with an e-signature shift that has likely permanently changed among enterprises moving forward."

**11. June – September 2021: Defendants Were Well Aware That Docusign's COVID-Fueled Demand Boost Was at an End**

149. By summer 2021, Defendants were well aware that eSignature demand was waning with the pandemic ebb, as shown by consumption and churn metrics, and many other red flags.

150. **<u>Consumption</u>:** Docusign's consumption metrics at this time signaled increased alarm. Notably, eSignature consumption growth in the Direct segment continued its negative trajectory, as shown in the graph below (from a presentation later in the Class Period):




(10/1/2021, DOCU_00325710).

151. Moreover, another graph in this presentation showed quarterly consumption growth for Direct had dropped from 56% in 1Q2022 to just 22% in 2Q2022, and that this 22% growth was below FY2021 and FY2020 consumption growth levels. (*Id.*). This 22% consumption growth was also half the FY2022 target of 44%-47% for the Direct business (as of March 2021, *see* DOCU_00000802). Thus, Docusign's 2Q2022 consumption growth dropped below pre-pandemic levels, confirming that the pandemic demand tailwind had ended:




(*Id.*).

152. An August 1, 2021 deck for a meeting of CS "Global Leadership"—including Walsh and Peretti—showed dire consumption growth numbers: Direct, Enterprise, and Commercial grew by only 22% (-34pts YOY), 12% (-36pts YOY), and 30% (-34pts YOY). (DOCU_00753024). Another slide showed that "Consumption Growth" for 2Q2022 missed all listed targets. (*Id.*). The deck also noted that Commercial customers with over $10,000 in business "[m]issed targets across industries" due to "Covid normalization & deprioritization." (*Id.*).

153. On August 10, 2021, Walsh was told Docusign was "seeing a pretty big drop in eSign transaction volume growth in the past couple of months." (DOCU_00188511). Walsh replied, "we are seeing this as well, and yes we expected some of this. It was inevitable." (*Id.*).

154. On August 27, 2021, Alhadeff presented to the Board on Docusign's sales performance in 2Q2022, which was a "[t]ough quarter" that was "[f]elt across the org[anization]." (DOCU_00268776; DOCU_00268778). He noted that "significant areas of pressure" included: (i) the "[s]low down in buying behaviors from COVID peak demand"; (ii) "[c]ompanies [that] moved past single and one time use cases that drove urgency at peak of COVID"; and (iii) "[c]onsumption," which "has also come down." (DOCU_00268778). He explained that Docusign's sales "[p]lan [had] assumed that we wouldn't see wide scale vaccination until late summer in our largest market [NA] - much faster opening up changed dynamics." (*Id.*). Thus, Alhadeff admitted Defendants knew that wide-scale vaccination, and thus return to in-person work, would negatively impact demand—they just assumed the reopening would take longer.

155. **Churn:** Docusign's churn concerns continued to mount in summer 2021. For example, in a June 23, 2021 message, Smith noted that he had raised "sirens on [C]ommercial churn" internally; Erickson replied that "I do have concern with [S]ales not giving a shit about sustainable deals"—*e.g.*, them doing COVID short-term "add-on" deals. (DOCU_00671658).

156. A Commercial Sales VP noted in a July 12, 2021 email to Commercial Sales GVP Matt Willis (who reported to Alhadeff) and Smith that this segment was "seeing more churn off inflation from [COVID] add-ons than normal. We're also seeing a propensity for the one year renewals to churn out fully. I think this is due to the SMB clients coming to us in a time of need last summer and not needing us as they did during the peak of C[O]V[I]D last year." (DOCU_00145401). The email made clear that this "problem" also impacted the Financial Services vertical, which was "at 134% of our churn number with a lot of churn left to book." (*Id.*).

157. Defendants were well aware of Docusign's churn problem at this time. On August 6, 2021, Alhadeff asked Smith "what is the underlying churn issue?" (DOCU_00758248). Smith replied, "Commercial again," explaining that the churn issues stemmed from, *inter alia*, "COVID consumption and one time use cases." (*Id.*). Smith noted that in "HLS," "COVID demand like [COVID] testing that [was] no longer continu[]ing" was also driving churn. (*Id.*).

158. An August 20, 2021 email to a Digital executive regarding a "Churn Update to Executive Leadership" attached a deck analyzing "Digital Customer Churn," which stated that of the customers that churned "56% returned to manual processes"—contradicting Defendants' assurances that customers do not go back to paper. (DOCU_00271766; DOCU_00271769).

159. On August 26, 2021, CS personnel discussed "churn mitigation efforts for FinTech clients" noting that with PPP ending "they are at risk of massive churn." (DOCU_00756679).

160. **Sales Slowdown and Other Demand Red Flags:** Defendants continued to be apprised of other demand red flags. For example, on June 19, 2021, GVP Willis informed Alhadeff he was "concerned" by the "trend[s]" in Commercial, as "Q2 [sales] pipeline math remains low (~65% of plan) and does not support the current forecast." (DOCU_00119924). Willis stated that these problems were "keeping me up at night." (*Id.*). On June 23, 2021, Alhadeff emailed Springer

and Gaylor that he "reduced [his sales] forecast in Q2." (DOCU_00199123). He detailed "a few factors in play," *e.g.*, poor new customer SQOs, adding, "there is a [redacted] net gap in [D]igital in H2 already . . . if we can't get [the] pipeline accelerated, I'm fearful of a similar gap in [D]irect." Springer replied that this "reduced" forecast was "even weaker than I expected, based on the last few forecast calls. Enterprise NA is the one I am even more concerned about." (*Id.*).

161. On June 30, 2021, Leschin asked a Finance employee for "new customer [numbers]" and was told that the "pace" of new customer acquisition was "dropping considerably" from when FY2022 began. (DOCU_00665140). When provided with the number of the Direct segment's new customers, Leschin responded: "yikes . . . there's fun!" (*Id.*).

162. Defendants were also aware of increasingly alarming bookings forecasts in summer 2021. For example, on July 6, 2021, Gaylor and others received a weekly bookings summary showing that Docusign was well below sales targets (DOCU_00153216):

> We are . . . 16.4 pts below Sales Plan, 13.7 pts below POR [Plan of Record, an internal company plan], and 10.7 pts below Sales Forecast. NNMMR [sic] is pacing behind linearity in all forecast categories, primarily driven by softness in GNMRR across all segments and strong churn pacing driven by Commercial-NA. With one month left of the quarter, being this behind in linearity is a bit alarming and will have a significant impact on billings.

163. On July 23, 2021, GVP Willis emailed Alhadeff: "I do not believe we have enough closeable pipeline to get to [redacted] by end of Q2 . . . This is something the pipeline math has been showing for a while now. . . Newco forecasts have been lowered by every AVP and VP over the past few weeks." (DOCU_00737081). Alhadeff replied, "we just can't afford another drop" in the sales forecast. (*Id.*). On July 30, 2021, Willis again warned Alhadeff that the sales "[p]ipeline math is working against us . . . I think pipeline has been scarce all year." (DOCU_00242113).

164. The same day, Alhadeff emailed Springer and Gaylor to advise of "target miss[es]" for "Q2 Quarter Close" bookings and that "the pockets of the business that had a bad quarter, had

really, really bad quarters . . . far worse than I've ever seen." In his response, Springer described the quarter as a "disaster" due to "[t]he transition from Covid." (DOCU_00199526).

165. Per Leschin's August 20, 2021 notes of "key themes" for the upcoming 2Q2022 earnings call, Defendants were "concerned based on n[umbers] . . . shared over w[ee]k[e]nd[, which] are pretty low," and it was "not true" that Docusign was "growing faster than we did pre-covid"—"[g]rowth [is] coming down fast." (DOCU_00252785). On August 30, 2021, Holscher messaged Alhadeff about the Enterprise NA segment's "Q3 outlook," as he was "concerned" based on the sales "pacing and latest pipeline build." (DOCU_00682136). Alhadeff replied: "I don't know if I can take any more bad news from [][E]nterprise . . . It's crippling our business." (*Id.*).

**12. September 2021 Demand and Growth Misrepresentations**

166. **September 2, 2021 Earnings Call:** On September 2, 2021, Docusign released its 2Q2022 financial results, including a 47% YOY billings growth that quarter. During Docusign's September, 2, 2021 earnings call, Defendants made the following misrepresentations.

167. In her opening remarks, Gaylor stated: "***Regardless of whether people go back to the office, we don't see them going back to pen and paper***."

168. Similarly, when an analyst asked Springer if Docusign was seeing any adverse trends in product demand to suggest slower billings growth, Springer denied any such slowdown: "We feel like we're seeing a lot of demand . . . ***I don't think there's a perspective we have that the business has some significant slowdown*** . . . ***we're not seeing any differences in churn rates in any meaningful way . . . customers very rarely leave us***."

169. These statements conveyed that Docusign's increased billings growth and demand for eSignature were sustainable post-pandemic. As previously explained, these statements were false and misleading because they concealed that Docusign's results were driven by anomalous

pandemic-era events and were not sustainable. *See* ¶¶34-40, 67-70 (relevant facts); ¶¶57-58 (explanation). The previously described and still undisclosed warning signs remained clear signals that eSignature demand would not last. *See* ¶¶60, 83, 100, 111, 145. In addition, between June and September 2021, internal red flags continued to accumulate, confirming this reality. *See* Section IV.B.11. Notably: (a) by this time, Docusign's 2Q2022 consumption growth dropped below pre-pandemic levels, confirming that the pandemic demand tailwind had ended (¶¶150-54); (b) customers continued to churn, as many of them "returned to manual processes" and COVID demand abated (¶¶155-59); and (c) sales pipeline metrics deteriorated and bookings trended below forecasts (¶¶160-65).

170. **<u>September 8, 2021 Conference</u>:** On September 8, 2021, Gaylor spoke at the Wolfe Research Inaugural TMT Conference, during which she made the following misrepresentations.

171. In response to an analyst's question about the "durability" of the growth that Docusign experienced because of the pandemic, Gaylor insisted: "***[P]eople are not going to go back to pen and paper*** once they've signed digitally or once they've been able to do agreements and the different components of agreements, digitally."

172. When an analyst asked about the impact of COVID one-time use cases, Gaylor replied: "[T]here are some customers who came to us for a specific COVID use case that they no longer have. . . . But ***I would say that's the vast minority versus the majority of the motion***."

173. These statements, which touted Docusign's demand and growth sustainability post-pandemic and downplayed the volume and impact of COVID one-time use cases, were false and misleading for the same reasons as the September 2, 2021 statements above. *See* ¶169. In particular, Gaylor's statement minimizing COVID one-time use cases as "the vast minority" of

Docusign's business was refuted by the wealth of internal evidence at this time regarding the magnitude and adverse effect of COVID one-time use cases on Docusign's performance.

**13. September 2021 – End of Class Period: Docusign's Tailspin Continued**

174. In fall 2021, Docusign's demand problems continued deteriorating, as was reflected internally in increasingly alarming 3Q2022 bookings forecasts and other KPIs. For example, on September 13, 2021, Gaylor, Leschin, and others received a 3Q2022 bookings summary showing that Docusign's bookings were trending well below targets: "We are tracking 18.1 pts below Sales Plan, 16.9 pts below POR, and 12.9 pts below Sales Forecast. . . . GNMMR weakness is primarily driven by Commercial-NA and Enterprise-NA and these two segments make up the majority of our bookings forecast." (DOCU_00322339). Leschin forwarded the email to VP Sells and others, noting "nothing like yellow/orange and red all over your bookings report. Tell me there's hope…somewhere?" (*Id.*). Sells replied, "NA Ent[erprise] and Comm[ercial] I am concerned on"; Leschin responded: "Appreciate the honesty, despite the pit it is digging in my stomach." (*Id.*).

175. By October 4, 2021, another 3Q2022 bookings forecast update informed Gaylor that bookings continued to fall even further below targets, "tracking 23.1 pts below Sales Plan, 27.2 pts below POR, and 13.8 pts below Sales Forecast." (DOCU_00322339). On October 12, 2021, Sells emailed Gaylor: "After the bookings call this morning … Loren [Alhadeff] has decided to lower his Q3 call due to [sales] pipeline concerns in NA." (DOCU_00571877).

176. Defendants also knew that once they disclosed this internal reality to investors, Docusign's stock price would tumble. For example, on September 22, 2021, Sheridan texted Alhadeff that, at a September 21, 2021 eStaff meeting attended by all Individual Defendants, Springer "actually said out loud that maybe a 25% stock decline would be ok." Alhadeff replied, *inter alia*, that "[w]e are ailing right now." (DOCU_00758669). After the truth began to publicly

emerge in December 2021, on January 25, 2022, an RM director texted Erickson, reflecting that Docusign Sales employees "spent a year taking orders and living the good life. All the while we [*i.e.*, RM employees] were warning them it wasn't sustainable." (DOCU_00758809).

### C. Defendants Misrepresented Docusign's Competitive Environment

#### 1. Competition Red Flags Before the First Such Misrepresentations

177. During the Class Period, Docusign's eSignature product was also facing increased competition, primarily from Adobe (*i.e.,* Adobe Sign), further reducing eSignature demand and jeopardizing Docusign's ability to sustain its pandemic-fueled growth long-term. Defendants, however, publicly denied such competitive pressures, even while tracking this alarming trend.

178. Late in the Class Period, Alhadeff internally admitted that Defendants knew "all along" that cheaper Adobe competition was adversely impacting Docusign during the Class Period. In January 2022, Leschin sent a UBS analyst report to Springer, Alhadeff, Olrich, among others, which noted that "Adobe Sign is stealing a lot of DocuSign customers because [Adobe is] more open with the billings and costs whereas DocuSign has a bad rep with our customers and it's mostly due to the cost. We have seen about 8-10% of DocuSign customers have switched over to Adobe Sign per quarter." (DOCU_00166694). Alhadeff replied to Leschin and Walsh: "[T]his is the [redacted], etc. It[']s not new." (*Id.*).

179. Consistent with Alhadeff's admission, internal documents show that shortly before and during the early months of the Class Period, customers advised Docusign that they were choosing (or seriously considering) its eSignature competitors, especially Adobe, [redacted]. For example, on March 6, 2020, an AVP in Enterprise Sales emailed colleagues that "[redacted] has signed a broad agreement [redacted]," and this decision was [redacted]." (DOCU_00028062). Similarly, a September 9, 2020 briefing sent to Springer for a meeting with [redacted] noted that renewal was "at risk due

to perception of eSign solution [redacted] compared to competitors . . . [redacted]," among other reasons. (DOCU_00262097; DOCU_00262101).

180. As another example, in May 2020, [redacted][10] informed Sales GVP Holscher that it was [redacted]. (DOCU_00072192). One of the key rationales for [redacted] switch was [redacted], as [redacted] believed the "[redacted]." (*Id.*). [redacted]." (*Id.*). Indeed, Alhadeff's August 28, 2020 slide deck for the Board noted [redacted] as a "lost" account because "[redacted]." (DOCU_00230198).

181. Defendants and other executives closely tracked this competitive trend. For example, on June 24, 2020, an HLS Manager emailed Smith about losing a "big" customer as they "said that [redacted] than our most recent proposal and they were moving forward with them." (DOCU_00144007). The email noted "[redacted] than we have historically seen has been an increasing trend lately." (*Id.*).

182. This trend negatively impacted Docusign's churn metrics and other KPIs. For instance, a September 2, 2020 email to CMO Giglio noted that "we saw sustained [redacted] since mid-July," and that this "resulted in" significant declines in several marketing metrics. (DOCU_00649063). On August 16, 2020, SVP Walsh received an email regarding a CS NA "Q3 Outlook," noting that Docusign was "expecting more than normal quarter of churn," citing, *inter alia*, "[redacted]." (DOCU_00753447).

[10] [redacted] was listed as number 10 on Docusign's "Top Customers by ACV [Annual Contract Value]" based on the size of its business in prior quarters from FY2019 to FY2021. (DOCU_00230198).

### 2. September 2020 Competition Misrepresentations

183. **September 9, 2020 Conference:** On September 9, 2020, Springer spoke at the DA Davidson Software and Internet Conference, where he made the following competition misrepresentations. In response to an analyst's question about the impact of Adobe competition on Docusign's business, Springer downplayed such impact: "[W]hen you think about the question around the competitiveness, we do really thoughtful analysis every quarter . . . . ***There has been virtually no change since we've been a public company, 10 quarters in, and we're just not seeing it***." Springer further responded to that question by stating that "***our biggest competitor is paper***."

184. These statements conveyed that Docusign was not facing significant competitive pressure from other esignature providers, which was false and misleading because, as explained in Section IV.C.1, Adobe and others were already adversely affecting its eSignature business.

185. **September 14, 2020 Conference:** On September 14, 2020, Springer spoke at the Deutsche Bank Virtual Technology Conference, where he made the following competition misrepresentations. In response to an analyst's question about Docusign's "competitive landscape," including Adobe, Springer repeatedly denied seeing adverse competitive trends:

> "***[W]e haven't seen a lot of change.*** And every quarter, we do a detailed analysis right before earnings . . . we go through this analysis. When we look at our pricing, we look at by geography. We look at it by vertical. We look at it by the industry size, trying to understand if there's anything changing. ***We haven't seen a lot of change . . . .*** So it doesn't mean we'll never see it, ***but we haven't yet***."

186. These statements conveyed that Docusign was not facing significant competitive pressure from other esignature providers, which was false and misleading because, as explained in Section IV.C.1, Adobe and others were already adversely affecting Docusign's eSignature business.

### 3. September 2020 – March 2021: [redacted] Continued Its "Full Strategic Blitz," as Docusign's "Competitive Challenges" Mounted

187. In late 2020 to early 2021, Docusign personnel continued to report [redacted], resulting in lost (or at least threatened) business.

188. For example, on December 7, 2020, a CS manager emailed VP Valenti regarding a customer called [redacted] "As of mid-November 2020, [redacted]," and [redacted]." (DOCU_00754579). On December 8, 2020, a RM employee lamented to Erickson that [redacted] was "[redacted]. Customer is transitioning everything. [redacted]." (DOCU_00174778). Likewise, on February 16, 2021, a "LOST Deal Alert" informed RM Head Smith that Docusign lost [redacted] due to "[redacted]." (DOCU_00492504). Notably, a February 16, 2021 slide deck from Springer's files stated that [redacted] was "a 15-year client heavily deployed across the organization" and that "we're hearing from many points that they are [redacted]." (DOCU_00262185). The deck stated [redacted] was at high "[r]isk[] of [non-r]enewal," as it "see[s] [redacted]." (*Id.*).

189. Defendants and other senior executives closely tracked this adverse competition trend during this period. For example: (i) On September 18, 2020, SVP Walsh received an "update" on the 3Q2021 outlook for CS NA discussing "[c]ontinued general trends," including that "[redacted]" (DOCU_00753651); (ii) on January 21, 2021, Smith was told that "we are pushing a 26% churn number this quarter," including as "[w]e've lost some larger billing accounts to competition more than usual this Q[uarter]"

(DOCU_00192464); and (iii) on March 4, 2021, VP Peretti informed SVP Walsh and VP Scheffel that "[l]ast year we saw more competitive challenges [redacted]," noting that "the reason" was "[redacted]" factors. (DOCU_00265151). Peretti provided a list of over 15 customers who represented "some of the big names" who "churn[ed] . . . in FY21 due to Compet[i]tive" [redacted]. (*Id.*).

**4. March 2021 Competition Misrepresentations**

190. **March 11, 2021 Earnings Call:** On March 11, 2021, Docusign held an earnings call discussing the Company's 4Q2021 financial results, where Springer made the following competition misrepresentations. When asked if Docusign saw any changes in competition, Springer downplayed competitive pressures: "***[A]round the competitive landscape, we don't think there's been any change. We always say very aggressively, when we think about competition, we fundamentally think about paper, when we think about paper and manual processes.***"

191. In response to another analyst's question, later on the call, Springer reiterated this statement: "We have such a dramatic market share lead and, quite frankly, product capability lead in eSignature that it's -- there's just -- ***the competition, I said, is paper***."

192. These statements conveyed that Docusign was not facing significant competitive pressure from other esignature providers, which was false and misleading because, as explained in Sections IV.C.1 and IV.C.3, Adobe and others were already adversely affecting its eSignature business.

193. Analysts were encouraged by Docusign's competition misstatements. For example, a March 12, 2021 Morgan Stanley analyst report stated: "We see DOCU's strong competitive positioning coupled with durable COVID tailwinds as helping it penetrate a $25B+ mkt opp[ortunit]y while traction of the Agreement Cloud [*e.g.*, CLM] drives long-term growth."

194. **__March 24, 2021 Analyst Day:__** On March 24, 2021, Docusign hosted its first Virtual Financial Analyst Day, during which COO Olrich, whose statements are attributable to Defendant Docusign, made the following competition misrepresentation. In response to an analyst's question regarding a change in competitive landscape with respect to Adobe, Olrich stated: "***[W]e don't see a big change in the competitive dynamic with Adobe***."

195. This statement conveyed that Docusign was not facing significant competitive pressure from Adobe, which was false and misleading because, as explained in Sections IV.C.1 and IV.C.3, Adobe and others were already adversely affecting its eSignature business.

**5. Summer 2021 and Beyond: Docusign – "Losing [Its] Competitive Edge"**

196. In summer 2021, Defendants knew that Docusign continued to face perilous competition. For example, on June 1, 2021, Springer, Gaylor, and Alhadeff were presented a "Quarterly Pricing/ Competitive Review" slide deck for 1Q2022, stating Docusign was "[s]tarting to see more competition, [redacted]." (DOCU_00101642; DOCU_00101644). The deck also warned that Docusign should [redacted]. Feeling competitive pressure." (DOCU_00101644). On May 12, 2021, RM Head Smith received a 2Q2022 "NA Renewal Business Review" deck discussing, as "Threats," "Commoditization & Competition," noting "[t]wo of our largest losses were tied to [redacted]. We are losing our competitive edge in eSign." (DOCU_00496671; DOCU_00496672).

197. These trends impacted Docusign's most important customers. On May 4, 2021, Leschin emailed herself notes from a call with SVP Walsh: "Sign def[initely] under pressure – [redacted] – prob[ably] more narrative about how

ridiculously competitive it is – some just noise. But seeing larger [E]nt[erprise] customers under pressure." (DOCU_00622473). And in May 2021, an Excel sent to Peretti regarding "[redacted]," *i.e.*, large customers with over [redacted], showed many customers, like [redacted] and [redacted] with large amounts of churn due to competition. (DOCU_00116950; DOCU_00116953).

198. Further, a deck sent to CMO Giglio in June 2021, titled "Competitive Barometer, [1Q2022] Analysis," discussed "strong competition" from [redacted], and other esignature entrants, showing Docusign's "[redacted]." (DOCU_00211186, DOCU_00748924). In an August 2021 email, a VP of Competitive, Pricing & Services Strategy lamented: "Last quarter there were a number of highly visible customers [redacted]." (DOCU_00190594). The VP added: "The competes team has had a series of eStaff [which included the Individual Defendants] conversations about this." (*Id.*).

**6. June 10, 2021 Competition Misrepresentation**

199. **<u>June 10, 2021 Conference</u>:** On June 10, 2021, at the Robert W. Baird Global Consumer, Technology & Services Conference, Gaylor made the following competition misrepresentation. In response to an analyst's question about the impact of competition, Gaylor assured: "[W]e do look at the competitive landscape quite closely as it relates to the Agreement Cloud but also just in eSignature. ***But I'd say there hasn't been really a changing dynamics***."

200. This statement conveyed that Docusign was not facing significant competitive pressure from other esignature providers, which was false and misleading because, as explained in Sections IV.C.1, IV.C.3, and IV.C.5, Adobe and others were already adversely affecting Docusign's eSignature business.

### D. Defendants Misrepresented Docusign's CLM Success

#### 1. Before and Early in the Class Period, Docusign Struggled to Sell CLM

201. Given numerous internal signs that COVID-fueled demand for Docusign's eSignature would be short-lived, Docusign needed to pivot to other products to try to sustain the high billings growth that it had been touting to the market, including its "land and expand" strategy, by which it aimed to upsell eSignature customers to CLM. But, throughout the Class Period, Docusign struggled to sell CLM, further jeopardizing Docusign's ability to sustain its growth long-term. Indeed, in early 2020, Docusign prioritized chasing pandemic-driven eSignature growth and deprioritized selling CLM, thus further undermining CLM sales, which were already floundering because of the product's complexity and integration problems with customers' platforms.

202. Internal evidence of Docusign's deprioritization of CLM sales in early 2020 was stark. For example, an April 3, 2020, "Customer Pulse" update by CS noted that Docusign was "moving CLM resources into [e]Sign work in response to Covid-19" to capture the pandemic-fueled eSignature demand (DOCU_00034528). Indeed, on March 18, 2020, SVP Walsh emailed the Executive Staff group a deck stating that "CLM related projects show early signs of delay due to prioritization to Covid-19." (DOCU_00043474; DOCU_00043475). Similarly, in a March 24, 2020 email to the Executive Staff, Walsh warned: "CLM projects are continuing to slow and pipeline [is] stalling." (DOCU_00014145). Springer replied that he "keep[s] hearing CLM is being delayed while esig[nature] is being accelerated. Are you seeing that too?" (*Id.*). Walsh responded: "Yes, we are seeing a slowdown in inbound CLM projects and current in play CLM projects and that is across the globe. The primary push is for support of Sign use cases." (*Id.*).

203. Indeed, at this time, Docusign was already struggling to sell CLM. For example, an April 8, 2020 email from GVP Willis to Rudsenske noted that he and another sales colleague were "running a meeting next week to put some focus on our lagging Q1 CLM bookings/pipeline."

(DOCU_00046812). On April 14, 2020, Marketing VP Castillo emailed COO Olrich and Alhadeff that "while eSignature is booming due to Covid-19, this is not true for CLM." (DOCU_00004380). A slide attached to the email noted that "Sales lacks incentives to drive CLM Pipeline," that "[d]emand for CLM dropped since Covid-19," and that "[f]uture CLM $ are also at risk due to poor CLM [sales pipeline generation]." (*Id.*; DOCU_00004381).

204. Defendants were aware of these CLM sales problems by the start of the Class Period. For example, on May 1, 2020, Alhadeff was informed that for Commercial NA and MM segments, "only 26% of in seat [Account Executives] have sold [redacted], and 61% have not sold any CLM"; for Enterprise NA (excluding Small and Medium Government customers), "only 26% has sold [redacted], and 62% have not sold CLM." (DOCU_00047132). In a deck to be presented by Alhadeff at a May 11-12, 2020 meeting, GVP Willis noted that the NA Commercial unit was struggling to sell CLM: "Poor CLM performance was driven by deteriorating pipeline and low close rates." (DOCU_00067668). Other regions and business segments reported similar CLM sales underperformance—*e.g.*, Enterprise reported that it was only at an abysmal "34% of Quota" and the "closest segment to plan [was] at 50% attainment." (*Id.*).

205. Documents from this period also show that CLM had serious product integration problems with customers' technological systems, which contributed to Docusign's CLM sales woes. For instance, a March 9, 2020 email from VP Valenti to VP Peretti concerning the [redacted] account noted that there was "[a] recent acrimonious negotiation over a disputed contract for new document generation tool combined with a communications issue that resulted in a production system disruption along with disappointment in many of the CLM post-sale teams & processes for their CLM implementation have made the customer's senior leaders satisfaction levels lower than historically has been the case with DocuSign." (DOCU_00029794). An April 14, 2020 deck, which

was emailed to Scheffel, Walsh, Smith, and others, stated that the [redacted] "CLM deal" was at risk of churning due to "implementation issues." (DOCU_00045838; DOCU_00045839).

206. Defendants deliberately concealed these CLM sales problems from investors when the Class Period began. In particular, a June 1, 2020 draft script for Sheridan's use at the June 4, 2020 earnings call noted that, "[a]s Dan [Springer] mentioned, while we continue to see interest in other Agreement Cloud solutions, customers are delaying purchase decisions for more complex products [*i.e.*, CLM]." (DOCU_00063618; DOCU_00063620). A related comment by FP&A VP Fu asked: "I thought we weren't going [to] refer to anything related to the slow down in CLM?" (DOCU_00063620). In fact, this planned disclosure about the CLM sales slowdown was cut from Defendants' earnings script, indicating they intended to withhold this information from investors.

### 2. June 2020 CLM Misrepresentations

207. **June 4, 2020 Earnings Call:** On Docusign's June 4, 2020 earnings call regarding its 1Q2021 financial results, Springer made the following CLM misrepresentations. In his opening remarks, Springer touted that the increased eSignature demand would also boost sales of other Docusign Agreement Cloud products, of which CLM was the largest (besides eSignature): "***This [increased eSignature adoption] also acts as the on-ramp for the adoption of other agreement cloud products, sometimes at the same time and sometimes as follow-ons***."

208. In response to an analyst question regarding moving existing eSignature customers to CLM, Springer touted that there was a significant pipeline of customers ready to adopt CLM, stating that "it's not like we're thinking about the CLM sale opportunity and saying, well, we can't go talk to someone for CLM, other than the people that joined last quarter with Signature, ***we've got years of Signature customers that have sort of a pent-up opportunity for us to bring the Agreement Cloud, and that's where we're really focused today***."

209. These statements were false and misleading because they touted CLM as a key growth driver for Docusign and its success selling CLM to customers, while omitting that Docusign was in fact struggling to sell CLM at this time, as evidenced, for example, by its missing internal CLM sales targets by at least 50% across all segments. *See* Section IV.D.1. Further, it was misleading for Springer to convey that Docusign was "really focused today" on CLM, as it had significantly deprioritized CLM sales efforts at this time in favor of eSignature. *See id.*

210. Analysts were encouraged by Defendants' CLM claims. For example, a June 4, 2020 RBC report noted that "[o]nce a customer starts DocuSigning, they don't go back to paper, they become a target for upsell for CLM." On June 5, 2020, Evercore ISI similarly wrote "[t]he [C]ompany had an extremely impressive quarter in the eSignature business, and noted that due to their land and expand model which is typically le[d] with the eSignature product, this will bode well for further CLM expansions over the next 3-4 quarters."

**3. July 2020 – December 2020: Docusign's CLM Problems Continued**

211. In summer 2020, Docusign's CLM sales woes continued. For example, on August 6, 2020, Alhadeff received an email with an attached "Global Sales Leadership Q3FY21 Meeting" deck listing Alhadeff as the presenter. (DOCU_00720887; DOCU_00720889). The deck revealed that there were "[s]till too few AEs engaging in CLM." (DOCU_00720889).

212. On November 6, 2020, Giglio forwarded to Alhadeff, Sheridan, and COO Olrich, a "Q3 Demand Post-Mortem" deck, which discussed the "[u]nderperformance in CLM," including that "[w]ithin CLM, our biggest gap was in AE sourced pipeline," as "AEs . . . had 22% SQO attainment." (DOCU_00663027; DOCU_00663029). The deck stated further: "The Q3 SQO miss was driven by AEs, M[arket] D[evelopment] R[epresentative] capacity, and declining inbound

demand," noting that the "AE miss in SQOs[] [was] particularly heavy in CLM and Upsell." (DOCU_00663029). Indeed, the "AE miss had greatest effect on CLM pipeline." (*Id.*).

213. Docusign also continued documenting serious customer complaints about CLM integration issues. On July 21, 2020, a VP in Enterprise Sales emailed others an invite to discuss a contract with [redacted], where he flagged a "Key Issue[]" with "CLM" as there was an "issue with onboarding and offboarding users w/ S[ingle] S[ign] O[n]." (DOCU_00176009). An August 2020 Enterprise 3Q2021 slide deck noted in the slides for the "South East" region that an area Docusign "need[ed] help" was "CLM [i]ntegration with [redacted] (high install in [the] Southeast) and it has forced us to walk away from large deals." (DOCU_00273188). In an October 16, 2020 email, Valenti told Walsh that "[redacted] had "[i]ssues with CLM implementation and the customer [was] looking at [a] competitor to replace [the] solution." (DOCU_00648654).

### 4. December 3, 2020 CLM Misrepresentations

214. **<u>December 3, 2020 Earnings Call</u>:** On Docusign's December 3, 2020 earnings call discussing the Company's 3Q2021 financial results, Springer made the following CLM misrepresentations in response to an analyst's question about CLM and other products: "***Agreement Cloud is right back where we want it to be in terms of top of mind with our customers***. And I'll just give you a quick example. I had a call this morning with a very large customer of ours. And they said, hey, we're super excited to be now reaccelerating our plans to roll out CLM. While they had been dramatically increasing their signature usage over the course of the year, they said, now is the time. ***We're ready to reaccelerate with CLM. And I think that's what we're going to see throughout the next few quarters***."

215. These statements were false and misleading because they touted CLM as a key growth driver for Docusign and its success selling CLM to customers, while omitting that

Docusign was in fact struggling to sell CLM at this time, as evidenced, for example, by the November "Q3 Demand Post-Mortem" deck sent to Alhadeff, Sheridan, and COO Olrich (all of whom reported to Springer), which discussed the dismal "[u]nderperformance in CLM." *See* Sections IV.D.1 and IV.D.3. Further, at this time, Docusign was far from "ready to reaccelerate with CLM" given its deprioritization of CLM sales efforts earlier in 2020 (*see id.*), and was just starting to try to reverse course on that mistake, as further detailed in the below section.

### 5. December 2020 – March 2021: As CLM Sales Continued to Flounder, Docusign Reversed Course to Reprioritize Its Sales Efforts

216. Docusign's CLM sales problems continued in late 2020 and early 2021. For example, on December 9, 2020, Alhadeff and his direct reports received a deck stating that "CLM Line Bookings" were only "at 9% to Plan" and "underperforming against historical pacing," and that CLM new customer sales had a "[l]ower close rate" and "smaller [average sales price] compar[ed] to historical Q4 trends." (DOCU_00166102; DOCU_00166103). On January 5, 2021, another deck sent to Alhadeff and other executives, which was to be discussed at the January 6, 2021 "Global Sales Pipeline Council" meeting, reported that "CLM . . . [was] still pacing well behind." (DOCU_00166139; DOCU_00166141).

217. Indeed, a 4Q2021 "Scorecard" in the deck had the vast majority of the sales pipeline metrics for CLM color-coded red, meaning they were pacing significantly below targets; for example, CLM totals were only at 20% of new customer "Pipeline $ Attainment" for NA, and only 16% for "Worldwide"; likewise, CLM "NewCo SQO# Attainment" was only at 17% for NA, and only at 10% for "Worldwide." (DOCU_00166141). Similarly, as of January 25, 2021, internal sales pipeline "Scorecard[s]" for CLM NA were largely color-coded red, which indicated below-target attainment levels for CLM sales pipeline metrics. (DOCU_00206906). These included a total "QTD Pipe $ Attainment" of only 50% and a total "SQO attainment" of only 23%. (*Id.*).

218. Presumably driven by this abysmal performance, Docusign reversed course on its prior decision to deprioritize CLM sales efforts. For example, a November 17, 2020 slide deck sent to Alhadeff noted that there was an "[o]pportunity to double down on NA CLM M[arket] D[evelopment] R[epresentatives]," including a plan to "increase team capacity" and even "max" the "capacity." (DOCU_00115022; DOCU_00115025). Similarly, an audio recording and transcript of a November 19, 2020 "Go to Market Directors" meeting, held by COO Olrich, discussed the need to refocus on CLM sales going forward. (DOCU_00728169). For example, at this meeting, a Docusign employee noted that "[CLM] is clearly a priority next year in terms of investment," and asked about specific action items. (*Id.*). Olrich responded as follows:

> We need to get more of our core [sales] reps selling CLM and going through those deal cycles themselves. So I think we're going to be pushing more accountability to direct sales and having quotas for CLM. We didn't have that this year, and so we're . . . committed to doing that, and I know Loren [Alhadeff] is, too . . . . Number two is I think . . . we need more CLM product specialists that can go into competitive [] situations and help customers understand that we're a leader in CLM, . . . and we got to have more of these CLM specialists that can help really sell the credibility that we're a real player in this space . . . . I also believe we need more ownership around CLM marketing from a demand perspective, from a product marketing perspective, and from an enablement of the MDR efforts. I think we're going . . . to hire more MDRs that are focused on building CLM pipeline in FY22.

(DOCU_00728169 (cleaned up); DOCU_00052177). A March 2, 2021 deck also noted that "Comm[ercial] NA is investing in . . . CLM as a core growth driver in FY22." (DOCU_00255010).

219. Notwithstanding this attempt to reverse course, global "CLM bookings decelerated in FY21 (only 6% y/y [YOY] growth) driven by a difficult H1 [first half] (-17%)," as reported in a deck circulated on February 20, 2021 to Alhadeff and COO Olrich. (DOCU_00268575; DOCU_00268578). Further, documents confirm that Docusign was losing customers due to continued CLM integration problems. For instance, on December 7, 2020, a CS manager emailed that the renewal of a CLM customer was "at [r]isk," and Docusign expected it to "[f]ull[y] [c]hurn

as CLM will not meet their needs." (DOCU_00212904). Similarly, a February 9, 2021 slide deck sent to Alhadeff, SVP Walsh, and Smith noted that (i) [redacted] churned "due to implementation issues" with CLM, and (ii) [redacted] churned "due to [a] CLM feature gap." (DOCU_00242061; DOCU_00242063).

**6. March 24, 2021 CLM Misrepresentations**

220. **March 24, 2021 Analyst Day:** On March 24, 2021, during Docusign's Virtual Financial Analyst Day, Defendants made the following CLM misrepresentations. While interviewing Springer about a variety of Docusign topics, Gaylor asked him about the demand for products outside of eSignature, such as CLM. In response, Springer stated: "[W]e see ***particularly in CLM and CLM+*** . . . ***That's going to be a real growth area for us. And I think we're going to see that really kick off in fiscal year '22 to start to reaccelerate, and that will become noticeable as a growth driver in our business literally this year***."

221. During the same interview, in response to a question about CLM, Gaylor similarly assured: "***[I]t is a huge part of our future in terms of how we're going to grow revenue over time. And kind of sustain our growth over a long period of time***."

222. These statements were false and misleading because they touted CLM as a key growth driver for Docusign and its success selling CLM to customers, while omitting that Docusign was in fact struggling to sell CLM at this time, as evidenced by, for example, the February 2021 deck sent to Alhadeff and Olrich showing that global "CLM bookings decelerated in FY21 (only 6% y/y [YOY] growth)" and CLM integration problems persisting at this time. *See* Sections IV.D.1, IV.D.3, and IV.D.5. In particular, CLM was unlikely to be a "growth driver in our business literally this year," nor "sustain [Docusign's] growth" long-term, given all these

persisting, severe problems, including that the fact that it had just begun efforts to reverse course on its prior deprioritization of CLM sales efforts. *See id.*

**7. Spring – December 2021: CLM "Lack of Progress" Was So Poor That the Board Wondered if Docusign "[redacted]"**

223. Docusign's CLM sales troubles persisted throughout 2021 despite the belated pivot back to CLM sales efforts. For example, in May 4, 2021 "Q1 F[Y]22 Notes" on a call with Walsh and others, Leschin wrote, under the heading "Lambert [Walsh]:" "Stress around CLM still there . . . Never been more focused on CLM before – trying to solve for/fix it/figure out what was wrong/having [meetings] didn't have last year . . . [N]ow paying the price." (DOCU_00622473). The CLM integration problems also remained unresolved. For example, a May 12, 2021 "Q2FY22 NA Renewal Business Review" deck (sent to RM Head Smith) noted that "CLM has been difficult to deploy" and "we are starting to see more failed CLM deployments impacting our churn rates." (DOCU_00496671; DOCU_00496672). On July 19, 2021, Peretti was told that the "CLM contract [[redacted]] is in danger of being at 100% [c]hurn due to lack of [u]sage," and they met with the customer "to discuss the current CLM [i]ntegration issue." (DOCU_00163407).

224. CLM sales still floundered in fall 2021, including because the "[q]uantity and fit of NewCo CLM [opportunities] were generally poor" (11/28/2021, DOCU_00053458), and CLM "product performance issues" were "interrupting" efforts to create "a huge success story" with customers (12/1/2021, DOCU_00120405). Indeed, the CLM performance was so poor that, on June 1, 2021, Board Chair Wilderotter told Springer that "the Board is [redacted]"; she warned that "[t]he Company needs to stop making excuses for the lack of progress and own a cohesive plan to course correct." (DOCU_00110641).

**E. The Truth Was Revealed and Investors Suffered Losses**

225. During the Class Period, as detailed above, Defendants made false and misleading statements and omissions that misrepresented the sustainability of eSignature demand, Docusign's billings growth, competitive environment, and CLM success. These misstatements and omissions caused Docusign common stock to trade at artificially inflated levels because they created and/or maintained a misleading depiction of Docusign's business and growth, which was important to investors' assessments of the investment value of the Company's common stock.

226. The relevant truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between December 2, 2021 and June 9, 2022. As truthful information was incrementally revealed to the market and/or as the previously undisclosed, understated, or misrepresented risks materialized, Docusign's common stock price declined as the artificial inflation was removed from its share price.

227. Truthful information that removed artificial inflation from Docusign's stock price was revealed on December 2, 2021, March 10, 2022, and June 9, 2022, which respectively corresponded to significant stock price declines on December 3, 2021 (more than 42%), March 11, 2022 (over 20%), and June 10-13, 2022 (over 24.5% on June 10; over 10% on June 13). The timing and magnitude of these declines and public reactions to the news negate any inference that the losses suffered by investors were caused by facts unrelated to the fraud. As a result of their purchases of Docusign common stock at artificially inflated levels during the Class Period, Plaintiffs and Class members suffered economic loss, *i.e.*, damages, under federal securities laws.

**1. December 2, 2021: Docusign Revealed Poor Billings Growth, But Continued Misrepresenting eSignature and CLM Demand**

228. On December 2, 2021, Defendants were no longer able to hide waning demand from investors. Specifically, after the market closed that day, Docusign released its financial

results for 3Q2022, wherein it revealed that its YOY billings growth had decreased to 28% for the quarter—half of the 59% growth that Docusign previously reported after the pandemic began. At the time, this represented the second lowest billings growth that Docusign reported as a public company. Docusign also announced the departure of Defendant Sheridan, one of the primary executives responsible for setting the Company's billings guidance early in the pandemic.

229. Docusign also held an earnings call on December 2, 2021, after market-close, during which Springer admitted that Docusign "fell short of our billings guidance" and "saw demand slow and the urgency of customers' buying patterns temper," which were "primary contributors" to Docusign's billings miss. Further, in response to an analyst's question about billings growth, Springer admitted that "we always expected there to be a reduction of that really heightened COVID buying, which drove our growth rates dramatically higher" during the pandemic. Springer further acknowledged that Docusign had experienced a "heightened demand model" during the pandemic, with customers "probably purchasing more aggressively than we would have seen in the past."

230. In response, on the next trading day—December 3, 2021—Docusign's stock price plummeted, falling $98.73 per share, or more than 42%, closing at $135.09.

231. Analysts were shocked by this news. For example, on December 3, 2021, Citi described Docusign's billings miss as "one of the biggest SaaS whiffs in recent memory." That same day, Wedbush downgraded its rating of Docusign's stock, calling it "a debacle quarter from DOCU" and as the news revealed "a much more difficult selling environment as the company expands into broader CLM deals with e-signature going through a major growth transition in the field." Wolfe Research also downgraded Docusign, noting that "[t]he billings weakness miss was

a result of a return to more normalized purchasing patterns." J.P. Morgan also downgraded Docusign, noting: "pandemic tailwinds came to a much faster than expected halt for DocuSign."

232. Internal Company documents show that Defendants and Docusign employees were greatly concerned about Defendants' revelations on December 2, 2021, and that they directly linked the resulting stock price drop to the disclosures about waning post-pandemic demand and CLM issues. For example, on December 1, 2021, Sheridan texted Leschin that "Dan [Springer]'s house of cards may be starting to tumble." (DOCU_00758959). During the earnings call, Sheridan texted Alhadeff that "[p]eople are not buying" Springer's attempt to minimize Docusign's demand problems, as Springer's "story" was "paper thin." (DOCU_00758688). Sheridan agreed: "It's total BS and investors aren't buying it. The stock has been falling throughout the call." (*Id.*). On December 3, 2021, Leschin's text exchange with a colleague described the disclosures as a "[t]otal worst case scenario" and discussed a call with an "investor [who was] [] disappointed with CLM and DAC not stepping up to fill in some of the [eSignature] hole." (DOCU_00758062).

233. Still, the Company's stock price remained artificially inflated, as Defendants continued to reassure the market. During the December 2, 2021 earnings call, Springer falsely stated that "[e]ven as the pandemic subsides and people begin to return to the office, ***they are not returning to paper. eSignature and the broader Agreement Cloud [e.g., CLM] are clearly here to stay***, and DocuSign's value will persist no matter how the future of work unfolds."

234. This statement, in assuring that eSignature customers are "not returning to paper" and was "clearly here to stay," touted the sustainability of eSignature demand post-pandemic and was false and misleading for the reasons stated in Section VI.B. This statement, in assuring that "the broader Agreement Cloud" (which besides eSignature primarily referred to CLM) was "clearly here to stay" also touted CLM as a critical driver that would help maintain Docusign's

high growth, and was false and misleading for the same reasons as explained in Section IV.D. Indeed, as late as June 1, 2021, Docusign recognized the "lack of progress" in CLM. *See* ¶223-24

235. Analysts were reassured by these statements. For instance, a December 3, 2021 RBC report noted that "[w]e believe DocuSign is making the move from product to platform and any bull thesis does rely on non-core products growing as a percentage of the business. Early traction with CLM is encouraging to us and gives us confidence DocuSign can grow into a broader agreement cloud." That same day, an Evercore report similarly explained that "[f]rom a longer-term perspective, we believe the shift towards e-signature technology is not going away."

**2. March 10, 2022: Docusign Revealed Continued Poor Billings Growth, But Still Misrepresented eSignature Demand Sustainability**

236. On March 10, 2022, the relevant truth concerning the temporary, COVID-fueled nature of Docusign's prior record billings growth was further partially revealed. After the market closed, Docusign released its financial results for the 4Q2022 and held a related earnings call, wherein the Company revealed that its YOY billings growth had decreased further (from 28% the prior quarter) to 25% for the quarter—the lowest billings growth Docusign ever experienced as a public Company. Further, Docusign disclosed that its billings guidance for FY2023 would be between $2.71 billion and $2.73 billion, representing a substantial slowdown in billings growth. Docusign also announced the planned resignation of Alhadeff, whose responsibilities as CRO primarily included driving sales within the Company.

237. Also during that call, Springer attributed Docusign's poor billings growth and lower billings guidance to waning demand for eSignature as businesses returned to in-person work. Specifically, Springer stated: "In the second half of the year, there were more challenging macro conditions impacting our customers' priorities. We saw a diminished level of urgency in their buying patterns," and "[a]s we saw urgent demand wane, we have just begun to shift in our sales

motion, back to a demand generation mode of cross-sell, upsell and departmental expansion." Springer further admitted that this change in demand was a result of the pandemic ending, as "the shift in customer buying patterns coming out of the pandemic was quicker than we anticipated."

238. On this news, on March 11, 2022, the next trading day, Docusign's stock price fell $18.87 per share, or over 20%, to close at $75.01—the lowest closing price per share for Docusign stock since March 2020—erasing all of Docusign's stock price gains during the pandemic.

239. Once again, analysts were caught off guard by these disclosures. For example, a March 11, 2022 Wedbush report explained that Docusign's poor results revealed the unsustainability of Docusign's COVID-driven growth: "Last night the demise of the Docusign growth story continued" and its "very weak and concerning guidance [] speaks to some darker days ahead." Wedbush continued: "Following a trend from the prior quarter the sales environment at DOCU has quickly changed and it appears the pull forward sales activity during COVID is making for an incredibly difficult uphill selling environment in the field and thus slowing down the expansion of CLM deals." The same day, a Morgan Stanley report similarly highlighted that "DocuSign's Q4 underscored that the growth scare of Q3 was not a one quarter event."

240. Internal Docusign documents also support that Company insiders were concerned about Docusign's March 10, 2022 disclosures and linked the resulting stock price drop to the news about its post-COVID growth decline. For example, on March 11, 2022, COO Olrich sent Springer and others notes admitting that that "the market is not happy with us," and Docusign's "valuation is being impacted" because of its "growth rate" underperformance. (DOCU_00200055).

241. However, despite Docusign's negative disclosures, Defendants continued to reassure investors that Docusign's demand problems were temporary. During the March 10, 2022 earnings call, Springer falsely insisted: "As the pandemic subside[s] and people begin to return to

the office, ***they are not returning to paper. eSignature is clearly here to stay***." This statement touted the sustainability of demand for eSignature and was false and misleading for the reasons stated in Section VI.B.

### 3. June 9, 2022: The Relevant Truth Was Fully Revealed

242. On June 9, 2022, the relevant truth concerning the temporary nature of Docusign's demand and growth during the pandemic was fully revealed. After the market closed that day, Docusign released its financial results for 1Q2023, disclosing that its YOY billings growth had decreased to ***just 16%*** for the quarter—the lowest billings growth in Docusign's history as a public Company, and the third consecutive quarter of disappointing billings growth. Moreover, Docusign lowered its billings guidance for 2Q2023 by approximately $200 million.

243. Also on June 9, 2022, Docusign held an earnings call, discussing the Company's 1Q2023 financial results, during which Springer attributed the poor billings growth and lower billings guidance to waning eSignature demand as businesses returned to in-person work. When asked by one analyst whether the Company's lower billings was the result of macroeconomic conditions, Springer admitted that Docusign's growth problems were due to diminished demand: "I think we believe the larger impact for us is coming off the sort of very aggressive buying that we had during COVID." He also admitted that Docusign's demand during the pandemic was the result of COVID one-time use cases that no longer existed:

> I underestimated sort of the impact in the post COVID sort of demand acceleration and maybe how dramatic that was. Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like 6, to 7 quarters. So it wasn't that we were not aware of the dramatic economics of it. I think we just didn't understand what portion of that would be things like one time use cases or an acceleration where people bought in a more fulsome way.

244. On this news, the price of Docusign's stock fell $21.43 per share, or over 24.5%, to close at $65.93 on June 10, 2022, the first trading day after the Company's announcement.

245. Analysts were again surprised by Docusign's disclosures. They finally fully understood that Defendants' promises of sustainable growth could not, and would not, be fulfilled, and the Company's performance would likely continue to slide even further as the pandemic ended and CLM failed to drive growth. For example, as a June 10, 2022 Wedbush report explained:

> DocuSign delivered yet another disappointing quarter as the company once again lowered billings guidance which continues to overshadow the top-line revenue beat the company experienced this quarter. The demise of DOCU's growth story continues as the [work from home] poster child faces new and ongoing complications with the selling environment following COVID's pull forward effect on sales over the previous two years and deceleration of their planned expansion of CLM deals.

246. Wedbush went on to explain that Docusign's latest disclosure finally apprised them of the truth regarding Docusign's growth, stating "we believe that the end of [Docusign's] core growth story is now essentially over with the clock striking midnight following a billings guidance drop of ~$200 million pointing to an uncertain future for the remainder of FY23." Similarly, William Blair downgraded Docusign's stock because of Docusign's "weaker-than-expected billings guidance for fiscal 2023." Further, a June 10, 2022 Wolfe Research report also downgraded Docusign, citing "[m]anagement disclosed they underestimated the level of pulled forward spending during COVID, and are now seeing customers reduce expansion" and Docusign "drastically reducing billings guidance" as the reasons for the downgrade.

247. As the market continued to digest the above disclosures, investors continued to react negatively to the news, causing Docusign's stock price to fall another $6.81, or over 10%, to close at $59.12 on Monday, June 13, 2022.

## V. ADDITIONAL ALLEGATIONS OF SCIENTER

248. The scienter of each Individual Defendant is imputed to Docusign, as each of them were among the most senior employees of the Company during the Class Period and were acting within the scope of their authority. The scienter of other senior executives is also imputed to

Docusign. Many senior executives knew the undisclosed truth that rendered Docusign's statements misleading, including CS SVP Walsh, Head of IR Leschin, CMO Giglio, COO Olrich, RM Head Smith, VP Scheffel, VP Rudsenske, and GVP Peretti.

249. The allegations in Section IV (*e.g.*, the numerous documents establishing Defendants' knowledge or recklessness of falsity) establish a strong inference of scienter. This Section provides additional allegations further supporting that Defendants acted with scienter.

**A. Defendants' Large and Suspicious Docusign Stock Sales**

250. As detailed herein, Defendants' misstatements artificially inflated and/or maintained Docusign's stock price. Through their misstatements, the Individual Defendants were able to execute substantial sales while that price was artificially inflated, for tremendous personal benefit. Thus, they were motivated to make those misstatements, to secure those personal benefits. Defendants' stock sales, therefore, provide strong evidence of scienter.

251. During the Class Period, the Individual Defendants collectively reaped over $112 million in proceeds from open market sales of Docusign stock, and $193 million in total proceeds (including "Code F" sales, which is the designation on SEC Form 4 that a sale was made to pay for personal taxes and/or the strike prices of options). These sales were suspiciously timed, amounted to a substantial portion of these Defendants' holdings, and were abnormal in other ways.

252. **Springer:** During the Class Period, Springer disposed of over 722,000 Docusign shares for proceeds of more than $154 million. On February 1, 2021, Springer sold 356,479 shares of Docusign stock in open market sales, while Docusign's stock was trading at $230 per share. As a result, he reaped proceeds (*i.e.*, shares sold multiplied by sale price) of over $81.8 million. This sale represented a disposition of over 19.2% of Springer's holdings of Docusign common stock (and a large portion of his beneficial interest including options and restricted stock). Springer's

sale was the first time he sold Docusign stock on the open market since Docusign's IPO. Springer knew of demand red flags, including a global sales growth slowdown and adverse SQO trends, by this time. Indeed, five days before this sale, Springer told Alhadeff and Gaylor: "Q4 [FY2021] is the transition to the new normal where we will have tougher quarter closes," noting "the reality of the incredible Covid boom coming back to earth." (DOCU_00703839).[11]

253. During the Class Period, Springer also disposed of 366,351 Docusign shares for proceeds of over $72.4 million in Code F sales. Notably, on September 15, 2021, less than two months before Docusign first began to reveal its slowing billings, Springer disposed of 13,735 shares of his Docusign stock, for proceeds of more than $3.6 million, through Code F transactions.

254. While Springer purportedly purchased $15 million in stock after the first corrective disclosure in December 2021, these purchases were designed to forestall his termination and boost Docusign's stock price. Notably, the Board had begun considering removal of Springer as CEO in November 2021 due to Docusign's underperformance, which had "confirmed" the Board's "prior concerns and fears" that had begun in early 2021 (DOCU_00744116), and academic literature confirms that stock purchases may be a "way to forestall termination."[12] These purchases also served a public-relations purpose. As Leschin noted in a December 17, 2021 email that "[t]he size of [Springer]'s recent purchase was not the point as much as the visual of demonstrating his confidence in the company and its future opportunity." (DOCU_00098844). Likewise, when Docusign's dismal 4Q2022 results were announced, employees commented on the "need" for Springer to "buy another $5MM," *i.e.*, to boost Docusign's stock price. (DOCU_00661620).

---

[11] While Springer's $81 million sale on February 1, 2021 was made pursuant to a Rule 10b5-1 plan, that plan was adopted on December 8, 2020—after he became aware of adverse internal reports and other information showing that Docusign's growth was not sustainable.

[12] *See* Christopher Armstrong et al., *Are CEO's purchases more profitable than they appear?*, 71 J. ACCT. & ECON. 101378 at 1, 3, 16 (Apr.–May 2021).

255. **Gaylor:** On November 8, 2021, less than one month before the fraud began to be revealed, Gaylor sold 5,983 Docusign shares, reaping proceeds of over $1.6 million, while Docusign's stock price was trading at approximately $270 per share. This was the first time Gaylor ever sold Docusign stock into the open market.[13] Gaylor also disposed of 10,572 Docusign shares through "Code F" transactions for proceeds of over $2.2 million. During the Class Period, Gaylor sold 16,555 Docusign shares, reaping over $3.8 million in proceeds.

256. **Alhadeff:** During the Class Period, Alhadeff sold 151,882 shares of Docusign stock, worth over $36 million, most of which were open market sales.[14] In particular, on July 26, 2021, Alhadeff sold over $15.7 million Docusign shares into the open market. This was more than three times the size of his largest sale since the IPO, and represented over 26% of his Docusign stock holdings at the time (and a large portion of his beneficial interest, including options and restricted stock). This sale occurred just as 2Q2022—described internally as "an ugly quarter" and a "blood bath for sales"—was ending. (DOCU_00663047). When the fraud was partially revealed on December 2, 2021, causing a massive stock drop, RM Head Smith texted a colleague that the prior high price "never made sense" and "there was no way it was going to last"; the employee replied: "Loren [Alhadeff] saw it too according to his sale." (DOCU_00758305).

257. During the Class Period, Alhadeff sold 116,182 Docusign shares on the open market, reaping over $28.7 million in proceeds. During the Class Period, Alhadeff also disposed of 35,700 shares of his Docusign stock through "Code F" transactions worth over $7.4 million.

[13] While Gaylor's sale was purportedly made pursuant to a Rule 10b5-1 plan, that plan was adopted only about a month before this sale (on October 6, 2021) and after she became aware of adverse internal reports, *e.g.*, alarming bookings forecasts, and other information (including Springer's warnings of a looming large stock price drop) showing that Docusign's growth was unsustainable.
[14] The Form 4 for Alhadeff's "Code F" sale on September 15, 2020 reported a seemingly erroneous price of $0. It is assumed this sale was made at the September 15, 2020 closing price of $202.02.

**B. The Fraud Concerned Docusign's Core Operations**

258. The Individual Defendants' knowledge of the demand for Docusign's products and its billings growth and related issues can be inferred because these facts were critical to Docusign. eSignature made up the vast majority of Docusign's revenue (*see* ¶14) and was its flagship product. As one Sales employee stated in an all-hands call: "We talk about being an Agreement Cloud Company, but >90% of sales are generated via E-Sig." (DOCU_00111002; DOCU_00111003).

259. Defendants recognized the core importance of eSignature. For example, during Docusign's 1Q2021 earnings call, Springer described eSignature as its "core" offering. Analysts agreed. For example, during the 1Q2021 earnings call, Morgan Stanley referred to eSignature as Docusign's "core" product. On September 2, 2020, Oppenheimer similarly wrote that "the flagship eSignature product will drive durable growth for the foreseeable future." Because Docusign was not historically profitable, the demand for Docusign's products and its billings growth were crucial to its financial success and valuation. For example, in its 2020 10-K Docusign stated "[w]e believe billings is a key metric to measure our periodic performance."

260. While CLM represented a small portion of Docusign's revenue, it was a key part of its growth story, including its "land and expand" (¶¶17, 201) strategy. For example, during the 1Q2021 earnings call, Springer explained with regard to CLM that "[w]e've got years of Signature customers that have sort of a pent-up opportunity for us to bring the Agreement Cloud." Analysts agreed. For example, on June 18, 2021, Wedbush wrote that Docusign was "continuing to expand throughout the entire deal process," through CLM, calling it a "major differentiator."

**C. Defendants Closely Monitored Relevant Information and Metrics**

261. The Individual Defendants were responsible for Docusign's efforts to manage demand during the pandemic, including through personally overseeing the sales team's efforts to

sell eSignature and CLM, which further supports a strong inference that they knew, or were deliberately reckless in not knowing, the truthful information contrary to their misstatements.

262. In particular, Alhadeff was primarily responsible for leading Docusign's sales function, and Gaylor had primary responsibility for financial forecasting, including sales, bookings, and billings metrics and forecasts. As detailed herein, the Individual Defendants were frequently updated and had access to data on issues concerning demand and growth, including consumption, churn, sales pipeline metrics like SQOs, and other KPIs, which they also tracked through various internal databases like Salesforce.

263. Defendants' public statements confirm that they closely monitored demand for Docusign's eSignature and CLM products, including sales, bookings, billings, and other demand KPIs. For example, during the September 3, 2020 earnings call, Sheridan stated: "And so we are endeavoring to stay ahead of the trends that we're seeing. We're looking at the demand data very carefully to try to forecast the trends and get ahead of that with capacity across the business."

264. Indeed, Defendants repeatedly told investors that they had good visibility into Docusign's billings growth due to their focus on how customers were using their product. For instance, during the March 11, 2021 earnings call, Gaylor touted that their "subscription-based model gives [them] a certain level of visibility." When discussing the Company's guidance, Gaylor noted that "[w]e guide to what we can see. And it's largely data-driven[,]" explaining that "we use everything from pipeline and demand trends to close rates." During the September 2, 2021 earnings call, Gaylor reiterated that they have "visibility into customer consumption and how they're using the products, how they're consuming it through the life cycle of their contracts" and emphasized that consumption "is something that we track."

265. With regard to CLM, during Docusign's June 4, 2020 earnings call, Springer stated that "we've got years of Signature customers that have sort of a pent-up opportunity for us to bring the Agreement Cloud, and that's where we're really focused today." Given Defendants' admitted close focus on CLM as a way of sustaining growth from the beginning of the Class Period, such statements further support their knowledge or reckless disregard of CLM sales struggles, which further jeopardized the Company's ability to sustain its COVID-fueled growth after the pandemic.

266. Indeed, many of the documents cited in Section IV also demonstrate that the Individual Defendants closely tracked such demand and growth-related metrics and trends. For example, per a December 9, 2020 email, "Loren [Alhadeff] has been closely monitoring the COVID impact on global sales pacing since late March." (DOCU_00166102).

### D. The Focus and Specificity of Defendants' Public Statements

267. Throughout the Class Period, Defendants repeated similar misrepresentations about the nature of demand for Docusign's products, including the relevance of the pandemic to its growth. Their continued focus on this issue in investor-facing earnings calls and conferences demonstrates that they were either well informed of the true information – contrary to their public statements – or acted with deliberate recklessness by speaking on these topics without becoming informed of the readily available, true information. Indeed, this conclusion is substantially bolstered by the wealth of internal documents described in Section IV, which establish that the truthful information was readily available.

268. For example, during the June 4, 2020 earnings call, Springer claimed that "when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes," and made many similar statements throughout the Class Period. It would be

unreasonable to imagine that Defendants made statements like these without reviewing the readily available internal information contradicting this statement and other similar ones.

**E. The Departures of Defendants Sheridan, Alhadeff, Springer, and Gaylor**

269. The suspicious resignations of Defendants Sheridan, Alhadeff, and Springer—senior executives primarily responsible for sales and setting financial guidance and achieving billings targets—at key points during the Class Period support an inference of scienter. Additionally, Defendant Gaylor's resignation in March 2023 adds to the inference of scienter.

270. **Sheridan:** On December 2, 2021, the date of the first partial corrective disclosure, Docusign announced the departure of former CFO and then-President of International, Sheridan. Sheridan had served as the CFO from the time of Docusign's IPO in April 2018 to September 2020, when he was moved to the sales organization to lead the Company's international business. As CFO, Sheridan had primary oversight over the Company's financial performance, including the forecasting of sales, revenue, billings growth, and other such metrics.

271. **Alhadeff:** On March 10, 2022, the date of the second partial corrective disclosure, when Docusign reported its second consecutive quarter of poor billings growth, it also announced the planned departure of Alhadeff, explaining that the effective date of his resignation has not been finalized but was expected to occur before the end of FY 2023. On or about October 14, 2022, Alhadeff wrote on LinkedIn that he was leaving Docusign that day. Alhadeff was primarily responsible for leading the sales function, including ensuring that Docusign was meeting its bookings, billings, and revenue targets. Indeed, Alhadeff was forced out of Docusign due to his conduct relevant to this Action. For example, Springer stated in an arbitration filing that "[b]y November 2021," Board Chair "Wilderotter began to press Mr. Springer to replace key members of the management team in response to [Docusign's] downturn." (DOCU_00743877).

272. **Springer:** On June 21, 2022—less than two weeks after the final corrective disclosure—Docusign announced the purported voluntary resignation of Springer as CEO, effective immediately. On October 9, 2022, Docusign announced that it had "accepted the resignation of [Defendant] Springer from the Board." After Springer exited Docusign, however, he launched two legal actions against Docusign and Board Chair Wilderotter: (i) in late October 2022, a lawsuit in Delaware contesting his supposed resignation from the Board; and (ii) in January 2023, an arbitration proceeding regarding his removal as CEO and Board member.

273. In his Delaware complaint, Springer admitted that he was actually "terminated" for cause as CEO, and linked his termination to the corrective disclosures related to Docusign's demand slowdown post-pandemic. *See Springer v. Wilderotter*, No. 2022-0963-LWW, Trans. ID 68319644, ¶¶26-49 (Del. Ch. Oct. 31, 2022) (Wilderotter "[o]rchestrate[d] Mr. Springer's [d]eparture as CEO" and Director after "pandemic-related customer trends began to slow, [and] the Company's revenue growth rate slowed to 45%[] and DocuSign's stock began to fall.").

274. Similarly, the Award in Springer's arbitration found that Docusign's and Springer's performance became worrisome to the Board after "the early days of the pandemic . . . as the COVID pandemic continued," and that the proximate cause of Springer's firing were the revelations on the three corrective disclosures, as "DocuSign's share value dropped 80% . . . following three quarters of disappointing earnings and leadership." (DOCU_00750633). A June 10, 2022 presentation by J.P. Morgan, which was advising the Board, noted that Springer "ha[d] little to no remaining credibility with investors," as he and other "management didn't acknowledge the magnitude of COVID pull-forward and ha[d] been too bullish on not being a 'pandemic stock,'" further noting that "[t]hey've overstated [the Company's] growth and the pull forward and now [were] going back to more normalized growth rate." (DOCU_00743746). Leschin echoed

these sentiments when she texted Sheridan on June 10, 2022, discussing the disclosures on the June 9 earnings call, that Springer's "issue" was that he "hasn't been honest about what is going on (or hasn't wanted to really see it)." (DOCU_00758983). Thus, as the primary architect of Docusign's supposed growth strategy during the pandemic, who falsely assured investors that such demand and growth were not temporary, Springer's suspicious termination supports scienter.

275. **Gaylor:** On March 9, 2023, Docusign publicly announced Gaylor's planned departure, explaining that she had "informed the company that she intends to step down from her position as [CFO] in the coming months." The same day, Docusign announced another quarter of disappointing billings and revenue growth that were linked to the exact issues underlying Plaintiffs' claims. For example, in a March 10, 2023 analyst report, J.P. Morgan downgraded Docusign's stock because, *inter alia*, "deteriorating demand trends, clear competitive presence of Adobe and likelihood of emerging competition from Microsoft, CFO departure, . . . seem to tilt the risk/reward profile downward." Per J.P. Morgan, Docusign continued to experience "deteriorating demand trends" and "continued moderation in growth for the broader eSignature market relative to pandemic-elevated levels," and an "increasingly challenging competitive environment" as, *e.g.*, "customers [were] looking to move to Adobe for its more favorable pricing after signing 'unnecessarily large and expensive' DocuSign contracts during the pandemic." Internal documents also support that Gaylor's departure was involuntary and related to the corrective disclosures revealing the truth regarding Docusign's demand unsustainability. As more fully explained above, J.P. Morgan commented on June 10, 2022 (after the final corrective disclosure) that "management," which would include Gaylor, had lost "credibility" with investors because "management didn't acknowledge the magnitude of COVID pull-forward and has been too bullish on not being a 'pandemic stock." (DOCU_00743746). Further, a June 10, 2022 text

message from Leschin to Sheridan noted that "all I can tell you is I heard directly from various analysts/investors that they are done with [Gaylor]." (DOCU_00758983).

**F. Defendants Springer and Gaylor's Spoliation of Text Messages**

276. Defendants represented to Plaintiffs that in December 2021, after a similar action was filed, Defendants' counsel sent litigation holds to Docusign employees, including the Individual Defendants, which covered any text messages relevant to this action. Defendants, however, refused to produce texts for document custodians until ordered to do so by the Court in July 2024. ECF No. 169. After the Court's Order, Defendants' counsel represented that they were not aware of any text message spoliation issues as late as September 2024. After Plaintiffs later learned that at least one text custodian had not preserved texts, Plaintiffs brought this to Defendants' and the Court's attention. ECF No. 196 at 9. But Defendants still insisted that they were "not aware of any basis to believe" any claim of spoliation of text messages "has merit." *Id.*

277. However, it is now clear that, after receiving a litigation hold, Springer and Gaylor spoliated their text messages—thus evidencing a consciousness of guilt and supporting an inference of scienter. Specifically, in early January 2025, Defendants' counsel for the first time revealed that Springer and Gaylor had not preserved their text messages. Based on Defendants' representations, Springer had a practice of manually deleting business-related texts after related tasks were completed, and continued this practice even after he received the litigation hold in December 2021. Similarly, Gaylor apparently failed to turn off an auto-delete feature for text messages on her personal mobile device. Remarkably, Defendants' counsel revealed in January 2025 that Springer's phone had been imaged in February 2022. Thus, Defendants' counsel had been on notice, but concealed, that Springer had spoliated evidence for nearly three years.

278. Moreover, text messages collected from other Docusign custodians confirm that Springer and Gaylor both frequently texted about work, including regarding key topics related to this Action, meaning that their destroyed texts are highly relevant. In sum, the evidence shows that Springer and Gaylor used text messaging for business purposes and deleted their texts during and after the Class Period, despite receiving a litigation hold. Such conduct evidences consciousness of guilt and supports an inference of scienter, including because it indicates that Defendants intentionally sought to destroy potentially incriminating text messages, or recklessly failed to preserve such evidence by failing to comply with a litigation hold, and then further sought to conceal such failures from both Plaintiffs and the Court.

## VI. CONTROL PERSON ALLEGATIONS

279. As detailed herein, and by virtue of their senior and controlling positions, the Individual Defendants directly participated in the management of Docusign; were directly involved in its day-to-day operations; were privy to non-public information about the Company; and had a duty to disseminate prompt, accurate, and truthful information about the Company.

280. Because of their positions of control and authority as senior executive officers of Docusign, the Individual Defendants were able to and did control the content of Docusign's SEC filings, press releases, and other public statements issued by or on behalf of Docusign during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants were responsible for the accuracy of the misstatements alleged herein.

## VII. CLASS ACTION ALLEGATIONS

281. On May 28, 2024, the Court certified this case as a class action. ECF No. 158. The claims herein are brought by and on behalf of Plaintiffs and on behalf of "[a]ll persons and entities

who or which, during the period from June 4, 2020 through June 9, 2022, inclusive (the 'Class Period'), purchased the publicly traded common stock of DocuSign and were damaged thereby."[15]

282. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Docusign had over 180 million outstanding shares of common stock and was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that the proposed Class has thousands of members and is geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Docusign and/or its transfer agent and may be notified of the pendency of this action by mail, using a customary form of notice.

283. Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct. Plaintiffs will fairly and adequately protect the Class members' interests and have retained counsel competent and experienced in class and securities litigation.

284. Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual Class members. The questions of law and fact common to the Class include whether (i) Defendants' misstatements were materially misleading; (ii) Docusign's common stock price was artificially inflated (and to what extent) because of the alleged misstatements; (iii) Defendants acted with the requisite level of scienter;

---

[15] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Docusign during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Docusign's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

(iv) the Individual Defendants were control persons of Docusign; and (v) the members of the Class have sustained damages as a result of the fraud, and if so, the proper measure of such damages.

285. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

286. Plaintiffs and other Class members are entitled to a presumption of reliance on the misstatements alleged herein pursuant to the fraud-on-the-market theory, because (i) Defendants publicly made material misstatements that would tend to induce a reasonable investor to misjudge the value of Docusign's common stock; (ii) Plaintiffs and other Class members purchased Docusign's common stock between the time of Defendants alleged misstatements and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts; and (iii) the Company's common stock traded in an efficient market.

287. Docusign's common stock traded in an efficient market throughout the Class Period. Indeed, among other things, (i) Docusign's common stock met the requirements for listing and was actively traded on the NASDAQ, an efficient and automated market; (ii) Docusign filed periodic public reports with the SEC; (iii) Docusign regularly communicated publicly with investors, including regular dissemination of press releases; and (iv) Docusign was covered and reported on by many securities analysts employed by major brokerage firms during the Class

Period. Additionally, a reputable expert has concluded—and detailed his basis for such conclusion—that DocuSign's common stock traded in an efficient market. *See* ECF 111-2.

288. As a result of the foregoing, the market for Docusign's common stock promptly digested current information regarding Docusign from publicly available sources and reflected such information in Docusign's common stock prices. Under these circumstances, all persons and entities who or which purchased or otherwise acquired Docusign common stock during the Class Period suffered similar injuries through their purchase of Docusign common stock at artificially inflated prices and thus, the presumption of reliance applies.

## IX. NO SAFE HARBOR

289. The safe harbor provided by the PSLRA for certain forward-looking statements does not apply to any of the alleged misstatements.

290. The misstatements concern historical facts or existing conditions and are therefore not covered by the safe harbor. To the extent Defendants discussed forward-looking information while making any misstatements, such misstatements were materially misleading in their depiction of present or historical facts and are not entitled to PSLRA safe-harbor protection.

291. To the extent that any statement is forward-looking, it is not protected by the safe harbor because: (i) the misstatements were not identified as forward-looking; (ii) the misstatements were not accompanied by meaningful cautionary language; and (iii) Defendants made the misstatements with actual knowledge or through an executive with actual knowledge that they were materially misleading. Indeed, any cautionary language provided was not meaningful because any potential risks identified by Defendants had already manifested—Defendants failed to disclose that Docusign was experiencing waning demand for eSignature as businesses returned to an in-person work environment and COVID one-time use cases ended, Adobe and other

competition adversely affected Docusign's eSignature business, and CLM sales struggled, thus leading to declining billings growth.

292. As to many oral and other misstatements (*i.e.*, those made at analyst conferences, Docusign's Analyst Day, and in Alhadeff's Tweet, *see* ¶¶63, 84, 86, 102, 121, 146, 171, 172, 183, 185, 199),[16] Defendants did not include cautionary statements that the particular oral statements were forward-looking or that "actual results might differ materially from those projected in the forward-looking statement," as is required to invoke the safe harbor. 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).

## X. CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder Against Docusign and the Individual Defendants**

293. Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

294. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Docusign and the Individual Defendants.

295. As alleged herein, throughout the Class Period, Docusign and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Docusign

[16] Although the analyst conference transcripts for some of these misstatements (*see e.g.*, ¶¶ 84, 86) provide generic language about forward-looking statements, it appears that this was a standard disclaimer added by the company that owns and distributes transcripts, not Docusign.

and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of Docusign common stock; and (iii) cause Plaintiffs and members of the Class to purchase Docusign common stock at artificially inflated prices.

296. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

297. As set forth above, Docusign and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Docusign common stock during the Class Period.

298. In ignorance of the false and misleading nature of Docusign's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Docusign common stock, Plaintiffs and other members of the Class purchased Docusign common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Docusign common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Docusign common stock declined precipitously, and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their

purchases of Docusign common stock at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

299. By virtue of the foregoing, Docusign and the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

300. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

301. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

302. The Individual Defendants had control over Docusign and made the materially false and misleading statements and omissions on behalf of Docusign within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements, which Plaintiffs contend were false and misleading. The Individual Defendants were provided with, or had unlimited access to, the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

303. In particular, the Individual Defendants had direct involvement in and responsibility over Docusign's day-to-day operations and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein.

304. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

305. WHEREFORE, Plaintiffs pray for judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs' counsel as Lead Counsel for the Class;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such equitable, injunctive, or other relief as deemed appropriate.

## JURY DEMAND

306. Plaintiffs demand a trial by jury.

DATED: May 22, 2025

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

/s/ Irina Vasilchenko
Carol C. Villegas (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
Matthew J. Grier (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
ivasilchenko@labaton.com
mgrier@labaton.com

*Counsel for Class Representatives and Lead Counsel for the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**

Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

*Liaison Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
(admitted *pro hac vice*)
7080 Northwest 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Class Representative PERSI*

**DRRT**
Joseph Gulino (admitted *pro hac vice*)
340 West Flagler Street, 2nd Floor
Miami, Florida 33130
Tel: 1 (305) 760-8030
Fax 1 (305) 760-8030
jgulino@drrt.com

*Additional Counsel for Class Representative DIL*

**RISCH PISCA, PLLC**
Jason S. Risch
(admitted *pro hac vice*)
407 W. Jefferson St.
Boise, ID 83702
Tel: (208) 345 9929
jrisch@rischpisca.com

*Additional Counsel for Class Representative PERSI*

## CERTIFICATE OF SERVICE

1. I HEREBY CERTIFY that on May 22, 2025 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ *Irina Vasilchenko (admitted pro hac vice)*