LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Whitney B. Weber (Bar No. 281160)
*whitney.weber@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: 415.391.0600

Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
*susan.engel@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

Michele D. Johnson (Bar No. 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: 714.540.1235

*Attorneys for Defendants Docusign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff*

*[Additional Counsel Listed Below]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| RICHARD R. WESTON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOCUSIGN, INC., DANIEL D. SPRINGER, MICHAEL J. SHERIDAN, CYNTHIA GAYLOR, and LOREN ALHADEFF,<br><br>Defendants. | CASE NO. 3:22-cv-00824-VC (SK)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AND STRIKE THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: September 11, 2025<br>Time: 10:00 A.M.<br>Courtroom: Courtroom 4 – 17th Floor<br>Judge: Hon. Vince Chhabria |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. Plaintiffs Fail to Plead an Actionable Misstatement or Omission ..... 5

1. The FY21 and 1Q22 Statements Were Not False or Misleading ..... 5

2. The 2Q22 Through 1Q23 Statements Were Not False or Misleading ..... 8

3. The Challenged Statements Are Not Actionable ..... 9

B. Plaintiffs Do Not Plead a Strong Inference of Scienter ..... 12

1. Defendants' Stock Sales Do Not Establish Motive to Commit Fraud ..... 12

2. The Documentary Evidence Shows Transparency, Not Fraud ..... 13

3. Plaintiffs' Remaining Allegations Do Not Establish Scienter ..... 16

4. Plaintiffs Do Not Plead a Strong Inference of Scienter as to Docusign ..... 17

C. Plaintiffs Fail to Plead Loss Causation ..... 18

D. Plaintiffs' Challenges to the CLM and Competition Statements Fail ..... 19

III. CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Akimenko v. Mayorkas*,
2022 WL 1539519 (N.D. Cal. May 16, 2022) ... 12

*AMI – Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*,
2024 WL 4353637 (N.D. Cal. Sept. 3, 2024) ... 10

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ... 3

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ... 16

*Chang v. Accelerate Diagnostics, Inc.*,
2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ... 2

*Chicago & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
2024 WL 4375775 (N.D. Cal. Oct. 2, 2024) ... 6, 7

*Chicago & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
2025 WL 82206 (N.D. Cal. Jan. 13, 2025) ... 2

*Curry v. Yelp Inc.*,
2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ... 9

*Elec. Workers Pension Fund v. HP, Inc.*,
2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) ... 13

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ... 13

*Habelt v. iRhythm Techs., Inc.*,
2022 WL 971580 (N.D. Cal. Mar. 31, 2022) ... 16

*Hadian v. Fate Therapeutics, Inc.*,
2024 WL 4246083 (S.D. Cal. Sept. 19, 2024) ... 13

*Hessefort v. Super Micro Comp., Inc.*,
2020 WL 1551140 (N.D. Cal. Mar. 23, 2020) ... 17

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ... 4

*In re Acuity Brands, Inc. Sec. Litig.*,
2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) .......... 20

*In re Apple Comp. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .......... 3

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) .......... 4

*In re Enovix Corp. Sec. Litig.*,
2024 WL 349269 (N.D. Cal. Jan. 30, 2024) .......... 15

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal., Nov. 23, 2021) .......... 6

*In re Fusion-io, Inc. Sec. Litig.*,
2015 WL 661869 (N.D. Cal. Feb. 12, 2015) .......... 9

*In re Intel Corp. Sec. Litig.*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) .......... 8

*In re Intuitive Surgical Sec. Litig.*,
2017 WL 363269 (N.D. Cal. Jan. 25, 2017) .......... 4, 11

*In re iRobot Corp. Sec. Litig.*,
527 F. Supp. 3d 124 (D. Mass. 2021) .......... 11

*In re JDS Uniphase Corp. Sec. Litig.*,
2003 WL 26615705 (N.D. Cal. Nov. 3, 2003) .......... 6

*In re Keryx Biopharms., Inc., Sec. Litig.*,
2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) .......... 13

*In re Leapfrog Enter., Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016) .......... 10

*In re LeapFrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) .......... 13

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) .......... 20

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
806 F. App'x 603 (9th Cir. 2020) .......... 18

*In re Pfizer Inc. Sec. Litig.*,
2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) .......... 3, 4

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) .......... 11

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) .......... 10

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020) .......... 12

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .......... 13

*In re Verisign, Inc., Deriv. Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) .......... 12

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021) .......... 18

*Jaszczyszyn v. Sunpower Corp.*,
2024 WL 3463348 (N.D. Cal. July 17, 2024) .......... 12

*Joyce v. Amazon.com, Inc.*,
2025 WL 835054 (W.D. Wash. Mar. 17, 2025) .......... 17

*Kim v. Advanced Micro Devices, Inc.*,
2019 WL 2232545 (N.D. Cal. May 23, 2019) .......... 17

*Kong v. Fluidigm Corp.*,
2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) .......... 10

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) .......... 18

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .......... 10, 13

*Lloyd v. CVB Fin. Corp.*,
2012 WL 12883517 (C.D. Cal. Aug. 21, 2012) .......... 7

*Lomingkit v. Apollo Educ. Grp.*,
2017 WL 633148 (D. Ariz. Feb. 16, 2017) .......... 3

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .......... 18

*Markette v. XOMA Corp.*,
2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) .......... 11

*McGovney v. Aerohive Networks, Inc.*,
367 F. Supp. 3d 1038 (N.D. Cal. 2019) ........ 2, 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ........ 12, 13, 14

*Mineworkers' Pens. Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ........ 18

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ........ 12

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ........ 14

*Plumbers & Steamfitters Local 60 Pens. Trust v. Meta Platforms, Inc.*,
2024 WL 4251896 (N.D. Cal. Sept. 17, 2024) ........ 18, 19

*Police and Fire Ret. Sys. of the City of Detroit v. Crane*,
87 F. Supp. 3d 1075 (N.D. Cal. 2015) ........ 12

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021) ........ 17

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ........ 12

*Robb v. Fitbit Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........ 14

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) ........ 12

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) (Opp. ) ........ 16

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
2023 WL 11691540 (N.D. Cal. Aug. 18, 2023) ........ 17

*Shemian v. Research In Motion Ltd.*,
2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ........ 7

*Strifling v. Twitter Inc.*,
2024 WL 54976 (N.D. Cal. Jan. 4, 2024) ........ 4

*Un. Asset Mgmt. Holding AG v. Sandisk Corp.*,
2016 WL 406283 (N.D. Cal. Jan. 22, 2016) ........ 4, 10

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ........ 4

*Vaughan v. Wardhaugh*, 2025 WL 251694 (N.D. Cal. Jan. 21, 2025) ........ 9, 10, 19

*Weston Fam. P'Ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) ........ 8

*Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266 (N.D. Cal. 2019) ........ passim

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ........ 16

# GLOSSARY OF DEFINED TERMS

**THE FOLLOWING TERMS ARE USED IN THIS MEMORANDUM:**

| Term | Definition |
|---|---|
| ¶: | Citation to the paragraph numbers in Plaintiffs' Third Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 273) |
| 1H21: | The first half of FY21 (February 1, 2020 through July 31, 2020) |
| 1Q21, 2Q21, 3Q21, 4Q21, 1Q22, 2Q22, 3Q22, 4Q22, 1Q23: | Quarterly periods, starting with the first quarter of FY21 (February 1, 2020 through April 30, 2020) through the first quarter of FY23 (February 1, 2022 through April 30, 2022) |
| 2H21: | The second half of FY21 (August 1, 2020 through January 31, 2021) |
| AC: | Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws, filed July 8, 2022 (Dkt. No. 59) |
| App. A: | Appendix A to the Motion (Dkt. 279), listing in tabular format statements challenged by Plaintiffs in their TAC |
| CEO: | Chief Executive Officer |
| CFO: | Chief Financial Officer |
| Challenged Statements: | The statements Plaintiffs allege are false or misleading in their TAC (Dkt. 273), ¶¶53-56, 63, 80-82, 84, 86, 97-99, 102, 110, 113-114, 118-119, 121, 143-144, 146, 167-168, 171-172, 183, 185, 190-191, 194, 199, 207-208, 214, 220-221, 223, 241 |
| Class Period: | June 4, 2020 through June 9, 2022, inclusive |
| CLM: | Docusign's Contract Lifecycle Management product |
| COO: | Chief Operating Officer |
| CW(s): | Confidential Witness(es), as identified in Plaintiffs' July 8, 2022 AC, ¶¶49-64 |
| Defendants: | Docusign, former Docusign CEO and Director Daniel D. Springer, former Docusign CFO and President of International Michael J. Sheridan, former Docusign CFO Cynthia Gaylor, and former Docusign Chief Revenue Officer Loren Alhadeff |
| Docusign or the Company: | Docusign, Inc. |
| Exchange Act: | Securities Exchange Act of 1934 |
| Exhibit(s) or Ex(s).: | Exhibits attached to the Declaration of Whitney Weber (Dkt. 279-2), which are public filings and documents that are incorporated into the TAC and/or subject to judicial notice |

| | |
|---|---|
| FY20, FY21, FY22, FY23: | Fiscal years, starting with fiscal year 2020 through fiscal year 2023. Docusign's fiscal year begins on February 1 and ends on January 31, *i.e.*, fiscal year 2020 was February 1, 2019 through January 31, 2020, fiscal year 2021 was February 1, 2020 through January 31, 2021, fiscal year 2022 was February 1, 2021 through January 31, 2022, and fiscal year 2023 was February 1, 2022 through January 31, 2023 |
| HR: | Human Resources |
| Individual Defendants: | Former Docusign CEO and Director Daniel D. Springer, former Docusign CFO and President of International Michael J. Sheridan, former Docusign CFO Cynthia Gaylor, and former Docusign Chief Revenue Officer Loren Alhadeff |
| Motion or Mot.: | Defendants' Motion to Dismiss Third Amended Class Action Complaint (Dkt. 279) |
| Opposition or Opp.: | Plaintiffs' Opposition to Defendants' Motion to Dismiss Third Amended Class Action Complaint (Dkt. 286) |
| Plaintiffs: | Public Employee Retirement System of Idaho and Deka International S.A. Luxembourg |
| PSLRA: | Private Securities Litigation Reform Act of 1995 |
| RSU: | Restricted Stock Unit |
| SAC: | Second Amended Class Action Complaint for Violations of the Federal Securities Laws, filed April 14, 2025 (Dkt. 252) |
| SEC: | United States Securities and Exchange Commission |
| TAC: | Plaintiffs' Third Amended Class Action Complaint for Violations of the Federal Securities Laws, filed May 22, 2025 (Dkt. 273) |
| YoY: | Year-over-year |

## I. INTRODUCTION

Plaintiffs' Opposition confirms they have no cogent theory of fraud. Throughout, Plaintiffs insist that the TAC is the "same" as their AC—just "based on internal documents, instead of CWs"—and that the Court should thus adopt Judge Orrick's prior ruling. Opp. at 3-4. That is false. Now missing from the TAC is any allegation that customer demand declined at all, let alone to pre-pandemic levels. Instead, the TAC repeats the AC's allegation that Defendants knew of "internal warning signs" that Docusign's growth would slow—without ever alleging that those warning signs came to fruition. That stands in stark contrast to the AC, which had alleged, based upon now-disavowed CW allegations, that by late 2020 "internal metrics *proved out* those initial warning signs," with customer demand declining Company-wide year-over-year. Dkt. 88 at 10. In other words, the AC alleged that by late 2020, customers were supposedly using Docusign's products *less* than they had in late 2019 before the pandemic began. *E.g.*, AC ¶¶ 17, 140, 148; Dkt. 219 at 12-13. That alleged drop in demand is what Judge Orrick specifically relied upon in allowing the AC to survive, holding that Defendants' statements about continued growth were contradicted by Plaintiffs' allegations about "waning demand in DocuSign products, as evidenced by customer usage and retention metrics." Dkt. 88 at 2, 10, 28; Dkt. 219 at 2.

But now, those allegations—not just the CWs themselves, but any metric showing any drop in demand—are gone from the TAC. Plaintiffs admit that throughout the Class Period, demand did *not*, in fact, wane. Just the opposite, and as Defendants truthfully disclosed in the Challenged Statements, demand continued to grow, initially at "pandemic-era" high rates, then—beginning in the last quarter of FY21—at lower rates, but still growing. Opp. at 10; *id*. at 12-13 (noting "drop in [consumption] *growth rate*," not that "consumption declined in absolute terms"); *id*. at 15 ("the TAC alleges a slowdown in growth, *not a business decline in absolute terms*"). Plaintiffs are left only with allegations about "internal warning signs" that "growth rates" would "decelerate[]" post-COVID. Opp. at 1, 6. This leftover theory, however, runs headlong into Defendants' disclosures to investors to expect just that. From the outset, Defendants told investors that while they expected demand to grow, it would be, and was, growing at decelerating rates. Mot. at 5, 9. That Defendants publicly disclosed exactly what Plaintiffs say was concealed is the opposite of fraud.

Beyond this fatal, cross-cutting defect, Plaintiffs' Opposition also confirms that their TAC fails to allege falsity, scienter, and loss causation—and that their attempt to resuscitate the dismissed CLM and competition claims is not just improper, but that Plaintiffs come nowhere close to pleading a securities-fraud claim on those statements, either. The TAC must be dismissed.

## II. ARGUMENT

Plaintiffs now concede that Docusign *grew* throughout the entire Class Period. Yet they double-down on their theory that Defendants falsely "assured investors" that Docusign's "explosive pandemic-era [] demand and related billings growth were sustainable long-term." Opp. at 6. That theory is divorced from reality: *none* of the Challenged Statements say that Docusign would continue to grow at pandemic-level highs.[1] To the contrary, Defendants "disclose[d] exactly what Plaintiffs claim [they] omitted," *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019)—*i.e.*, that "demand will continue" but "*not continue* at the pace that we saw" in the early months of COVID. ¶102; *see also* Ex. 6 at 10 (highs not "going to be sustained"); Ex. 11 at 2 (guidance "not at the same rate of billings growth or revenue growth we had in the first half because that was with an unusually heightened demand"); Ex. 12 at 15 (expecting a "lack of [] accelerant occurring [] post-pandemic"). These disclosures doom Plaintiffs' claims. *Chicago & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2025 WL 82206, at *2 (N.D. Cal. Jan. 13, 2025) (dismissing where "forecasted growth" was "below" rate from prior quarters).

Recognizing as much, Plaintiffs ask the Court to ignore these disclosures entirely, claiming that by relying on them, Defendants are raising improper "summary judgment-style evidentiary attacks" or a "truth-on-the-market defense." Opp. at 3, 15. But as the Court recently recognized in rejecting the first argument, "the Ninth Circuit has affirmed multiple dismissals on exactly this basis." *Amplitude*, 2025 WL 82206, at *1. And reading a statement "in context"—as the Ninth Circuit instructs—is "*not* a truth-on-the-market defense." *Chang v. Accelerate Diagnostics, Inc.*,

[1] Specifically, the Challenged Statements (i) reported on demand that had already happened (*e.g.*, ¶81 ("[w]e've seen a sustained rise in demand")), (ii) expressed confidence in Docusign's business model going forward (*e.g.*, ¶102 ("continue to see that accelerated demand"), ¶119 ("we believe [the digital transformation is] going to continue to happen for years")), and (iii) conveyed Defendants' belief that Docusign would continue to grow and retain its customer base (*e.g.*, ¶53 ("Once [customers] take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, they rarely go back")).

2016 WL 3640023, at *5 (D. Ariz. Jan. 28, 2016) (citing *In re Apple Comp. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989)). Indeed, Defendants told investors to expect slowing growth rates on the *same* calls where Defendants made the Challenged Statements—including when Defendants issued public guidance that Plaintiffs ignore. *Lomingkit v. Apollo Educ. Grp.*, 2017 WL 633148, at *15 (D. Ariz. Feb. 16, 2017) (must "examine allegedly false" "statements" in "broader context"). And contrary to Plaintiffs' contention, Opp. at 16, investors understood these warnings. Analysts repeatedly noted the "decel" and moderating growth rates reflected in Docusign's guidance, and—as Docusign continued exceeding that guidance—questioned whether Defendants were being conservative (and Defendants assured analysts that they were not). *E.g.*, Ex 2 at 8-9 (analyst noting "guidance [] calls for" "a decel in Q2"); Ex. 6 at 7 (analyst noting "guidance for the second half [of FY21] does look like a pretty different kind of growth trajectory"); Ex. 10 at 6 (analyst noting that 4Q21 guidance was "a material deceleration … from the growth levels that we've seen"); Ex. 22 at 12 (analysts noting guidance was "more conservative").

Plaintiffs also urge the Court to blindly adopt Judge Orrick's prior order as its own under the law of the case doctrine. But that doctrine *does not apply to a "motion to dismiss an amended complaint*." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1038, 1043 (9th Cir. 2018). Regardless, Judge Orrick allowed this case to proceed based on entirely different allegations and theories Plaintiffs no longer advance here. Far from a "routine[]" amendment that merely "refine[s] the complaint," *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *2 (S.D.N.Y. Mar. 22, 2012) (Opp. at 5), the TAC substantially alters this action by omitting *all* CW allegations and the central theory Plaintiffs claimed the CWs supported: that internal metrics showed demand declined in absolute terms by late-2020 and early-2021, while Defendants represented to the public that demand was continuing. *See* Dkt. 88 at 10 ("by December 2020, customer usage levels had declined by approximately 30% year-over-year"). Plaintiffs now admit the "TAC alleges a slowdown in *growth*, not a business decline in absolute terms." Opp. at 15.

Plaintiffs' pleading deficiencies only exacerbate these problems. Plaintiffs do not seriously dispute that their TAC is an impermissible puzzle pleading—instead blaming Defendants for finding it "confusing." *Id.* at 5. But the TAC's defects are not limited to a "handful of cherry-

picked allegations" as Plaintiffs suggest, Opp. at 5—they plague the entire TAC. Mot. at 7-8.[2] Indeed, by jamming the 99-page TAC with (misleading) snippets of over 200 internal documents (most of which the Individual Defendants never even received), it is impossible to discern why Plaintiffs allege each Challenged Statement was false *when made*, let alone how each was made with scienter. *Id*. Plaintiffs' Opposition makes this clear. They point, for example, to documents from May and June 2021 purportedly discussing a "sales slowdown"—but they *never explain* how those documents even relate to the Challenged Statements, much less render them false. Opp. at 12-13. Likewise, in their scienter argument, Plaintiffs purport to summarize documents they claim show the Individual Defendants were "expressly informed" of "demand red flags contradicting their public statements," but they tellingly never connect those documents to the Challenged Statements themselves. Opp. at 20. The TAC is just a "skeletal, disjointed chronology" that does not "meet the demanding pleading standards of the PSLRA." *Un. Asset Mgmt. Holding AG v. Sandisk Corp.*, 2016 WL 406283, at *4 (N.D. Cal. Jan. 22, 2016).

In any event, all of those allegations should be stricken, as they go beyond the scope of leave to amend Plaintiffs' AC to "*exclude* any CW allegation that does not have evidentiary support." Dkt. 230 at 3, 4, 5; Mot. at 7. Indeed—unlike their cited authority—Plaintiffs never sought leave to add allegations nor specified the allegations and theories they intended to add or withdraw. *See In re Intuitive Surgical Sec. Litig.*, 2017 WL 363269, at *1 (N.D. Cal. Jan. 25, 2017) (adding documentary evidence to complaint only after asking for and receiving leave of court to do so); *Pfizer*, 2012 WL 983548, at *1 (same); *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL 39936, at *7 (N.D. Cal. Jan. 6, 2025) (permitting plaintiff to "seek leave to amend" after discovery).[3] The TAC must be dismissed and the improper allegations stricken.

---

[2] Plaintiffs' cited cases are inapposite. *Homyk v. ChemoCentryx, Inc.* provided a "list of reasons" as to why each statement was "misleading when made." 2023 WL 3579440, at *6-7 (N.D. Cal. Feb. 23, 2023). And in *In re Apple Inc. Sec. Litig.*, plaintiffs included reasons "specific to each statement" in a "well-structured logical" format. 2020 WL 2857397, at *8 (N.D. Cal. June 2, 2020).

[3] Defendants "did not raise any objection" in the parties' joint stipulations modifying case schedules or page limits (Opp. at 5) because the proper time to do so is in connection with their Motion. *See, e.g.*, *Strifling v. Twitter Inc.*, 2024 WL 54976, at *1 (N.D. Cal. Jan. 4, 2024).

**A. Plaintiffs Fail to Plead an Actionable Misstatement or Omission**

**1. The FY21 and 1Q22 Statements Were Not False or Misleading**

Plaintiffs argue that Defendants' statements about continued demand, and expressing confidence that once customers used Docusign's products, they wouldn't go back to pen and paper, App. A at 1-4, 7-10, 12, 14-17, 19-22, 25, 27, 30-33, were purportedly "inconsistent with" internal documents. Opp. at 6. But none of the cited documents contradicts the Challenged Statements.

***COVID-Related Customers***. Plaintiffs first say Defendants concealed that a "substantial" portion of Docusign's new customers were "COVID one-time use cases." Opp. at 7. But Plaintiffs again confuse temporary, onetime uses that would disappear post-COVID, with customers who signed up for a *single* use that was *not* temporary but fed straight into Docusign's "land and expand" business model. ¶17. That is why Plaintiffs' challenge to Sheridan's June 2020 statement (to cite one example) fails. ¶54. During the June 2020 earnings call, Sheridan said that temporary "use cases that are more project-oriented or onetime in nature" were the "extreme minority"—*not* that people who signed up during COVID for a single use (*e.g.*, to administer HR paperwork electronically) were "the extreme minority." Ex. 2 at 6; Opp. at 7. And that 25% of 1Q21 bookings were "COVID-19 related," Opp. at 7, was no secret—Defendants readily acknowledged COVID "brought some of that demand to us" and "accelerat[ed]" demand. Ex. 2 at 2, 6. Indeed, Springer provided examples of several customers that came to Docusign for a single use during COVID (*e.g.*, "to onboard employees"). *Id*. at 8. But he and Sheridan believed those customers would "stay with us because the value proposition" of eSignature (*i.e.*, digitizing "[c]ore business processes") applied whether people were "remote working or in-office working," *id*. at 3, 6—just as the pre-Class Period presentation Plaintiffs rely upon predicted. Ex. 35 at 46 ("seeing the power of the [eSignature] solution in addressing these use cases will open new areas for sales"). After all, as Plaintiffs admit, that was Docusign's entire business model. ¶17, ¶70 ("Docusign's 'goal is to take any single use case accounts from COVID, and increase their use case awareness.'").

Nor did Docusign conceal an alleged decline in COVID customers' contract length. Opp. at 7-8. Docusign disclosed its average contract length, which remained largely static throughout the Class Period at 18 months. *E.g.*, Ex. 3 at 5, Ex. 7 at 5, Ex. 13 at 5. And when it "tick[ed] down

slightly to 17 months" in 2Q21 (before returning to 18 months in 1Q22), Docusign disclosed that, too. Ex. 6 at 12. Plaintiffs argue this was insufficient, claiming the disclosure nonetheless concealed that contract lengths declined among Docusign's "largest" enterprise customers. Opp. at 16. But again, Plaintiffs ignore that Sheridan specifically attributed the "tick down" to "larger enterprises." Ex. 6 at 12; *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *15-16 (N.D. Cal., Nov. 23, 2021) ("plaintiff ignores the express disclosures defendants made"). Docusign also reported average contract length on a "dollar weighted" basis, which places greater weight on the value of contracts from Docusign's largest customers—and that, too, remained static. Ex. 13 at 5; Ex. 32 at 4. Regardless, none of the Challenged Statements say anything about contract length. *Chicago & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2024 WL 4375775, at *2 (N.D. Cal. Oct. 2, 2024) (must "match up" statement with a "reason [] why it is misleading").

***Consumption and Churn.*** Plaintiffs next point to anecdotal "concerns" that salespeople (not Defendants) noted between May and July 2020 that the "COVID-related consumption boost" may "wane in the months ahead," or that Docusign may see "churn in FY22" for accounts "related to [C]ovid." Opp. at 8-9. But Plaintiffs admit that consumption had *not* "wane[d]" and customers had *not* "churn[ed]" at this time. Opp. at 12 (TAC "does not allege that consumption declined in absolute terms"). So, none of the supposedly omitted "concerns" contradicts any of the Challenged Statements about continued demand, including Springer's September 2020 statements noting the "trends that emerged in the latter half of Q1 have continued throughout Q2" and that "[w]e've seen a sustained rise in demand." ¶81. Indeed, in 2Q21, Docusign recorded YoY billings growth of 61% (higher than 1Q21), added 88,000 customers (20,000 more than in 1Q21), and posted a higher net retention than in 1Q21 (120% vs. 119%). Mot. at 5; *In re JDS Uniphase Corp. Sec. Litig.*, 2003 WL 26615705, at *4 (N.D. Cal. Nov. 3, 2003) (no "reasonable explanation for how [defendant] could be experiencing [] uncontroverted revenue growth without experiencing strong demand").

Still, as Docusign continued to grow, Defendants acknowledged that COVID had "accelerat[ed]" demand for its products, and—on the very next earnings call *after* salespeople expressed "concerns"—Springer told investors that, "I don't think [] we expect" the growth rates of 1H21 "to happen again, by any means, next quarter," as "there would be some lack of that

accelerant occurring." Ex. 12 at 15. He also expressly acknowledged "the potential for churn" post-pandemic. *Id.* at 12; Mot. at 9, 13. Plaintiffs' cherry-picked documents are thus entirely consistent with Defendants' public disclosures. *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883517, at *14 (C.D. Cal. Aug. 21, 2012) (documents "support[ed] an inference that when concerns arose…defendants made efforts to disclose the situation in a timely manner").

Plaintiffs also argue that by "late 2020," there was "declining consumption" within a small subset of customers from the height of COVID. Opp. at 10. But they ignore that among that cohort, consumption still remained *higher* than for non-COVID and pre-COVID customers, ¶91—and concede that Company-wide consumption grew *over 50%* YoY at that time. ¶126. And although Plaintiffs argue that by "Spring 2021," "consumption *growth*" declined, they admit that consumption still *grew* YoY. Opp. at 12. That the *rate* of growth decelerated was exactly what Gaylor predicted would (and would be expected to) happen when measured against a significantly increased base: Docusign "will have tough" YoY growth "compares" in FY22 due to the incredibly high growth Docusign experienced at the start of the pandemic. Ex. 12 at 4, 10. That growth *rates* declined after April 2021, *i.e.*, a year after the start of the pandemic, does not show the Challenged Statements were false—it confirms Gaylor's "predictions were correct." *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *22 (S.D.N.Y. Mar. 29, 2013).

***Sales "Slowdown."*** Plaintiffs next point to a "sales slowdown," which they say rendered false Sheridan's September 2020 statement that "we don't see trends that things are going to return to the way they looked and trended pre-COVID." Opp. at 9; ¶82. This fails for three reasons. *First*, Sheridan wasn't talking about sales—the "trend" he referred to was customers' "awareness of [the] need to digitize the[ir] business." ¶82; *Amplitude, Inc.*, 2024 WL 4375775, at *2. *Second*, that Defendants discussed in July 2020 that demand might "'cool off' in the months to come" was not "inconsistent with" their public statements. Opp. at 9. To the contrary, that is exactly what they predicted would happen during the same September 2020 earnings call. Ex. 6 at 5, 10; Ex. 11 at 2. And *third*, Plaintiffs concede that, in fact, sales did *not* slow, Opp. at 10—indeed, the next quarter (3Q21), Docusign's billings grew a record *63%* YoY, with salespeople exceeding their quotas. Ex. 12 at 3-4; ¶106. Defendants' statements are thus "uncontradicted by any of the plaintiffs'

allegations." *Weston Fam. P'Ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 n.5 (9th Cir. 2022).

The same is true for Gaylor's January 2021 statement that we "continue to see that accelerated demand." ¶102. Again, Plaintiffs admit that demand *had* continued to accelerate at this time, Opp. at 10, yet they claim Gaylor concealed that the "2020 growth trends were not permanent," citing internal documents noting a "lower volume of inbound leads" and forecasting a "return[] to more normalized levels, pre-COVID." Opp. at 9-10. But again, Gaylor warned exactly that: "we've certainly been a beneficiary of that [COVID-related] demand," which "will continue," "just *not* [] at the pace that we saw earlier this year [in FY21]." Ex. 14 at 2; *Twitter*, 29 F.4th at 622. Likewise, Plaintiffs suggest that Springer's and Gaylor's June 2021 statements that customers "simply don't go back" to pen and paper were false because Alhadeff was supposedly "nervous" Docusign would "miss [2Q22] sales plan," and a different employee thought Summer 2021 would be a "blood bath for sales velocity." Opp. at 12-13. But Springer's and Gaylor's statements "bear no connection" to the aspirational, internal sales targets. *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276-78 (N.D. Cal. 2019). And whether or not those targets were met, Plaintiffs concede that sales *were* continuing to grow, Opp. at 12, 15—while Defendants repeatedly warned that Docusign's growth *rates* would start to decline. Mot. at 5, 9.

**2. The 2Q22 Through 1Q23 Statements Were Not False or Misleading**

Plaintiffs argue Springer's September 2021 statement falsely assured of "demand sustainability." Opp. at 13. Not so. In fact, during the September 2021 call, analysts recognized that Docusign would "*not* hav[e] sustainable growth at the peak levels of the pandemic." Ex. 22 at 7. That was why, when asked about Docusign's decelerating billings guidance, Springer said that he believed the guidance was "strong"—but noted the "peak of COVID" "was a big tailwind for us," and it would be "difficult" "to deliver" those growth rates in the "long run." *Id.* at 12-13. Still, Springer explained that, while growth *rates* would drop, he did not have a "perspective" of a "*significant* slowdown" in the business, given the "new customer adds" and "revenue growth." *Id.* at 4, 12-13 (Docusign added 65,000 customers, with net retention of 124%); *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *11 (N.D. Cal. Mar. 29, 2019) ("relevant context undermines plaintiff's allegations"). None of the internal documents Plaintiffs cite suggest otherwise. Opp. at

13-14. Indeed, Plaintiffs admit both consumption and sales *grew* YoY, just at lower rates. *Id*. That was why Docusign continued to project growth—but, as Defendants explained, not at "peak levels," in part because of "consumption trends." Ex. 22 at 9-10. In context, "no reasonable investor could have understood [Springer's] statements to mean" anything other than what he said. *Curry v. Yelp Inc*., 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015).

Plaintiffs also challenge Springer's statement that "we're not seeing any differences in churn rates in any meaningful way," arguing that churn within "Digital" and "Financial Services" was higher than Docusign's internal targets. Opp. at 13-14. But Springer was discussing *Company-wide* churn, Ex. 22, and Plaintiffs concede there were *no* meaningful differences there. *Id.* at 14 n.16 (churn at "102%," in line with target); *see also* Mot. at 15.

Finally, Plaintiffs say Gaylor's September 8, 2021 statement (which they distort entirely), and Springer's December 2021 and March 2022 statements (which they don't quote at all) were false. Opp. at 13. But Plaintiffs do not even attempt to explain how that is so, and thus have waived any argument as to those statements. *Vaughan v. Wardhaugh*, 2025 WL 251694, at *1 (N.D. Cal. Jan. 21, 2025); *see also* Mot. at 15-16.

### 3. The Challenged Statements Are Not Actionable

***The PSLRA Safe Harbor***. Plaintiffs admit that eight of the Challenged Statements are forward looking. App. A at 3, 12, 14, 18, 21, 25, 29-30. The remaining twenty are either forward-looking on their face—or Plaintiffs strategically omit the forward-looking language. *Id*. at 1-2, 4, 8, 10, 15-16, 19-20, 22, 26-27, 31-33, 35, 37-40. For instance, Plaintiffs say Sheridan's statement "we don't see trends" was not forward-looking, Opp. at 17, but leave out (1) that he was responding to an analyst question asking about "driving sales" "over the next 6 months," and (2) the rest of his statement—"[i]n terms of what we *will anticipate post-COVID*," "[w]e believe that" a "greater awareness of need to digitize the business" is "*going to be sustained* even after things return to whatever normal looks like in the future." App. A at 10; Ex. 6 at 9-10; *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *11 (N.D. Cal. Feb. 12, 2015) (statements about current conditions "made in response to an analyst question" about future forward looking). Plaintiffs do the same when they quote Springer as saying, "in our experience, it's very rare to see anyone go back to

paper" (Opp. at 17)—omitting the critical part where he said the pandemic is "causing greater adoption of our offerings, something we believe *will persist beyond the crisis*." App. A at 8; *see also* Opp. at 17 (excerpting "customers 'rarely go back'" but omitting, "*even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes*"). In each statement Defendants identified, "'then-present effects and circumstances[]' of known trends" were inputs about the "*future*" of Docusign's business. *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 991-92 (N.D. Cal. 2017); *Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *9 (N.D. Cal. Aug. 4, 2021) ("[w]e're seeing really strong global funnel development" and "we continue to be very encouraged by the demand that we've seen" forward looking); Mot. at 16.

Relying on Judge Orrick's prior decision, Plaintiffs also contend that Docusign's "risk disclosures were not meaningful" because Defendants "warned of *potential* 'risks and uncertainties'" when "some of those risks had *already* come to pass." Opp. at 18. But the allegations Judge Orrick relied upon are gone from the TAC. Dkt. 88 at 26-27. Plaintiffs now allege only that Defendants were aware of purported "red flags" that demand *may* decline—not that demand *had* declined. Opp. at 18.; *see also id*. at 10, 12, 15. And of course, while Docusign grew every Class-Period quarter, Defendants continued to warn investors that they expected demand to "moderate" and "*not* continue at the pace that we saw" at the height of the pandemic—projecting decelerating growth rates. Mot. at 5, 9, 17. These disclosures "identify the very risks" Plaintiffs allege "came to fruition," yet Plaintiffs ignore them entirely. *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016); *Sandisk*, 2016 WL 406283, at *3.

Finally, Plaintiffs argue Defendants made the statements with "actual knowledge" of falsity. Opp. at 18. But their allegations do not show scienter, much less *actual* knowledge (a higher bar). *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002); *infra* II.B.

***<u>Opinions</u>***. Plaintiffs do not address twenty-three of the thirty-one opinion statements Defendants identified, App. A at 2-5, 8, 10, 12, 14-16, 18-19, 21, 23, 25-27, 30, 32-35, 38, and thus forfeit any challenge to them. *Vaughan* , 2025 WL 251694, at *1. As for the remaining eight, Plaintiffs say they lack "opinion qualifiers." Opp. at 18. But "not all statements of opinion include qualifying language like 'I believe' or 'I think.'" *AMI – Gov't Emps. Provident Fund Mgmt. Co.*

*Ltd. v. Alphabet Inc.*, 2024 WL 4353637, at *3 n.1 (N.D. Cal. Sept. 3, 2024); *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023). Plaintiffs also excerpt portions of Springer's and Sheridan's statements about what they "see" or have "seen," ¶¶54, 63, claiming they are "expressions of fact." Opp. at 18-19. But in context, the statements reflect Defendants' subjective state of mind on what they anticipate and believe, App. A at 1, 7, 20, 31, 36-37, 39-40—none are objectively verifiable. *See, e.g.*, *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 136 (D. Mass. 2021) ("we continue to see the new competitive products selling through Amazon" an opinion).

Plaintiffs next say Defendants' opinions "omitted many conflicting, material facts." Opp. at 19. But Plaintiffs do not identify *which* "facts" *each* opinion statement supposedly omitted or *how* these unspecified "facts" conflicted with Defendants' opinions. Nor can they. *Supra* II.A.1-2; Mot. at IV.B.1-3. And in a footnote, they say Defendants "did not hold the belief[s] [they] professed." Opp. at 19 n.28. But Defendants provided investors the specific bases for each opinion, none of which Plaintiffs challenge. *E.g.*, Ex. 15 at 3 ("we just don't see people going back in use cases" *because* of the "time lags and the cost increases" of "going back to the manual processes"); *Markette v. XOMA Corp.*, 2017 WL 4310759, at *5 (N.D. Cal. Sept. 28, 2017) (plaintiff "makes no effort to allege that Defendants 'did not hold the belief they professed,'" "opting instead to argue that their beliefs and expectations were ultimately not borne out").

***Puffery***. Plaintiffs do not address the twenty-nine statements Defendants identified as nonactionable corporate optimism nor the cases dismissing nearly identical statements. App. A at 1-2, 4, 6-9, 11-12, 14-16, 19-24, 26, 30-33, 35-40; Mot. at 19-20. Instead, they say *all* the statements are actionable under the law of the case doctrine. Opp. at 16, 19. That doctrine does not apply here. *Supra*, II. But in any event, Plaintiffs admit that Judge Orrick based his decision on allegations suggesting the statements "address specific aspects of a company's operation that the *speaker knows to be performing poorly*." Opp. at 19. The allegations Judge Orrick relied upon—reports that Company-wide consumption "declined by approximately 30% year-over-year" by December 2020, and by February 2021, consumption was at half the "targeted growth" (Dkt. 88 at 34)—are gone from this case. Plaintiffs allege no facts showing the statements amounted to anything more than "vague statements of optimism." *Intuitive*, 759 F.3d at 1060.

**B. Plaintiffs Do Not Plead a Strong Inference of Scienter**

**1. Defendants' Stock Sales Do Not Establish Motive to Commit Fraud**

Recognizing their inability to plead motive, Plaintiffs attempt to downplay its importance. They first say "motive is not required." Opp. at 24 n.38. That may be true when, as in *Police and Fire Retirement System of the City of Detroit v. Crane*, there were "compelling" allegations that defendants "systematically" concealed "a serious problem that obviously needed to be disclosed." 87 F. Supp. 3d 1075, 1085-87 (N.D. Cal. 2015). But here, Defendants repeatedly told investors—contrary to Plaintiffs' allegations—that while growth would continue, it would *not* be at pandemic-high rates. *See infra*, II.B.2; Mot. at 5, 9. And under these facts, where one Defendant (Sheridan) is not alleged to have sold any stock, it "supports an inference of *no scienter*" as to all Defendants, *Jaszczyszyn v. Sunpower Corp.*, 2024 WL 3463348, at *14 (N.D. Cal. July 17, 2024), because it suggests there was "*no insider information* from which to benefit." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).

As to Springer, Gaylor, and Alhadeff, Plaintiffs improperly group their sales, claiming the total "amounts" were "suspicious." Opp. at 24 ("*Defendants collectively* reaped over $193 million"). But "even large stock sales, without more, cannot give rise to a strong inference of scienter." *In re Verisign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007). That is particularly true here, since Plaintiffs admit Defendants sold under automatic Rule 10b5-1 plans. Opp. at 25; *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020). Plaintiffs also claim they sold between 19% and 26% of their shares, Opp. at 25—but again omit that when accounting for options and RSUs, the actual percentage is much smaller. Mot. at 21-24. And in any event, "typically 'larger sales amounts' than 37% of a defendant's holdings are *necessary* to support scienter." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1057 (N.D. Cal. 2018) (citing *Metzler*, 540 F.3d at 1067 (9th Cir. 2008)).[4] Plaintiffs likewise improperly include transactions

[4] Plaintiffs say Gaylor sold 35.7% of her shares (Opp. at 25 n.41) but that is not alleged in the TAC, and they "may not amend" through their "opposition." *Akimenko v. Mayorkas*, 2022 WL 1539519, at *4 (N.D. Cal. May 16, 2022). Moreover, neither of Plaintiffs' cited cases suggests Gaylor's sale was suspicious. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1231-32 (9th Cir. 2004) (giving "less weight" to percentage where one defendant sold "$900 million worth of stock"); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (*pre-PSLRA*

made to cover tax obligations, which "do not support a strong inference of scienter." *Elec. Workers Pension Fund v. HP, Inc.*, 2021 WL 1056549, at *7 (N.D. Cal. Mar. 19, 2021); Mot. at 22.[5]

Finally, Plaintiffs fail to show that Defendants' sales were "suspiciously timed"—in fact, they say there's "no requirement" that "sales be temporally linked to the [alleged] misstatements." Opp. at 25. Plaintiffs are wrong. To survive dismissal, Plaintiffs must identify "*contemporaneous* statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements *when made*." *Metzler*, 540 F.3d at 1066. Indeed, the Ninth Circuit has recognized that where, as here, the Class Period is long, "'it becomes difficult to see" how "sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made.'" *Hadian v. Fate Therapeutics, Inc.*, 2024 WL 4246083, at *37 (S.D. Cal. Sept. 19, 2024) (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002)). And here, Plaintiffs do not come close to doing so. They claim that Springer's February 1, 2021 sale was suspicious because in January, he noted the "Covid boom [was] coming back to earth." Opp. at 25. But Plaintiffs concede Springer adopted the 10b5-1 plan pursuant to which that sale occurred in *December*. *Id.* at 26. So they argue instead that in December, Springer learned of a "'trend' of a global sales slowdown" following the Covid highs. *Id.* But they ignore that Springer told the public just that days *before* he adopted his plan, warning of a "lack of . . . accelerant" post-Covid. Ex. 12 at 15; *Lipton v. Pathogen. Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002). Nor do Plaintiffs allege Alhadeff's or Gaylor's sales were suspiciously timed—indeed, they still "make no attempt" to link those sales to any "intentional misrepresentations or omissions." *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1052 (N.D. Cal. 2007).

### 2. The Documentary Evidence Shows Transparency, Not Fraud

Without any plausible motive, Plaintiffs point to internal documents as evidence that

---

denial of summary judgment where defendants "traded their stock in large amounts *at sensitive times*"). Nor do Plaintiffs dispute that Gaylor's overall holdings increased during the Class Period. Mot. at 23.

[5] In Plaintiffs' sole out-of-circuit authority, the court noted only that sales made for tax purposes did not negate scienter where defendant's confidential admissions contradicted his public statements. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 177, 201 (S.D.N.Y. 2010). As recent authority in that circuit makes clear, "sales for tax reasons are not indicative of fraud." *In re Keryx Biopharms., Inc., Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014).

Defendants knew about "demand red flags," supposedly signaling that demand was not continuing. Opp. at 20. But the documents show the opposite: that the Individual Defendants believed demand would continue, and that demand *was* continuing but (ultimately) at decelerating growth rates—just as they said publicly. Plaintiffs do not plead any of the statements were "intentional[ly] or deliberately reckless[ly] false" when made. *Metzler*, 540 F.3d at 1066.[6]

***June 2020 – March 2021 Statements***. Plaintiffs argue documents from April, May, and June 2020 show Springer and Sheridan knew 25% of 1Q25 bookings were "COVID-19 related," and that the "demand boom would 'inevitab[ly] decelerat[e].'" Opp. at 20. But Plaintiffs never say *how* those documents "contradict[ed] [the] public statements." *Id*. Nor can they: Springer and Sheridan publicly acknowledged that COVID "accelerated growth" in 1Q21—with billings growing 59% YoY. Ex. 2 at 3. And, just as discussed internally, they projected that growth would "decelerat[e]" going forward. Mot. at 5; Ex. 2 at 9 ("wouldn't want to draw a trend line" based on 1Q21 results; and providing billings guidance of 32-36% YoY growth, well below prior quarter's 59%). Still, Defendants were optimistic about the future and believed customers *would* remain. As the documents Plaintiffs cite note, Defendants were "focused on figuring out how to capitalize on customers who may have come to us for Covid but will stay with us because it just makes sense for their business." Ex. 43; ¶¶36-37. Indeed, they believed "new sales trends are the result of long-term behavior changes," reflecting a "long term change," not a "blip." Exs. 35 at 30, 43.

For the same reason, none of the allegations Plaintiffs cite show that the Individual Defendants' September or December 2020, or January and March 2021 statements were intentionally or recklessly false. They point to internal documents predicting that demand would "cool off in the months to come," that certain customers *could* churn the next year, and that demand "would 'moderate' from earlier 'frenzied' [COVID] quarters." Opp. at 21. But the same documents

---

[6] Plaintiffs continue to cite documents that the Individual Defendants were not on and did not receive—that their "direct reports" received certain documents (Opp. at 20 n.31) says nothing about the Individual Defendants' states of mind. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014); *In re Eargo, Inc. Sec. Litig*., 2023 WL 5663154, at *2 (N.D. Cal. Aug. 31, 2023), *aff'd sub nom. Cai v. Eargo, Inc*., 2025 WL 66041 (9th Cir. Jan. 10, 2025). Plaintiffs' sole authority, *Robb v. Fitbit Inc.*, does not suggest otherwise; there, the court applied a core operations inference based on CW allegations absent here that "trac[ed]" the CFO's knowledge to other C-suite members. 2017 WL 219673, at *6 n.6 (N.D. Cal. Jan. 19, 2017).

indicate that the "business is obviously killing it"—indeed, Plaintiffs admit Docusign continued growing—noting there was opportunity to "drive disruptive change" to achieve "growth in future periods." Ex. 38. Not to mention that Plaintiffs ignore that Defendants said publicly the same thing they discussed internally:

- September 2020: the "highs of any particular quarter are [not] going to be sustained forever," and while demand would "be strong," it would "not [be] at the same rate" as 1H21, when demand was "unusually high" because of Covid "tailwind[s]," Exs. 6 at 10, 10 at 3, 6,11 at 2;
- December 2020: "lack of that [Covid] accelerant occurring in a post-pandemic world," and "[w]e do think about the potential for churn. We don't know how much longer the pandemic is going to last…we do worry about small businesses," Ex. 12 at 12, 15;
- January 2021: Docusign was "beneficiary of [Covid] demand" that Gaylor "believe[d] … will continue. It may just not continue at the pace that we saw earlier this year." ¶102;
- March 2021: "we may not see the peak billings growth rates that we saw during the early days of COVID," and demand was "reflected in the guide," which projected decelerating billings growth rates for FY22, Exs. 16 at 6,17 at 20.

Plaintiffs "fail to connect the dots to show that any defendant said one thing while knowing (or being deliberately reckless about not knowing) that the reality at the time differed in a material way." *In re Enovix Corp. Sec. Litig.*, 2024 WL 349269, at *15 (N.D. Cal. Jan. 30, 2024).

***June 2021 Statements***. Plaintiffs say that documents suggesting Docusign was monitoring 240 (out of 980,000) customers' "churn *risk,*" and that Alhadeff was "nervous" about missing Docusign's internal sales plan, show that Springer and Gaylor knew their June 2021 statements were false. Opp. at 21-22. But neither statement—predicting that customers "don't go back" to pen and paper after digitalization, ¶¶143-144—said anything about internal sales plans or 0.02% of customers' potential to churn. *See Align*, 417 F. Supp. 3d at 1280 (where allegations "bear no connection" to Challenged Statements, no intent to mislead). And again, the documents Plaintiffs cite noted that Gaylor was told Docusign's business "fundamentals [were] strong," and "all of it looks better than pre-covid"—the Company was "growing." Ex. 36.

***September 2021 – March 2022 Statements***. Finally, Plaintiffs argue that because Docusign slightly missed its internal 2Q22 sales targets, Gaylor and Springer must have known their September 2021, December 2021, and March 2022 statements were false. Opp. at 22. But Plaintiffs never say how these documents contradicted Defendants' statements, which said nothing about

Docusign's *internal* sales plans. *See* ¶¶167-168, 171-172, 233, 241; *Align*, 417 F. Supp. 3d at 1280. In any event, as the materials Plaintiffs cite make clear, Docusign's 2Q22 sales still grew significantly YoY (16%), and "fundamentals remain[ed] solid." Ex. 40 at 3. Still, both Springer and Gaylor told investors—as they had for "the last several quarters"—that growth would not be "at the peak levels [] we saw [] during the height of the pandemic," and had "continued to moderate" in FY22. Ex. 22 at 7, 9. Plaintiffs' "allegations are consistent with [Defendants'] express warnings to investors" and thus cannot "allege a strong inference of scienter." *Habelt v. iRhythm Techs., Inc.*, 2022 WL 971580, at *20 (N.D. Cal. Mar. 31, 2022).

**3. Plaintiffs' Remaining Allegations Do Not Establish Scienter**

***Core Operations/Day-to-Day Management***. Plaintiffs' continued reliance on the core-operations doctrine is puzzling. Plaintiffs argue that—as evidenced by internal documents—Defendants had access to demand metrics through internal reports, and it is thus "absurd to suggest that [they were] without knowledge" of "issues." Opp. at 22-23. But Plaintiffs don't identify what "issues" Defendants were allegedly aware of—indeed, Plaintiffs admit the demand metrics showed continued *growth*. None of their cited documents thus detail "information conveyed to management" that was "*related to the fraud*." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (Opp. at 23). Just the opposite, those materials are *consistent with* Defendants' disclosures. *Supra*, II.B.2; *see also Browning v. Amyris, Inc.,* 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014) (rejecting core operations doctrine for company's "signature product" because it would "turn it into an automatic presumption of comprehensive knowledge").

***Departures***. Plaintiffs argue the Individual Defendants' departures were "abrupt," but concede they took place over fifteen months. Opp. at 23. And nothing suggests Defendants left due to "fraudulent representations." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009). Plaintiffs claim Springer was terminated because he "'had little to no remaining credibility with investors,' as he and other 'management' had 'overstated Docusign's growth.'" Opp. at 23. But that is misleading. What the cited "feedback" document *actually* says is that, in hindsight, some investors thought Springer had been "too bullish on not being a 'pandemic stock'" and had not grasped the extent of Covid's "pull forward," which somehow "overstated [the

Company's] growth . . . and *now [were] going back to more normalized growth rate[s]*." ¶274. With the full context, the most cogent inference is that Springer left because—despite his honest optimism—disappointing results happened "on his watch." *Hessefort v. Super Micro Computer, Inc.*, 2020 WL 1551140, at *7 (N.D. Cal. Mar. 23, 2020); Mot. at 25-26.

***Text Message Deletions***. Plaintiffs admit that they have not invoked Rule 37(e), but nevertheless ask the Court to draw an inference that Springer and Gaylor deleted texts to "'hide evidence of some wrongdoing.'" Opp. at 24. But as Plaintiffs' cited authority makes clear, the Court must also consider "plausible, nonfraudulent inferences" that can be drawn from the deleted texts. *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at *13 (W.D. Wash. Mar. 17, 2025). And here, Plaintiffs acknowledge that Springer had a long-standing "practice of manually deleting business-related texts after related tasks were completed," but accidentally "continued this practice" after the litigation was filed, while Gaylor inadvertently failed to turn off the "auto-delete feature" in her phone's settings. ¶277. Plaintiffs "do not allege [either] Individual Defendant[] deleted" messages because those messages suggested they intentionally or recklessly made a false public statement. *Joyce*, 2025 WL 835054, at *13 (*Tellabs* sets "high bar" to plead scienter).

***Holistic Analysis***. Far from pleading "'smoking gun' evidence" of fraud, Opp. at 20, Plaintiffs' allegations "affirmatively plead a more compelling inference" that Defendants were *transparent* with investors. *Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, at *9 (N.D. Cal. May 23, 2019). Indeed, the cited materials show Defendants' good-faith belief that COVID was a "driver for long term change" in the adoption of digital eSignature solutions, Exs. 35 at 30,36, 43, and that demand would continue (*and it did*)—but at lower rates, just as they said.

**4. Plaintiffs Do Not Plead a Strong Inference of Scienter as to Docusign**

The Ninth Circuit requires scienter allegations "with respect to those individuals who actually made the [alleged] false statements." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021); Mot. at 26. Because Plaintiffs do not allege the Individual Defendants' scienter, they have likewise failed to allege scienter with respect to Docusign.[7]

[7] Plaintiffs cannot impute the "scienter" of certain employees to Docusign (Opp. at 22 n.36)—none are alleged to have made any Challenged Statement with scienter. *See SEB Inv. Mgmt. AB v.*

### C. Plaintiffs Fail to Plead Loss Causation

Plaintiffs concede that none of the alleged "corrective disclosures" revealed the "truth" about the alleged misstatements. Opp. at 29. Instead, they claim they need only show "a causal link between the [alleged] misstatements and the disclosures of billings growth misses." *Id.* (citing *Mineworkers' Pens. Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018)). But even *Mineworkers* held that plaintiffs must "trac[e] the loss back to the very facts about which the defendant lied." 881 F.3d at 753. And subsequent Ninth Circuit authority makes clear, "when plaintiffs plead a causation theory based on market revelation of the fraud"—as here (¶226)—the Court must "evaluate whether plaintiffs have pleaded" supporting facts. *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 410 (9th Cir. 2021). Plaintiffs admit they do not.

*First*, Plaintiffs admit they do not challenge Docusign's guidance, so the **December 2, 2021** "disclosure[]" of a billings growth miss cannot be corrective. *Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014). Nor did this disclosure "reveal[] a major demand slowdown as COVID ebbed," Opp. at 29-30—Docusign had been telling investors that it expected "a reduction of that really heightened COVID buying[]" for over a year, expressly projecting declining growth rates. ¶229; Mot. at 9. And growth rates *did* begin to slow in 4Q21, which ended January 31, 2021 (*i.e.* ten months before the alleged corrective disclosure), which Docusign disclosed. Mot. at 5. That growth rates later slowed further merely "confirmed" what Docusign had "repeatedly warned investors" about in the Class Period. *Plumbers & Steamfitters Local 60 Pens. Trust v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11-12 (N.D. Cal. Sept. 17, 2024). Further, that "analysts downgraded Docusign" following this disclosure, Opp. at 30, does not "plead with particularity [] the required causal relationship" between the Challenged Statements and Plaintiffs' alleged losses, *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020).

*Second*, Plaintiffs claim Docusign's **March 10, 2022** and **June 9, 2022** disclosures reported "a worsening decline in growth." Opp. at 30. But that was no secret; Docusign projected 4Q21 and

---

*Wells Fargo & Co.*, 2023 WL 11691540, at *9 (N.D. Cal. Aug. 18, 2023). Plaintiffs' sole authority—*Kyung Cho v. UCBH Holdings, Inc.*—is not to the contrary, as the court there imputed scienter based on well-plead allegations of "respondeat superior," which Plaintiffs do not do here. 890 F. Supp. 2d 1190, 1204-05 (N.D. Cal. 2012) (Opp. at 22).

1Q23 YoY billings growth would be *lower* than the prior quarter's actual billings growth—and then proceeded to *beat* those projections. Mot. at 5; *Meta*, 2024 WL 4251896, at *11 (disclosures "did not correct, but rather confirmed" warnings). Even under Plaintiffs' own theory, neither of the March 10, 2022 nor June 9, 2022 disclosures could constitute corrective disclosures.

### D. Plaintiffs' Challenges to the CLM and Competition Statements Fail

***CLM Statements Fail on Falsity, Scienter, and Loss Causation Grounds***. Plaintiffs do not dispute that Defendants' CLM statements "were literally true"; instead, they claim Defendants "touted CLM as a key growth driver" at the same time they "concealed" "Docusign's CLM sales struggles." Opp. at 28. Plaintiffs are wrong. For example, Plaintiffs say Springer learned in March 2020 that CLM "projects show early signs of delay due to prioritization to Covid-19." Opp. at 28. Springer did not "conceal" that—instead, on the very next earnings call, he said CLM sales were "delay[ed]" as customers had "an urgency to get" eSignature. Ex. 2 at 10; Ex. 6 at 6 (trend "continued" in 2Q22). Likewise, Plaintiffs say Alhadeff learned of "[p]oor CLM performance" in 2020 "due to the product's complexity and integration issues." Opp. at 29. Again, Springer told investors in September and December 2020 that "we believe that the sales cycle" for CLM "will always be a bit longer" because "[t]hey're *more complex*." Ex. 6 at 6; Ex. 9 at 3; Ex. 12 at 6 ("slowing of [CLM] deals"); Ex. 15 at 3 ("defocus" on CLM). And in FY22, Defendants disclosed that they expected to focus on CLM as a growth driver *in the future*. Ex. 25 at 2 (expected the "focus" on CLM to "return"). There can be no claim where Defendants "disclose[d] exactly what Plaintiffs claim [they] omitted." *Aerohive Networks*, 367 F. Supp. 3d at 1056.

Nor do Plaintiffs even *attempt* to argue either Springer or Gaylor acted with scienter. Opp. at 28-29. They say nothing about their states of mind at all, *Align*, 417 F. Supp. 3d at 1280, even though this is precisely the ground on which Judge Orrick previously dismissed this claim, Dkt. 88 at 36 n.9. Plaintiffs have thus waived any argument that Springer and Gaylor acted with scienter with respect to the CLM statements. *Vaughan*, 2025 WL 251694, at *1; *see also* Mot. at 29.

And Plaintiffs concede that *none* of the alleged corrective disclosures said anything about CLM, claiming only that analysts later "linked" the disclosures to "CLM issues." Opp. at 30. That is insufficient. *Meta*, 2024 WL 4251896, at *11 n.16.

***Competition Statements Fail on Falsity, Scienter, and Loss Causation Grounds***. Pointing to internal documents suggesting that a few customers "switch[ed]" to Adobe or were "considering" "choosing" Docusign's "eSignature competitors" "due to pricing pressures," Plaintiffs continue to claim that Defendants concealed alleged "competitive impacts" threatened by Adobe. Opp. at 26-27. Not only does this claim contradict Plaintiffs' theory that customers returned to "pen and paper," this was no secret. Defendants told investors Adobe "tend[s] to compete more on price," and Plaintiffs allege no facts showing the lost customers—or the risk that customers would leave—had "any material impact" on Docusign's performance or market share. Mot. at 30; *Align*, 417 F. Supp. 3d at 1278.[8]

Likewise, Plaintiffs fail to point to specific facts showing Springer and Gaylor knew "all along" of "changes" in the eSignature competitive landscape, Opp. at 27, let alone new facts they added (without leave of court) following Judge Orrick's decision dismissing on scienter grounds, Dkt. 88 at 36 n.9. At most, they say Springer knew that Docusign lost *one* customer to Adobe and that two other customers were "at risk" of leaving Docusign (not specifically to join Adobe). Opp. at 27. By this time, however, Docusign had almost 900,000 customers (Ex. 16 at 2)—losing one (or possibly three) does not show Springer *knew* his statement that, "we don't think there's been any change . . . around the competitive landscape," was false. App. A at 23; *Align*, 417 F. Supp. 3d at 1278. As for Gaylor, Plaintiffs point only to a June 2021 slide deck that Docusign was "feeling competitive pressure" due to "price declines" (Opp. at 28)—which is precisely what Gaylor told investors a week later. Ex. 21 at 7 (disclosing Docusign faced competition "on price.").

And as with the CLM statements, Plaintiffs fail to allege loss causation, as *none* of the alleged corrective disclosures revealed that Docusign had lost market share to its competitors. *In re Nektar Therapeutics*, 2020 WL 3962004, at *17-18 (N.D. Cal. July 13, 2020).

## III. CONCLUSION

Defendants respectfully request that the Court grant their Motion to Dismiss with prejudice.

---

[8] *In re Acuity Brands, Inc. Securities Litigation* does not help Plaintiffs; there, the company lost sales of "5 to 10 percent year-over-year" but said competitive concerns were just "noise." 2019 WL 10246166, at *6, 17 (N.D. Ga. Aug. 12, 2019) (Opp. at 27). In contrast, Docusign continued adding customers each time it spoke about the competitive landscape." Mot. at 5.

Dated: July 24, 2025

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: /s/ *Andrew B. Clubok*
Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
*susan.engel@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

Michele D. Johnson (Bar No. 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: 714.540.1235

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Whitney B. Weber (Bar No. 281160)
*whitney.weber@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: 415.391.0600

**FENWICK & WEST LLP**

Dean S. Kristy (Bar No. 157646)
dkristy@fenwick.com
Jennifer C. Bretan (Bar No. 233475)
*jbretan@fenwick.com*
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Felix S. Lee (Bar No. 197084)
*flee@fenwick.com*
801 California Street
Mountain View, California 94041
Telephone: 650.938.5200

*Attorneys for Defendants Docusign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff*